## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AbbVie Inc.,

       *Plaintiff*,

    v.

Payer Matrix, LLC

       *Defendant*.

Civil Action No.

JURY TRIAL DEMANDED

## <u>COMPLAINT</u>

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

THE PARTIES..............................................................................................................9

JURISDICTION AND VENUE ....................................................................................9

FACTUAL ALLEGATIONS .......................................................................................10

    I.       AbbVie's Drugs and Patient Assistance Program Have Benefited Millions of Patients......................................................................................10

    II.     Payer Matrix's Program Is Deceptive and Fraudulent............................14

    III.    Payer Matrix Engages in Deceptive Trade Practices Directed at the Market........18

    IV.    Payer Matrix Engages in Coercive Tactics and Presents False and Misleading Information to Patients of Specialty Drugs........................21

        A. Payer Matrix Uses Coercion to Force Patients to Join Its Program.....................21

        B. Payer Matrix Representatives Make False Statements About the Value of the Payer Matrix Program........................................22

        C. Payer Matrix Omits Material Information Regarding Patients' PAP Ineligibility......................................................23

        D. Payer Matrix Provides Misleading Information About the Payer Matrix Program to Conceal the Scheme ...............................24

    V.     Payer Matrix's Coercive and Deceptive Marketing Results in Patients Agreeing to Participate in an Unnecessarily Burdensome Process to Obtain Their Specialty Drugs .................................................25

    VI.    Payer Matrix Utilizes Sham Exclusions of Specialty Drugs to Deceive AbbVie Into Admitting Ineligible Patients Into the PAP ......................28

    VII.   Payer Matrix Intended for AbbVie to Rely on Its Misrepresentations in the PAP Applications by Admitting Ineligible Patients Into the PAP.......................37

    VIII.  Once AbbVie Began Denying Patients' Admission Into the PAP in 2023 Due to Their Affiliation With Payer Matrix, Payer Matrix Representatives Began Concealing Their Involvement in the Application Submissions ...............38

    IX.    Payer Matrix's Fraudulent and Deceptive Practices Implicate Consumer Protection Concerns ...........................................................41

    X.     Payer Matrix's Fraudulent and Deceptive Practices Harm AbbVie .....................43

CLAIMS FOR RELIEF ..............................................................................................44

COUNT I: Violations of the Illinois Consumer Fraud and  Deceptive Business Practices Act (815 ILCS 505 *et seq.*) ........................................................44

COUNT II: Violations of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510 *et seq.*) ...............................................................46

COUNT III: Tortious Interference With Business Opportunity ....................................47

DEMAND FOR JURY TRIAL ...................................................................................49

PRAYER FOR RELIEF ..............................................................................................49

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AbbVie Inc., | |
| *Plaintiff*, | Civil Action No. |
| v. | |
| | JURY TRIAL DEMANDED |
| Payer Matrix, LLC | |
| *Defendant*. | |

## **COMPLAINT**

Plaintiff AbbVie Inc. ("AbbVie") for its Complaint against Defendant Payer Matrix, LLC ("Payer Matrix") alleges as follows:

## **PRELIMINARY STATEMENT**

1.     AbbVie developed and manufactures the ground-breaking drugs SKYRIZI® ("Skyrizi"), RINVOQ® ("Rinvoq"), and HUMIRA® ("Humira").  Since these medicines treat serious, life-altering diseases, AbbVie wants to make sure they are available to all appropriate patients irrespective of financial ability.  AbbVie provides the drugs for free, with no co-payments, deductibles, or shipping costs, to financially qualifying ***uninsured and underinsured*** patients through the myAbbVie Assist Patient Assistance Program ("PAP").  Currently, there are over 100,000 patients enrolled in AbbVie's PAP.

2.     Payer Matrix operates a fraudulent and deceptive scheme to enrich itself by exploiting AbbVie's PAP through the enrollment of ***insured*** patients into a charitable program not intended for them.  Payer Matrix's for-profit scheme jeopardizes the sustainability of AbbVie's program for those patients who truly need it.  AbbVie brings this action to stop Payer Matrix's

1

harmful conduct and protect its program so it can continue to serve its intended purpose—providing free drugs to uninsured and underinsured patients who otherwise could not afford their AbbVie medicine.

3.      Payer Matrix representatives know that AbbVie's PAP is only for uninsured and underinsured patients.  Indeed, Payer Matrix's entire business model is designed and intended to exploit this eligibility requirement.  Through acts of fraud and deceit, Payer Matrix knowingly maneuvers ineligible patients into AbbVie's PAP—specifically, *insured* patients who should be receiving their medicine through their employers' health insurance plans.  Payer Matrix then charges the patients' employers a substantial fee for reducing the employers' health insurance costs through its scam on AbbVie's PAP and other pharmaceutical manufacturers' patient assistance programs.

4.      Payer Matrix, in effect, takes AbbVie's program that is intended for a charitable purpose and turns it into a tool to generate substantial wealth for itself and its clients by diverting resources that were intended to help patients in need.

5.      The risk of harm to patients has escalated in recent months as Payer Matrix has responded to AbbVie's efforts to ban Payer Matrix's involvement in the PAP.  Payer Matrix is now interfering in doctor-patient relationships by making misrepresentations to doctors to try to convince them to switch patients from AbbVie's medicines to alternative options, not for reasons of medical necessity but rather so Payer Matrix can continue to improperly profit from these patients.

6.      For those insured patients whom Payer Matrix is unsuccessful in switching to a new medicine, Payer Matrix representatives have doubled down on their fraudulent conduct and are going to great lengths to conceal their continued efforts to enroll these ineligible patients in

AbbVie's PAP, including by lying to a doctor to cause him to submit a PAP application to AbbVie so AbbVie would not discover Payer Matrix's involvement, using white out to cover up the name of a Payer Matrix representative on a PAP application, calling AbbVie's PAP team to check the status of a PAP application while pretending to be from the patient's doctor's office, and removing Payer Matrix fax header information from PAP applications, among other acts of concealment.

### How Payer Matrix's Scheme Works

7.     Payer Matrix markets itself as an "alternate funding" vendor to employers that sponsor health insurance plans for their employees, meaning Payer Matrix promises that it has "alternate" methods for "funding" the provision of specialty drugs[1] to insured employees under these plans that can drastically reduce the amount the employers spend on their health insurance plans.

8.     Once employers with health insurance plans sign up as Payer Matrix clients, Payer Matrix utilizes the employers' insurers and private health administrators (collectively "payers") and certain Pharmacy Benefit Manager ("PBM") partners to modify the employers' health insurance plans and generate a sham exclusion of coverage for specialty drugs, including Skyrizi, Rinvoq, and Humira.

9.     The deception of this sham exclusion is the heart of the problem here—and it is at the heart of Payer Matrix's business.  Patients with traditional insurance from their employers that covers specialty drugs generally would not be eligible for the AbbVie PAP.  But, at the same time, employers telling patients that their insurance benefits have been reduced to eliminate coverage for specialty drugs is not typically a realistic or desirable option for employers.

---

[1] The phrase "specialty drugs" is commonly used to describe high-complexity drugs that treat serious chronic conditions.

10. Payer Matrix squares this circle, and makes its money, by being dishonest on both ends of this equation through the sham exclusion. On the one hand, it creates the pretense—to AbbVie—that a patient is uninsured for specialty drugs, like Skyrizi, Rinvoq, and Humira, by creating an **on paper** exclusion of coverage for specialty drugs in the hopes that AbbVie will accept the patient into the PAP as uninsured and provide the medicines for free—which earns Payer Matrix a hefty "savings fee" from its clients. But, on the other hand, Payer Matrix does not tell the patients that it is representing them to AbbVie as uninsured. Indeed, Payer Matrix assures patients that under its program "[t]he plan will still pay for your medication with no increase in co-pay or cost share . . . If Payer Matrix is unable to . . . secure alternative funding, then coverage will revert to your traditional coverage." *See, e.g.*, Plan Sponsor No. 1,[2] *Payer Matrix Program Overview*, at 2 (last visited May 2, 2023), https://bit.ly/3ZMHwoJ. So, **in practice**, the patients continue to be guaranteed specialty drug insurance coverage despite the **on paper** sham exclusion.

11. AbbVie recently has confirmed approximately 200 instances of patients affiliated with Payer Matrix being denied admission into the PAP in 2023 and then promptly redeeming co-pay assistance through a separate AbbVie program **for only commercially insured patients**, thus confirming that the patients' health insurance plans did in fact provide coverage when the patients were denied PAP admission—in other words, the purported specialty drug exclusion was indeed a sham.

12. Payer Matrix also lies to its employer clients by representing that they "partner" with AbbVie, that AbbVie uses "grant" money to fund the PAP, and that AbbVie financially **benefits** from Payer Matrix's program, all of which are untrue.

---

[2] The term "Plan Sponsor" is used to encompass both self-insured employer plans and plans administered by third parties. The plan sponsors and specialty drug patients referenced within this Complaint are not identified by name but rather are referenced numerically as "Plan Sponsor No. 1" through "Plan Sponsor No. 9" and "Patient No. 1" through "Patient No. 59."

13.     When Payer Matrix succeeds in passing off a patient as "uninsured" and gets them enrolled in AbbVie's PAP, Payer Matrix then charges the employers for each medicine distribution that the patients receive for free from AbbVie.  Payer Matrix calculates the amount it charges the employers as approximately 30 percent of the "savings" Payer Matrix generates for the employer, which Payer Matrix refers to as "cost-avoidance fees."  Since the employer was properly paying for the drugs before retaining Payer Matrix and now is getting the drugs for free due to Payer Matrix's sham specialty drug exclusion, Payer Matrix is in effect charging the employer a portion of the funds that Payer Matrix has improperly diverted from AbbVie's PAP, resulting in millions of dollars of profit for Payer Matrix at the expense of uninsured and underinsured patients who truly need AbbVie's PAP.

14.     In short, Payer Matrix's scheme involves telling AbbVie that the patients are not covered, telling the patients that they are covered, and telling its clients words to the effect of "don't worry, our partner manufacturers support what we are doing and benefit too, so just pay us when we save you money."

### Payer Matrix's Fraudulent and Deceptive Marketing

15.     After coordinating the sham conditional specialty drug exclusion for its clients, Payer Matrix next coerces the patients employed by its clients into joining Payer Matrix's program.

16.     Payer Matrix's coercive tactics include directing its clients to inform the patients covered by their plans that *unless* they enroll in Payer Matrix's program, the patients will be responsible for the full cost of their medication going forward.

17.     Payer Matrix also publishes false information and otherwise misleads these insured patients into believing that the Payer Matrix program is for their benefit, touting the program's potential to reduce their out-of-pocket expenses for the medications, such as co-pays, and

downplaying the more burdensome process they will have to endure to obtain their specialty drugs through the Payer Matrix program, all because Payer Matrix is enrolling them into a patient assistance program for which they are ineligible. The following representations about Payer Matrix's program appear on its website:



**Care coordinators**

Our Care Coordinators are at the heart of our operation and work directly with members, plan sponsors, and any other vendors as required to complete program enrollment.

We also maintain the prior authorization process to ensure appropriate clinical care. As a result, members are not disrupted and always receive their medications. There is no interruption in supply, no requirements to change brands or dosing, the only difference is the source of the medication, and of course the reduced cost.

*Employers: Comprehensive Clinical Care and Cost Management for Specialty Medications*, PAYER MATRIX (last visited May 2, 2023), https://payermatrix.com/employers/.

18. Payer Matrix, however, does not tell the insured patients important information in these communications, including that (1) the Payer Matrix program does in fact cause disruption and burden with respect to obtaining their specialty drugs, (2) the program provides no real value because the patients can obtain co-pay assistance without joining Payer Matrix's program, (3) Payer Matrix is not just applying on their behalf for coverage of their out-of-pocket expenses but rather for free specialty drugs by falsely representing that they are uninsured, and (4) Payer Matrix's program is structured such that lower income insured patients will be required to deal with Payer Matrix's burdensome process to receive their specialty drugs (because they will meet the income requirements for the PAP) whereas insured patients from higher income households

will continue to receive insurance from their employers' plans as usual (because they will exceed the income ceiling for the PAP).

19.     Once the coerced and misled patients have provided Payer Matrix with their personal financial and health insurance information, Payer Matrix submits or assists these patients and their doctors in submitting PAP applications to AbbVie that falsely represent that their specialty drugs have been "excluded" from their health insurance plans.

20.     Upon information and belief, Payer Matrix oftentimes does not disclose to the insured patients the PAP eligibility requirements or the financial source of the specialty drugs. Indeed, Payer Matrix's marketing materials deceptively represent that its program leverages "extensive, often unused funds made available by Pharma Manufacturers." At least one employer working with Payer Matrix was led to believe and represented to patients on its plan that Payer Matrix seeks "grant money" from pharmaceutical companies to reduce the cost of some specialty drugs. Some patients are led to believe that Payer Matrix is the program through which their employers' health insurance plans provide the specialty drugs. Payer Matrix even falsely tells some prospective clients and patients that its program and its submission of PAP applications to AbbVie **benefits** AbbVie through tax savings and an increase in the number of patients who are prescribed AbbVie's drugs. None of these representations is accurate.

### AbbVie's Change in Patient Terms of Participation and Payer Matrix's Subsequent Concealment Efforts

21.     On January 2, 2023, AbbVie updated its PAP eligibility requirements on the myAbbVie Assist website to explicitly exclude alternate funding programs like Payer Matrix's program. On January 30, 2023, AbbVie made similar updates to its Patient Terms of Participation in the PAP applications and in fact banned Payer Matrix's program **by name**.

22.    To enforce its new terms, AbbVie began sending letters to certain PAP applicants who were believed to be working with Payer Matrix, denying their admission into the PAP on the ground that their involvement with Payer Matrix made them ineligible for the PAP.

23.    Nonetheless, Payer Matrix was not deterred from continuing its fraudulent conduct. Instead of immediately ceasing the submission of PAP applications on behalf of insured patients, Payer Matrix representatives began taking steps to conceal from AbbVie the nature and extent of their continued involvement in the PAP application submissions.

24.    Payer Matrix's involvement in the fraudulent submission of PAP applications and its escalating concealment efforts have continued even after AbbVie sent a letter to the CEO of Payer Matrix on February 10, 2023, notifying him that patients working with Payer Matrix are ineligible for the PAP.  Specifically, AbbVie's investigation has identified over 55 patients affiliated with the Payer Matrix program who submitted PAP applications after AbbVie sent the letter to Payer Matrix's CEO.  In several of those instances, Payer Matrix was patently trying to conceal its involvement in the process, including by instructing a doctor to send in the PAP application form to AbbVie so it would not be seen as coming from Payer Matrix (which instructions from Payer Matrix the doctor included in her submission to AbbVie), by using white out (ineffectively) to try to obscure Payer Matrix's involvement in a patient's submission to AbbVie's PAP, by removing Payer Matrix fax machine headers from documents to conceal Payer Matrix's involvement, and other acts of concealment demonstrating both that (i) Payer Matrix knew its submissions of these ineligible patients to AbbVie's PAP was improper and (ii) it intended to deceive AbbVie into believing these were eligible patients.

25.    By pilfering AbbVie's PAP for its own financial gain and treating the patients as pawns in its scheme, Payer Matrix has put the PAP into jeopardy and has piled stress, confusion,

and burdensome administrative hassle onto specialty drug patients who already are dealing with serious health conditions. Ultimately, Payer Matrix's scheme threatens the continued viability of AbbVie's PAP for the patients it is designed and intended to serve. This threatens irreparable harm to patients and AbbVie. Payer Matrix should, therefore, be enjoined from including AbbVie's drugs in its alternate funding program and should be ordered to compensate AbbVie for the funds it fraudulently diverted from the PAP.

## **THE PARTIES**

26.     Plaintiff AbbVie is a corporation organized and existing under the laws of the state of Delaware, with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie is a global research and development-based biopharmaceutical company committed to developing innovative therapies for some of the world's most complex and critical conditions. The company's mission is to use its expertise, dedicated people, and unique approach to innovation to improve patient lives across therapeutic areas. AbbVie employs thousands of people in Illinois and is engaged in the development, sale, and distribution of a broad range of pharmaceutical and biologic drugs, including Skyrizi, Rinvoq, and Humira. Indeed, these drugs were developed and are marketed under the leadership of AbbVie's management in Illinois.

27.     Payer Matrix was formed in 2016 and is a limited liability company organized under the laws of Delaware. Its principal place of business is located at 1400 North Providence Road, Suite 5000, Media, Pennsylvania 19063. Payer Matrix has operations in Connecticut, Delaware, Illinois, Nevada, New Jersey, New York, Pennsylvania, and Texas. Upon information and belief, none of the members of Payer Matrix are citizens of Delaware or Illinois.

## **JURISDICTION AND VENUE**

28.     This action asserts claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.* ("Illinois Fraud Act"), Illinois Uniform Deceptive

Trade Practices Act, 815 ILCS 510 *et seq.* ("DTPA"), and for tortious interference with business opportunity.

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interests and costs, and complete diversity of citizenship exists between the parties because AbbVie is a citizen of Delaware and Illinois and no member of Payer Matrix is a citizen of Delaware or Illinois.

30.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim" occurred here, including Payer Matrix's false and deceptive representations to AbbVie, its misleading marketing and false representations to Illinois consumers about its program, its registration of Illinois patients into the Payer Matrix program, AbbVie's shipping of drugs to ineligible patients as a result of Payer Matrix's conduct, and AbbVie's injuries resulting from Payer Matrix's wrongful acts.

## FACTUAL ALLEGATIONS

I.     **AbbVie's Drugs and Patient Assistance Program Have Benefited Millions of Patients**

31.     AbbVie's scientists and clinicians invested decades developing Skyrizi, Rinvoq, and Humira.  Skyrizi is FDA-approved to treat a number of conditions, including active psoriatic arthritis and moderate to severe plaque psoriasis.  Skyrizi is also approved to treat adults with moderately to severely active Crohn's disease.  Rinvoq is FDA-approved to treat a range of immune-mediated inflammatory diseases, including rheumatoid arthritis, active psoriatic arthritis, ulcerative colitis, and atopic dermatitis, among other conditions.  Humira is the first fully human antibody ever approved by the FDA, and its use has been expanded into a variety of diseases and patient populations.

32.     Millions of patients have benefited from AbbVie's pioneering work developing Skyrizi, Rinvoq, and Humira, and AbbVie has invested billions of dollars in research and innovation for these drugs and continues to do so.

33.     Through a patient-focused approach, AbbVie does more than just treat diseases— it aims to make a remarkable and lasting positive impact on people's lives. To that end, AbbVie's PAP provides free drugs for financially eligible patients who are uninsured or underinsured.[3] The PAP has provided Humira to eligible patients since approximately 2003 and has provided Skyrizi and Rinvoq since 2019. The PAP has helped thousands of patients receive medicines that they could not otherwise afford. Currently, there are over 19,600 patients receiving Skyrizi, 13,700 patients receiving Rinvoq, and 76,000 patients receiving Humira through the PAP.

34.     The PAP application website prominently discloses the PAP eligibility requirements. To qualify for the PAP, patients must meet four primary criteria: (1) they must have a prescription from a licensed U.S. health care provider ("HCP"); (2) limited or no health insurance coverage; (3) reside in the United States; and (4) demonstrate qualifying financial need.

35.     Financial need guidelines are based on the size of the patients' households and their annual income. In 2023, annual income cutoffs for the PAP are as follows: for a household of one, $87,480; for a household of two, $118,320; for a household of three, $149,160; for a household of four, $180,000; for households larger than four, $28,320 is added for each additional dependent family member.

36.     To participate in the PAP, the patient or the patient's legal representative must complete the PAP application and submit it to AbbVie. The application consists of several sections, some of which must be filled out and signed by the patient's doctor and the rest must be

---

[3] Patients are "underinsured" when they have insurance coverage for the requested AbbVie medication, but they remain unable to afford their out-of-pocket costs.

filled out and signed by the patient or the patient's legal representative. The patient sections request the applicant's contact information and social security number, monthly household income, health insurance information, and the name of anyone the applicant authorizes to speak with AbbVie representatives, along with that person's relationship to the applicant. The final section of the application sets forth the Patient Terms of Participation and certain privacy-related requirements.

37.     The Patient Terms of Participation state that the program provides free medication to "qualifying patients" based on their insurance status and household incomes. The terms further state, "You will notify the program if your insurance or financial situation changes." The information requested on the PAP application and the eligibility requirements set forth on the PAP website make it clear that the program is intended solely for patients with "limited or no health insurance coverage." https://www.abbvie.com/patients/patient-support/patient-assistance.html. Additionally, the Patient Terms of Participation state, "If this application has been completed by a personal representative, the personal representative will provide a copy of this completed application to you."

38.     On January 2, 2023, AbbVie updated its PAP eligibility requirements described on its PAP website to explicitly ban the type of conduct in which Payer Matrix was engaging. Specifically, AbbVie supplemented its eligibility requirements to state, "Patients with commercial insurance plans requiring them to apply to myAbbvie Assist as a condition of, requirement for, or prerequisite to coverage of relevant AbbVie products commonly known as alternate funding programs, are not eligible for myAbbVie Assist."

39.     On January 30, 2023, AbbVie incorporated the updated eligibility requirements into even more explicit Patient Terms of Participation on a new version of the PAP application, which is available on the myAbbVie Assist website page for the PAP.  The updated terms state in part:

> ***Patients with insurance plans or employers participating in an alternate funding program*** (also sometimes referred to as patient advocacy programs, specialty networks, SHARx, Paydhealth, or ***Payer Matrix***, among other names) requiring them to apply to a manufacturer's patient assistance program or otherwise pursue specialty drug prescription coverage through an alternate funding vendor as a condition of, requirement for, or prerequisite to coverage of relevant AbbVie products, or that otherwise denies, restricts, eliminates, delays, alters, or withholds any insurance benefits or coverage contingent upon application to, or denial of eligibility for, specialty drug prescription coverage through the alternate funding program ***are not eligible for the myAbbvie Assist program***. You agree to inform myAbbVie Assist if you are a member of such an insurance plan or if you are applying to myAbbVie Assist on behalf of a patient who is a member of such an insurance plan (emphasis added).

40.     The updated PAP applications also include a new question in the insurance section of the applications.  Applicants are now required to answer the following question by checking a yes or no box:  "Has your employer, insurance company, or another third party directed you to apply to myAbbVie Assist?"

41.     On February 8, 2023, AbbVie sent a letter to the CEO of Payer Matrix, notifying him of AbbVie's updated Patient Terms of Participation for its PAP.  The letter was received on February 10, 2023.

42.     Since AbbVie has updated its PAP eligibility requirements and Patient Terms of Participation to explicitly ban Payer Matrix's involvement, AbbVie's investigation has identified over 450 new PAP applications that Payer Matrix has submitted or caused to be submitted to AbbVie in violation of AbbVie's express PAP terms.  Additionally, there are likely more applications that AbbVie has not identified due to Payer Matrix's escalating concealment efforts,

as detailed below. AbbVie has issued denial letters for the Payer Matrix-affiliated applications it

has recently identified with the following explanation:

> Based on the information provided, we believe your insurance provider is, or is partnering with a third-party company, to inappropriately utilize our program instead of your insurance coverage, commonly known as alternate funding programs. Please contact your insurance provider regarding your insurance benefits.

43. Neither the explicit ban on Payer Matrix's involvement on the PAP website and in

the PAP applications themselves nor the issuance of application denial letters on these grounds has

deterred Payer Matrix's deceptive conduct.

## II. Payer Matrix's Program Is Deceptive and Fraudulent

44. Payer Matrix was formed in 2016 and has expanded its client base over time. The

company's abuse of AbbVie's PAP escalated in 2021 and 2022.

45. Payer Matrix currently represents hundreds of employer groups, most of which

have self-funded health insurance plans for their employees.[4]

46. Payer Matrix represents to prospective clients that it is "tapping into" "top

manufacturers," including AbbVie, by using their patient assistance programs to lower the costs

for over 350 drugs on Payer Matrix's Specialty Drug List. Risk Strategies, *Webinar: Managing*

*Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 34:27 (June 30,

2020), https://www.youtube.com/watch?v=gbLfl28KylE. The list includes Skyrizi, Rinvoq, and

Humira. Once an employer retains Payer Matrix and they enter into Payer Matrix's Business

---

[4] In a self-funded plan, the employer pays the insurer a specific amount to be set aside each month to cover its own employees' estimated hospital, doctor and pharmacy bills. At the end of the year, if the employer contributed more to the set aside than was used by the employees, the employer and the insurance company typically split the left over amount. In contrast, a fully-insured health care program requires an employer to pay an insurance premium, which goes into a larger pool of money that the insurer uses to pay claims across a group of employers. Under this type of program, the employer does not receive any money back at the end of the year.

Associate Agreement, Payer Matrix works with the employer to identify all specialty drugs required by the patients on the employer's plan.

47.     Payer Matrix's program literature fails to mention that it lowers costs on the specialty drugs by registering insured patients for manufacturer patient assistance programs that were not intended for them, thus depleting the resources for those patients who are truly uninsured or underinsured and need the PAP to obtain their medications.

48.     Payer Matrix provides a guarantee to employers that it will utilize performance-based pricing, meaning that the employers will not pay any fees unless Payer Matrix saves them money on their plans' specialty drug expenditures.  Accordingly, the need to generate drug cost savings for the employer is the driving force behind the Payer Matrix scheme; it is the means by which Payer Matrix is paid.

49.     As long as employers continue to pay less for specialty drug coverage than what they would pay without the Payer Matrix program, Payer Matrix continues to bill the employers. Payer Matrix bills the employers for its "performance" *each time the insured patients receive free drugs from AbbVie's PAP*.  Payer Matrix charges approximately 30 percent of the amount the employer would have paid for the prescription if Payer Matrix had not improperly maneuvered the insured patient into the PAP.  In effect, Payer Matrix is fraudulently obtaining Skyrizi, Rinvoq, and Humira for free from AbbVie and then charging the employers 30 percent of the drug price as its own gain, which it refers to as the "cost avoidance fee."  Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 50:10 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

50.     Payer Matrix's partnership with certain PBMs is a critical part of the scheme. PBMs are companies that manage prescription benefits on behalf of health insurance plans.

Among other duties, PBMs assist health insurance plans in creating the list of prescription drugs covered by the plan (known as "formularies"). PBMs have the ability to add or remove drugs from the formularies and adjust plan coverage for members, as authorized by the employers.

51.     Payer Matrix's program literature that it distributes to insured patients explains that Payer Matrix's Care Coordinators work directly with PBMs to coordinate services regarding the patients' prescriptions.

52.     In furtherance of the scheme, Payer Matrix directs its partner PBMs to create an exclusion of specialty drugs from the employers' health insurance plans, which is sometimes referred to as a "carve-out." Payer Matrix informs employers that altering their health insurance plans to include a carve-out of specialty drugs is a necessary initial step when joining its program. For example, a Payer Matrix brochure available online states in part, "When you carve out your specialty benefits with Payer Matrix, the savings can be powerful. Since these medications are no longer covered under your health plan, 100% of their cost is removed upon successful funding approval." *See* Pharmacy Payer Matrix Program, *Save on Specialty Medications With Carve-Out Solution* (last visited May 2, 2023), https://beonbrand.getbynder.com/m/7a467c3674bb8a5f/original/REG-706627-21-OR-FLYER-Payer-Matrix-Employer.pdf.

53.     A Payer Matrix senior vice president admits in a presentation available online that a routine step in Payer Matrix's scheme is working with the employers to get the specialty drugs excluded from their health insurance plans. Specifically, she states, "You know, really the best way to approach it is for an employer to take that proactive step to carve out the specialty drugs, make them not covered and then work with the company that can get the alternative funding in place and get the drugs sourced directly through the manufacturer and where that drug cost doesn't

16

even go through the plan." *See* Benefits Pro, *Strategies for Managing Specialty Drug Costs With Sherri Tetachuck*, at 14:03 (Jan. 20, 2021), http://bit.ly/3FL5Dgq.

54.     Payer Matrix's chief business officer also acknowledges that directing employers to exclude the specialty drugs is a necessary part of Payer Matrix's program.  During an online interview, he presented a Payer Matrix video that stated in part, "Payer Matrix uses performance based pricing.  Clients pay no fees unless the program achieves savings." *See* Union Labor Advisory Network, *ULA Network Interviews Michael Jordan From Payer Matrix*, YOUTUBE, at 07:10 (Aug. 27, 2022), https://www.youtube.com/watch?v=wb6hkh4Kcfk.  Performance-based pricing necessarily requires the exclusion of Skyrizi, Rinvoq, Humira, and other specialty drugs from employer plans.  The exclusion is the only way Payer Matrix can generate substantial savings for employers, and therefore, enrich itself.

55.     A representative from Plan Sponsor No. 2, one of Payer Matrix's clients, also acknowledged Payer Matrix's role in the carve-out process in a memorandum, dated June 14, 2022. The memorandum stated in part that a certain PBM partner of Payer Matrix "has suggested that we implement a carve-out, or alternative funding program, for specialty medications through Payer Matrix.  Under this program, all specialty medications would be 'carved-out,' and the member would need to follow the alternate process to receive the medication at no cost."

56.     Payer Matrix actually refers to itself at times as a specialty carve-out.  Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 35:40 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

57.     Implementing the specialty drug carve-out is a required first step ***after*** the employer joins the Payer Matrix program.  Without Payer Matrix initiating this step, there would be no basis for the employers to pay Payer Matrix according to performance-based pricing.

58.     Recent investigation of Payer Matrix's employer client plans and benefit summaries discovered online reveal the deceptive nature of the specialty drug exclusions that Payer Matrix coordinates.  These plans promise or imply continued specialty drug coverage for patients under the plan if they are ineligible for the PAP, as detailed below.  In fact, Payer Matrix's chief business officer admitted in a webinar that the reason Payer Matrix's relationship with PBMs is so important is because Payer Matrix can tell the PBMs that "you need to dispense the drug" when patients on its clients' insurance plans are ineligible for the PAPs.  Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 45:39 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

### III.     Payer Matrix Engages in Deceptive Trade Practices Directed at the Market

59.     As part of its scheme to exploit AbbVie's PAP, Payer Matrix makes numerous false and misleading statements to businesses and consumers of specialty drugs in Illinois and across the United States to deceive them into joining Payer Matrix's program.

60.     Payer Matrix advertises to prospective employer clients on its website and elsewhere about a deal that seems too good to be true—because it is.  A video on its website claims that Payer Matrix's program "dramatically reduces costs" for employers, "reduces [the employer's] specialty drug spending by up to 50%, and significantly mitigates member co-pays while maintaining a high level of service." *The Specialty Drug Dilemma*, PAYER MATRIX, at 00:55 & 02:17 (last visited May 2, 2023), https://payermatrix.com.

61.     The website includes a link to Payer Matrix's Specialty Drug List, which includes Skyrizi, Rinvoq, and Humira.  *Payer Matrix Specialty Drug List (as of December 2022)*, PAYER MATRIX (last visited May 2, 2023), https://payermatrix.com/pmdruglist.

62.     The website also describes Payer Matrix's services in the following vague terms: "Payer Matrix focuses on providing clinical care management and advocacy for specialty drugs,

providing a substantial cost saving to our clients and members who may not otherwise have this type of discounted access to the drugs they need." A website video states that Payer Matrix utilizes multiple sources for its services, including patient assistance programs, co-pay assistance, foundations, and alternative purchasing sites. *The Specialty Drug Dilemma*, PAYER MATRIX, at 01:32 (last visited May 2, 2023), https://payermatrix.com.

63.     Conspicuously omitted from the website is the fact that "advocacy for specialty drugs" includes enrolling specialty drug patients covered by the employers' health insurance plans in manufacturers' patient assistance programs ***that were not intended for them*** and that Payer Matrix engages in multiple deceptive acts to get the employers their promised "savings." Payer Matrix also does not tell employers that they are paying Payer Matrix substantial sums of money to complete an online application for these patients that the patients and their doctors could do on their own, if they are truly eligible. Payer Matrix also fails to inform employers that the change in their health insurance plan design adversely affects these patients by subjecting them to an unnecessarily burdensome process and creates potential delays in receiving their needed medications.

64.     In order to mislead prospective employer clients into believing that this too-good-to-be-true program is legal and permitted by AbbVie and other manufacturers, Payer Matrix makes numerous misrepresentations to the employers about why AbbVie and other manufacturers permit, and even benefit from, Payer Matrix's abuse of their PAPs, including that (1) the PAPs are "overfunded and under-utilized," (2) the manufacturers are able to take a tax deduction so they still "win," and (3) the Payer Matrix program makes manufacturers, including AbbVie, "better off . . . in the long term" because they "expand the net of [patients] who they are getting onto these particular drugs." Payer Matrix's chief business officer made these false statements to a group of

employers on June 30, 2020, and the video subsequently was posted online. Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 35:27, 57:56, 58:07 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

65. Payer Matrix also falsely tells prospective employer clients that AbbVie's PAP is for patients on health insurance plans "that put in a management process [referring to the Payer Matrix program] to help," falsely implying that commercially insured patients are eligible for AbbVie's PAP if the patients' employers hire a vendor like Payer Matrix. *See* Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 57:42 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

66. Payer Matrix's deceptive marketing campaign also targets consumers of specialty medications, including Illinois consumers, and encourages them to become members of Payer Matrix's program.

67. Payer Matrix's website has a "Patients" page which states in part, "Let us be your personal advocate for affordable prescriptions and quality care. With decades of on-demand experience at your disposal, you can spend less time tracking down prescription drug benefits information." *Patients: Customized Just For You*, PAYER MATRIX (last visited May 2, 2023), https://payermatrix.com/patients.

68. The website, however, makes false and misleading statements to dupe the patients into believing that the Payer Matrix program has legitimate, legal methods for obtaining the drugs at discount prices. For example, the website states, "Our Care Coordinators are at the heart of our operation and work directly with members, plan sponsors, and any other vendors as required to complete program enrollment . . . members are not disrupted and always receive their medications. There is no interruption in supply, no requirements to change brands or dosing, the only difference

20

is the source of the medication, and of course the reduced cost." *Employers: Comprehensive Clinical Care and Cost Management for Specialty Medications*, PAYER MATRIX (last visited May 2, 2023), https://payermatrix.com/employers/.

69. The references to "Care Coordinators," lack of disruption, and reduced cost create marketplace confusion and falsely suggest that members will receive value from the Payer Matrix program when in fact the members are merely pawns in a fraudulent process, receive no real value, and must deal with a disruptive and burdensome process, as detailed below.

## IV. Payer Matrix Engages in Coercive Tactics and Presents False and Misleading Information to Patients of Specialty Drugs

### A. Payer Matrix Uses Coercion to Force Patients to Join Its Program

70. Once Payer Matrix successfully coordinates the alteration of the employers' health insurance plan designs to "exclude" AbbVie's medications, Payer Matrix seeks to coerce the patients covered by the employers' health plans to join the Payer Matrix program. Payer Matrix's clients, at Payer Matrix's direction, commonly issue health insurance benefit descriptions that tell patients they ***must*** enroll in the Payer Matrix program if they take a specialty drug or else they will be responsible for 100% co-insurance or the full cost of their medication.

71. Payer Matrix's chief business officer told prospective employer clients in a webinar on June 30, 2020 that Payer Matrix asks employers to make participation in the Payer Matrix program a requirement for patients covered by their plans and to tell these patients that if they "refuse to engage with Payer Matrix," they will be "subject to 100% of a cost of a drug." Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 48:50 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

72.     When specialty drug patients are forced to choose between personally paying thousands of dollars for their needed medications or participating in the newly introduced Payer Matrix program, they have no real choice and are in effect required to join Payer Matrix's program.

**B.     Payer Matrix Representatives Make False Statements About the Value of the Payer Matrix Program**

73.     As part of its scheme to exploit AbbVie's PAP, Payer Matrix engages in more targeted false marketing to patients on its clients' health insurance plans through brochures, correspondence, and other promotional material.  By consistently marketing the Payer Matrix program as reducing the costs of specialty drugs for patients, the Payer Matrix website and its program brochures create a false impression that the program is designed to benefit the patients. In actuality, Payer Matrix's program provides no real value to the patients.  Payer Matrix fails to tell the patients that if they are truly eligible for the PAP, they are free to—and encouraged to— *directly* apply to the PAP without the involvement of Payer Matrix.

74.     Payer Matrix representatives claim that it is "very difficult" for patients to apply to the PAP directly, thus creating a false impression that Payer Matrix's involvement is needed.  *See* Benefits Pro, *Strategies for Managing Specialty Drug Costs With Sherri Tetachuck*, at 12:48 (Jan. 20, 2021), http://bit.ly/3FL5Dgq.

75.     The Payer Matrix program also does not provide any real value with respect to a reduction in co-pays, despite Payer Matrix's representations to the contrary to consumers of specialty drugs.  Financial assistance with commercially insured patients' out-of-pocket expenses, including co-pays, is available through separate AbbVie assistance programs, and patients also can easily apply to these co-pay assistance programs without the involvement of Payer Matrix.  An executive at Payer Matrix admits during an online interview that pharmaceutical manufacturers make co-pay cards "readily available" and that these cards "waive" the co-pay.  *See* Benefits Pro,

*Strategies for Managing Specialty Drug Costs With Sherri Tetachuck*, at 09:55 (Jan. 20, 2021), http://bit.ly/3FL5Dgq.

76.     Payer Matrix also fails to disclose to the patients the true beneficiary of its program. Specifically, Payer Matrix does not tell the patients that its compensation is tied directly to whether the patients agree to apply to the PAP and that if admitted into the PAP, Payer Matrix is paid by their employers every time the patients receive a new distribution of medication.

### C.     Payer Matrix Omits Material Information Regarding Patients' PAP Ineligibility

77.     Payer Matrix's promotional materials do not inform insured patients that as part of the Payer Matrix program they have been shifted to uninsured status for specialty medications, ***on paper***, so Payer Matrix can maneuver them into AbbVie's PAP.  Likewise, they are not informed that Payer Matrix is causing them to apply to a PAP for which they are not truly eligible.

78.     Even if the patients were informed about their ineligibility for the PAP or Payer Matrix's misrepresentations to AbbVie about their insurance status, the patients have no real recourse because they are forced to choose between participating in Payer Matrix's fraudulent program or having to pay 100% of their medicine costs themselves.

79.     But most commonly, Payer Matrix conceals from the patients the misrepresentations it is making to AbbVie about their specialty drug insurance coverage or otherwise creates enough confusion through vague and unclear representations that patients do not understand Payer Matrix's scheme or why Payer Matrix is submitting an application to AbbVie for their admission into a manufacturer assistance program.  In fact, Payer Matrix assures patients that they still have insurance coverage for specialty drugs.  This is further evidence that the representations Payer Matrix makes to AbbVie about these patients being uninsured are false.

23

80.     For example, a Payer Matrix brochure that was issued to Plan Sponsor No. 3 markets the Payer Matrix program to the insured patients as follows:

> As your Reimbursement Care Coordinator, I would like to introduce myself and explain **the benefit** that is now available to you through the new partnership with Payer Matrix and your Employer.  Once enrolled with the Payer Matrix program, my goal is to find programs that will make your **high cost specialty drug more affordable**.  Alternate funding is obtained in different ways: copay assistance cards, patient assistance programs and foundations.  There are current programs in place for the specialty drugs you are taking and once you are in the program, **your copay will decrease or go away** (emphasis added).

81.     Noticeably absent from this correspondence is any indication that the patients have become uninsured.  Indeed, the program is referred to as a benefit.  Moreover, the reference to co-pay assistance cards and a potential for decreased co-pays is another representation of continued insurance coverage.  Uninsured individuals do not have co-pays.

### D.      Payer Matrix Provides Misleading Information About the Payer Matrix Program to Conceal the Scheme

82.     In order to further conceal the scheme and solicit new program members, Payer Matrix at times falsely represents that it is partnering with manufacturers, including AbbVie, in providing the specialty drugs to the patients at no cost.  For example, Payer Matrix falsely advertised in a webinar that was posted on YouTube between at least March 2021 and January 2022 (and later taken down) that it "partners" with AbbVie and other drug manufacturers, misleading prospective clients and patients to believe that there is an affiliation between manufacturers, like AbbVie, and Payer Matrix.  In point of fact, Payer Matrix has no business relationship with AbbVie, and the Payer Matrix program has no sponsorship or approval by AbbVie.

83.     Payer Matrix also misleads its clients and the patients covered under its clients' plans to believe that the specialty drugs that Payer Matrix is procuring are coming from specialty drug manufacturers' "unused funds" or "grant money," when in fact Payer Matrix is improperly

obtaining the drugs from a patient assistance program by making misrepresentations about the patients' eligibility for the program. *See, e.g.*, Plan Sponsor No. 4, 2022-2023 Benefit Changes, at 15.

84.     Payer Matrix also commonly falsely represents to insured patients or otherwise misleads them into believing that their employers' health insurance plans are still providing the specialty drugs when the drugs are coming from patient assistance programs. For example, the 2022 Payer Matrix brochure for Plan Sponsor No. 1 states in part, "The plan will still pay for your medication with no increase in co-pay or cost share to you. However, the method of obtaining these medications have changed. Instead of funneling through your Pharmacy Benefits Manager, this will now funnel through Payer Matrix." Similarly, the 2022 Payer Matrix brochure for Plan Sponsor No. 2 includes a Frequently Asked Questions section with the following question: "Is my medication still covered?" The answer provided is strategically vague: "The method of obtaining the medication has changed. Instead of going through the Pharmacy Benefit Manager, fulfillment will now go through Payer Matrix."

85.     These additional misrepresentations interfere with specialty drug patients' ability to accurately assess the value of the Payer Matrix program and create a likelihood of confusion and misunderstanding regarding the financial source of the specialty drugs and their plan benefits.

**V.     Payer Matrix's Coercive and Deceptive Marketing Results in Patients Agreeing to Participate in an Unnecessarily Burdensome Process to Obtain Their Specialty Drugs**

86.     Payer Matrix's coercive and deceptive marketing causes insured patients to agree to participate in a program that is unnecessarily burdensome for them. Payer Matrix's marketing material available online includes a diagram showing multiple steps specialty drug patients are required to take to receive their medicines through Payer Matrix's program, including phone calls with Payer Matrix representatives, completion of Payer Matrix paperwork, and completion of the

initial PAP application, along with renewal applications on an annual basis. *See, e.g.*, Plan Sponsor No. 2, Human Resources Committee Memorandum, *Payer Matrix: Specialty Medication Program* (June 17, 2022).

87.    Notably, the diagram Payer Matrix uses in marketing its program to insured patients does not show what happens when a manufacturer denies the patients' admission into a PAP *and* Payer's Matrix's appeal of that decision also is denied. However, the version of the diagram that Payer Matrix shows to employers, which is set forth below, does include an explanation of what happens if the appeal is denied. Specifically, the diagram states, ***"If denied, override placed so member will receive medication without disruption,"*** once again confirming that the purported specialty drug exclusion is a sham. Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 43:45 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE (emphasis added).



88.     With respect to the burdensome paperwork, the participating patients must complete a "Patient HIPAA Authorization" form, a "Program Enrollment & Communication Consent" form, and a "Patient Authorization" form.  The Patient Authorization form gives Payer Matrix permission to contact patient assistance programs on the patient's behalf and to disclose and use the patient's protected health and financial information.  The Patient Authorization form also allows Payer Matrix to track the patient's prescriptions and dispenses and to confirm medicine deliveries, which Payer Matrix uses to bill the employer for health care plan cost "savings." Finally, the Patient Authorization form gives Payer Matrix permission to contact the patient to "ask for financial, insurance, and/or medical information."

89.     If the patient's household income is low enough to qualify financially for the PAP, Payer Matrix requires the patient to engage in the next burdensome task of assisting in the completion of a PAP application and collecting and providing the financial, insurance, and medical records that Payer Matrix requests (for the initial enrollment and then again for annual renewal applications), steps the patient did not have to take prior to enrollment in Payer Matrix's program.

90.     As an additional layer of burden and stress, the patients who are coerced into joining Payer Matrix's program sometimes experience delays in medicine delivery due to program administration issues, such as Payer Matrix representatives failing to promptly obtain the patients' doctors' portion of the PAP applications, thereby creating a potential negative impact on their health.  If patients are denied admission into the PAP, they often experience additional delays as Payer Matrix coordinates its backup option for the provision of their medicine.

91.     The burden of the Payer Matrix program is not evenly distributed among its clients' insured patients.  Payer Matrix does not tell patients whose household incomes fall below the ceiling for PAP admission that their employers' new benefit structure under the Payer Matrix

program discriminates between them and their colleagues with higher household incomes. If Payer Matrix successfully maneuvers the insured patients into AbbVie's PAP, they will remain classified ***on paper*** through the sham exclusion as uninsured for specialty medications (despite the insurance premiums they pay) and will suffer all of the resulting inconveniences and potential medicine delays that those who are actually uninsured sometimes experience, whereas their higher income colleagues (whose household incomes exceed the ceiling for PAP eligibility) will continue to have drug insurance coverage paid by their employers' plans.

92. Not only does Payer Matrix fail to disclose to patients this material information about the discrepancy in their treatment depending on their household income levels, but it also sometimes affirmatively misrepresents in its program brochures that "[t]he coverage under the medical benefit's plan is the same for all employees regardless of pay level." Plan Sponsor No. 1, *Payer Matrix Program Overview*, at 2 (last visited May 2, 2023), https://bit.ly/3ZMHwoJ.

93. Payer Matrix intends for its clients and consumers of specialty drugs to rely upon its false representations and material omissions about the value and true nature of its program by agreeing to join the program and cooperate in the PAP application process, and they do in fact rely on these false representations and material omissions by joining the program and submitting PAP applications. But for Payer Matrix's coercion, false statements, and material omissions, insured patients would not join the program or cooperate in the PAP application process.

## VI. Payer Matrix Utilizes Sham Exclusions of Specialty Drugs to Deceive AbbVie Into Admitting Ineligible Patients Into the PAP

94. Payer Matrix's entire business model is structured to deceive AbbVie and other pharmaceutical manufacturers and enrich itself on the backs of patients with serious medical conditions.

95.     In the process of executing its scheme, Payer Matrix makes or causes patients taking one of AbbVie's medicines to unknowingly make misrepresentations to AbbVie in PAP applications, upon which AbbVie relies in making admission decisions.  Specifically, the applications falsely represent that the applicants do not have insurance coverage for specialty drugs when in fact the specialty drug exclusion is a ruse.  Payer Matrix facilitates this misrepresentation by including letters from its partner PBMs, plan representatives, or the insurers as part of the PAP application packet.  The letters state that the specialty drug requested in the PAP application is a plan exclusion.  Payer Matrix submits these letters to AbbVie, or causes their submission, as part of the applications, knowing full well that the exclusion is a sham.

96.     As evidence that the exclusion is a sham, Payer Matrix guarantees and directs the employers and PBMs to guarantee patients continued coverage from their employers' insurance plans if the patients are financially ineligible for admission into the PAP or are otherwise not admitted.  In other words, Payer Matrix does not use the exclusions when they do not facilitate the fraud.  If the specialty drug exclusions were made in good faith, higher income and other ineligible patients would have to pay out-of-pocket for their specialty drugs.  But that is not what happens in Payer Matrix's program.  Instead, these patients continue to receive coverage under the plan in the same manner as they had before Payer Matrix was involved.

97.     Payer Matrix directs or is aware of this continued coverage guarantee set forth in plan documents and benefit descriptions, which is similar to the language in Payer Matrix's own program brochures.  Additionally, Payer Matrix sometimes faxes the employer benefit descriptions with the promise of continued coverage under the plan, if found to be ineligible for the PAP, to the patients' doctors.

98.     Payer Matrix, working with the plan sponsors and/or certain PBMs, utilizes multiple means for perpetuating the false pretense of a specialty drug exclusion while at the same time ensuring that those patients who are ineligible for the PAP receive continued coverage under the plans.  The plan designs they develop utilize purported waivers, appeals, exceptions, and overrides to the plans' "exclusion."

99.     Each time Payer Matrix causes a PAP application to be submitted to AbbVie, representing that the relevant specialty drug is excluded from the patient's plan, it is intentionally deceiving AbbVie because it knows that the insurance exclusion is a ruse and made in bad faith.

100.    Payer Matrix representatives send or cause these false and deceptive applications to be sent to AbbVie's principal place of business in Illinois.  Once approved, AbbVie ships the medications to the admitted patients from its facility in Lake County, Illinois.

101.    To date, AbbVie has identified over 530 PAP applications that were submitted by Payer Matrix between 2021 and 2022, and AbbVie admitted most of these applicants into the PAP. So far in 2023, AbbVie is aware of Payer Matrix submitting or causing the submission of over 450 PAP applications, which AbbVie has denied due to its explicit ban on patients participating in programs like Payer Matrix's program.

102.    A sample of the deceptive PAP applications Payer Matrix submitted or caused to be submitted to AbbVie is set forth in the chart below.  For each of the 2021 and 2022 applications listed below, a Payer Matrix representative was listed as the care coordinator on the patient portion of the applications and/or other application documentation referenced Payer Matrix's involvement. For the 2023 applications, AbbVie's investigation uncovered evidence linking Payer Matrix to the applicants, as further detailed in Section VIII.

| Plan Sponsor Working With Payer Matrix | Statements in Plan Sponsor's Benefits Descriptions Demonstrating the Exclusion Was a Sham | Date and Method of Communication to Patients | PAP Applications Payer Matrix Submitted to AbbVie's PAP That Deceptively Utilized the Sham Exclusion[5] | PAP Admission Decision |
|---|---|---|---|---|
| Plan Sponsor No. 4 | In describing the Payer Matrix program, the document states, "What are the possible outcomes?" One possible outcome offered was the following: "They are not able to secure funding for the medication and it *will revert back to the original coverage provided for under your medical plan*." (emphasis added) | 2022-2023 Benefits – Open Enrollment, Payer Matrix Overview and FAQs | One application filed on behalf of a patient of Plan Sponsor No. 4:<br><br>• Patient No. 1 (8/4/2022)<br><br>The application stated through the letter from the PBM that Humira was a plan exclusion. | AbbVie admitted Patient No. 1 into the PAP in 2022. |
| Plan Sponsor No. 5 | When describing the Payer Matrix program, the benefits guide stated, "Plan participants (if eligible) will have a zero-copay. *If NOT eligible, [specialty drugs] will be paid through the Plan*, based on Plan Benefits with a zero copay as well." (emphasis added) | 2023 Benefits Guide | One application filed on behalf of a patient of Plan Sponsor No. 5:<br><br>• Patient No. 2 (1/10/23)<br><br>The application stated through the letter from the PBM that Humira was a plan exclusion. | AbbVie denied application of Patient No. 2 on 2/19/23 due to AbbVie's investigation identifying affiliation with Payer Matrix. |
| Plan Sponsor No. 6 | "*If you are not eligible* after applying for any alternate funding program through Payer Matrix for any Specialty Drug prescription covered by the Plan, Payer Matrix will work with [the PBM] and *you will receive your drugs with all your Plan provisions in force*." (emphasis added) | 2022 Plans of Benefits: Summary of Material Modifications | Fourteen applications filed on behalf of patients of Plan Sponsor No. 6 in 2021-2022:<br><br>• Patient No. 3 (7/20/2021)<br>• Patient No. 4 (8/10/2021)<br>• Patient No. 5 (9/28/2022)<br>• Patient No. 6 (7/11/2022)<br>• Patient No. 7 (10/26/2022)<br>• Patient No. 8 (9/21/2022) | AbbVie admitted all 2021 patients into the PAP in 2021 and admitted all 2022 patients into the PAP in 2022. |

[5] For 2023 PAP applications, AbbVie sometimes denied the applications before all of the required paperwork was submitted if AbbVie's investigation identified the applicant as being affiliated with Payer Matrix.

| Plan Sponsor Working With Payer Matrix | Statements in Plan Sponsor's Benefits Descriptions Demonstrating the Exclusion Was a Sham | Date and Method of Communication to Patients | PAP Applications Payer Matrix Submitted to AbbVie's PAP That Deceptively Utilized the Sham Exclusion[5] | PAP Admission Decision |
|---|---|---|---|---|
| | | | • Patient No. 9 (10/12/2022)<br>• Patient No. 10 (3/11/2022)<br>• Patient No. 11 (9/2/2022)<br>• Patient No. 12 (10/24/2022)<br>• Patient No. 13 (12/29/22)<br>• Patient No. 14 (11/22/2022)<br>• Patient No. 15 (6/13/2022)<br>• Patient No. 16 (2/22/2022)<br><br>The applications stated through the letters from the PBM or plan sponsor that Rinvoq, Skyrizi, or Humira were plan exclusions.<br><br>Four applications filed on behalf of patients of Plan Sponsor No. 6 in 2023:<br><br>• Patient No. 17 (1/17/2023)<br>• Patient No. 18 (1/7/2023)<br>• Patient No. 19 (2/1/2023)<br>• Patient No. 20 (2/15/2023) | AbbVie denied applications of Patient No. 17 on 2/17/2023, Patient No. 18 on 2/27/2023, Patient No. 19 on 2/27/2023, and Patient No. 20 on 3/13/2023 due to AbbVie's investigation identifying affiliation with Payer Matrix. |

| Plan Sponsor Working With Payer Matrix | Statements in Plan Sponsor's Benefits Descriptions Demonstrating the Exclusion Was a Sham | Date and Method of Communication to Patients | PAP Applications Payer Matrix Submitted to AbbVie's PAP That Deceptively Utilized the Sham Exclusion[5] | PAP Admission Decision |
|---|---|---|---|---|
| Plan Sponsor No. 7 | *"If you are not eligible to enroll in Payer Matrix, you will be provided benefits with a copay.* If you are eligible but refuse to enroll in Payer Matrix, you will have to pay the full cost of the drug, unless you file an appeal." (emphasis added). | Summary of Drug Coverage for 2022-2023 | One application filed on behalf of a patient of Plan Sponsor No. 7:<br><br>• Patient No. 21 (6/20/2022)<br><br>The application stated through the letter from the plan sponsor that Humira was a plan exclusion. | AbbVie admitted Patient No. 21 into the PAP in 2022. |
| Plan Sponsor No. 8 | *"If you are NOT eligible for a Payer Matrix funding program, Payer Matrix will automatically submit your case for benefit reconsideration* and your out-of-pocket costs will apply to your plan benefits." (emphasis added) | Employee Benefits Guide 2020-2021 | Two applications filed on behalf of patients of Plan Sponsor No. 8:<br><br>• Patient No. 22 (6/30/2022)<br>• Patient No. 23 (7/11/2022)<br><br>The applications stated through the letters from the PBM that Humira was a plan exclusion. | AbbVie admitted both patients into the PAP in 2022. |
| Plan Sponsor No. 3 | "If your Specialty Drug is eligible for alternative funding under the Payer Matrix Program and you choose to not enroll in the Payer Matrix Program, your Specialty Drug will be excluded from Coverage under the Plan and you will be responsible for the full cost of your Specialty Drug (this expense will not count towards your Out-of-Pocket Maximum). *If your Specialty Drug is not eligible for alternative funding under the Payer Matrix Program, your Specialty Drug will be paid according to the applicable Tier.*" (emphasis added) | 2022 Plan and Summary Plan Description | Fourteen applications filed on behalf of patients of Plan Sponsor No. 3:<br><br>• Patient No. 24 (11/28/2022)<br>• Patient No. 25 (11/7/2022)<br>• Patient No. 26 (7/5/2022)<br>• Patient No. 27 (7/1/2022)<br>• Patient No. 28 (6/10/2022)<br>• Patient No. 29 (7/12/2022)<br>• Patient No. 30 (11/15/2022)<br>• Patient No. 31 (10/31/2022) | AbbVie admitted all patients into the PAP in 2022. |

| Plan Sponsor Working With Payer Matrix | Statements in Plan Sponsor's Benefits Descriptions Demonstrating the Exclusion Was a Sham | Date and Method of Communication to Patients | PAP Applications Payer Matrix Submitted to AbbVie's PAP That Deceptively Utilized the Sham Exclusion[5] | PAP Admission Decision |
|---|---|---|---|---|
| | | | • Patient No. 32 (8/24/2022)<br>• Patient No. 33 (5/31/2022)<br>• Patient No. 34 (6/6/2022)<br>• Patient No. 35 (5/31/2022)<br>• Patient No. 36 (6/21/2022)<br>• Patient No. 37 (11/7/2022)<br><br>The applications stated through the letters from PBMs that Skyrizi, Rinvoq, or Humira were plan exclusions. | |
| Plan Sponsor No. 9 | "The Fund has arranged for Payer Matrix to assist you in obtaining financial assistance to get your specialty drugs. You need to enroll with Payer Matrix to obtain such assistance. *If you enroll with Payer Matrix but are not provided financial assistance, you will be provided with benefits at no copay.*" (emphasis added) | 2022 Plan Summary of Benefits and Coverage | One application filed on behalf of a patient of Plan Sponsor No. 9:<br><br>• Patient No. 38 (6/20/2022)<br><br>The application stated through the letter from the fund that Rinvoq was a plan exclusion. | AbbVie admitted Patient No. 38 into PAP in 2022. |

103.    As further evidence of Payer Matrix's false and deceptive representations about specialty drug exclusions in the PAP applications, approximately 200 of the applicants for whom AbbVie denied PAP admission in 2023 due to their affiliation with Payer Matrix subsequently applied to AbbVie for financial assistance with their specialty drug co-pays through separate AbbVie patient support programs that are only available to patients who have commercial insurance.   In other words, the patients' employers ***did in fact cover their specialty drug prescriptions when the PAP denied coverage and then the patients sought AbbVie's assistance***

34

*with the co-pays*.  A representative sample of these applicants and the relevant timeline is set forth in the chart below:

| Patient Name | Date of Application to AbbVie PAP | Date AbbVie Denied Admission to PAP | Date Patient Redeemed Co-Pay Assistance From AbbVie Indicating Insurance Coverage for Drug |
|---|---|---|---|
| Patient No. 39 | 12/22/2022 | 2/14/2023 | 3/2/2023 |
| Patient No. 40 | 1/6/2023 | 1/10/2023 | 1/25/2023 |
| Patient No. 41 | 1/5/2023 | 1/10/2023 | 1/20/2023 |
| Patient No. 42 | 12/13/2022 | 1/11/2023 | 2/7/2023 |
| Patient No. 43 | 12/19/2022 | 1/11/2023 | 1/28/2023 |
| Patient No. 44 | 11/22/2022 | 1/11/2023 | 1/14/2023 |
| Patient No. 45 | 12/29/2022 | 1/11/2023 | 2/8/2023 |
| Patient No. 46 | 12/19/2022 | 1/11/2023 | 1/23/2023 |
| Patient No. 47 | 12/1/2022 | 1/12/2023 | 2/6/2023 |
| Patient No. 48 | 12/10/2022 | 3/6/2023 | 3/16/2023 |
| Patient No. 49 | 11/22/2022 | 1/18/2023 | 1/27/2023 |
| Patient No. 50 | 1/6/2023 | 1/19/2023 | 2/8/2023 |
| Patient No. 51 | 12/28/2022 | 1/22/2023 | 1/24/2023 |
| Patient No. 52 | 12/26/2022 | 1/22/2023 | 1/24/2023 |
| Patient No. 53 | 11/11/2022 | 1/23/2023 | 1/30/2023 |
| Patient No. 54 | 11/18/2022 | 1/24/2023 | 2/2/2023 |
| Patient No. 55 | 12/21/2022 | 1/25/2023 | 1/26/2023 |
| Patient No.56 | 12/28/2022 | 1/25/2023 | 1/30/2023 |
| Patient No. 57 | 1/3/2023 | 1/25/2023 | 2/6/2023 |
| Patient No. 58 | 12/27/2022 | 1/25/2023 | 1/27/2023 |

104.    In addition to the employer health plans and co-pay redemption records that reveal the sham exclusion, Payer Matrix's own program literature and marketing material admit that the specialty drugs will continue to be covered by the employers' plans if the patients are ineligible for the PAP:

---

Our advocacy model successfully procures alternate funding for high-cost drugs, therefore reducing to the plan and the members. Our program utilizes manufacturer assistance programs to achieve these cost-saving costs goals.

### KEY POINTS TO OUR PROGRAM:

- Plan participants (if eligible) will have a zero-copay
- If NOT eligible, it will be paid through the Plan, based on Plan Benefits with a zero copay as well
- The drug list covers approximately 340 drugs for various chronic health conditions
- Our program leverages extensive, often unused funds made available by Pharma Manufacturers
- Payer Matrix will help the participant complete the necessary paperwork
- Contact Payer Matrix via email – customerservice@payermatrix.com or **877-305-6202**

---

Plan Sponsor No. 5, *2023 Benefits Guide*, at 12 (last visited May 2, 2023), https://bit.ly/43jDDdS (emphasis added).

---



The plan will still pay for your medication with no increase in co-pay or cost share to you. However, the method of obtaining these medications have changed. Instead of funneling through your Pharmacy Benefits Manager, this will now funnel through Payer Matrix. If Payer Matrix is unable to obtain secure alternative funding, then coverage will revert to your traditional coverage.

Plan Sponsor No. 1, *Payer Matrix Program Overview*, at 2 (last visited May 2, 2023), https://bit.ly/3ZMHwoJ (emphasis added).

105.    Additionally, the Payer Matrix introductory letter for the patients covered by Plan Sponsor No. 3 stated in part, "If it is determined that you are NOT eligible to enroll in the Payer Matrix program, Payer Matrix will refer your prescription to [a partner PBM] and your coverage will be adjusted back to the specialty prescription drug design (as outlined under the Traditional, Core or Progressive plans)."

106.    Payer Matrix's chief business officer also admitted in a presentation on June 30, 2020 that Payer Matrix will direct the PBMs to issue the specialty drugs to patients on its clients' plans who are ineligible for the PAP.  Risk Strategies, *Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction*, YOUTUBE, at 45:39 (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.

## VII.    Payer Matrix Intended for AbbVie to Rely on Its Misrepresentations in the PAP Applications by Admitting Ineligible Patients Into the PAP

107.    For each application that Payer Matrix submitted or caused to be submitted to the PAP, Payer Matrix intended for AbbVie to rely on the sham exclusions of specialty drug coverage. Payer Matrix representatives were well aware that if AbbVie knew the exclusions referenced in the application submissions were shams, AbbVie would not have admitted those patients into the PAP.

108.    Payer Matrix intentionally misled AbbVie representatives into believing that the provision of free specialty drugs through the PAP would benefit the patients represented by Payer Matrix and that the patients were eligible for the PAP when in fact admission into the PAP solely benefitted Payer Matrix and its employer clients because the patients still would receive specialty drug coverage through their plans if they were not admitted into the PAP.

109.     AbbVie did in fact rely on Payer Matrix's misrepresentations in admitting insured patients covered by Payer Matrix's clients' plans into the PAP.  Between 2021 and 2022, AbbVie admitted over 530 of these applicants into the PAP.

## VIII.     Once AbbVie Began Denying Patients' Admission Into the PAP in 2023 Due to Their Affiliation With Payer Matrix, Payer Matrix Representatives Began Concealing Their Involvement in the Application Submissions

110.     In 2023, AbbVie initially utilized several sources to investigate Payer Matrix's continued involvement in the PAP application process, including application documentation that explicitly referenced Payer Matrix, call records indicating that Payer Matrix representatives called the PAP phone line on behalf of patients, PAP applications in which known Payer Matrix employees identified themselves as the applicants' "care coordinators," fax headers on PAP applications known to be affiliated with Payer Matrix, and historical patient application records and third-party resources indicating that the applicant was a member of Payer Matrix's program, among other methods of investigation.

111.     AbbVie's investigation revealed that Payer Matrix representatives were not complying with the ban on their PAP participation.  As a result, AbbVie began issuing letters to applicants who were believed to be working with Payer Matrix, denying their admission into the PAP.

112.     In response to the denials, Payer Matrix representatives began concealing their identities and involvement in the PAP application process from AbbVie representatives and continue to submit or cause the submission of PAP applications, despite Payer Matrix's knowledge of the now explicit ban on its involvement and its applicants' ineligibility for the PAP.

113.     As one method of concealment, Payer Matrix representatives no longer include their names as care coordinators on the PAP applications.  In fact, in one application that was

38

submitted to AbbVie on February 20, 2023, it appears that the Payer Matrix representative's name, title, and phone number were covered with white out.

114.    Payer Matrix representatives also have stopped including their letterhead and fax header information on PAP documentation submitted to AbbVie.  They direct the patients or their doctors to fax the completed PAP applications to AbbVie.

115.    The Payer Matrix representatives also engage in concealment with respect to communications with AbbVie's PAP team.  Specifically, they direct the patients to call AbbVie to ask about the status of their applications when they previously called AbbVie themselves.  On at least one occasion, it was discovered that a Payer Matrix representative was present on the line when the patient called AbbVie.  On another occasion, the Payer Matrix representative called AbbVie directly but pretended to be calling as an employee of the patient's doctor's office.

116.    Upon information and belief, Payer Matrix also has continued to direct and cause patients to use AbbVie's outdated PAP application form (which is no longer available on the myAbbvie Assist website) rather than the current one posted on the myAbbvie Assist website, thus avoiding (1) written acknowledgement of the updated Patient Terms of Participation that explicitly ban patients working with Payer Matrix and (2) the required question about whether the patients were directed by their employers, insurers or other third parties to apply for PAP admission.

117.    Even after AbbVie sent Payer Matrix's CEO a letter on February 10, 2023, notifying him of the explicit ban on his company's program, Payer Matrix has continued to cause the submission of PAP applications to AbbVie.  AbbVie's investigation has identified over 55 PAP applications and/or supporting documents that were submitted to AbbVie between February 14, 2023 and May 2, 2023 that are believed to be the result of Payer Matrix's direct or indirect involvement.

118.    For example, on April 5, 2023, Payer Matrix caused a PAP application to be submitted to AbbVie on behalf of Patient No. 59.  This application included a note from a Payer Matrix representative that was directed to the patient's doctor.  Upon information and belief, the Payer Matrix representative did not intend for the doctor to send the note to AbbVie as part of the application materials.  In the note, the Payer Matrix representative asked the doctor to submit the patient's PAP application to AbbVie in lieu of Payer Matrix faxing the application to AbbVie because "myAbbvie will only receive [a] program application from [the] MD office."  The Payer Matrix representative made this statement to the doctor knowing that AbbVie did not have any rule requiring PAP applications to be submitted by the patients' doctors.  The Payer Matrix representative made this request to the doctor solely to conceal her involvement in the application process from AbbVie.

119.    For other recent applications, AbbVie has confirmed through the patients' health insurance company or PBM that the patients are required to go through Payer Matrix to obtain their specialty drugs, among other methods of investigation.

120.    Despite over 450 identified attempts by Payer Matrix to submit PAP applications to AbbVie for ineligible patients in 2023, Payer Matrix's chief business officer sent an email to AbbVie on April 12, 2023, stating in part, "[W]e are not advocating any longer for Humira patients (effective January of this year)."

121.    Payer Matrix representatives engage in acts of deception and concealment because they know that AbbVie will reject the PAP application if they determine Payer Matrix is representing the applicant.

40

122.     Due to Payer Matrix's concealment efforts, there is no way for AbbVie to know how many additional applications Payer Matrix has submitted or caused to be submitted in 2023 that AbbVie has not caught.

123.     Payer Matrix has put AbbVie in the difficult and costly position of having to investigate extensively each applicant with any form of commercial health insurance and deny coverage to all applicants whom AbbVie has determined may be working with Payer Matrix to try to preserve the program for truly uninsured and underinsured patients.

124.     As of the filing date of this Complaint, Payer Matrix still includes Skyrizi, Rinvoq, and Humira on its "Payer Matrix Specialty Drug List," which is located on its website.

## IX.     Payer Matrix's Fraudulent and Deceptive Practices Implicate Consumer Protection Concerns

125.     As detailed above, the Payer Matrix program causes unnecessary burden to the specialty drug patients it enrolls through unnecessary paperwork, frequent telephonic contact from Payer Matrix representatives, and potential treatment delays.

126.     The Payer Matrix program also causes insured patients who are covered by its clients' plans to be confused about the financial source of their specialty drugs and the true value of the Payer Matrix program, thus hindering their ability to make well-informed choices about their health insurance options.

127.     Payer Matrix's scheme also implicates consumer protection concerns because the substantial losses it has caused and continues to cause pharmaceutical manufacturers will be passed to consumers of specialty drugs and/or will result in patient assistance program cutbacks, additional eligibility restrictions, or more onerous application processes.

128.     Payer Matrix's recent actions in 2023 have escalated the risk of harm that its program causes consumers of specialty drugs.  In response to AbbVie's updated Patient Terms of

Participation and its issuance of denial letters to patients, Payer Matrix is now contacting the doctors of patients in the Payer Matrix program and asking the doctors to switch the patient from one of AbbVie's specialty drugs to alternative treatments, specifically, treatments that have a patient assistance program available for Payer Matrix to try to exploit. Payer Matrix is not a medical provider and its interference in the process of patient prescriptions, motivated by its own desire for profit, is a harmful practice that does not focus on the best interests of the patients.

129. For example, on March 14, 2023, Payer Matrix faxed a message to a doctor of a patient covered by one of its clients' plans who had been prescribed Humira for the treatment of her rheumatoid arthritis. The fax stated in part:

> Patients [on] Humira no longer [have] coverage under the patient's plan benefits. We are also finding that assistance through the manufacture[r], AbbVie, is no longer available for those with self-funded plans. Is there another alternative therapy you would like to try? Listed below are the medications/manufacturers that are on our formulary for Rheumatoid Arthritis, and we work with regularly. We can assist with coordinating their benefits.

The fax went on to list eight other medication options, including ACTEMRA®, ENBREL®, KEVZARA®, KINERET®, OLUMIANT®, ORENCIA®, SIMPONI®, XELJANZ®. Payer Matrix has sent similar correspondence to other health care providers who treat patients participating in the Payer Matrix program.

130. Payer Matrix's fax communication contains false statements intended to convince the doctor to switch the patient's medication. First, Payer Matrix claims that manufacturer assistance with Humira "is no longer available for those with self-funded plans." As Payer Matrix well knows, the only recent modification to the PAP eligibility requirements was the exclusion of patients working with programs like the Payer Matrix program. Second, based upon information and belief, Payer Matrix is representing to the doctor that Humira is no longer covered under the patient's plan benefits based on a sham exclusion, thereby falsely representing to the doctor that

he had no other option but to switch the patient from the medication he originally prescribed. Finally, Payer Matrix is misleadingly suggesting that it is the insurer and the alternative medications are covered through insurance offered by Payer Matrix.

131. While the eight other therapies recommended by Payer Matrix are approved by the FDA for treatment of rheumatoid arthritis, there are important differences among the products. For example, each product's FDA approval has its own unique dosing regimen and route of administration that potentially would need to be considered by a physician and the patient. While many of the products listed by Payer Matrix have subcutaneous dosage forms for treating rheumatoid arthritis, the administration schedule can vary significantly (*e.g.*, once per month, once per week, every other week, or daily). Additionally, certain products listed by Payer Matrix have both subcutaneous and intravenous infusion formulations whereas Humira only has a formulation for subcutaneous injection. Patients switching among these therapies, therefore, potentially would have their treatment schedule adjusted significantly, and the frequency of dosing and route administration could have a material impact on the patients' satisfaction with treating their medical conditions—all so Payer Matrix can continue to profit.

## X. Payer Matrix's Fraudulent and Deceptive Practices Harm AbbVie

132. Payer Matrix's fraudulent and deceptive conduct harms AbbVie by causing the PAP to provide free medication to patients whom the program was not intended to assist for the sole purpose of enriching Payer Matrix. Its business model is based on shifting the costs of specialty drugs from employers to AbbVie, which Payer Matrix representatives know is not an intended purpose of the PAP.

133. Payer Matrix's deception has resulted in increased costs to AbbVie for administering the PAP and lost sales. Specifically, Payer Matrix has caused AbbVie to provide free Skyrizi, Rinvoq, and Humira to commercially insured and ineligible PAP applicants who were

43

applying through the Payer Matrix program. This has resulted in losses to AbbVie of over $30 million dollars for 2021 and 2022. So far in 2023, by enforcing its new Patient Terms of Participation that explicitly prohibit Payer Matrix's participation, AbbVie has caught over 450 attempts by Payer Matrix to maneuver ineligible patients into the PAP. The number of ineligible patients that Payer Matrix has successfully gotten into the PAP through its acts of concealment is currently unknown.

134. Due to Payer Matrix's escalating concealment efforts, there is no easy or foolproof way for AbbVie to identify and stop Payer Matrix's fraud going forward. Payer Matrix representatives continue to update and refine their processes to advance the fraudulent scheme.

135. Payer Matrix, therefore, continues to harm AbbVie. Furthermore, damages for ongoing and future wrongdoing are inadequate because Payer Matrix takes concerted measures to avoid detection. Payer Matrix must be enjoined or else it will continue to cause damages and irreparable harm to AbbVie.

## **CLAIMS FOR RELIEF**

### **COUNT I:**
**Violations of the Illinois Consumer Fraud and**
**Deceptive Business Practices Act (815 ILCS 505 *et seq.*)**

136. Plaintiff AbbVie incorporates by reference paragraphs 1-135 of this Complaint as though fully stated herein.

137. The conduct giving rise to this Complaint occurs primarily and substantially in Illinois because Payer Matrix's website is public and accessible to Illinois consumers, Payer Matrix is registered to conduct business in Illinois as a "foreign LLC," AbbVie's principal place of business is in Illinois, its PAP is operated out of Illinois, and the medications are shipped to PAP members out of Illinois.

138.    Payer Matrix engages in deceptive practices by falsely representing to AbbVie that PAP applicants are uninsured for Skyrizi, Rinvoq, and Humira and thus qualify for the PAP when in fact the specialty drug exclusions in the employers' plans are a sham.

139.    The representation that these applicants lack insurance coverage is false because Payer Matrix knows that the patients' employers will continue to provide specialty drug coverage if AbbVie does not admit the patients into the PAP.

140.    Payer Matrix also misrepresents the purpose of its PAP applications, creating the false impression that admission into the PAP will benefit the patients when in fact it will solely benefit Payer Matrix and the payers.

141.    In 2023, Payer Matrix representatives have concealed and continue to conceal from AbbVie their affiliation with PAP applicants to circumvent AbbVie's ban on its involvement in the application process and continue to apply on behalf of ineligible patients for admission into the PAP.

142.    Payer Matrix intends for AbbVie to rely on the deception by admitting otherwise ineligible, commercially insured patients into the PAP, thus eliminating its clients' responsibility to pay for these drugs through their health insurance plans.

143.    Payer Matrix also engages in deceptive practices by making false and misleading representations to specialty drug consumers about the value of its program and its methods of doing business.

144.    Payer Matrix intends for consumers to rely on the deception by joining its program and cooperating in the PAP application process.

145.    Payer Matrix's fraudulent and deceptive conduct occurs in the course of conduct involving trade and commerce.

146.     Payer Matrix's fraudulent and deceptive conduct has harmed consumers of specialty drugs in multiple ways, including by (1) causing or likely causing consumer confusion and lack of transparency about the true value of the Payer Matrix program and their health benefits, insurance options, and financial source of medication, (2) creating inconvenience, uncertainty, confusion, and delays in the receipt of their specialty drugs and otherwise interfering with their access to medication, and (3) interfering with patients' doctors' prescription decisions, thus creating additional health risks for patients.

147.     Payer Matrix's conduct also implicates consumer protection concerns because the substantial losses it has caused and continues to cause AbbVie and other pharmaceutical manufacturers may be passed to consumers through increased drug costs, greater restrictions on the availability of patient assistance programs, and/or more stringent eligibility requirements.

148.     Through its fraudulent and deceptive conduct, Payer Matrix also has harmed and continues to harm AbbVie by causing an increase in the operational costs associated with its patient assistance program and a loss of sales.

149.     Payer Matrix has willfully engaged in the acts described in Count I against consumers of specialty drugs and AbbVie and has acted with a reckless disregard for the safety of consumers of specialty drugs.

**COUNT II:**
**Violations of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510 *et seq.*)**

150.     Plaintiff AbbVie incorporates by reference paragraphs 1-149 of this Complaint as though fully stated herein.

151.     Payer Matrix engages in deceptive trade practices that occur primarily and substantially in Illinois.

152. Payer Matrix engages in a deceptive trade practice by representing that its program has the sponsorship, partnership, and approval of AbbVie that it does not in fact have.

153. Payer Matrix also engages in deceptive trade practices by representing that its program has the characteristic, use, and benefit of facilitating patients' admission into a manufacturer assistance program for which they are eligible when in fact Payer Matrix is maneuvering them into a program for which they are ineligible through false representations to AbbVie and into a program for which they could easily apply on their own if truly eligible.

154. Payer Matrix's deceptive trade practices also create the likelihood of consumer confusion as to the financial source of the patients' specialty drugs because Payer Matrix commonly obfuscates (1) whether the drugs are provided to patients as part of their employers' plan benefits and (2) Payer Matrix's role in the process. Even when free coverage through the PAP is acknowledged, Payer Matrix misleads patients about the basis for that benefit, including falsely representing that the manufacturers utilize grant money or receive other financial benefits from admitting the patients into the PAP.

155. AbbVie is not able to stop Payer Matrix's conduct in all instances due to Payer Matrix's concealment efforts.

156. Payer Matrix's deceptive trade practices have caused and will continue to cause harm to AbbVie in increased operational costs for the PAP and lost sales unless enjoined.

**COUNT III:**
**Tortious Interference With Business Opportunity**

157. Plaintiff AbbVie incorporates by reference paragraphs 1-156 of this Complaint as though fully stated herein.

158. AbbVie has a reasonable expectation of entering into or continuing a valid business relationship with patients and/or their employers and insurers to purchase Skyrizi, Rinvoq, and

Humira, and Payer Matrix knows of that expectation through its review of its clients' health insurance plans and its industry knowledge.

159.    There is a high probability of future economic benefit to AbbVie as a result of these current and prospective business relationships.

160.    Payer Matrix knowingly, intentionally, and unjustifiably interferes with these current and prospective business relationships by soliciting employers and patients of specialty drugs to join its fraudulent program, which enables employers to shift to AbbVie responsibility for covering specialty drug prescriptions for insured patients covered by the employers' plans.

161.    Payer Matrix's interference prevents AbbVie's legitimate expectancy from ripening into a valid business relationship or a continuing business relationship with the patients or their employers and insurers.

162.    Payer Matrix engages in the acts of interference set forth in this Complaint with a conscious desire to prevent the relationships from occurring or continuing.

163.    Payer Matrix knows that the interference is certain or substantially certain to occur as a result of its conduct.

164.    AbbVie has been damaged and continues to be damaged as a result of Payer Matrix's interference.

165.    Payer Matrix acts maliciously, and no privilege permits Payer Matrix's tortious interference with AbbVie's business relationships with commercially insured patients and/or their employers and insurers.

166.    There is no adequate remedy at law to fully compensate AbbVie for the harm Payer Matrix is willfully causing.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable.

## **PRAYER FOR RELIEF**

**NOW, THEREFORE,** Plaintiff AbbVie respectfully requests that the Court:

A.     Issue an injunction prohibiting Payer Matrix from applying its alternate funding program to Skyrizi, Rinvoq, Humira, and any other AbbVie therapies;

B.     Award economic damages in an amount to be ascertained at trial;

C.     Award punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of Payer Matrix towards AbbVie and the general public and for Payer Matrix's complete disregard and reckless indifference for the safety and welfare of the general public in an amount sufficient to punish Payer Matrix and deter future similar conduct;

D.     Award pre-judgment and post-judgment interest;

E.     Award AbbVie its reasonable attorneys' fees, court costs, and other litigation expenses; and

F.     Grant such other and further relief as the Court may deem appropriate.

49

Date:  May 5, 2023

Respectfully submitted,

*/s/ Valarie Hays*

Valarie Hays (ARDC No. 6272380)
Daniel E. Raymond (ARDC No. 6313789)
Stephanna F. Szotkowski (*pro hac vice* forthcoming)
Nicholas C. Zebrowski (*pro hac vice* forthcoming)
valarie.hays@arnoldporter.com
daniel.raymond@arnoldporter.com
stephanna.szotkowski@arnoldporter.com
nicholas.zebrowski@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, Illinois 60602-4321
Telephone:  (312) 583-2440
Facsimile:  (312) 583-2360

Jeffrey L. Handwerker (*pro hac vice* forthcoming)
Andrew Tutt (*pro hac vice* forthcoming)
Volodymyr Ponomarov (*pro hac vice* forthcoming)
jeffrey.handwerker@arnoldporter.com
andrew.tutt@arnoldporter.com
volodymyr.ponomarov@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone:  (202) 942-6103
Facsimile:  (202) 942-5999

*Counsel for Plaintiff AbbVie Inc.*