# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AbbVie Inc.,

        *Plaintiff,*

   v.

Payer Matrix, LLC,

        *Defendant.*

Civil Action No. 1:23-cv-02836

Hon. Jorge L. Alonso

Hon. Magistrate Judge Young B. Kim

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF ABBVIE INC.'S MOTION FOR PRELIMINARY INJUNCTION

Valarie Hays
Daniel E. Raymond
Stephanna F. Szotkowski (*pro hac vice*)
Nicholas C. Zebrowski (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
valarie.hays@arnoldporter.com
daniel.raymond@arnoldporter.com
stephanna.szotkowski@arnoldporter.com
nicholas.zebrowski@arnoldporter.com
Telephone: (312) 583-2440
Facsimile: (312) 583-2360

Jeffrey L. Handwerker (*pro hac vice*)
Andrew Tutt (*pro hac vice*)
Volodymyr Ponomarov (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
jeffrey.handwerker@arnoldporter.com
andrew.tutt@arnoldporter.com
volodymyr.ponomarov@arnoldporter.com
Telephone: (202) 942-6103
Facsimile: (202) 942-5999

*Counsel for Plaintiff AbbVie Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    STATEMENT OF FACTS ...................................................................................10

    A.    AbbVie's Drugs and Patient Assistance Program ..................................10

    B.    Payer Matrix's Fraudulent Scheme to Enrich Itself Using AbbVie's PAP ..........11

        1.    Step One:  Misleading Representations to Prospective Clients ................11

        2.    Step Two:  Payer Matrix Implements Carve Out of Specialty Drugs and Override Process for New Clients ......................................13

        3.    Step Three:  Payer Matrix Coerces Specialty Drug Patients to Join Its Program and Misleads Them About the Value and Purpose of the Program ......................................17

        4.    Step Four:  Payer Matrix Requires Patients to Apply to AbbVie's PAP Even Though They Are Ineligible ......................................18

        5.    Step Five:  Payer Matrix Charges Clients Thousands of Dollars in "Cost Avoidance Fees" ......................................19

    C.    The Scope of Payer Matrix's Fraudulent Scheme Against AbbVie in 2021 and 2022 ......................................20

    D.    AbbVie's Explicit Ban on Patients Who Were Members of Payer Matrix's Program Beginning in January 2023 ......................................20

    E.    Payer Matrix's Continued Fraud on AbbVie's PAP in 2023 ................................20

    F.    Payer Matrix's Acts of Concealment ....................................................21

    G.    Payer Matrix's "High Powered Offensive Strategy" Against AbbVie ................24

    H.    Payer Matrix's Drug Switching Strategy and Its False Representations to Doctors and Patients About AbbVie's PAP ......................................26

III.    LEGAL STANDARD ........................................................................................29

IV.    ARGUMENT .....................................................................................................31

    A.    AbbVie Is Likely to Succeed on the Merits ..........................................31

        1.    Illinois Consumer Fraud and Deceptive Business Practices Act ..............31

i

2.      Illinois Uniform Deceptive Trade Practices Act and Tortious Interference with Business Opportunity ....................................................35

B.     AbbVie Lacks an Adequate Remedy at Law and Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction ...................................................36

1.      There Is No Adequate Remedy at Law......................................................36

2.      AbbVie Will Suffer Irreparable Harm .......................................................40

C.     The Balancing of Harms Weighs Heavily in Favor of an Injunction ...................47

D.     A Preliminary Injunction Against Payer Matrix Is in the Public's Interest ..........49

1.      Payer Matrix Is Engaging in a Fraudulent Scheme ..................................50

2.      Payer Matrix Is Interfering with Doctor-Patient Relationships and Causing the Switching of Prescriptions When It Is Not Medically Necessary ..................................................................................................51

3.      Payer Matrix Is Putting the Sustainability of Patient Assistance Programs at Risk for Patients Who Truly Need Them .............................52

4.      Payer Matrix Coerces Patients Into a Program Offering Nothing More Than Burdensome Barriers to Medicine Access .............................53

5.      Payer Matrix's Scheme Discriminates Against Patients from Lower Income Households With Respect to Medicine Access ................53

6.      Payer Matrix's Scheme Results in Consumer Harm and Confusion .........54

V.     CONCLUSION.............................................................................................................54

**Page(s)**

**Cases**

*BellSouth Telecomms., Inc. v. Mintz*,
No. 04-cv-3586, 2005 WL 8155198 (N.D. Ga. Mar. 4, 2005) ...........................................40, 47

*Brightstar Franchising, LLC v. N. Nevada Care, Inc.*,
No. 17-cv-9213, 2018 WL 4224454 (N.D. Ill. Sept. 4, 2018)................................................36

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) ....................................................................................................30

*Cigarette Racing Team, Inc. v. Donzi Marie Corp.*,
No. 85-cv-07947, 1985 WL 71995 (N.D. Ill. Sept. 16, 1985)................................................50

*Checker Car Club of Am., Inc. v. Fay*,
262 F. Supp. 3d 621 (N.D. Ill. 2017) ......................................................................................31

*Club Gene & Georgetti Ltd. P'ship v. La Luna Enters., Inc.*,
889 F. Supp. 324 (N.D. Ill. 1995) ...........................................................................................43

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
420 F. Supp. 2d 866 (N.D. Ill. 2006) ......................................................................................29

*Doctors Nursing and Rehab. Ctr., LLC v. Norwood*,
No. 16-cv-9837, 2017 WL 3838031 (N.D. Ill. Sept. 1, 2017)................................................47

*Doe v. Univ. of S. Indiana*,
43 F.4th 784 (7th Cir. 2022) ....................................................................................................30

*Domanus v. Lewicki*,
857 F. Supp. 2d 719 (N.D. Ill. 2012) ......................................................................................50

*EPA v. Env'l Waste Control*,
917 F.2d 327 (7th Cir. 1990) ...................................................................................................47

*Foodcomm Int'l v. Barry*,
328 F.3d 300 (7th Cir. 2003) ............................................................................................36, 40

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*,
35 F.3d 1134 (7th Cir. 1994) ...................................................................................................54

*Generac Power Sys., Inc. v. Kohler Co.*,
No. 12-cv-66, 2013 WL 238843 (E.D. Wis. Jan. 22, 2013) ....................................................54

*H-D, U.S.A., LLC v. Partnerships & Unincorporated Associations Identified on
Schedule "A"*,
No. 21 C 3581, 2021 WL 4459472, at *4 (N.D. Ill. Sept. 24, 2021)................................41, 43

*Holbrook Mfg LLC v. Rhyno Mfg. Inc.*,
    497 F. Supp. 3d 319 (N.D. Ill. 2020) ...........................................................36, 54

*Illinois Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) .....................................................................30

*Int'l Profit Assocs., Inc. v. Paisola*,
    461 F. Supp. 2d 672 (N.D. Ill. 2006) .........................................................36

*Koss v. Norwood*,
    305 F. Supp. 3d 897 (N.D. Ill. 2018) .........................................................52

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
    735 F.3d 735 (7th Cir. 2013) .....................................................................40

*Kurowski v. Rush Sys. for Health*,
    No. 22-cv-5380, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023) .................36

*Life Spine, Inc. v. Aegis Spine, Inc.*,
    8 F.4th 531 (7th Cir. 2021) ............................................................ 30, 40-41

*Malooley v. Alice*,
    251 Ill. App. 3d 51 (Ill. App. Ct. 1993) ....................................................31

*Mishkin v. Kenney & Branisel, Inc.*,
    609 F. Supp. 1254 (S.D.N.Y 1985)...........................................................40

*Newton-Nations v. Rogers*,
    316 F. Supp. 2d 883 (D. Ariz. 2004) .........................................................52

*PepsiCo, Inc. v. Redmond*,
    54 F.3d 1262 (7th Cir. 1995) .............................................................. 48-49

*Russian Media Grp., LLC v. Cable Am., Inc.*,
    598 F.3d 302 (7th Cir. 2010) .....................................................................48

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
    988 F. Supp. 2d 1047 (D. Minn. 2013).......................................................48

*SMC Corp. v. Lockjaw, LLC*,
    481 F. Supp. 2d 918 (N.D. Ill. 2007) .........................................................41

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) .....................................................................30

*Troogstad v. City of Chicago*,
    571 F. Supp. 3d 901 (N.D. Ill. 2021) .........................................................47

*Ty, Inc. v. Jones Grp., Inc.*,

237 F.3d 891 (7th Cir. 2001) ...................................................................................41

*United States v. Gupta*,
No. 11-cv-3329, 2011 WL 3841684 (C.D. Ill. Aug. 30, 2011) ...............................50

*United States v. Raymond*,
228 F.3d 804 (7th Cir. 2000) .................................................................................48

*Walgreens Co. v. Peters*,
No. 21 C 2522, 2021 WL 3187726 (N.D. Ill. Jul. 28, 2021) ...........................40, 48

*Wigod v. Wells Fargo Bank, N.A.*,
673 F.3d 547 (7th Cir. 2012) .................................................................................31

*YourNetDating, LLC v. Mitchell*,
88 F. Supp. 2d 870 (N.D. Ill. 2000) ......................................................................43

*Zazove v. Pelikan, Inc.*,
326 Ill. App. 3d 798 (2001) ...................................................................................50

## Statutes & Rules

Fed. R. Civ. P. 65(a) ......................................................................................................29

815 ILCS 505/2 ...............................................................................................................31

815 ILCS 505/10a ...........................................................................................................29

815 ILCS 510/3 ...............................................................................................................29

## Other Authorities

Patrick Hoff, *Senators Plot Sweeping Action On Pharmacy Intermediaries* (Apr.
20, 2023), https://www.law360.com/articles/1599458/senators-plot-sweeping-
action-on-pharmacy-intermediaries ......................................................................53

## I.    INTRODUCTION

██████████████████████████████████████████████████████████████████  These

were the questions that Payer Matrix's Director of Pharmacy Business, Joseph Szurgyjlo, urgently

asked Payer Matrix's Chief Business Officer, Michael Jordan, on January 19, 2023, just weeks

after AbbVie updated the eligibility terms for its patient assistance program ("PAP").  AbbVie's

PAP is a charitable program designed to provide free AbbVie drugs to patients without insurance

coverage for AbbVie's medicines who have genuine financial need.  AbbVie updated its PAP

eligibility terms on January 2, 2023, to try to stop Payer Matrix's fraudulent scheme to enroll

commercially insured, ineligible patients into the PAP for its own financial gain.  Rather than

complying with AbbVie's updated PAP eligibility terms, which expressly exclude patients who

are members of Payer Matrix's program, Payer Matrix's leadership team instead immediately

began devising methods to conceal Payer Matrix's continued involvement with PAP application

submissions.  By January 19, Payer Matrix had implemented and been acting upon its concealment

efforts for weeks, and the panicked questions asked above reflect its leadership team's frustration

that AbbVie was able to, at least at times, catch Payer Matrix's deception and deny the PAP

applications Payer Matrix caused to be submitted.  But even that did not deter Payer Matrix.  It

continues to develop and execute new strategies and tactics to circumvent AbbVie's updated PAP

terms.  Without Court intervention, Payer Matrix will not stop perpetrating its fraud on AbbVie's

charitable free drug program.

AbbVie develops and manufactures medicines upon which patients rely to treat serious,

life-altering medical conditions. In addition to selling its medicines in the normal course of

business, AbbVie gives its medicines away for free to uninsured and underinsured patients through

its PAP.  Payer Matrix exploits this charitable program by taking patients who have insurance from

an employer-based plan and misrepresenting to AbbVie that these patients' insurance plans do not

cover their prescribed drug so that AbbVie will give its medicines to these patients for free.  Payer Matrix then turns around and charges the patients' employers a portion of the insurance "savings" it achieved for them by deceiving AbbVie.  Payer Matrix represents these patients to AbbVie as uninsured for certain types of AbbVie drugs, but its insurance plan clients **continue to insure** these patients for those AbbVie medicines if they are denied admission into AbbVie's PAP—making Payer Matrix's representations to AbbVie that the patients are uninsured for specialty drugs demonstrably false.

The evidence of Payer Matrix's duplicity could not be clearer.  To help patients access its important medicines regardless of their financial circumstances, AbbVie has two distinct financial assistance programs.  One is AbbVie's co-pay assistance program.  This co-pay assistance program is exclusively for patients who have insurance coverage for AbbVie medicines, as it helps patients offset the out-of-pocket co-payment that their insurance companies impose on them as part of that coverage.  Patients enrolling in this program must provide, among other things, details about their insurance coverage, so AbbVie can verify the co-payment amount that their insurance coverage requires to determine the appropriate amount of co-payment financial assistance to provide.  The other program is for patients who do not have insurance coverage for AbbVie medicines.  This program, AbbVie's PAP, provides a qualifying uninsured patient's prescribed AbbVie medication for free, since the patient lacks insurance coverage to help them pay for their prescription.  Obviously, these programs are mutually exclusive:  a given patient cannot, simultaneously, both *have* and *not have* insurance coverage for a prescribed AbbVie medication.  The only way a patient could contemporaneously apply for both the I-don't-have-insurance program and the I-do-have-insurance program is if someone were lying about their insurance status.  But that is exactly what Payer Matrix has been doing.

For example, on January 24, 2023, Payer Matrix submitted Patient A's application to AbbVie's PAP no-insurance program, asserting in the application that she lacked insurance coverage for AbbVie's drug Skyrizi. AbbVie denied Patient A's application on March 2, 2023. If Patient A truly had no insurance coverage for Skyrizi, then that would have been the end of it. But, instead, four days later, Payer Matrix utilized AbbVie's co-pay assistance program that is only for insured patients to assist in the insurance plan's purchase of a Skyrizi prescription refill for this patient. Payer Matrix was bluffing about Patient A not being insured to try to trick AbbVie into giving away Skyrizi for free, so the insurance provider would not have to pay for it and Payer Matrix would receive a cut of the savings. But, when push came to shove, Patient A's enrollment in the I-do-have-insurance co-pay assistance program proves that the patient had insurance coverage for AbbVie's drug all along, and Payer Matrix had been lying when it claimed she did not. And this is hardly an isolated instance. AbbVie has identified over 260 instances of Payer Matrix assisting the same patients in attempting to utilize both the insurance and no-insurance AbbVie financial assistance programs—which it could not do without being dishonest about these patients' insurance statuses. (Najjar Decl., Ex. 1.) In fact, Payer Matrix oftentimes does not wait for a PAP denial from AbbVie to utilize the program for insured patients. It routinely directs patients who have applied to AbbVie's PAP to apply to the co-pay assistance program while their PAP applications are pending if the patients need a refill on their prescription, ***thus representing the patients as insured and uninsured at the same time.*** (Hays Decl., Ex. 37) (Hays Decl., Ex. 29, p. 8.)

In January 2023, AbbVie attempted to put an end to Payer Matrix's fraudulent scheme. It did so by updating its PAP terms and conditions to explicitly exclude those patients whose insurance plans were enrolled in Payer Matrix's program. To enforce its new terms, AbbVie

investigated and denied admission to those patients it identified as being affiliated with Payer Matrix. Once Payer Matrix's leadership team learned that AbbVie was denying PAP applications that it submitted, they immediately began implementing methods to conceal Payer Matrix's continued involvement in the PAP application process. Payer Matrix's concealment strategies and actions are documented in numerous written communications produced in discovery and include:

- Payer Matrix leadership directing its employees to (1) hide Payer Matrix fax header information before they fax the PAP applications to AbbVie and (2) fax the application materials from third-party locations;

- Payer Matrix leadership directing its employees to stop including their names as contacts on the PAP applications (and they even used whiteout to remove their names from already completed applications);

- Payer Matrix leadership directing employees to coach patients to unknowingly make false statements to AbbVie to hide Payer Matrix's involvement;

- Payer Matrix leadership directing its employees to make false representations to the patients' doctors to manipulate them into submitting the application paperwork to AbbVie on behalf of Payer Matrix;

- Payer Matrix employees calling AbbVie's PAP phone line and impersonating the patients' doctors' staff members; and

- Payer Matrix's Chief Business Officer falsely representing to AbbVie in April 2023 that Payer Matrix had stopped "advocating" for Humira patients in January 2023, knowing fully well that Payer Matrix leadership had been plotting to get applications submitted through the date of his email and they had no plans to stop.

Not only do the extreme steps Payer Matrix takes to hide its involvement in the application submissions demonstrate that it knows what it is doing is wrong, but they also hinder AbbVie's ability to identify and exclude the Payer Matrix-affiliated applications.

When Payer Matrix was able to get an application approved through its concealment tactics in 2023, its leadership team celebrated what they perceived as a victory. For example, on March 27, 2023, Payer Matrix's Executive Vice President of Operations, Jennifer Hoefner, wrote the

4

following email after she and Payer Matrix's CEO, among others, were informed that Payer Matrix managed to get another AbbVie PAP application approved:



(Hays Decl., Ex. 57, Tab 10.) (emphasis added). This email demonstrates that not only did Payer Matrix continue to submit PAP applications through concealment tactics in 2023, but even after AbbVie sent the applicants a letter denying PAP admission due to suspected affiliation with Payer Matrix, Payer Matrix was unwilling to stop trying to circumvent AbbVie's eligibility terms.

Through Payer Matrix's recent document production and AbbVie's investigation, AbbVie has identified 573 PAP applications that Payer Matrix submitted or caused to be submitted to AbbVie's PAP *after* AbbVie had explicitly banned the participation of Payer Matrix-affiliated patients. (Bates Decl., ¶ 11, Ex. 3.) Many of these applications were identified by the PAP team's investigation, and AbbVie subsequently issued application denial letters to these patients explaining the basis for denial. However, AbbVie recently learned through Payer Matrix's document production that despite AbbVie's efforts to identify and deny Payer Matrix-affiliated applications, Payer Matrix has maneuvered at least 29 patients into AbbVie's PAP in 2023, including as late as June and July. (Hays Decl., Exs. 35, 45.) AbbVie's PAP has been forced to devote considerable resources to investigating each PAP application submission for potential fraud, which should not be a charitable program's primary or even secondary focus.

In addition to continuing to submit PAP applications to AbbVie through concealment, Payer Matrix has responded to AbbVie's ban by trying to convince patients' doctors to switch

patients from their currently prescribed AbbVie drug to an alternative medication manufactured by someone with a patient assistance program that Payer Matrix can continue to bilk. Payer Matrix does this by falsely representing to doctors that a patient no longer has coverage for the AbbVie drug. But Payer Matrix fails to tell these doctors that ***their patient's health insurance plans <u>will</u> <u>pay for</u> the AbbVie drugs*** if the doctors or patients decline to switch their medications. Payer Matrix's process of keeping these patients in limbo while it tries to secure a new path to its undeserved fees has created chaos for these patients, including medicine delays, adverse health consequences, confusion, and severe stress. (Bates Decl., ¶ 16, Ex. 4.)

Payer Matrix is the antithesis of a patient advocacy organization, acting against the interests of patients and trivializing the harm its scheme causes them. Patients are merely a means to a profitable end. Payer Matrix erects barriers to patients' drug access unbeknownst to them (at least initially) and then pretends to help them deal with the barriers that it created, as it works tirelessly to defraud AbbVie's and other pharmaceutical manufacturers' patient assistance programs. Patients eventually see the truth, as patient statements from Payer Matrix's own records reveal:



(Bates Decl., ¶ 16, Ex. 4, rows 12, 14, 15, 24.)  From records produced by Payer Matrix, AbbVie has compiled over 150 similar statements from patients subjected to Payer Matrix's program, a summary of which is attached as an exhibit to this memorandum.  (*Id.*, ¶ 16, Ex. 4.)  Without this Court's intervention, Payer Matrix has made clear it will continue defrauding AbbVie's PAP and making false statements about AbbVie to conceal its scheme.  For the safety of patients, the sustainability of AbbVie's PAP, and the protection of AbbVie's reputation and goodwill, Payer Matrix should be restricted from further misconduct during the pendency of this litigation.

Payer Matrix's response to AbbVie's ban continues to cause substantial damage to AbbVie's reputation and goodwill.  To hide the truth about its scheme from its clients, patients, and doctors, Payer Matrix has engaged in a deliberate and coordinated smear campaign against AbbVie, (*see, e.g.*, *id.*, ¶ 18, Ex. 6) (Hays Decl., Ex. 54), dishonestly flipping the narrative such that AbbVie is the barrier to these patients' medicines and Payer Matrix is the "patient advocacy" program trying to help the patients get the medicines that AbbVie is unfairly withholding.  Payer Matrix's leadership and staff falsely have claimed that AbbVie has eliminated its PAP program entirely, that AbbVie has reduced PAP coverage out of greed and in response to Humira biosimilars coming into the market, and that AbbVie's PAP will no longer work with any patient advocacy groups, doctor's offices, or any other third party.  (*See, e.g.*, *id.*.)  Payer Matrix's self-serving false statements are particularly galling in light of the fact that AbbVie has done nothing more than try to ***protect*** its charitable free drug program from fraudsters like Payer Matrix.

AbbVie has no adequate remedy at law because Payer Matrix has proven through its utter disregard of AbbVie's PAP eligibility requirements and its unabashed concealment efforts that if left to its own devices, it will continue to exploit AbbVie's PAP and tarnish AbbVie's reputation

and goodwill through false statements. The conduct of Payer Matrix's leadership team to date has shown that they cannot be trusted to self-enforce compliance with AbbVie's PAP eligibility terms or the law. The risks are heightened by the fact that every time Payer Matrix solicits a new employer client, that prospective client is likely to have patients on its health insurance plan who are currently taking AbbVie's drugs. As a result, Payer Matrix will continue to have strong incentives to make false statements about AbbVie's drugs and its PAP to conceal its scheme and convince its clients to support switching the patients to another drug or, if that is not an option for a particular patient, assist the patient from the shadows in applying for AbbVie's PAP.

Payer Matrix's conduct during the course of this lawsuit also demonstrates its continued disregard for AbbVie's PAP eligibility requirements. Payer Matrix has coordinated the submission of PAP application materials to AbbVie and even got some approved after AbbVie filed the Complaint. (Hays Decl., Exs. 35, 45.) Moreover, Payer Matrix represented to this Court on July 7, 2023, that it "has not submitted a single PAP application since April 12, 2023." (Dkt. 57, at 1, 6.) There is irrefutable evidence that this representation was false. Since April 12, 2023, Payer Matrix has submitted PAP application materials for multiple patients, both directly to AbbVie and indirectly through the patients and their doctors, and Payer Matrix's involvement is documented in its files that have been produced in this case. (Hays Decl., Exs. 45, 66.) Furthermore, the evidence demonstrates that for some of these *direct* submissions of application materials to AbbVie, they were submitted by a Payer Matrix employee shortly after she made calls to AbbVie impersonating the applicants' health care providers. (*Id.*, Ex. 56, Tabs 2.E, 3.E, 5.E, 5.F, 7.C.).

AbbVie seeks a preliminary injunction to stop Payer Matrix's misconduct before it causes further irreparable harm to AbbVie's PAP and its reputation and goodwill. The prerequisites for a preliminary injunction are easily satisfied here. AbbVie is highly likely to succeed on the merits

of its claims for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act and for tortious interference with business opportunity. AbbVie will suffer irreparable harm absent an injunction, including irreparable harm to AbbVie's reputation and goodwill and harm to its PAP. The balance of equities overwhelmingly favors AbbVie because the requested injunctive relief requires nothing more than for Payer Matrix to stop its illegal conduct and false statements as they pertain to AbbVie. Finally, the public interest weighs heavily in favor of an injunction. Payer Matrix's scheme preys on free drug programs intended for uninsured and underinsured patients with serious medical conditions,[1] thus putting the sustainability of the programs at risk. The patients themselves are subjected to unnecessary burden, stress, medicine delays, and health risks after being forced into its program. Yet, Payer Matrix holds itself out as an "advocate" for patients. It should not be allowed to continue this charade.

The preliminary injunctive relief AbbVie seeks is crucial but also narrowly tailored to ensure Payer Matrix's compliance with AbbVie's PAP terms and to protect the continued viability, reputation, and goodwill of AbbVie's PAP. The requested injunctive relief also would ensure Payer Matrix does not mislead patients about their insurance coverage benefits or their treatment options. Payer Matrix has represented to AbbVie and this Court that it has stopped its involvement with AbbVie's PAP. AbbVie merely requests that its representations be judicially enforced in light of the inconsistency between Payer Matrix's words and actions to date. Accordingly, this Court should grant AbbVie's motion and enter a preliminary injunction against Payer Matrix.

---

[1] The scope of Payer Matrix's scheme is staggering. Payer Matrix targets at least 11 of the largest pharmaceutical manufacturers' patient assistance programs and over ***300*** specialty drugs. On just ***one*** of AbbVie's drugs alone, it is estimated that Payer Matrix received at least $18 million dollars in fraudulent proceeds between 2021 and 2023 due to the hundreds of ineligible, commercially insured patients that Payer Matrix got into AbbVie's PAP. (Bates Decl., ¶ 21.)

## II.     STATEMENT OF FACTS[2]

### A.     AbbVie's Drugs and Patient Assistance Program

AbbVie's drugs include SKYRIZI® ("Skyrizi"), RINVOQ® ("Rinvoq"), and HUMIRA® ("Humira").  These drugs treat serious, life-altering diseases.  Skyrizi is FDA-approved to treat a number of conditions, including active psoriatic arthritis and moderate to severe plaque psoriasis. Rinvoq is FDA-approved to treat a range of immune-mediated inflammatory diseases, including rheumatoid arthritis, active psoriatic arthritis, ulcerative colitis, and atopic dermatitis, among other conditions.  Humira is the first fully human antibody ever approved by the FDA that treats a variety of diseases and patient populations.  (Najjar Decl., ¶ 5.)

To ensure these drugs are available to all appropriate patients irrespective of financial ability, AbbVie provides the drugs for free, with no co-payments, deductibles, or shipping costs, to qualifying uninsured and underinsured[3] patients through its PAP, which is called myAbbVie Assist.  (*Id.*, ¶ 7.)  To qualify, patients must reside in the United States and have a prescription from a licensed U.S. healthcare provider, limited or no health insurance coverage, and a household income under the caps set forth in AbbVie's eligibility requirements.  (*Id.*, ¶ 8.)  AbbVie's PAP applications and the myAbbVie Assist website prominently disclose these patient eligibility requirements.  (*Id.*, ¶ 11.)  Over 116,000 patients are enrolled in AbbVie's PAP.  (*Id.*, ¶ 12.)

---

[2] The facts relevant to this motion are set forth in the declarations and supporting exhibits of Heather Bates, Dr. Philip Cohen, Craig Garthwaite, Valarie Hays, Anne Najjar, and Dr. Michael Pick, along with AbbVie's Complaint.  (Dkt. 1, Compl.)

[3] Patients are "underinsured" when they have commercial health insurance coverage but no coverage for their prescribed specialty drug or they have some level of coverage for the drug but their out-of-pocket costs are unaffordable.  Patients are "uninsured" when they have no coverage.  To increase its chances of enrolling ineligible patients into AbbVie's PAP and other manufacturers' patient assistance programs, Payer Matrix's scheme intentionally blurs the lines, sometimes claiming its clients' members have insurance but not for the their prescribed drugs and sometimes claiming the members do have insurance for the drug but the plan has set the members' "co-pay" or "co-insurance" at 100% of the drug cost.

**B.       Payer Matrix's Fraudulent Scheme to Enrich Itself Using AbbVie's PAP**

Payer Matrix's business involves defrauding AbbVie's PAP and other pharmaceutical manufacturers' patient assistance programs for Payer Matrix's own financial gain.  Payer Matrix's scheme involves five main steps:

1.       Step One:  Misleading Representations to Prospective Clients

Payer Matrix's clients are employers and plan sponsors who provide health insurance (also referred to collectively as "clients") to employees (also referred to as "members" or "patients"). Payer Matrix markets itself to prospective clients as providing "alternate funding" services (meaning an alternate way to fund the cost of specialty medicines other than the plans covering the product consistent with the employee's insurance benefits).  (Hays Decl., Ex. 2, pp. 7, 10; Ex. 3, p. 21; Ex. 8.)

Payer Matrix advertises that it obtains alternate funding through patient assistance programs, co-pay assistance, foundations, and grants.  (*Id.*, Ex. 1, p. 1, lines 20-22; Ex. 8.)  Despite its advertisements, Jennifer Hoefner, Payer Matrix's Executive Vice President of Operations and corporate representative in this matter, testified during her deposition that she is not aware of Payer Matrix receiving any grant support.  (Hoefner Tr. 446:10-24.)  Hoefner could only think of one specific foundation with which Payer Matrix purportedly had worked, namely the PAN Foundation, (*id.* at 445:11-20), but the PAN Foundation recently sent a letter to Payer Matrix indicating that it did not support Payer Matrix's program. (Hays Decl., Ex. 69.)  Payer Matrix's Chief Business Officer Michael Jordan acknowledged during a June 2020 presentation to prospective clients that Payer Matrix is "primarily tapping into" manufacturer patient assistance programs.  (*Id.*, Ex. 3, p. 23, lines 16-17.)

Payer Matrix advertises that it "dramatically reduces costs" of specialty drugs for its clients (*Id.*, Ex. 1, p. 1, line 14 & p. 2, line 7; Ex. 2, p. 6) and that it will use "performance-based pricing,"

11

meaning employers will not pay any fees unless Payer Matrix saves them money on health insurance costs. (*Id.*, Ex. 1, p. 2, lines 3-5.) Payer Matrix even provides potential cost savings reports to its prospective clients that show how much they are expected to save on specialty drug coverage if they join Payer Matrix's program. Specifically, the report calculates the amount the prospective client's plan paid over the previous 12 months for its members' specialty drugs and estimates that if the client joins the Payer Matrix program, it will only have to pay 30% of that amount. (*Id.*, Ex. 24.) Payer Matrix takes this full 30% as "cost-avoidance fees" since it fraudulently obtains the drugs for free from manufacturer patient assistance programs like AbbVie's PAP. Although Payer Matrix promises its clients substantial savings, it fails to tell its clients material information about these savings, including that the central feature of its program involves enrolling its clients' members into manufacturers' patient assistance programs ***that were not intended for them and for which they are ineligible***. Payer Matrix also does not tell its clients that they are paying Payer Matrix substantial sums of money to simply complete an online application for these members that the members could do on their own, if they are truly eligible. Payer Matrix also fails to disclose that its program adversely affects members by subjecting them to an unnecessarily burdensome process and creating the risk of medicine delays.

Payer Matrix's scheme also utilizes numerous misrepresentations to try to convince prospective clients that pharmaceutical manufacturers support its too-good-to-be-true program. For example, Payer Matrix representatives have made the following statements:

- Payer Matrix "***partners***" with AbbVie and other drug manufacturers. (Najjar Decl., ¶¶ 54-56, Exs. 15-16; Hays Decl., Ex. 54, Tab 8.) (emphasis added);

- "[W]hat these big pharma organizations are doing is they're allowing access on both sides, but frankly, a lot of people don't know how to get access to the side that's significantly reduced in cost, and they do it for a variety of reasons, which I'll get into, but the bottom line is we're a model that's actually helping plans tap into these

programs, which are ***overfunded and underutilized***." (Hays Decl., Ex. 3, p. 22, lines 6-11.) (emphasis added);

- When Payer Matrix utilizes patient assistance programs, manufacturers are able to take a "tax deduction" so ***they still "win from a financial standpoint***." (*Id.*, Ex. 3, p. 35, lines 1-12.) (emphasis added);

- When Payer Matrix utilizes patient assistance programs, it makes manufacturers, including AbbVie, "***better off*** . . . long term" because Payer Matrix "expand[s] the net of [patients] who they're getting onto these particular drugs." (*Id.*, Ex. 3, p. 35, lines 12-17.) (emphasis added);

- AbbVie's PAP is for patients who "either don't have access, have limited access, or ***plans that put in a management process to help in that. We can offer that***." (*Id.*, Ex. 3, p. 35, lines 5-8.) (emphasis added);

- Employers can "go through a company [like Payer Matrix] that can assist with the cost of the specialty drug and then ***work directly with the manufacturers*** who offer these programs." (*Id.*, Ex. 7, p. 8, lines 16-20.) (emphasis added).

All of these statements are demonstrably false. AbbVie has never partnered or worked with Payer Matrix, nor does it benefit from Payer Matrix's fraud.

2.  Step Two:  Payer Matrix Implements Carve Out of Specialty Drugs and Override Process for New Clients

*a.  Purpose of Carve Out and Override*

To its clients and prospective clients, Payer Matrix refers to itself as a "specialty carve-out," meaning that when employers join its program, Payer Matrix will "carve out" or exclude specialty drug coverage from the health insurance plans they offer to their employees. (Hays Decl., Ex. 3, p. 22, lines 13-15; Ex. 5, p. 21; Ex. 6; Ex. 7, p. 9, line 25 & p. 10, lines 1-3 & p. 12, lines 13-18.)  Payer Matrix uses this purported exclusion as the basis for representing its clients' employees as uninsured for specialty drugs to AbbVie's and other pharmaceutical manufacturers' free-drug programs.  The rub is that these employers have no intention of truly excluding specialty drugs from their plan coverage or telling their premium-paying employees that their drugs are no longer covered—and Payer Matrix knows this.  Payer Matrix's scheme provides a way for its

13

clients to have their cake and eat it too with its "override" process. (*See, e.g.*, *id.*, Ex. 25.) Payer Matrix assures its clients that if Payer Matrix cannot get certain employees into a free-drug program (*e.g.*, the employee's household income is too high to qualify), it will "override" the "exclusion" and the plans will continue to pay for the drugs. This enables Payer Matrix and its clients to continue to guarantee the employees coverage for specialty drugs while typically getting the drugs for free from AbbVie and the other drug manufacturers. (Hoefner Tr. 164:6-165: 8.) As one of Payer Matrix's clients recently acknowledged, its plan would have continued to pay for its members' specialty drugs ███████████████████████ (Hays Decl., Ex. 46.) Indeed, when AbbVie began denying Payer-Matrix affiliated patients enrollment in the PAP in 2023, Payer Matrix issued overrides to at least 468 of the patients that Payer Matrix attempted to get admitted into AbbVie's PAP in 2023.[4] (Bates Decl., ¶ 11, Ex. 3.) For these patients, the plans went back to paying for the drugs like they had done prior to joining Payer Matrix's program.[5]

### b. Required Implementation of Carve-Out and Override

Payer Matrix presents the specialty drug "exclusion" and the override process to clients as "requirements" of Payer Matrix's program. (Hays Decl., Ex. 25, p. PMX-532-33.) As part of the program implementation, Payer Matrix directs its clients to modify their health insurance

---

[4] Out of the 573 patients that Payer Matrix attempted to enroll in the PAP in 2023, 468 of them received an override once they were denied admission. Out of the remaining 105 patients, 22 were admitted into AbbVie's PAP due to Payer Matrix's concealment tactics, 14 applied for co-pay assistance at Payer Matrix's direction through AbbVie's co-pay program for patients with commercial insurance, and 16 were switched to an alternate drug at Payer Matrix's initiation. (Bates Decl., ¶ 11, Ex. 3.) For the remaining 53 patients, they either changed employers or insurance, refused to work with Payer Matrix, or for 16 of them, there are no records of Payer Matrix's communication with them since early 2023.

[5] Prior to AbbVie updating its terms in 2023 to exclude Payer Matrix-affiliated applicants, the primary circumstance that led to Payer Matrix utilizing an override was when a member's household income was too high to qualify for the PAP. The override also was used when plan members refused to cooperate with Payer Matrix. (Hoefner Tr. 89:9-90:2; 227:19-228:9.) Once AbbVie began rejecting Payer Matrix-affiliated PAP applications in 2023, Payer Matrix's use of overrides escalated.

Summary Plan Descriptions ("SPDs") to reflect the specialty drug exclusion and the override process. (*Id.*) (stating ██████████████████████████████████████████ ██████████████████████████████████) (*See also id.*, Ex. 44) (stating ████████████ ██████████████████████████) Payer Matrix provides clients with templates to use for the exclusion and override language (*see id.*, Ex. 27, p. PMX-792-93), and on some occasions they even make the edits themselves on their clients' plan documents. (*Id.*, Ex. 26, p. PMX-619.) Payer Matrix's clients' SPDs commonly contain language consistent with the template and inform members that their specialty drugs will continue to be covered by the plan if Payer Matrix is unable to obtain alternate funding. (*Id.*, Ex. 3, p. 28, lines 6-15, p. 30, lines 4-7; Exs. 8-15.) Payer Matrix's client brochures and other marketing materials include similar language:



**KEY POINTS TO OUR PROGRAM:**
- Plan participants (if eligible) will have a zero-copay
- If NOT eligible, it will be paid through the Plan, based on Plan Benefits with a zero copay as well
- The drug list covers approximately 340 drugs for various chronic health conditions
- Our program leverages extensive, often unused funds made available by Pharma Manufacturers
- Payer Matrix will help the participant complete the necessary paperwork

(*Id.*, Ex. 15) (*see also id.*, Ex. 8) (████████████████████████████████████████ ██████████████████████████████████████) (*Id.*, Ex. 2, p. 10.) ("If denied, override placed so member will receive medication without disruption.").

Michael Jordan also made it clear that the "override" is a standard feature of Payer Matrix's program. He stated in the June 2020 presentation that Payer Matrix directs its partner Pharmacy

Benefit Managers ("PBMs") to provide the specialty drugs to patients on its clients' plans *if* they

are ineligible for the PAP. Specifically, he said:

> With Humira, a household of four making more than $150,000 or $160,000 a year
> is not going to be eligible for patient assistance. That's kind of their income cutoff
> based on that family unit. We'll appeal it, but ultimately, if it's upheld, this is where
> the interaction with the PBM, your current PBM, is so important, because now we
> go back to the PBM and say, "Michael Jordan wasn't eligible for Humira. ***You
> need to dispense that drug.***" So, now, when the PBM dispenses the drug, you're
> getting the rebate again, but you're also obviously spending more money, because
> it's going through the traditional system.

(*Id.*, Ex. 3, p. 28, lines 6-15.) (emphasis added). Jordan also stated during this presentation that if

the prospective clients join the Payer Matrix program, their plan descriptions should explain the

following to the patients on their plans: "If Payer Matrix contacts you, goes through the process

with you, ***and you are ineligible, then you'll receive that drug at the current copay or whatever

the plan, you know, doc[ument] speaks to***." (*Id.*, Ex. 3, p. 30, lines 4-7.) (emphasis added).

Payer Matrix also trains its employees on the override process. (*Id.*, Ex. 29.) The training

presentation defines ██████████████ as ████████████████████████████████

████████████████████ (*Id.*, Ex. 29, p. 8.) The training presentation defined ████████

████████ as follows:

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

(*Id.*, Ex. 29, p. 9.) Hoefner conceded during her deposition that ████████ of Payer Matrix's clients

sign up for the ████████ process during program implementation. (Hoefner Tr. 81:4-9.)

Tellingly, Payer Matrix's Lead Claims Specialist referred to the rare situations where a client does not allow overrides as ███████████ (Hays Decl., Ex. 60, PMX-965-66.)

      3.    <u>Step Three: Payer Matrix Coerces Specialty Drug Patients to Join Its Program and Misleads Them About the Value and Purpose of the Program</u>

For the third step, Payer Matrix directs its clients to inform their employees that they are required to join the Payer Matrix program or else they will have to pay the full cost of their medicines from their own pockets. In Jordan's June 2020 presentation, he described the language Payer Matrix would be "making sure" its clients included in their SPDs. (Hays Decl., Ex. 3, p. 29, lines 21-24.) He said, "The last bucket, and this is very important, if as an employee, you refuse to engage with Payer Matrix, you'll be subject to 100% of the cost of the drug . . . we're asking the employer to make this a, you know, a management program that they must follow." (*Id.*, Ex. 3, p. 30, lines 7-13.) Consistent with Payer Matrix's directive, its clients' benefit plans typically include similar language stating that participation is ███████ or ███████ or that if members do not participate they will be responsible for the full cost of their drugs. (*Id.*, Exs. 10-14, 16-19, 21.) Furthermore, Payer Matrix's introductory letter to its clients' members states, ███████

███████████████████████████████████████████

███████████████ (*Id.*, Ex. 25, p. PMX-528.)

Payer Matrix also misleads its clients' members into believing that they receive value from the Payer Matrix program, including a material reduction in their co-pays and other out-of-pocket expenses. (*Id.*, Ex. 1, p. 1, line 14.) Payer Matrix fails to tell the members upfront, however, that they can apply for co-pay assistance on their own at no cost through AbbVie's separate co-pay assistance program that it offers to patients who have commercial insurance for their prescribed medicine. (*See* Najjar Decl., ¶¶ 14-17.)

17

Payer Matrix falsely advertises its program, including on its website, as causing no disruption to patients (Hays Decl., Ex. 22), when in fact it causes burdensome procedures, confusion, concern about potential medicine delays, and sometimes actual delays, with respect to the patients' receipt of their medicines. (*Id.*, Ex. 5) (Najjar Decl., ¶¶ 39-42, 52-53.) Payer Matrix also advertises that its program does not require patients to change medicine brands or dosing, (Hays Decl., Ex. 22), when in fact Payer Matrix has gone to great lengths in 2023 to force its clients' members and their doctors to switch medications if the members are denied admission into AbbVie's PAP, as detailed below. (Najjar Decl., ¶¶ 43-51) (Bates Decl., ¶ 19, Ex. 7.) Additionally, Payer Matrix fails to inform members that they are ineligible for AbbVie's PAP, and as of 2023, are explicitly banned due to their plans' enrollment in Payer Matrix's program. (Najjar Decl., ¶¶ 42, 49-50.) In fact, Payer Matrix oftentimes fails to provide its clients' members with the page of the PAP application that contains the Patient Terms of Participation. (Hays Decl., Ex. 68.) Accordingly, Payer Matrix is causing its clients' members to violate AbbVie's terms without the members' knowledge or consent. (*See* Najjar Decl., ¶¶ 24-25.)

4. Step Four: Payer Matrix Requires Patients to Apply to AbbVie's PAP Even Though They Are Ineligible

Once its clients' members are coerced into engaging with Payer Matrix, the PAP application process begins. Payer Matrix requires patients to go through a more burdensome process to receive their medicines. (*See, e.g.*, Hays Decl., Ex. 5, p. 21; Ex. 31, pp. 56-72.) They are required to communicate with Payer Matrix representatives and provide them with financial and health insurance information and documentation, which Payer Matrix uses to prepare their applications for enrollment into AbbVie's PAP—steps these *insured* patients would not have had to take but for Payer Matrix's scheme. (*Id.*) (*see* Najjar Decl., ¶ 22, Exs. 2(b), 2(c).) This process also can lead to medicine delays, resulting in potential adverse health consequences for the

18

patients. (Cohen Decl., ¶¶ 16-17) (Najjar Decl., ¶ 52.) Furthermore, Payer Matrix representatives do not tell patients during the application preparation process that they are ineligible for AbbVie's PAP. (Najjar Decl., ¶¶ 42, 49-50.)

Once the paperwork is complete, Payer Matrix submits or causes the submission of the patients' PAP applications to AbbVie, along with benefit letters that falsely and deceptively state that the patient's specialty drug ████████████████████████████████ and that the ████████████████████████████████ (Hays Decl., Ex. 27, p. PMX-787.)[6] Payer Matrix submits these letters to AbbVie knowing that the patient's health insurance plan will continue to cover the drug if the patient is not admitted into AbbVie's PAP, contrary to what is represented in the letter. Payer Matrix does not provide the members with a copy of the benefit letter. (Hoefner Tr. 214:15-215:13.) Payer Matrix also assures the patients that they will continue to have specialty drug coverage if Payer Matrix cannot secure alternate funding. (*see e.g.,* Hays Decl., Exs. 8, 31, 53.)

5.    Step Five:  Payer Matrix Charges Clients Thousands of Dollars in "Cost Avoidance Fees"

Payer Matrix charges its clients a "cost avoidance fee" for each specialty drug distribution that their members receive from AbbVie. Payer Matrix typically calculates the amount to charge its clients as 25-30% of the "savings" generated. (Hays Decl., Ex. 2, p. 12; Ex. 3, p. 23, lines 22-23;  Ex. 41, p. PMX-988) (Hoefner Tr. 451:7-16.) Since the clients were properly paying for the drugs before retaining Payer Matrix and now are getting the drugs for free due to Payer Matrix's

---

[6] Payer Matrix refers to these letters internally and with their clients as "Benefit Clarification Letters" or "BCLs." Payer Matrix provides a copy of the BCL letter template to clients at the time of program implementation. (Hays Decl., Ex. 25.) (Hoefner Tr. 209:18-210:5.) Payer Matrix also trains its employees on how to request the letters from Payer Matrix's management team or the PBM as part of the process of collecting the application materials for submission to AbbVie's PAP. (Hays Decl., Ex. 31, p. 66.) (Hoefner Tr. 213:17-24.) Once the letter is prepared, Payer Matrix submits the letter to AbbVie's PAP. (Hoefner Tr. 214:15-215:1) (Hays Decl., Ex. 33.)

scheme, Payer Matrix is, in effect, charging their clients a portion of the funds that Payer Matrix has improperly diverted from AbbVie.

### C.     The Scope of Payer Matrix's Fraudulent Scheme Against AbbVie in 2021 and 2022

AbbVie's investigation and Payer Matrix's document production to date has identified over 1,104 PAP applications that Payer Matrix submitted to AbbVie between 2021 and 2022 requesting the free provision of Skyrizi, Rinvoq, and Humira to patients who were, in fact, commercially insured for these drugs and ineligible for the PAP.  (Bates Decl., ¶ 15 n.6.)  AbbVie enrolled these patients in the PAP due to Payer Matrix's false representations about the patients' lack of insurance coverage for specialty drugs.  (Najjar Decl., ¶ 23.)

### D.     AbbVie's Explicit Ban on Patients Who Were Members of Payer Matrix's Program Beginning in January 2023

On January 2, 2023, AbbVie updated its PAP eligibility requirements on the myAbbVie Assist website to explicitly exclude those patients whose plans were part of Payer Matrix's program in an effort to stop Payer Matrix's fraud on AbbVie's PAP.  (Najjar Decl., ¶ 24.) (Najjar Tr. 153:18-23, 162:17-22.)  On January 30, 2023, AbbVie made similar updates to its Patient Terms of Participation in its PAP applications and even explicitly identified Payer Matrix by name. (Najjar Decl., ¶ 25, Ex. 3.)  The updated terms state that patients who are members of plans participating in Payer Matrix's program are ineligible for the PAP.  (*Id.*)  The updated applications also require applicants to answer a question regarding whether their employers, insurers, or other third parties directed them to apply to the PAP.  (*Id.*)

### E.     Payer Matrix's Continued Fraud on AbbVie's PAP in 2023

Since AbbVie banned Payer Matrix from participating in the PAP, AbbVie has identified 573 attempts by Payer Matrix in 2023 to continue to enroll ineligible patients into the PAP.  (Bates Decl., ¶ 11, Ex. 3.)  Furthermore, Payer Matrix's recent document productions have revealed that

despite AbbVie's substantial investment of resources into investigating PAP applications for Payer Matrix involvement, Payer Matrix was able to get approximately 29 patients into AbbVie's PAP in 2023. (Hays Decl., Exs. 35, 35(a).)  Payer Matrix has even continued to cause the submission of applications after this lawsuit was filed.  (*Id.*, Exs. 45, 66.)

F.      **Payer Matrix's Acts of Concealment**

Payer Matrix learned of AbbVie's updated PAP eligibility terms on or about January 4, 2023.  (Hays Decl., Ex. 65, response to interrogatory no. 5.)  By January 5, 2023, Payer Matrix's leadership already was conspiring about how to conceal its continued submission of PAP applications to AbbVie.  The following email excerpts referencing AbbVie's PAP provide a sample of the voluminous concealment evidence that Payer Matrix has produced to date:



- 1/5/23:  Executive VP Hoefner wrote, ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ (Hays Decl., Ex. 57, Tab 1);

- 1/12/23:  Chief Business Officer Jordan wrote (after being notified of more AbbVie PAP application denials), ████████████████ ████████████ (*Id.*, Ex. 62);

- 1/12/23:  Director of Pharmacy Benefits Joseph Szurgyjlo wrote, ████████ ████████████████████████████████ (*Id.*, Ex. 62);

- 1/18/23:  Jordan wrote, ████████████████████ ████████████████████████ ████████ (*Id.*, Ex. 57, Tab 13);

- 1/19/23:  Szurgyjlo wrote, ████████████████████ ████████████ (*Id.*, Ex. 57, Tab 11);

- 1/22/23:  Jordan wrote, ████████████████ ████████ ████████████████ ████████████████████████████ ████████████████████████ (*Id.*, Ex. 57, Tab 15);

- 1/23/23: Care Coordinator wrote, ██████████████████████████
  ████████████████████████████████████████████████████████████
  ████████ █ ██████████████████████ (*Id.*, Ex. 57, Tab 2, p. PMX-567);

- 1/30/23: In an exchange with the client Jordan wrote, ████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████ (*Id.*, Ex. 57, Tab 12);

- 2/1/23: Care Coordinator wrote, ████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████ (*Id.*, Ex. 57, Tab 4, p. PMX-379);

- 2/1/23: Care Coordinator Manager wrote, ██████████████████████████
  ████████████████ ██████████████████████████████
  ████████████████████████[7] (*Id.*, Tab 4, p. PMX-378);

- At least five Care Coordinators used whiteout to block their names on PAP applications that had already been completed. (*Id.*, Ex. 55);[8]



- 2/3/23: Regional Operations Manager John Camacho wrote, ████████████
  ████████████████████████████ ████████████████████████
  ████████████████████████ (*Id.*, Ex. 63);

- 2/3/23: Lead Clinical Care Coordinator circulated an AbbVie "tip sheet" for employees stating in part that any PAP applications for Humira, Rinvoq, and

---

[7] Affordable Scripts has a shareholder in common with Payer Matrix. (Hoefner Tr. 340:7-342:1.) When asked to confirm what was obvious from the documents, namely that Payer Matrix was sending applications from Affordable Scripts' fax machine to conceal Payer Matrix's involvement in the PAP application submissions, Hoefner testified, ████████████████████████████████████████████████████
████████████████████ (*Id.* 354:12-21.) Payer Matrix also utilized Affordable Scripts for its clients' members prescription refills using AbbVie's co-pay assistance cards. (Hays Decl., Ex. 36.)

[8] Although this was a designated deposition topic for Hoefner, she did not do anything to investigate this practice, claimed it was not a directive from leadership, and had no explanation for how multiple employees ended up utilizing this tactic. (Hoefner Tr. 333:18-336:15.)

Skyrizi that Payer Matrix prepared had to be submitted to AbbVie by the patient or the patient's HCP. (*Id.*, Ex. 57, Tab 8, p. PMX-259);

- 2/14/23: Email to Payer Matrix's CEO, Jason Cofone, stating in part, ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ (*Id.*, Ex. 57, Tab 9);

- 3/27/23: After being notified that Payer Matrix got a PAP application approved by AbbVie, Hoefner wrote, ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ (*Id.*, Ex. 57, Tab 10);

- 4/18/23: Care Coordinator wrote, ██████████ ██████████████████ ████████████████████████████████████████████████████████████ ██████████████ (*Id.*, Ex. 57, Tab 6, PMX-899);

- 5/1/23: Care Coordinator Manager wrote, ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ (*Id.*, Ex. 57, Tab 7.)

In addition to the concealment tactics described above, at least two Payer Matrix employees called AbbVie's PAP team pretending that they were calling from the PAP applicants' doctors' offices in order to get the status on the applications. These calls were recorded. (Hays Decl., Ex. 56.) One of these employees, a Regional Care Coordinator ("RCC") Manager, impersonated staff members from at least five different doctor's offices, using a different name each time. (*Id.*)[9]

---

[9] Even though this was a designated Rule 30(b)(6) topic for Payer Matrix, Hoefner testified that she did nothing more to inquire into this practice other than to ask the RCC Manager whether the allegations of her impersonating HCPs were true. (Hoefner Tr. 366:1-367:21.) According to Hoefner, the RCC Manager claimed that she accurately represented who she was in the calls to AbbVie. (*Id.* 368:1-5.) Despite the undisputable evidence to the contrary that AbbVie has produced to Payer Matrix, Hoefner did nothing further to investigate the practice or the employee's representations. (*Id.* at 367:3-17.)

Payer Matrix also made false statements directly to AbbVie in an attempt to conceal its continuing fraud. On April 12, 2023, Jordan wrote an email to AbbVie employees claiming that Payer Matrix had stopped ██████████ for Humira patients as of January 2023. (Hays Decl., Ex. 54, Tab 12.) Hoefner admitted during her deposition that this was an inaccurate representation and claimed that Jordan ██████████ (Hoefner Tr. 370:10-371:10.)

### G.     Payer Matrix's "High Powered Offensive Strategy" Against AbbVie

On February 6, 2023, Jordan developed a written plan in response to AbbVie's updated PAP terms and emailed the plan to Payer Matrix's leadership team, including CEO Jason Cofone. (Hays Decl., Ex. 30.) The subject of the email was ████████████████ Jordan stated that the plan was ████████████████ He directed that this written plan should not be shared with others without first notifying him. The plan included several steps.

First, patients would be directed to call AbbVie and say that their employer ██████████ ████████████████ Jordan knew this was a false statement and that he was directing the patients to lie. In fact, a few lines down in the same email he wrote, ████████████████

Second, Payer Matrix would send brokers and consultants, who refer clients to Payer Matrix, a New York Times article about AbbVie, on unrelated topics, ██████████ ████████████ This idea formed on or around January 28, 2023, when Jordan sent CEO Cofone an email attaching the article and stated in part, ██████████ ████████████████ ██████████ (Bates Decl., ¶ 18, Ex. 6, row 1.) Jordan then proceeded to send the article to numerous clients, brokers and consultants with cover emails that made false statements about AbbVie, including that AbbVie restricted its PAP coverage out of greed and in response to biosimilars coming into the market and that AbbVie's PAP will no longer work with any patient

advocacy groups, doctor's offices, or any other third party. (*Id.*) Jordan's motive was clear. He did not want Payer Matrix's scheme to be revealed so he needed false excuses for why AbbVie was taking action to restrict access to Payer Matrix-affiliated patients.

The third step in Payer Matrix's response strategy was that it would tell brokers and consultants that plan sponsors who work with Payer Matrix ███████████████████████



(Hays Decl., Ex. 30.) (emphasis added). All of Jordan's options included an assumption that the plan would ultimately pay for their members' specialty drug costs after all other options had been exhausted. This is because both Payer Matrix and the plan sponsors understood that the patients were guaranteed coverage.

---

[10] Payer Matrix's practice of maxing out AbbVie's co-pay cards to cover the full cost of a prescription fill before the patients' plans began to pay for the drugs was another fraud on AbbVie. The cards were intended to cover commercially insured patients' co-pays on their specialty drugs for a year, not provide a financial benefit for the plans or a way for the plans to avoid paying for the drugs. This practice also was harmful to the patients, who were left with a depleted card. Payer Matrix also arranged it such that the patients did not get credit on their annual deductibles when Payer Matrix used their co-pay funds. (Hays Decl., Ex. 28, p. PMX-279, ¶ 9(b)) ████████████████████████████████████

[11] This refers to switching the patient's AbbVie drug to one that has an available manufacturer patient assistance program.

Jordan's reference to ███████████████████ demonstrates that Payer Matrix had no plans to stop submitting PAP applications to AbbVie.  Hoefner admitted that the plan at this time was to submit PAP applications indirectly through the patients and their doctors. (Hoefner Tr. 162:13-164:2)  However, she later claimed that Payer Matrix only asked doctors to submit the PAP applications ████████████████████████ before February 3.  (*Id.* 283:18-284:6; 323:5-324:24.)  This testimony is contradicted by Payer Matrix's AbbVie "tip sheet" for employees (Hays Decl., Ex. 57, Tab 8, p. PMX-259) and records that demonstrate that Payer Matrix sent Welcome packages and PAP application initiation letters to at least 87 AbbVie drug patients between February 4, 2023 and June 29, 2023.  (Bates Decl., ¶ 20, Ex. 8.)

### H.    Payer Matrix's Drug Switching Strategy and Its False Representations to Doctors and Patients About AbbVie's PAP

On February 6, 2023, Jordan wrote an email stating, █████████████  This was his response to learning that a broker believed that many of Payer Matrix's clients would agree to try to switch their members from an AbbVie drug to a different drug that had an available manufacturer patient assistance program.  (Hays Decl., Ex. 42)  Payer Matrix's leadership subsequently began a coordinated campaign to convince the members' doctors to switch their medicines.  At leadership's direction, Payer Matrix employees began sending faxes and text messages and making numerous phone calls to these doctors and their office staff in which they intentionally make false representations about AbbVie and its PAP.

Payer Matrix leadership provided its employees with a script to use when calling doctors and trying to get them to switch medicines.  (Hays Decl., Ex. 54, Tab 15.).  The script falsely stated that AbbVie's PAP was limiting access for patients who were members of self-funded plans. (*Id.*) Hoefner admitted that the script contained ██████████ information about AbbVie's PAP

coverage—a script she had approved at the time it was created. (Hoefner Tr. 434:7-435:1.) Of course, AbbVie has not eliminated PAP eligibility for all underinsured patients on self-funded plans. But Payer Matrix did not want to tell these doctors the truth: that AbbVie had denied access to patients who had insurance plans working with Payer Matrix and that Payer Matrix would only get paid cost avoidance fees if the doctors switched their patients to one of the alternative drugs Payer Matrix was recommending.

One Payer Matrix employee admitted in an email, dated March 14, 2023, that she tries to make doctors believe that AbbVie is their enemy when trying to get them on her side for the drug switching. Her email stated in part:



(Hays Decl., Ex. 54, Tab 9.) (emphasis added).

Payer Matrix's written communications to doctors also contained similar false statements. (Hoefner Tr. 430:13-432:16.) In the March 14 email referenced above, the employee attached a fax communication that she had recently sent to the patient's doctor and noted that it could be the template Payer Matrix employees use in making similar requests to other doctors. (Hays Decl., Ex. 54, Tab 9, p. PMX-901.). The fax stated in part:



(*Id.*) (emphasis added). The fax went on to recommend eight other specialty drug options. This

correspondence contained false and misleading statements intended to convince the doctor to switch the patient's medication. As Payer Matrix well knows, the only recent modification to AbbVie's PAP's eligibility requirements was the exclusion of patients working with programs like Payer Matrix's program. (Najjar Decl., ¶¶ 24-25.) Furthermore, the fax states that the patient no longer has coverage for Humira despite Payer Matrix knowing that the plan would use Payer Matrix's override option and provide Humira coverage as the last resort, which it ultimately ended up doing in this case. (Bates Decl., ¶ 11, Ex. 3, row 503.) On some occasions, Payer Matrix recommended a new drug as being "on the formulary," and then once the patient switched, Payer Matrix informed the patient and doctor that the patient must apply for the patient assistance program for the new medicine. (*See* Pick Decl., ¶¶ 5-7.)

The overall goal of Payer Matrix's false communications to doctors about their patients' plan coverage for AbbVie drugs is to convince them that they have no choice but to switch the patients to a different medicine. The critical piece of information that Payer Matrix fails to tell these doctors and their patients is that Payer Matrix's strategy, documented in multiple emails, is to have the plan pay for the drugs through Payer Matrix's override process but only if the doctor or patient refuse to switch medicines. (*See, e.g.*, Hays Decl., Ex. 30.) The evidence will show that these doctors would not have approved the switch if they had known the truth. (*See, e.g.*, Pick Decl., ¶ 6.)

Payer Matrix also used a non-practicing medical doctor with a specialty in Lyme disease (which is not a disease treated by the AbbVie products at issue)[12] to write inaccurate and misleading one-page flyers comparing AbbVie's drugs with alternative medications. (*See* Cohen

---

[12] Based on an internet search, it appears this doctor was disciplined in 2002 by the New York State's Administrative Review Board for Professional Medical Conduct for committing professional misconduct by negligently treating two patients. The Board placed him on two years' probation.

Decl., ¶¶ 18-22, Ex. 3.)  Payer Matrix leadership indicated that the purpose of the flyers was to

share them with doctors ███████████████████████████████████████ (Hays

Decl., Ex. 51, p. PMX-006.)

Payer Matrix utilized similar tactics with patients in trying to convince them to agree to

switch medicines.  For example, on May 12, 2023, a Payer Matrix employee lied to a patient and

represented that AbbVie did not have a PAP at all or a co-pay card option.  The letter stated:



(*Id.*, Ex. 54, Tab 16.) (emphasis added)  The Payer Matrix employee provided false and misleading

information about the patient's insurance coverage and AbbVie's PAP to convince the patient to

switch to a drug that would provide a financial benefit to Payer Matrix.

## III.    LEGAL STANDARD

A court may grant a preliminary injunction to prevent violations of the ICFA and the

IDTPA.  *See* 815 ILCS 505/10a ("[I]n any action brought by a person under [the ICFA], the Court

may grant injunctive relief where appropriate."); 815 ILCS 510/3 ( "A person likely to be damaged

by a deceptive trade practice of another may be granted injunctive relief upon terms that the court

considers reasonable."); *see also* Fed. R. Civ. P. 65(a) (authorizing courts to issue preliminary

injunctions).  A court also may grant a preliminary injunction to prevent tortious interference with

business opportunity.  *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F.

Supp. 2d 866, 871-72 (N.D. Ill. 2006) (granting preliminary injunction against business that

deliberately interfered with movant's reasonable expectation of business relationships with current and prospective customers).

To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without the injunction. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If the plaintiff makes this showing, the court weighs the harm of denying an injunction to the plaintiff against the harm of granting one to the defendant. *Id.* This balancing test is done on a sliding scale: "If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor." *Id.* In balancing the harms, the court also considers the public interest. *Id.*; *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (same). In evaluating whether a preliminary injunction is in the public's interest, courts consider "the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021).

In order to establish the first factor in the preliminary injunction analysis, a plaintiff must make a "strong showing" of likelihood of success on the merits. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). A "strong showing" is more than a "possibility of success" but "does not mean proof by a preponderance" because "that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending." *Id.* at 762-63; *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (strong showing requires plaintiff to "demonstrate that his claim has some likelihood of success on the merits, not merely a better than negligible chance"). Under the requisite standard, the plaintiff's showing "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Pritzker*, 973 F.3d at 763. A party seeking a preliminary injunction

only needs to demonstrate a likelihood of success on the merits for one of its claims. *Checker Car Club of Am., Inc. v. Fay*, 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017).

## IV. ARGUMENT

### A. AbbVie Is Likely to Succeed on the Merits

#### 1. Illinois Consumer Fraud and Deceptive Business Practices Act

In order to establish a likelihood of success on the merits under the ICFA, AbbVie need only show that it is likely to prove the following: (1) Payer Matrix engaged in a deceptive or unfair practice; (2) Payer Matrix intended that AbbVie rely on the deceptive or unfair practice; (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce; and (4) actual damages to AbbVie were proximately caused by Payer Matrix's deception. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). "Unfair or deceptive acts or practices" include deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact. 815 ILCS 505/2. The Act is "liberally construed to effectuate its purpose." *Wigod*, 673 F.2d at 574 (internal quotations omitted); *Malooley v. Alice*, 251 Ill. App. 3d 51, 56 (Ill. App. Ct. 1993) (same).

#### a. Payer Matrix Engages in Deceptive Business Practices

In addition to the evidence of Payer Matrix's egregious concealment efforts in 2023, as detailed in Section II(F), Payer Matrix submitted hundreds of PAP applications to AbbVie's PAP between 2021 and 2023 that contained false and deceptive statements and material omissions. Specifically, the PAP applications that Payer Matrix submitted to AbbVie included a benefits letter that contained language indicating that the patient's specialty drug was ███████ and that the patient ████████████████████████████ of the specialty drug. (Hays Decl., Ex. 25, p. PMX-530; Ex. 33.) These were false statements. In reality, Payer Matrix's program set up a system (*i.e.*, exclusions and overrides) in which its clients' members were guaranteed continued

31

coverage by the plan if Payer Matrix was not able to get them into AbbVie's PAP. The plan would pay for its members' specialty drugs just as it had done before joining Payer Matrix's program. The evidence of this "override" practice is extensive and includes the following, none of which was disclosed to AbbVie in the benefits letters, and in fact, contradicts the representations in the letters (Hoefner Tr: 222:8-223:14):

- The override process was a standard feature of Payer Matrix's program and was listed as a client requirement in its program implementation documents; (Hays Decl., Ex. 25, p. PMX-532-33.)

- Payer Matrix directed its clients to incorporate the override process into its Summary Plan Descriptions and provided them with a template; (*Id.*, Ex. 27, p. PMX-792-93.)

- Payer Matrix's program diagram that was presented to clients, entitled "Payer Matrix Procedures," stated in part, ***"If denied, override placed so member will receive medication without disruption"***; (*Id.*, Ex. 2, p. 10.) (emphasis added)

- In a webinar to prospective clients, Payer Matrix's Chief Business Officer described the override as a program requirement and explained that if a member's household income was too high, Payer Matrix would ***direct the PBM to "dispense that drug"***; (*Id.*, Ex. 3, p. 28 lines 6-15. ) (emphasis added)

- Payer Matrix trained its employees on the override process; (*Id.*, Ex. 29.)

- Some of Payer Matrix's clients' Summary Plan Descriptions that have been obtained to date explicitly state that the ***plan will continue to pay for the drugs if Payer Matrix is not able to obtain alternate funding***;[13] (*Id.*, Exs. 9-15.) (emphasis added)

- Payer Matrix's own brochures state that the ***plan will continue to provide coverage if it is unable to obtain alternate funding***; (*Id.*, Ex. 8.)

- Payer Matrix's introductory letter to its clients' members who are on specialty drugs informs them that their benefits have been ███████ which is the opposite

---

[13] AbbVie's Complaint includes a chart that summarizes the key statements from the employer plans that AbbVie has obtained to date that contradict the representations in the corresponding benefits letters that Payer Matrix submitted to AbbVie (Dkt. 1, Compl., ¶ 102), and those pages from the plans are attached as exhibits to this memorandum. (Hays Decl., Exs. 5, 9-15.)

of ***losing*** insurance coverage for specialty drugs;  (*Id.*, Ex. 25, p. PMX-528.) (emphasis added)[14]

- Payer Matrix trains its employees to tell its clients' members that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, Ex. 31.) (emphasis added) (*see also Id.*, Ex. 53.)

- Payer Matrix routinely issued overrides when its clients' members household incomes were too high to qualify for the PAP;  (*Id.*, Ex. 70.)

- Payer Matrix issued at least 468 overrides when AbbVie banned its members from eligibility in 2023;  (Bates Decl., ¶ 11, Ex. 3.)

- Once the members were denied admission to AbbVie's PAP in 2023, Payer Matrix assisted over 260 members in obtaining assistance from AbbVie's separate co-pay assistance program that was for patients who have commercial insurance for their specialty drug;  (Najjar Decl., ¶ 19, Ex. 1.)

- Payer Matrix uses a different benefits letter template for those rare occasions in which its clients opt out of the override process, and thus has what a Payer Matrix employee referred to as ▮▮▮▮▮▮▮▮  (Hays Decl., Ex. 60, p. PMX-965-66.)

AbbVie also will present expert testimony that continuing to guarantee specialty drug insurance coverage for a patient as a backup option if a free-drug program does not provide the medicine is inconsistent with the well-established industry meaning of a specialty drug insurance exclusion, and therefore, the representations that Payer Matrix made to AbbVie about patients being uninsured for specialty drugs were false.  (Garthwaite Decl., ¶¶ 5, 16-17.)

Finally, as further evidence that the benefits letters were false statements, Payer Matrix commonly assisted patients in accessing AbbVie's separate co-pay assistance program to cover a prescription fill ***while the PAP application was pending***.  (Hays Decl., Ex. 29, p. 8.)  The co-pay assistance program is solely for patients with insurance coverage for the specialty drug at issue. (Najjar Decl., ¶ 17.)  ***This means that Payer Matrix was representing the patient to AbbVie as***

---

[14] Hoefner testified that she did not know what the reference to "enhanced" benefits for specialty drugs meant in Payer Matrix's own template letter.  (Hoefner Tr. 184:16-185:16.)

*uninsured for specialty drugs* (through the pending PAP application) *and insured for specialty drugs* (through the co-pay card application) *at the same time.* (Hays Decl., Ex. 37.) (Hoefner Tr. 296:23-297:11; 386:23-387:5.) Furthermore, AbbVie has identified over 260 instances of Payer Matrix-affiliated patients applying for the co-pay assistance program for commercially insured patients shortly after being denied admission into AbbVie's PAP. (Najjar Decl., Ex. 1.)

    b.  *Payer Matrix Intended for AbbVie to Rely on Its Deception and Misrepresentations*

There is also strong evidence that Payer Matrix representatives intended for AbbVie to rely on its false representations in the benefits letters. The PAP eligibility terms clearly state that the program is only for uninsured and underinsured patients, and the submission of the benefits letter was part of Payer Matrix's routine application submission process for that reason. Accordingly, Payer Matrix understood the significance of those representations and that AbbVie would not have admitted the patients but for the false representations it made in those letters about its clients' members' insurance status. (Najjar Decl., ¶ 23.) Payer Matrix's understanding is further demonstrated by the fact that it intentionally tried to keep its override process a secret from AbbVie and others. (Hays Decl., Ex. 54, Tab 14; Hoefner Tr. 281:17-289:1.) For example, Payer Matrix's Senior Manager of Clinical Programs, Emilie Gutierrez, explained to Jordan and Hoefner in April 2023 that she provided guidance to an employee after that employee had mentioned to an AbbVie representative that Payer Matrix was placing overrides. Gutierrez wrote in part:



(Hays Decl., Ex. 54, Tab 14). Gutierrez then had a conversation with the same AbbVie employee and falsely represented ███████████████████████████████████

███████ (*Id.*)  Hoefner testified that she did not know what Gutierrez meant when she said that discussing the override process could ████████████ (Hoefner Tr. 219:2-221:1), but she admitted that the override contradicts what Payer Matrix represents to AbbVie in the benefit letters and that the letters omit the fact that the plan sponsors have an override process. (*Id.* 222:8-223:14.)

   c. *Payer Matrix's Deceptive Conduct Has Caused Damages to AbbVie*

The evidence will demonstrate that Payer Matrix has caused AbbVie to provide free Skyrizi, Rinvoq, and Humira to over one thousand commercially insured and ineligible PAP applicants who were applying through the Payer Matrix program.  This has resulted in additional program administrative costs and lost sales for AbbVie, totaling at least $109 million dollars for 2021 and 2022 alone.  (Bates Decl., ¶ 15.)  Additionally, through its investigation and Payer Matrix's recent document production, AbbVie has identified 573 attempts by Payer Matrix to enroll ineligible patients into the PAP between January 2, 2023 and the present.  Payer Matrix managed to get 29 patients into AbbVie's PAP in 2023, demonstrating AbbVie's inability to fully prevent Payer Matrix's fraud due to its concealment tactics.

   2. <u>Illinois Uniform Deceptive Trade Practices Act and Tortious Interference with Business Opportunity</u>

In addition to its ICFA cause of action, AbbVie has a high likelihood of success on its claims for violations of the IDTPA and tortious interference with business opportunity, which rely on the same evidence as the ICFA claim.  AbbVie incorporates by reference its Opposition to Payer Matrix's Motion to Dismiss for further detail on these causes of action.  (Dkt. 84.)

**B.** **AbbVie Lacks an Adequate Remedy at Law and Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction**[15]

      1.   <u>There Is No Adequate Remedy at Law</u>

Although monetary damages can compensate AbbVie for the fraudulent applications Payer Matrix has submitted to the PAP to date, damages cannot compensate AbbVie for Payer Matrix's ongoing harm to AbbVie's reputation and goodwill, its current and prospective business relationships, or AbbVie's PAP. Damages are inadequate when the harmful conduct is ongoing and an injunction is necessary to stop it. *See, e.g.*, *Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003) (affirming issuance of preliminary injunction where injunction was necessary to prevent interference with customer relationship from continuing); *Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 333 (N.D. Ill. 2020) (granting preliminary injunction where evidence suggested it was likely that defendants would "continue to engage in similar misrepresentations and deceptive practices" that would divert plaintiff's customers to defendants' website); *Brightstar Franchising, LLC v. N. Nevada Care, Inc.*, No. 17-cv-9213, 2018 WL 4224454, at *8 (N.D. Ill. Sept. 4, 2018) (granting preliminary injunction where harm, including "damaged customer and business relationships," was ongoing); *Kurowski v. Rush Sys. for Health*, No. 22-cv-5380, 2023 WL 2349606, at *8 (N.D. Ill. Mar. 3, 2023) (defendant's continued disclosure of patient's privacy data was sufficient to support claim for injunctive relief).

A preliminary injunction is necessary because Payer Matrix has proven time and time again that it will continue to look for ways to circumvent AbbVie's PAP eligibility requirements and that its representations of ceased involvement with AbbVie's PAP cannot be trusted. Payer

---

[15] Since AbbVie has made a strong showing of likelihood of success on the merits, irreparable harm should be presumed as to AbbVie's ICFA and IDTPA claims. Where an Illinois statute provides for injunctive relief, "irreparable harm may be presumed." *Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672, 680 (N.D. Ill. 2006).

Matrix's fraudulent submissions of PAP applications have continued for months after it knew about AbbVie's updated eligibility terms, totaling 573 applications to date, and even continued after this lawsuit was filed. (Bates Decl., ¶ 11, Ex. 3.) Its methods of concealment, ***directed by its current leadership team***, were egregious and intentional and documented in a voluminous number of emails and other correspondence. (*See, e.g.*, Hays Decl., Exs. 55-57.) Jordan also falsely represented to AbbVie in April 2023 that Payer Matrix stopped ▬▬▬▬▬ for Humira patients in January 2023 (*Id.*, Ex. 54, Tab 12.), when in fact the misconduct was ongoing. Payer Matrix concedes that Jordan's representations to AbbVie were inaccurate and that he ▬▬▬▬▬▬ (Hoefner Tr. 370:10-371:10.) Furthermore, Hoefner herself gave testimony that was contradicted by the documentary evidence. In addition to other inaccurate testimony described throughout this memorandum, she testified that she was not aware of Payer Matrix leadership directing its employees to block Payer Matrix's fax number when sending PAP applications to AbbVie—until she was confronted with an email showing that she personally gave that directive. (*Id.* 275:9-279:13.) Moreover, Payer Matrix's representations to this Court about its ceased conduct since April 12, 2023 also were inaccurate. (Dkt. 57 at 1, 6 ¶ 12) (stating "Payer Matrix has not submitted a single Patient Assistance Program . . . application to AbbVie since April 12, 2023.") There is irrefutable evidence that Payer Matrix has submitted PAP application materials to AbbVie, both directly and indirectly, well past April 12. (Hays Decl., Ex. 45, 66.) Even Hoefner admitted that Payer Matrix employees were submitting application materials directly to AbbVie (using Affordable Script's fax machine) as late as May 1. (Hoefner Tr. 348:15-349:9.) Payer Matrix has shown that nothing short of a court order will stop its mission to pilfer funds from AbbVie's free-drug program and interfere with AbbVie's business relationships.

In addition to concerns about Payer Matrix continuing to directly submit PAP applications

to AbbVie through new concealment methods, there are a number of red flags that indicate Payer Matrix will continue to indirectly submit PAP applications through patients and their doctors. First, in May 2023, Payer Matrix sent a memorandum to all of its clients notifying them of this lawsuit and stating that it would continue ████████████████ (Hays Decl., Ex. 39.) Second, in June 2023, a prospective client's Request for Proposal raised a question about how Payer Matrix enrolls members in patient assistance programs. Hoefner wrote in part:



(Hays Decl., Ex. 28, p. PMX-281.) (emphasis added) This demonstrates that Payer Matrix's current strategy is to ask doctors to send completed PAP applications to manufacturers' patient assistance programs and coach the patients behind the scenes on how to answer questions from the manufacturer. Third, Hoefner gave the following testimony when asked whether Payer Matrix was still providing advocacy services for its clients' members taking an AbbVie drug:



(Hoefner Tr. 374:2-378:7.) This testimony does not reflect a company that is committed to compliance with AbbVie's PAP eligibility requirements going forward or any sort of recognition that Payer Matrix's clients' members are ineligible for AbbVie's PAP. It also demonstrates the challenges AbbVie faces with enforcing its PAP terms in light of Payer Matrix's tactics. In fact, as recently as September 22, 2023, AbbVie received a renewal PAP application from a patient

whose application had been submitted by Payer Matrix in 2022. Of course, there were no signs of Payer Matrix's involvement on the face of the 2023 application, but Payer Matrix was communicating with this member by phone as recently as July 2023. (Hays Decl., Ex. 61.)

Payer Matrix's testimony about its understanding of AbbVie's PAP eligibility terms raised additional red flags. Hoefner testified—and took the incredible position—that Payer Matrix leadership believed that if the HCP submitted the PAP application for Payer Matrix's clients' members, it did not violate the PAP eligibility terms (Hoefner Tr. 288:13-289:1), contrary to the plain reading of the terms that precluded all patients who were members of health insurance plans working with Payer Matrix. The suggestion that Payer Matrix believed that compliance with the eligibility terms depended on who physically faxed the application to AbbVie lacks credibility, and what is more, Payer Matrix also continued to submit applications directly to AbbVie, utilizing other concealment tactics. Hoefner also testified that Payer Matrix believes it is **_AbbVie's responsibility_** to investigate and figure out when Payer Matrix is involved behind the scenes (*Id.* 346:8-14), that Payer Matrix's clients' members had the right to apply to AbbVie's PAP ██████████████████████████████████ and that she did not know ████████████ ██████████████████████████████████ (*Id.* 284:7-286:4.) Additionally, she testified, ██████████████████████████████████████ ██████████████ (*Id.* 268:2-8.) After being presented with documentary evidence showing Payer Matrix's concealment tactics in January, she retracted her original testimony and admitted that Payer Matrix ████████ the terms applied to them in January. (*Id.* 274:11-22; 279:21-280:5; 310:8-15.) Absent an injunction, AbbVie faces the near-certain prospect of repeat violations by Payer Matrix.

2. <u>AbbVie Will Suffer Irreparable Harm</u>

"Harm is irreparable if legal remedies are inadequate to cure it . . . Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Life Spine, Inc.*, 8 F.4th at 545 (quoting *Foodcomm Int'l*, 328 F.3d at 304). *See also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) (irreparable harm is "not fully compensable or avoidable by the issuance of a final judgment"); *Walgreens Co. v. Peters*, No. 21 C 2522, 2021 WL 3187726, at *5 (N.D. Ill. Jul. 28, 2021) (harm is irreparable if the party seeking an injunction does not have an adequate remedy at law and the threatened harm would impair the court's ability to grant an effective remedy).

The harmful effect of continuing conduct is heightened where there is evidence of an ongoing ***fraudulent*** scheme. *See e.g.*, *BellSouth Telecomms., Inc. v. Mintz*, No. 04-cv-3586, 2005 WL 8155198, at *2 (N.D. Ga. Mar. 4, 2005) (finding irreparable harm and no adequate remedy at law when defendants had taken "extensive and elaborate steps" in furtherance of a fraudulent telecommunications scheme); *Mishkin v. Kenney & Branisel, Inc.*, 609 F. Supp. 1254, 1256 (S.D.N.Y 1985) (granting preliminary injunction where defendants' "past fraudulent conduct and their current actions indicate[d] an intent to defeat and defraud the rights" of creditors).

a. *Payer Matrix Will Continue to Damage AbbVie's Reputation and Business Relationships Without a Preliminary Injunction*

The coordinated smear campaign that Payer Matrix, at all levels within the organization, has brought against AbbVie continues to cause irreparable harm to AbbVie's reputation and goodwill. AbbVie takes great pride in its PAP and the patients that it helps. It has devoted considerable resources over the years to ensuring that the patients it services have a good experience and that it prioritizes patients' needs and their medical care. (Najjar Decl., ¶ 58.) Payer Matrix's unwelcome intrusion into AbbVie's charitable program for its own financial gain, and

40

now, the lies it tells AbbVie's stakeholders to try to hold up its house of cards have resulted in AbbVie fielding calls from many unhappy patients and HCPs and has greatly diminished how AbbVie's PAP is viewed by some patients and HCPs.  (Najjar Tr. 275:17-282:6.)  Likewise, Payer Matrix has damaged AbbVie's commercial business and its reputation generally in the marketplace by falsely claiming that it "partners" with AbbVie, and now in 2023, telling lies about AbbVie's motives, its drugs, and its PAP program to try to cling onto its fraudulent proceeds.  (*Id.*)  Payer Matrix's scheme tarnishes AbbVie's goodwill and reputation in at least the following ways:

- By falsely representing that AbbVie runs the PAP for self-interested reasons, including financial benefits and by claiming in 2023 that AbbVie is restricting its PAP program out of greed and in response to biosimilars coming into the market;

- By falsely suggesting to HCPs and patients in written correspondence that AbbVie has eliminated its PAP or narrowed the group of eligible patients that it helps;

- By making false statements about comparisons between AbbVie's drugs and other drugs to try to establish that the alternate medicines are superior to AbbVie's drugs; and

- By falsely suggesting to patients that AbbVie's PAP is denying their enrollment despite their eligibility or AbbVie is otherwise responsible for the patients' recent inability to obtain their medicines.

Each of these types of reputational damage are described in more detail below.  "[I]t is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine, Inc.*, 8 F.4th at 546; *see also H-D, U.S.A., LLC v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 21 C 3581, 2021 WL 4459472, at *4 (N.D. Ill. Sept. 24, 2021) (damage to a plaintiff's goodwill is "a form of damage that courts have repeatedly found can constitute irreparable harm.").  These types of injuries are "presumed irreparable" because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill."  *SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007) (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001)).

First, Payer Matrix falsely represents to its current and prospective clients that AbbVie runs the PAP for self-interested purposes, such as receiving grant money and tax benefits and expanding its patient base. (Hays Decl., Ex. 3, p. 35, lines 5-17; *see also* Ex. 9, p. 5.) These statements are false and diminish goodwill towards the PAP in immeasurable ways. (Najjar Decl., ¶¶ 68-69.) Similarly, Jordan has sent numerous emails in 2023 to plan sponsors, brokers, consultants, and other third parties with cover emails that make false statements, including that AbbVie has cut back on its PAP program out of greed, that it is restricting its PAP access to save money due to Humira biosimilars entering the market, and that AbbVie refuses to work with any third parties. (Bates Decl., ¶ 18, Ex. 6.) Not once does Jordan tell the truth in these communications—that AbbVie's restrictions only apply to Payer Matrix and similar programs trying to take advantage of the PAP. AbbVie also has reason to believe that Payer Matrix is making similar statements in client presentations, live meetings, and phone calls. Indeed, clips of the New York Times article have been included in power point presentations that Payer Matrix has produced during expedited discovery. In its interrogatory responses, Payer Matrix listed 51 presentations that it gave in 2023 that referenced AbbVie, including many presentations after this lawsuit was filed in early May and continuing into August, when the interrogatory responses were served. (Hays Decl., Ex. 65, response to interrogatory no. 3.)

Second, once AbbVie began denying PAP admission to patients affiliated with Payer Matrix in 2023, Payer Matrix also began making false statements to doctors and patients indicating that AbbVie has reduced its PAP benefits and that the PAP is providing drugs to a narrower subset of patients. (Hays Decl., Ex. 54, Tabs 5, 9, 10, 15-17.) For example, Payer Matrix tells patients that AbbVie does not offer a patient assistance program at all for Skyrizi, Rinvoq, or Humira. (*Id.*, Ex. 54, Tab 16.) Even as recently as a few weeks ago, AbbVie obtained a letter that Hoefner wrote

to a patient falsely stating that AbbVie ████████████████████████████████████
████████████████████████████████████████████████████  (Hays Decl., Ex. 54, Tab

21.)  Payer Matrix makes these false statements to try to convince doctors and patients to switch

to a drug on which Payer Matrix can continue to profit and to provide an excuse for why its PAP

activities are being restricted by AbbVie.  These false statements are damaging to AbbVie's

reputation and goodwill.  They incorrectly suggest that the PAP has taken steps to restrict, or even

eliminate, patients' access when in fact AbbVie has done nothing more than try to stop Payer

Matrix's fraud on the PAP.  *See H-D, U.S.A., LLC*, 2021 WL 4459472, at *4 (granting preliminary

injunction because damage to plaintiff's goodwill was sufficient to show irreparable harm);

*YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (granting temporary

restraining order and finding that damage to goodwill suffices to show irreparable harm); *Club

Gene & Georgetti Ltd. P'ship v. La Luna Enters., Inc.*, 889 F. Supp. 324, 327 (N.D. Ill. 1995)

(granting preliminary injunction because loss of "consumer confidence and goodwill" was a

"legitimate concern" and constituted irreparable harm).

Third, as detailed in Section II(H), Payer Matrix prepared one-page flyers to send to doctors

that make false and misleading drug comparisons between AbbVie's drugs and drugs that have

manufacturer patient assistance programs that Payer Matrix can still access.  Not only does this

damage AbbVie's brand, but far worse, it jeopardizes patients' health.

Finally, Payer Matrix representatives have misled some patients into believing that the

medicine delays they are experiencing as the result of PAP denials in 2023 are AbbVie's fault.

Payer Matrix provides these patients with false information about AbbVie's PAP and omits telling

these patients the critical information that they are not eligible for the PAP because their health

insurance plans are enrolled in Payer Matrix's program.[16]  (Najjar Decl., ¶ 58.)  When AbbVie is unable to enroll these patients in the PAP due to their ineligibility, Payer Matrix representatives turn the situation on its head and attempt to portray themselves as the patients' "advocates" who are fighting to help patients receive their needed medications from AbbVie, when in actuality, Payer Matrix is the sole reason for the patients' recent barriers to medicine access.  Indeed, prior to the filing of this lawsuit, Payer Matrix directed denied patients, who were frequently upset, frustrated, and deeply concerned that they would not get their medicines on time, to call the PAP and ask why they were denied when Payer Matrix was falsely telling them that the PAP or an alternative medicine were their only options.  (*Id.,* ¶¶ 34, 52, 57-58)  Payer Matrix put AbbVie's PAP team in the difficult position of having to field calls from the victims of Payer Matrix's scheme who Payer Matrix has deceived into believing that they were being unfairly treated by AbbVie.

There is no end in sight for the harm Payer Matrix is causing AbbVie's reputation and goodwill without court intervention.  Every time Payer Matrix solicits a new client, it will have to explain why its clients' members currently taking an AbbVie drug should switch to a different drug.  As Hoefner acknowledged, Payer Matrix is currently receiving cost avoidance fees when it convinces its clients' members and their doctors to switch from an AbbVie drug to certain alternate medicines.  (Hoefner Tr. 426:17-427:9.)  To date, Payer Matrix has received cost avoidance fees for at least 170 patients that it got switched to new medicines.  (Bates Decl., ¶ 19, Ex. 7.)  Payer Matrix has consistently shown that it will not tell the truth about why the switch is needed. Furthermore, if drug switching is not an option for certain members, Payer Matrix will have to explain to its new clients why there are challenges with accessing AbbVie's PAP, and it cannot be

---

[16] The patients also were ineligible in 2021 and 2022 since they did in fact have guaranteed coverage for their specialty drugs.

trusted to tell the truth in this regard either.  Unless stopped, Payer Matrix will continue damaging AbbVie's reputation and goodwill.  This alone warrants a preliminary injunction.

>    b.    *AbbVie's Patient Assistance Program and Patients Will Be Irreparably Harmed by Payer Matrix's Scheme Without a Preliminary Injunction*

Payer Matrix's conduct also diverts resources from AbbVie's PAP and puts the PAP's sustainability at risk.  Every additional ineligible patient Payer Matrix gets admitted into the PAP harms the PAP.  (Najjar Tr. 131:4-132:8, 243:21-246:8, 256:23-257:5.)  Likewise, each newly submitted Payer Matrix-affiliated PAP application that AbbVie identifies or suspects, including one submitted as recently as late September, continues to confirm the need for AbbVie to investigate each application submitted.  (*Id.*)  It is not realistic for AbbVie's staff to continue to perform this fraud investigation function long term.  The PAP team should be focused on servicing the eligible PAP patients.  (*Id.*)  Having to conduct these investigations impacts the quality of the services received by eligible patients.  By way of example, between January and April 2023, investigating the PAP applications for Payer Matrix and other alternate funding vendor involvement and fielding calls from the patients who are victims of Payer Matrix's scheme put the PAP team an average of 8-15 days behind with respect to application processing time.  (Najjar Decl., ¶ 65.)  (Najjar Tr. 200:6-14, 247:11-20.)  The time it took for the PAP team to answer patient and doctor calls also increased.  Jordan and Cofone actually celebrated the phone delays that their scheme was causing AbbVie, even though it was the patients who were affected.  On February 11, 2023, Cofone wrote a chat to Jordan stating in part, ████████████████████████████ ████████████████████████████████████████████████████████  Jordan responded, ████████  (Hays Decl., Ex. 58.)  The PAP phone line delays that Payer Matrix caused meant that truly eligible patients had to wait longer to get their medicine due to Payer Matrix's

misconduct. This delay issue was only remedied by AbbVie increasing the number of staff members who were handling the investigative work, again diverting PAP resources.

Payer Matrix also contributed to AbbVie's PAP exceeding its budget in 2022, and Payer Matrix's fraudulent scheme and customer base continues to expand. (Najjar Decl., ¶ 61.) Therefore, the potential for irreparable harm to AbbVie's PAP is growing. Taking Payer Matrix's scheme to its logical conclusion, all employers in the United States could hire Payer Matrix and "carve out" specialty drug coverage from their health insurance plans for their lower income employees who financially qualify for a manufacturer patient assistance program and then shift these costs from the insurance plans to these free-drug programs. At some point, a business must draw the line, considering the multiple types of losses to the business from the rapidly expanding fraud and weighing that against the small number of legitimately underinsured patients who would be adversely affected by a narrowing of the PAP. Accordingly, if Payer Matrix is allowed to continue its fraudulent conduct for the next year while this litigation is pending, it poses a threat to the sustainability of AbbVie's PAP for a subset of its patients. (*Id.*, ¶ 64.)

The specialty drug patients who are most at risk of losing the benefit of AbbVie's PAP due to Payer Matrix's scheme are commercially underinsured patients, meaning patients who have health insurance coverage through their employer plans but the plans require a patient contribution that is unaffordable for the patient. (*Id.*) In contrast to the fraudulent "carve-out" Payer Matrix creates for the patients it is trying to enroll, the legitimately underinsured patients are on plans that are consistently applied to all members of the plan regardless of household income level. (*See* Garthwaite Decl., ¶ 18.) The legitimately underinsured do not get their specialty drugs through their health insurance plans even if they are denied admission to the PAP. The legitimately underinsured do not work with an alternate funding vendor like Payer Matrix who is making

thousands of dollars because they applied to the PAP. In short, their need for PAP assistance is real. But they are at risk of losing access to AbbVie's PAP because Payer Matrix has created a situation in which it is difficult, and oftentimes not possible, for AbbVie to distinguish between the legitimately underinsured and Payer Matrix's sham specialty drug "exclusion" patients.

The easy solution for AbbVie to stop the fraud would be to simply eliminate PAP eligibility for all patients with any form of commercial health insurance—even those that are legitimately underinsured. (Najjar Decl., ¶ 63) (Najjar Tr. 155:17-156:9.) But instead of taking that step, which is counter to AbbVie's culture of putting patients first, AbbVie attempted to limit the restrictions to patients whose plans were part of Payer Matrix's program. (Najjar Decl., ¶ 63.) AbbVie took this step because it wanted to protect the PAP for the small percentage of patients who enter the PAP with some form of commercial insurance but truly qualify as underinsured. (*Id.*)

### C. The Balancing of Harms Weighs Heavily in Favor of an Injunction

AbbVie has a high likelihood of success on the merits of its case against Payer Matrix, and this anticipated success tips the preliminary injunction balancing test in AbbVie's favor. "[T]he more likely [AbbVie] is to win, the less heavily need the balance of harms weigh in [its] favor." *Troogstad v. City of Chicago*, 571 F. Supp. 3d 901, 907 (N.D. Ill. 2021) (internal citation omitted); *see also Doctors Nursing and Rehab. Ctr., LLC v. Norwood*, No. 16-cv-9837, 2017 WL 3838031, at *9 (N.D. Ill. Sept. 1, 2017) (movant "must show that the balance of equities tips in [its] favor").

The balance of harms weighs heavily in AbbVie's favor because Payer Matrix's business model is based on a fraudulent scheme. Courts do not consider a preliminary injunction to be a hardship when issued against an entity engaged in fraudulent conduct. *See, e.g.*, *BellSouth Telecomms., Inc.*, 2005 WL 8155198, at *3 (finding that an injunction would not bring any hardship where it "prevents the continuance of Defendants' fraudulent scheme while allowing legitimate business practices"); *EPA v. Env'l Waste Control*, 917 F.2d 327, 332 (7th Cir. 1990)

47

("It is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful.") (internal citation omitted).

Furthermore, the preliminary injunction AbbVie is seeking only would stop Payer Matrix from doing what it already claims it is no longer doing, and therefore, it would impose no hardship on Payer Matrix. *See Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 988 F. Supp. 2d 1047, 1055 (D. Minn. 2013) (granting a temporary injunction where the injunction only required the defendant to stop doing something it already claimed not to be doing any longer). The court order is needed despite Payer Matrix's representations of ceased conduct because it has proven that its representations cannot be trusted. *See, e.g.*, *Walgreens*, 2021 WL 3187726, at *5 (granting a preliminary injunction where the defendant's informal representations that it would avoid harmful conduct were insufficient because absent a preliminary injunction the defendant "could change his mind at any point" and leave plaintiff with "limited recourse").[17]

The preliminary injunctive relief AbbVie requests is sufficient to protect AbbVie's PAP but narrowly tailored to avoid unnecessary restrictions on Payer Matrix. The appropriate scope of the injunction is left to the Court's discretion, but it must be "broad enough to be effective." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). *See also PepsiCo,*

---

[17] AbbVie anticipates that Payer Matrix will contend that AbbVie's motion is moot because it has taken the simple and easily reversible step of removing AbbVie's drugs from its advertised specialty drug list. It also ignores the reality that Payer Matrix will have ongoing business development incentives to assist its members' clients behind the scenes with applying to AbbVie's PAP and making false statements about AbbVie and its PAP. When evaluating voluntary cessation claims, the Seventh Circuit has looked to "factors such as: (1) 'the gravity of harm caused by the offense;' (2) 'the extent of the defendant's participation and his degree of scienter;' (3) 'the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transaction;' (4) 'the defendant's recognition of his own culpability;' and (5) 'the sincerity of his assurances against future violations.'" *United States v. Raymond*, 228 F.3d 804, 813 (7th Cir. 2000). Based on the evidence, Payer Matrix will not be able to meet its burden on any of these required elements.

*Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (finding that courts ordinarily have "wide latitude in fashioning injunctive relief").

The proposed preliminary injunction order only seeks to limit Payer Matrix's fraudulent scheme as it pertains to AbbVie and its drugs. Specifically, the requested parameters are aimed at ensuring that Payer Matrix is not able to use AbbVie's drugs in its marketing, precluding all methods that Payer Matrix has previously utilized to secretly maneuver patients into AbbVie's PAP, removing some of the financial incentives for Payer Matrix to continue abusing AbbVie's PAP, and stopping Payer Matrix from making false statements about AbbVie's drugs or its PAP to patients, doctors, clients, and other third parties. These preliminary injunction parameters are reasonably tailored to protect AbbVie's PAP, the patients who take AbbVie's drugs and are entitled to accurate information about their coverage for AbbVie drugs and the availability of assistance programs, AbbVie's reputation and goodwill, and AbbVie's business relationships.

### D.    A Preliminary Injunction Against Payer Matrix Is in the Public's Interest

Few cases are more compelling than this from a public interest perspective. Payer Matrix's conduct harms specialty drug patients in Illinois, (Bates Decl., ¶ 17, Ex. 5), and across the United States. Its scheme adversely impacts vulnerable victims who are already dealing with serious, and oftentimes debilitating, medical conditions. Payer Matrix takes advantage of the fact that at the end of the day these patients' primary concern is that they get their medications. Where it comes from and who pays for it is not their focus. They are unlikely to challenge the process they are told to follow or ask questions out of fear of losing access to their medication. Payer Matrix preys on those vulnerabilities to make the patients its pawns in diverting millions of dollars of patient assistance program resources to itself—for doing nothing more than coordinating an illegal scheme. Payer Matrix provides no actual value to the patients, and even worse, it causes unnecessary burden, stress, potential medicine delays, and more recently, unnecessary changes to

the patients' treatment regimens, and it puts the patient assistance programs at risk, as demonstrated in numerous patient complaints and reported medicine delays that have been collected from Payer Matrix and AbbVie's files produced to date. (*Id.*, ¶ 16, Ex. 4.) While taking all of these harmful actions against patients, Payer Matrix representatives unabashedly represent themselves to these patients as their advocates. The patients should be fully informed about their health insurance benefits and the true nature of Payer Matrix's "advocacy" services, and this will not happen until Payer Matrix is precluded from engaging in its deceptive tactics.[18] Accordingly, the public interest weighs heavily in favor of a preliminary injunction against Payer Matrix.

### 1. Payer Matrix Is Engaging in a Fraudulent Scheme

AbbVie has a high likelihood of proving that Payer Matrix has engaged in a far-reaching and longstanding fraud scheme, and it is well-recognized that "the public has . . . an interest in preventing fraud." *See Domanus v. Lewicki*, 857 F. Supp. 2d 719, 727 (N.D. Ill. 2012) (granting a TRO and preliminary injunction in a RICO case); *United States v. Gupta*, No. 11-cv-3329, 2011 WL 3841684, at *5 (C.D. Ill. Aug. 30, 2011) (granting a TRO where there was a substantial public interest in "protecting innocent parties from predatory and fraudulent schemes"); *Zazove v. Pelikan, Inc.*, 326 Ill. App. 3d 798, 808 (2001) ("The nature and object of the [ICFA] are indisputably the protection of the public interest."); *Cigarette Racing Team, Inc. v. Donzi Marie Corp.*, No. 85-C-07947, 1985 WL 71995, at *10 (N.D. Ill. Sept. 16, 1985) (finding injunction would be in the public interest in part because it would protect the public from fraud and deceit). There can be little doubt that stopping Payer Matrix's fraudulent conduct as it pertains to AbbVie's drugs and its PAP will benefit the public.

---

[18] Patients also should have access to the health insurance information they need to fully evaluate whether they are receiving the benefits guaranteed to them by the Employee Retirement Income Security Act and the Affordable Care Act.

2.  Payer Matrix Is Interfering with Doctor-Patient Relationships and Causing the Switching of Prescriptions When It Is Not Medically Necessary

Stopping Payer Matrix's interference with doctor-patient relationships greatly benefits the public. Payer Matrix interferes in these relationships by misleading doctors to believe that they have no choice but to change their patients' established treatments for serious medical conditions by switching these patients from one of AbbVie's specialty drugs to an alternative drug. This is a harmful, and potentially dangerous, practice because even if the new drug is an appropriate treatment for the medical condition at issue, all patients react differently to various drugs. (Cohen Decl., ¶ 16.) Accordingly, doctors do not typically switch these types of medications if one is working effectively for the patient. (*Id.*, ¶¶ 7-9.) At a minimum, the patients oftentimes are forced to go through the burden and stress of adjusting to a new treatment regimen. (*Id.*, ¶¶ 16-17.) Moreover, the new medication may not work as effectively for the patient or the patient may experience side effects with the new drug. (*Id.*) Despite these health risks and potential complications, Payer Matrix's typical practice is to initiate the drug switching without even first asking the patients for their consent. (Hoefner, Tr. 428:18-23) (Hays Decl., ¶ 62, Ex. 60.) Yet, Payer Matrix portrays itself as an advocate for patients.

According to a spreadsheet produced by Payer Matrix, it has already caused approximately 170 doctors to switch their patients to alternative medicines in response to AbbVie's updated PAP eligibility terms. (Bates Decl., ¶ 19, Ex. 7.) A few patients were even switched to drugs that were not FDA-approved for their medical conditions. (Cohen Decl., ¶ 23.). The harm the medicine switches have caused patients, and the general harms related to being coerced into the Payer Matrix program, are well documented in patient complaint records that Payer Matrix produced during expedited discovery. (Bates Decl., ¶ 16, Ex. 4.) The public will be well-served by an injunction that stops Payer Matrix from putting patients at risk.

51

3.    <u>Payer Matrix Is Putting the Sustainability of Patient Assistance Programs at Risk for Patients Who Truly Need Them</u>

In addition to the irreparable harm Payer Matrix's scheme is causing to AbbVie's PAP, its scheme is much broader and harms multiple patient assistance programs. Indeed, Payer Matrix targets the largest pharmaceutical manufacturer patient assistant programs across the United States. (Hays Decl., Ex. 2, p. 5.) Payer Matrix also advertises that it targets over 300 specialty brands. (Hays Decl., Ex. 1, p. 1, lines 19-20.) As a result, thousands of patients nationwide who rely on patient assistance programs are adversely impacted.

Payer Matrix's scheme makes pharmaceutical manufacturers' patient assistance programs, including AbbVie's PAP, substantially more costly to offer since it improperly shifts employers' health insurance payment responsibilities to free-drug programs. As Payer Matrix continues to rapidly expand its client base, at some point, its abuse of patient assistance programs will no longer be sustainable for the programs. This creates the possibility of the programs reducing their benefits or being eliminated entirely for some or all specialty drug patients, a step that would seriously harm vulnerable patients who have no other means of obtaining their medicines. (Najjar Decl., ¶ 64.) Some pharmaceutical manufacturers already have changed their patient assistance program terms to exclude patients with any form of commercial insurance. (*Id.*) Limiting Payer Matrix's ability to abuse AbbVie's PAP, therefore, benefits consumers of specialty drugs. There is a strong public interest in patients receiving necessary medical services. *See Koss v. Norwood*, 305 F. Supp. 3d 897, 924 (N.D. Ill. 2018) (granting in part preliminary injunction request and finding that there is a public interest in patients receiving medical services); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 890 (D. Ariz. 2004) (ordering preliminary injunction and finding public interest favors removal of barriers to access to medical services).

       4.      <u>Payer Matrix Coerces Patients Into a Program Offering Nothing More Than
Burdensome Barriers to Medicine Access</u>

As discussed throughout this memorandum, Payer Matrix's scheme also erects significant
access barriers to insured patients' needed medicines.  (*See also* Najjar Tr. 211:17-212:11) (Bates
Decl., ¶ 16, Ex. 4.)  Federal legislators recently identified "hurdles to pharmacy access" as one of
"four key challenges facing prescription drug programs."  *See* Patrick Hoff, *Senators Plot
Sweeping Action On Pharmacy Intermediaries*, Law360 (Apr. 20, 2023).  Accordingly, there is a
strong public interest in stopping Payer Matrix from interfering with insured patients' ability to
access their medicines and forcing them into programs out of fear of losing access.

Specifically, Payer Matrix directs its clients to alter its benefit plans to include the
following types of coercive statements:

- ███████████████████████████████████████████
  ██████████████████████████████████ (Hays Decl., Ex. 17.) (emphasis
  added)

- ███████████████████████████████████████████
  ████████████████████████████████ (*Id.*,
  Ex. 18.) (emphasis added)  *(See also* Exs. 10-14, 19, 21.)

Making these types of statements to commercially insured patients to coerce them into
joining a program that creates more burdensome procedures for obtaining their medications, and
potential medicine delays, is the antithesis of patient advocacy or the public's best interests.  If
Payer Matrix's program was as valuable to patients as it claims, it would not need to direct its
employer clients to make these coercive statements to force the patients to join.

       5.      <u>Payer Matrix's Scheme Discriminates Against Patients from Lower Income
Households With Respect to Medicine Access</u>

Payer Matrix's scheme also discriminates between lower and higher income patients on
the same health care plans, and there is a public interest in eliminating discriminatory treatment in
the provision of healthcare.  Although its clients' members are paying insurance premiums for

coverage, higher income members continue to receive their specialty drugs with their plan benefits—but lower income members are forced to receive their medicines through Payer Matrix's "alternate funding" process. By requiring insured patients who have household incomes low enough to qualify for a patient assistance program to participate if admitted, Payer Matrix sets up two classes of patients who have a materially different coverage experience. (*See* Garthwaite Decl., ¶ 18.) This discriminatory practice supports the public's interest in a preliminary injunction.

### 6. Payer Matrix's Scheme Results in Consumer Harm and Confusion

There is a strong public interest in preventing misleading advertisements to consumers, particularly with respect to pharmaceutical products. *See Holbrook*, 497 F. Supp. 3d at 333 (public interest would be served by granting injunction in IDTPA case because it would prevent consumer confusion in the marketplace); *Generac Power Sys., Inc. v. Kohler Co.*, No. 12-C-66, 2013 WL 238843, at *3 (E.D. Wis. Jan. 22, 2013) ("[I]t is always in the public's interest to have the truth rather that falsehoods injected into the stream of commerce."). As a result of Payer Matrix false advertisements about the true nature and value of its program, patients are not able to make informed choices about their health care. This too demonstrates that a preliminary injunction is in the public's interest.[19]

## V.    CONCLUSION

For the reasons set forth above, AbbVie respectfully requests that the Court grant its motion for preliminary injunctive relief.

---

[19] To facilitate entry of its requested relief, AbbVie proposes posting a bond of $25,000. The Seventh Circuit "anticipates the exercise of discretion in determining the amount of the bond to be posted." *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994). Here, no bond is required, because the requested preliminary injunction would not prevent Payer Matrix from doing anything it would otherwise have a legal right to do. Nonetheless, AbbVie is willing to post a $25,000 bond in order to avoid any dispute about the adequacy of security.

Dated: October 11, 2023        Respectfully submitted,

/s/ *Valarie Hays*
Valarie Hays
Daniel E. Raymond
Stephanna F. Szotkowski (*pro hac vice*)
Nicholas C. Zebrowski (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
valarie.hays@arnoldporter.com
daniel.raymond@arnoldporter.com
stephanna.szotkowski@arnoldporter.com
nicholas.zebrowski@arnoldporter.com
Telephone: (312) 583-2440
Facsimile: (312) 583-2360

Jeffrey L. Handwerker (*pro hac vice*)
Andrew Tutt (*pro hac vice*)
Volodymyr Ponomarov (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
jeffrey.handwerker@arnoldporter.com
andrew.tutt@arnoldporter.com
volodymyr.ponomarov@arnoldporter.com
Telephone: (202) 942-6103
Facsimile: (202) 942-5999

*Counsel for Plaintiff AbbVie Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Valarie Hays, one of the attorneys for Plaintiff AbbVie Inc., hereby certifies that on October 11, 2023, I caused the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF ABBVIE INC.'S MOTION FOR PRELIMINARY INJUNCTION** to be filed through the CM/ECF system of the United States District Court for the Northern District of Illinois thereby serving all counsel of record electronically.

By: */s/ Valarie Hays*
Valarie Hays