**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AbbVie Inc., | |
| *Plaintiff*, | Civil Action No. 1:23-cv-02836 |
| v. | Hon. Jorge L. Alonso |
| Payer Matrix, LLC | Hon. Magistrate Young B. Kim |
| *Defendant*. | |

## AMENDED DECLARATION OF VALARIE HAYS IN SUPPORT OF ABBVIE INC.'S MOTION FOR PRELIMINARY INJUNCTION

I, Valarie Hays, declare under penalty of perjury that the following is true and correct:

1.     I am a partner at the law firm of Arnold & Porter Kaye Scholer LLP ("Arnold & Porter"). I represent Plaintiff AbbVie Inc. ("AbbVie") in this matter.

2.     I submit this declaration in support of AbbVie's Motion for Preliminary Injunction and the Supporting Memorandum of Law (hereinafter referred to as "the brief") in the above-captioned matter. Except as otherwise stated herein, this declaration is based upon my personal knowledge.[1]

3.     Attached as **Exhibit 1** is a transcript of the promotional video "The Specialty Drug Dilemma" appearing on Payer Matrix's website (last visited Oct. 4, 2023), https://payermatrix.com. The video was preserved by a vendor at Arnold & Porter's direction.

---

[1] The gaps in the exhibits are intentional due to reducing exhibit volume prior to filing.

The transcript was prepared by TransPerfect Legal Solutions.[2]  This document has been produced with the Bates numbers AbbVie00003446-48.

4.      Attached as **Exhibit 2** is a copy of the slide deck used by Michael Jordan, Payer Matrix's Chief Business Officer, during the webinar called "Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction," YOUTUBE (June 30, 2020), https://www.youtube.com/watch?v=gbLfl28KylE.  It is a true and correct copy of the slide deck that Arnold & Porter collected from this website, with the exception of Arnold & Porter adding page numbers to the document and highlighting key portions.[3]  This document has been produced with the Bates numbers AbbVie00003403-20, but the native, color version has been filed.

5.      Attached as **Exhibit 3** is a transcript of the video called "Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction" and posted by Risk Strategies on June 30, 2020 on YouTube, https://www.youtube.com/watch?v=gbLfl28KylE.  The video was preserved by a vendor at Arnold & Porter's direction.  The transcript was prepared by TransPerfect Legal Solutions.  This document has been produced with the Bates numbers AbbVie00003631-69.

6.      Attached as **Exhibit 4** is a copy of the brochure called "Specialty Drug Cost Management Service (Payer Matrix)" (last visited October 4, 2023), https://bit.ly/3My0ZVC.  It is a true and correct copy of the brochure that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates number AbbVie00003421, but the native, color version has been filed.

---

[2] Arnold & Porter reserves the right to make corrections and modifications to all transcripts of recordings that are attached as exhibits to this declaration.  Additionally, for certain exhibits, Arnold & Porter has used excerpts of larger documents that have been produced by/to Payer Matrix, LLC ("Payer Matrix").

[3] For certain exhibits, Arnold & Porter has highlighted the portions referenced in the brief for ease of use.

7.      Attached as **Exhibit 5** is a copy of Plan Sponsor No. 2's memoranda introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/3BOilbP & https://bit.ly/3qcLkmO.[4]  It is a true and correct copy of the memoranda that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003449-59, but the native, color version has been filed.

8.      Attached as **Exhibit 6** is a copy of a now-deleted flyer called "Pharmacy Payer Matrix Program, Save on Specialty Medications With Carve-Out Solution" (last visited May 2, 2023),        https://beonbrand.getbynder.com/m/7a467c3674bb8a5f/original/REG-706627-21-OR-FLYER-Payer-Matrix-Employer.pdf.  It is a true and correct copy of the flyer that Arnold & Porter collected from this website on or about February 2023, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates number AbbVie00003460, but the native, color version has been filed..

9.      Attached as **Exhibit 7** is a transcript of the podcast interview called "Strategies for Managing Specialty Drug Costs with Sherri Tetachuck" and posted by Benefits Pro on Jan. 20, 2021, http://bit.ly/3FL5Dgq.  The video was preserved by a vendor at Arnold & Porter's direction.  The transcript was prepared by TransPerfect Legal Solutions.  This document has been produced with the Bates numbers AbbVie00003432-3445.

10.      Attached as **Exhibit 8** is a copy of the Payer Matrix Program Overview as it appears on the website of Plan Sponsor No. 1 (last visited October 4, 2023), bit.ly/3ZMHwoJ.  It is a true and correct copy of the Program Overview that Arnold & Porter collected from this website, with

---

[4] Uniform Resource Locators (URLs) were shortened with the help of link management platform Bitly.

the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003428-31, but the native, color version has been filed.

11.     Attached as **Exhibit 9** is a copy of Plan Sponsor No. 4's website introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/43jUnRk. The remainder of Exhibit 9 is a now-deleted benefits guide describing the Payer Matrix program (last visited May 24, 2023), previously collected by Arnold & Porter.  These documents are true and correct copies of pages on the website that Arnold & Porter collected, with the exception of Arnold & Porter highlighting portions.   These documents have been produced with the Bates numbers AbbVie00003422-27, but the native, color version has been filed.

12.     Attached as **Exhibit 10** is a copy of Plan Sponsor No. 6's 2022 plan documents and summary plan description introducing the Payer Matrix program (last visited October 4, 2023), bit.ly/3OAPzmk.  It is a true and correct copy of the plan documents and summary plan that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions. This document has been produced with the Bates numbers AbbVie00003399-3402, but the native, color version has been filed..

13.     Attached as **Exhibit 11** is a copy of Plan Sponsor No. 7's summary of drug coverage introducing the Payer Matrix program (last visited October 4, 2023), bit.ly/43rG1hX.  It is a true and correct copy of the summary that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003397-98, but the native, color version has been filed.

14.     Attached as **Exhibit 12** is a copy of Plan Sponsor No. 8's  employee benefits guide introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/3oAuXQy.  It is a true and correct copy of the guide that Arnold & Porter collected from this website, with the

exception of Arnold & Porter highlighting portions. This document has been produced with the Bates numbers AbbVie00003394-96, but the native, color version has been filed.

15.     Attached as **Exhibit 13** is a copy of Plan Sponsor No. 3's plan and summary plan description introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/3MuFHb9. It is a true and correct copy of the plan and summary plan description that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions. This document has been produced with the Bates numbers AbbVie00003389-91, but the native, color version has been filed.

16.     Attached as **Exhibit 14** is a copy of Plan Sponsor No. 9's plan summary introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/41YFAKF. It is a true and correct copy of the plan summary that Arnold & Porter collected from this website. This document has been produced with the Bates numbers AbbVie00003392-93, but the native, color version has been filed.

17.     Attached as **Exhibit 15** is a copy of Plan Sponsor No. 5's benefits guide introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/3LJKnun. It is a true and correct copy of the benefits guide that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions. This document has been produced with the Bates numbers AbbVie00003387-88, but the native, color version has been filed.

18.     Attached as **Exhibit 16** is a copy of Plan Sponsor No. 10's letter introducing the Payer Matrix program (last visited October 4, 2023), https://bit.ly/3oAv6DA. It is a true and correct copy of the letter that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions. This document has been produced with the Bates numbers AbbVie00003376-77, but the native, color version has been filed.

19.     Attached as **Exhibit 17** is a copy of Plan Sponsor No. 11's letter introducing the Payer Matrix Program (last visited October, 2023), https://bit.ly/3oqt6hd.  It is a true and correct copy of the letter that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003374-75, but the native, color version has been filed.

20.     Attached as **Exhibit 18** is a copy of Plan Sponsor No. 12's benefits guide introducing the Payer Matrix Program (last visited October 4, 2023), https://bit.ly/3WxaeKa.  It is a true and correct copy of the benefits guide that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003372-73, but the native, color version has been filed.

21.     Attached as **Exhibit 19** is a copy of Plan Sponsor No. 13's benefits guide introducing the Payer Matrix Program (last visited October 4, 2023), https://bit.ly/3omirnZ.  It is a true and correct copy of the benefits guide that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003370-71, but the native, color version has been filed.

22.     Attached as **Exhibit 20** is a copy of Plan Sponsor No. 14's benefits guide introducing the Payer Matrix Program (last visited October 4, 2023), https://bit.ly/3ODPdeH.  It is a true and correct copy of the benefits guide that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003378-80, but the native, color version has been filed.

23.     Attached as **Exhibit 21** is a copy of Plan Sponsor No. 15's benefits guide introducing the Payer Matrix Program (last visited October 4, 2023), https://bit.ly/3oxLkNZ.  It is a true and correct copy of the benefits guide that Arnold & Porter collected from this website, with

the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates numbers AbbVie00003381-84, but the native, color version has been filed.

24.     Attached as **Exhibit 22** is a copy of a now-deleted excerpt from a page of Payer Matrix's website (last visited May 24, 2023), https://payermatrix.com/.   Specifically, the highlighted language no longer appears on Payer Matrix's website.  The website was preserved by a vendor at Arnold & Porter's direction.  The excerpt is a true and accurate copy of a portion of the website page, with the exception of Arnold & Porter highlighting portions.  This document has been produced with the Bates number AbbVie00003385, but the native, color version has been filed.

25.     Attached as **Exhibit 23** is a copy of the now-deleted *Payer Matrix Specialty Drug List (as of December 2022)*, PAYER MATRIX (last visited May 24, 2023), https://payermatrix.com/pmdruglist.  It is a true and correct copy of the drug list that Arnold & Porter collected from this website, with the exception of Arnold & Porter highlighting portions. This document has been produced with the Bates number AbbVie00003386, but the native, color version has been filed.

26.     Attached as **Exhibit 24** is a copy of a sample Payer Matrix potential cost savings report for a prospective client, with AbbVie drugs included.  It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0321215-217, with the exception of Arnold & Porter highlighting portions.

27.     Attached as **Exhibit 25** is a copy of a Payer Matrix email communication with a prospective client.  The email attaches some of Payer Matrix's program implementation template documents.  It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0190522-33, with the exception of Arnold & Porter highlighting portions.

28.     Attached as **Exhibit 26** is a copy of a Payer Matrix email communication concerning revisions that a Payer Matrix executive made to a client's Summary of Benefits Coverage.  It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0170613-41.

29.     Attached as **Exhibit 27** is a copy of a Payer Matrix email communication with a prospective client. The email attaches some of Payer Matrix's program implementation template documents, including the template for its clients' new Summary Plan Description (PMX0148792-93).  It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0148773-93, with the exception of Arnold & Porter highlighting portions.

30.     Attached as **Exhibit 28** is a copy of a Payer Matrix email communication concerning a Request for Proposal from a prospective client and Payer Matrix's draft responses. It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0171276-84.

31.     Attached as **Exhibit 29** is a copy of Payer Matrix's employee training presentation on its program's override process.  It is a true and correct copy of a document produced by Payer Matrix with the Bates number PMX072268.  The native, color version has been filed.

32.     Attached as **Exhibit 30** is a copy of a Payer Matrix email communication, dated February 6, 2023, about Payer Matrix's strategy to address AbbVie's updated eligibility terms for the myAbbVie Patient Assistance Program ("PAP").  It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0110794-803, with the exception of Arnold & Porter highlighting portions.

33.     Attached as **Exhibit 31** is a copy of excerpts of a Payer Matrix training presentation provided to new employees.  The document metadata appended to the end of Exhibit 31 indicates

that this exhibit was last modified on March 23, 2023. Exhibit 31 is a true and correct copy of excerpts of a document produced by Payer Matrix with the Bates number PMX0367638. The native, color version has been filed, with Arnold & Porter highlighting portions.

34.     Attached as **Exhibit 32** is a copy of one slide of the training presentation attached as Exhibit 31, specifically a slide containing a welcome script to use with new patients, with an excerpt from the slide enlarged for ease of reading. It is a true and correct copy of one page of a document produced by Payer Matrix with the Bates number PMX0367638.

35.     Attached as **Exhibit 33** is a group exhibit of sample letters that Payer Matrix submitted to AbbVie on behalf of its clients' members that Payer Matrix was seeking to enroll in AbbVie's PAP. Payer Matrix refers to these letters internally and with its clients as Benefit Clarification Letters. It is a true and correct copy of documents produced by both AbbVie and Payer Matrix.

36.     Attached as **Exhibit 35** is a copy of a Payer Matrix email communication from July 2023 showing the number of PAP applications it submitted to AbbVie and got approved in 2023 as of the date of the email. It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0172789-95, with the exception of Arnold & Porter highlighting portions.

37.     Attached as **Exhibit 35(a)** is a copy of selected columns from a document produced by Payer Matrix with the Bates numbers PMX0417745-50 showing 63 patients Payer Matrix successfully enrolled in AbbVie's PAP in 2023. These patients were referenced in the email subject line of Exhibit 35. Arnold & Porter has highlighted on the spreadsheet those patients who were admitted into the PAP for coverage of Humira, Rinvoq, or Skyrizi.

38.    Attached as **<u>Exhibit 36</u>** is a copy of a Payer Matrix email communication about its clients' members' using co-pay cards to obtain prescription fills through Affordable Scripts Inc. It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0114784-86.

39.    Attached as **<u>Exhibit 37</u>** is a group exhibit of sample patient files referencing Payer Matrix's assistance with obtaining prescription fills for them with the use of co-pay cards after the submission of PAP applications to AbbVie. It is a true and correct copy of PAP applications and Payer Matrix call logs produced by Payer Matrix and AbbVie, with the exception of Arnold & Porter highlighting portions.

40.    Attached as **<u>Exhibit 38</u>** is a copy of a Payer Matrix email communication in which a third party attaches a previous Payer Matrix presentation wherein Payer Matrix refers to AbbVie on a slide entitled "We partner with top manufacturers." It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0122905-58.

41.    Attached as **<u>Exhibit 39</u>** is a copy of a Payer Matrix communication attaching a Payer Matrix statement in response to the Complaint filed in this action. It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0173387-88.

42.    Attached as **<u>Exhibit 40</u>** is a copy of a Payer Matrix communication attaching a potential plan savings report, dated May 3, 2023, that Payer Matrix sent to a prospective client, which includes AbbVie Drugs in a section at the bottom of the report with a footnote. It is a true and correct copy of a document produced by Payer Matrix with the Bates number PMX0179729-32.

43.    Attached as **Exhibit 41** is a sample of the standard service agreement that Payer Matrix enters into with its clients.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0148979-9000.

44.    Attached as **Exhibit 42** is a copy of a Payer Matrix email communication concerning Payer Matrix's reaction to AbbVie's change in eligibility requirements for admission to its PAP.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0195209-15.

45.    Attached as **Exhibit 44** is a copy of a Payer Matrix email communication with a prospective client.  It is a true and correct copy of documents produced by Payer Matrix with the Bates numbers PMX0148702-04, with the exception of Arnold & Porter highlighting portions.

46.    Attached as **Exhibit 45** is a group exhibit of documents showing Payer Matrix's interactions with six patients who were enrolled into AbbVie's PAP between May and July 2023. It includes true and correct copies of call notes and emails produced by Payer Matrix, with Arnold & Porter highlighting portions.  It also includes excerpts of metadata contained within Payer Matrix's production.

47.    Attached as **Exhibit 46** is a copy of a Payer Matrix email communication with the most recent email in the chain dated March 22, 2023, and relates to employee outreach.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0181588-597, with the exception of Arnold & Porter highlighting portions.

48.    Attached as **Exhibit 51** is a copy of a Payer Matrix email communication concerning the preparation of one-page information flyers related to comparisons between AbbVie and non-AbbVie drugs.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0164005-10, with the exception of Arnold & Porter highlighting portions.

49.     Attached as **Exhibit 52** is a group exhibit of documents related to Payer Matrix's involvement in 2023 with a patient whose health care provider recently transmitted a fax to AbbVie attaching a letter from Payer Matrix.  It is a true and correct copy of documents produced by Payer Matrix and AbbVie, with the exception of Arnold & Porter highlighting portions.

50.     Attached as **Exhibit 53** is a group exhibit of documents evidencing Payer Matrix's involvement in 2023 with a patient who asked about her options if she was not approved for AbbVie's PAP.  It is a true and correct copy of documents produced by Payer Matrix.

51.     Attached as **Exhibit 54** is a group exhibit of sample Payer Matrix statements to AbbVie and to third-parties about AbbVie that AbbVie contends are false.  It is a true and correct copy of documents produced by Payer Matrix, with the exception of Arnold & Porter highlighting portions.

52.     Attached as **Exhibit 55** is a group exhibit of examples of instances in which white out was used to cover up Payer Matrix representatives' names and contact information on completed PAP applications.  It is a true and correct copy of documents produced by Payer Matrix and AbbVie, with the exception of Arnold & Porter highlighting portions.

53.     Attached as **Exhibit 56** is a group exhibit of records showing calls that were placed to AbbVie's PAP team by Payer Matrix employees in which AbbVie contends the employees were impersonating health care professionals.  It is a true and correct copy of documents produced by Payer Matrix and AbbVie, with the exception of Arnold & Porter highlighting portions.

54.     Attached as **Exhibit 57** is a group exhibit of records that AbbVie contends demonstrates Payer Matrix's efforts to conceal its involvement in AbbVie's PAP.  It is a true and correct copy of documents produced by Payer Matrix, with the exception of Arnold & Porter highlighting portions.

12

55.     Attached as **<u>Exhibit 58</u>** is a Teams chat between Payer Matrix employees, dated February 11, 2023.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0399986-87, with the exception of Arnold & Porter highlighting portions.

56.     Attached as **<u>Exhibit 60</u>** is a copy of a Payer Matrix email communication that discusses, among other things, true exclusions and Payer Matrix speaking to doctors about switching their clients' members prescriptions to a non-AbbVie drug before discussing it with the members.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0344958-71, with the exception of Arnold & Porter highlighting portions.

57.     Attached as **<u>Exhibit 61</u>** is a copy of documents concerning a September 2023 PAP renewal application from a patient whose application had been submitted by Payer Matrix in 2022.  It is a true and correct copy of documents produced by Payer Matrix and AbbVie, with the exception of Arnold & Porter highlighting portions.

58.     Attached as **<u>Exhibit 62</u>** is a copy of a Payer Matrix email communication with the most recent email in the chain dated January 29, 2023, concerning Payer Matrix's reaction to an AbbVie PAP application denial.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0198183-85, with the exception of Arnold & Porter highlighting portions.

59.     Attached as **<u>Exhibit 63</u>** is a copy of a Payer Matrix email communication dated February 3, 2023, concerning Payer Matrix's reaction to learning about AbbVie's updated Patient Terms of Participation on the PAP application forms.  It is a true and correct copy of a document produced by Payer Matrix with the Bates numbers PMX0150995-97, with the exception of Arnold & Porter highlighting portions.

60.     Attached as **Exhibit 65** is a true and correct copy of Payer Matrix's Responses and Objections to AbbVie's First Set of Expedited Interrogatories, dated August 16, 2023, and verified by Jennifer Hoefner, Executive Vice President, Operations, at Payer Matrix.

61.     Attached as **Exhibit 66** is a group exhibit of patient records showing Payer Matrix's involvement with their PAP applications after April 12, 2023. It is a true and correct copy of documents produced by Payer Matrix and AbbVie, with the exception of Arnold & Porter highlighting portions.

62.     Attached as **Exhibit 67** is a true and correct copy of excerpts of the Rule 30(b)(6) deposition of Payer Matrix's designee Jennifer Hoefner, dated September 19, 2023, with the exception of Arnold & Porter highlighting portions.

63.     Attached as **Exhibit 68** is a group exhibit of examples of PAP applications faxed by Payer Matrix to patients without the Patient Terms of Participation included. It is a true and correct copy of documents produced by Payer Matrix.

64.     Attached as **Exhibit 69** is a copy of a letter from advocacy groups addressed to Payer Matrix regarding its identification as a "patient advocacy" company (last visited October 8, 2023), https://bit.ly/3tp0dUW). It is a true and correct copy of the letter that Arnold & Porter collected from this website. This document has been produced with the Bates numbers AbbVie00024621-23.

65.     Attached as **Exhibit 70** is a group exhibit of Payer Matrix call log records showing overrides for members with household incomes that exceed the PAP income limits for eligibility. It is a true and correct copy of Payer Matrix call logs produced by Payer Matrix, with the exception of Arnold & Porter highlighting portions.

66.     Attached as **<u>Exhibit 71</u>** is a true and correct copy of excerpts of the Rule 30(b)(6) deposition of AbbVie's designee Anne Najjar, dated September 29, 2023.  with the exception of Arnold & Porter highlighting portions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 11, 2023              <u>*/s/ Valarie Hays*            </u>

Valarie Hays
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
valarie.hays@arnoldporter.com
Telephone:  (312) 583-2440
Facsimile:  (312) 583-2360

# Exhibit 1

Draft Transcript prepared by TransPerfect Legal Solutions


Payer Matrix's Video from the website

"The Specialty Drug Dilemma"


https://payermatrix.com/

AbbVie00003446

1          VOICE:  Nearly 70% of Americans take prescription drugs.  Your

2     organization's prescription drug plan can provide a lifeline to

3     associates and their family members who have both chronic and short

4     term health issues.  The challenge, the specialty drug dilemma.  High

5     cost specialty drugs that disproportionately drive up healthcare costs.

6     Brand specialty drugs often play a significant role in these increases.

7     In 2020, spending on specialty drugs topped $160 billion dollars

8     representing an astounding 39% of the market.  Currently 2 to 3% of

9     associates drive 35 to 60% of overall drug costs, and these numbers are

10    expected to grow significantly.  Rising prescription drug costs can

11    create a significant financial burden, both for your organization and

12    your associates.  The solution – Payer Matrix, a specialty drug cost

13    containment company that reduces your organization's specialty drug

14    spending by up to 50% and significantly mitigates member co-pays while

15    maintaining a high level of service.  Payer Matrix helps organizations

16    manage specialty drug costs by partnering with third-party

17    administrators, stop-loss companies, pharmacy benefit managers, benefit

18    brokers and consultants, and pharmacy and medical advocacy companies.

19    The Payer Matrix drug list includes more than 300 specialty drugs for

20    chronic conditions.  Payer Matrix includes all forms of specialty drug

21    cost containment, including patient assistance programs, co-pay

22    assistance, foundations, and alternative purchasing sites.  The Payer

23    Matrix team never loses sight of the individuals and families whose

24    health depends on quality medical care.  Dedicated care coordinators

25    focus on providing each client concierge level care.  The Payer Matrix

1

AbbVie00003447

1    care coordinators use a structured approach to patient advocacy and

2    alternate funding.  Care coordinators ensure members experience a

3    normal specialty pharmaceutical experience.  Best of all, Payer Matrix

4    uses performance-based pricing; clients pay no fees unless the program

5    achieves savings.  Specialty drug costs are on the rise.  Payer Matrix

6    provides a comprehensive customer-focused approach to specialty drug

7    cost containment that dramatically reduces costs for your organization

8    and your associates, reducing their stress, and creating good will.

9    Payer Matrix, your specialty drug solution.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

AbbVie00003448

# Exhibit 2



Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost Reduction



**Risk Strategies**
11 subscribers

Subscribe

👍 0   👎   ↪ Share   =+ Save   ...

**140 views · Jun 30, 2020**
Risk Strategies Employee Benefits Monthly Webinar.

This month our focus will be on clients with a self-funded medical program, or considering self-funding. We will discuss two products which can save you significant dollars on your inpatient medical and specialty pharmacy spend.



EMPLOYEE BENEFITS

# Michael Jordan | Chief Business Officer





Michael Jordan is the Chief Business Officer for Payer Matrix, a National company headquartered in Sharon Hill, Pennsylvania whose primary focus is on cost reduction in the area of specialty drug through alternative funding programs.

Michael has been a benefits and insurance professional since 1992. Prior to Payer Matrix, Michael focused on healthcare and benefits Nationally working for One Call, MagnaCare, CIGNA and Horizon BCBSNJ with extensive experience dealing in all sectors of the marketplace including Taft-Hartley, private sector as well as the public sector. He has held various sales and sales leadership positions and achieved Presidents Cup and Gold Circle levels.

Michael has been health and life insurance licensed for over 25 years. Michael earned an economics degree from the College of New Jersey. He led the Colts Neck Sports Foundation Basketball program for several years and serves on a number of local charitable boards.

He resides in Spring Lake Heights , New Jersey with his wife Tracy and their three children.  29

# About Us

- Payer Matrix, LLC is a U.S. based Specialty Drug Cost Containment Company who partners with commercial plans, Taft Hartley Funds, and TPAs in the industry to address and assess the financial risk and growing liability related to specialty drug costs.   Drugs costs for specialty products have risen by approximately 15% annually.

- The founder of Payer Matrix has over 30 years in Specialty Pharmacy & Healthcare and formed the Company to help find a solution to these rising costs.

- Our advocacy model successfully procures alternative funding for high cost drugs thus reducing the cost to the plan.  Our program utilizes manufacturer assistance programs and benefit design to achieve these goals.



# Specialty Drug Dilemma

- Trend has been growing at a double digit rate
- New specialty drugs are being introduced at an astounding rate
- 2-3% of members are driving 35-60% of overall drug cost
- Member out of pocket costs have increased substantially
- Contributions can't keep pace with drug cost inflation





# Key Differentiators

- Payer Matrix works with all PBM carriers
- Our medication list includes over 300 specialty brands (covering over 1,500 NDCs) for various chronic conditions
- Our program is not only a manufacturer coupon plan, but includes all forms of patient assistance, including:
  - Patient Assistance Programs (PAP)
  - Copay Assistance Programs (CAP)
  - Foundations
  - Clinic Pharmacy and Alternate Sites
- Payer Matrix can save in excess of 50% of specialty spend
- Reduces out of pocket costs for members





# Program Features

 **Provides an advanced plan-sponsored advocacy service**
- Works with existing PBM and health Plans (TPA, carriers) using the approved specialty drug list.
- Access all forms of alternative funding

 **Utilizes a structural approach to accessing alternate forms of funding**
- Reimbursement Care Coordinators(RCC's) are responsible for coordinating services that are independent of pharmaceutical benefit management providers.
- RCC's work closely with members during the eligibility process.
- Maintains prior authorization for appropriate care.

 **Members experience a normal specialty pharmaceutical experience**
- RCC's are clinicians – pharmacy technicians, pharmacists, and nurses
- Specialty prescription timelines remain the same.
- Clinical review and assessment by pharmacy is maintained.

 **No Fees Unless Payer Matrix Achieves Savings**





# Managing Expectations

Q: Who manages the clinical edits if the drug is not covered by the PBM?
A: We are not a PBM, but the clinical edit will be provided by the manufacturer clinical department before the drug is approved.

Q: How long is the typical reimbursement case review turnaround time?
A: The normal turn-around time is 7-10 business days.

Q: Who manages the patient?
A: Our RCC's are all clinicians (nurses, pharmacy technicians, pharmacists) with extensive customer service & pharmacy experience.



# In-Depth Analysis

| SPD Review | Proposal Savings | Contracting | Implementation |
|---|---|---|---|

1. Analyze SPD and general specialty data of at least the prior 6 months to make a proposal

2. Payer Matrix will provide assumptions of cost savings based on the data

3. If Client is interested in moving forward, we start the contracting and implementation process

4. There is an approximate 90 day timeline from when contracting is completed until the Go-Live Stage

**Payer Matrix**



# Commitment to Reduce Your Costs

Payer Matrix Advantage

- Flexible Implementation Timeline (can be implemented off anniversary)
- Work with all PBM & TPA's
- Work with pharmacy as well as medical specialty products including Buy & Bill
  - i.e. IV Remicade
- SPD Review
- Compatible with Stop Loss programs



# Significant Potential Savings through Alternate Funding for Top Specialty Brands

## Top 10 Specialty Brands:

| Rank [1] | Brand Name | Pre-Payer Matrix Plan Cost [2] | Plan Cost with Payer Matrix [3] | Plan Savings |
|---|---|---|---|---|
| 1 | Humira | $6,524 | $1,957 | $4,567 |
| 2 | Enbrel | $5,589 | $1,677 | $3,912 |
| 3 | Revlimid | $19,480 | $5,844 | $13,636 |
| 4 | Cosentyx | $7,839 | $2,352 | $5,487 |
| 5 | Stelara | $24,403 | $7,321 | $17,082 |
| 6 | Dupixent | $3,324 | $997 | $2,327 |
| 7 | Tecfidera | $7,703 | $2,311 | $5,392 |
| 8 | Ibrance | $14,421 | $4,326 | $10,095 |
| 9 | Biktarvy | $3,184 | $955 | $2,229 |
| 10 | Genvoya | $3,163 | $949 | $2,214 |

Notes
1. Based on total alternate funding secured for TTM May 2020.
2. Based on average net claim cost per 30-day supply.
3. Assumes 30% cost avoidance fee.



# Superior Savings with Alternate Funding through Payer Matrix vs. Copay Only Programs

## Cost Saving Comparison:

| Top 15 Drugs | Baseline Cost to Plan per Dispense* | New Cost Using Other Copay Funding Programs | New Cost Using Payer Matrix | Additional Savings with Payer Matrix | Add'n Savings |
|---|---|---|---|---|---|
| Cosentyx | $7,366 | $5,700 | $2,210 | $3,490 | 47% |
| Dupixent | $2,688 | $1,688 | $806 | $881 | 33% |
| Enbrel | $8,026 | $6,776 | $2,408 | $4,368 | 54% |
| Gilenya | $8,485 | $6,819 | $2,546 | $4,274 | 50% |
| Humira | $9,998 | $8,332 | $2,999 | $5,333 | 53% |
| Ibrance | $12,630 | $10,550 | $3,789 | $6,761 | 54% |
| Otezla | $4,353 | $3,353 | $1,306 | $2,047 | 47% |
| Revlimid | $15,455 | $14,625 | $4,636 | $9,988 | 65% |
| Sprycel | $16,778 | $15,528 | $5,033 | $10,495 | 63% |
| Stelara | $24,855 | $23,189 | $7,456 | $15,732 | 63% |
| Taltz | $6,704 | $5,374 | $2,011 | $3,363 | 50% |
| Tasigna | $12,827 | $11,577 | $3,848 | $7,729 | 60% |
| Tecfidera | $8,341 | $7,741 | $2,502 | $5,239 | 63% |
| Tremfya | $10,816 | $9,150 | $3,245 | $5,905 | 55% |
| Xeljanz | $6,963 | $5,713 | $2,089 | $3,624 | 52% |

On average, **Payer Matrix** saves the plan **54%** more

*Based on FY 2019 claims data; average net claim cost per dispense.



# Long Island based Plan

- 2018 Plan Membership – 3100 union participants
- 2019 Plan Membership – 3400 union participants
- 2018 Total Drug spend - $6.8M
- 2019 Total Drug Spend - $5.2M
- Year over year savings - $55.34 PMPM or 30.2% (no trend adjustment)



# Over $1.6M in Plan Savings through Alternate Funding with Patient Assistance Partner

## Alternate Funding Summary: FY 2019 Savings

| | |
|---|---|
| Members Utilizing Alt. Funding: | 77 |
| Alternate Funding Claims: | 444 |
| | |
| Cost Avoidance Basis: | $ 2,614,862 |
| Plan Paid: | $ 207,091 |
| Member Paid: | $ 65 |
| | |
| Alternate Funding Paid: | $ 2,407,705 |
| Cost Avoidance Fee: | $ 794,543 |
| **Total Plan Savings:** | **$ 1,613,163** |



# Savings Across Several Products and Therapeutic Areas

| Product | Members | Claims | Alternate Funding | Plan Savings | % of Total |
|---|---|---|---|---|---|
| Humira | 10 | 51 | $ 375,728 | $ 251,738 | 16% |
| Tasigna | 2 | 16 | 213,022 | 142,725 | 9% |
| Iclusig | 1 | 12 | 180,756 | 121,107 | 8% |
| Vectibix | 1 | 8 | 97,132 | 65,079 | 4% |
| Tremfya | 2 | 9 | 96,171 | 64,435 | 4% |
| Tecfidera | 1 | 13 | 93,984 | 62,969 | 4% |
| Dupixent | 4 | 29 | 78,737 | 52,753 | 3% |
| Xolair | 3 | 37 | 74,909 | 50,189 | 3% |
| Enbrel | 2 | 9 | 72,504 | 48,578 | 3% |
| Genvoya | 3 | 23 | 68,797 | 46,094 | 3% |
| **Top 10 Total** | **29** | **207** | **$ 1,351,740** | **$ 905,666** | **56%** |
| | | | | | |
| All Other | 48 | 237 | 1,055,965 | 707,497 | 44% |
| | | | | | |
| **Grand Total** | **77** | **444** | **$ 2,407,705** | **$1,613,163** | **100%** |

Monthly Averages: $ 200,642 $ 134,430



Michael Jordan

**Chief Business Officer**

**Payer Matrix**

E: Michael.Jordan@payermatrix.com

C: 201-232-8670

Office: 877-305-6202








# Exhibit 3

Draft Transcript prepared by TransPerfect Legal Solutions

Webinar: Managing Healthcare Spending: Cutting Edge Programs for Cost

Reduction (Michael Jordan)

June 30, 2020

https://www.youtube.com/watch?v=gbLfl28KylE

AbbVie00003631

1    MICHAEL GRANT: …New York area, but I welcome those guests and

2    attendees who are in the tri-state as well as those that are out on the

3    East Coast as well as representation from both coasts.  Today's

4    presentation is one that many of our clients and prospects have asked

5    us to help educate them on, and that's one of the things which we try

6    to do regularly at our continuing educational seminars.  So, we have

7    two very knowledgeable experts who are going to present today: Michael

8    Jordan from Payer Matrix, as well as Matthew Kennedy from HST, and Matt

9    had started to talk a little bit about he and his organization and

10   reference-based pricing.  Certainly, as a result of the COVID-19 and so

11   much of what's going on with our economy, every employer that we talk

12   to is asking for unique ways to help control cost and to bend trend,

13   and reference-based pricing, as was identified a few minutes ago, is

14   certainly one of those ways that's been around a while, but certainly

15   taking a lot more traction, and so, Matt's going to walk us through

16   some of the fundamental key aspects to reference-based pricing and how

17   it works.  We'll then be followed by Michael Jordan, where Michael's

18   the chief business officer for Payer Matrix, a very well-known national

19   PBM, and he brings extensive experience, and so, he's going to talk

20   about some of the unique things in the market that he and his company

21   and others are doing to bend the trend on pharmacy costs as well as

22   particularly to many of the specialty drugs, which many of you have

23   shared with us, and we've observed, are spending more and more of the

24   pharmacy dollar on the special pharmaceutical, particularly the

25   injectables.  So, our format today will be Matt will speak.  We will

1

AbbVie00003632

1    then take a break and pass it over to Michael, and we will hold

2    questions for both of them at the end.  So, without further ado, Matt,

3    again, sorry to kind of interrupt, but I'm going to pass it back to

4    you, and there also is the opportunity for each one of our guests, as

5    you have questions, to submit those to us through the chat bar, and

6    we'll take as many questions as we can at the end of both Matt and

7    Michael's presentation.  For those that we don't get, we will certainly

8    respond back to you and to the group with any questions that are asked

9    that we don't get to.  So, we will follow up with that information in

10   the event time does not permit, and so, Matt, why don't you take it

11   away.  Thanks so much.

12        MATTHEW KENNEDY:  Thanks.  I appreciate it, and good afternoon,

13   again, everyone.  So, what I'll do is just tell you, obviously, about

14   reference-based pricing, and again, we refer to it as value-based

15   payments as well.  It's become very popular recently, as Michael

16   alluded to, with COVID-19.  Folks definitely have to think about being

17   a little bit more innovative with how they're managing their health

18   plan, and we have a specific focus on the medical aspect of it, and

19   then, of course, Michael Jordan can talk to you about the PBM aspect of

20   it too, which is definitely a huge cost driver, but just to give you a

21   little overview of HST, we've been in this space since 2009, and as I

22   mentioned earlier, it's been around probably for about 15 years.  Some

23   of the early players that came in there, we were applying a factor

24   above Medicare for reimbursement with a very high focus on hospital

25   spend, because if you look at your medical spend, you have your doctors

2

1    and your hospitals.  The doctors are really not the ones that are

2    driving the cost increases.  It's the hospital.  Typically, most

3    employers nationally are paying 300% of Medicare when they have what's

4    called a BUCA network, so, Blue Cross, United, Cigna, Aetna.  On the

5    doctor's side, it's usually most employers are paying around 110% of

6    Medicare.  So, we're not too concerned about that, but what we do is we

7    provide technology that allows us to tell the hospital what the price

8    is at 140% of Medicare, that's our Medicare plus reimbursement rate,

9    very highly focused on inpatient/outpatient claims, and then typically,

10   for most of our clients, they will keep a physician-only PPO network in

11   place, and that's usually where we're using, you know, PHTS, or a

12   health smart network, so that we're not disrupting the physicians too

13   much, because that's where a lot of your high volume claims are.  We're

14   just focused on the smaller volume claims, but that really add up from

15   a dollar perspective with the value-based payments, and we work with

16   third-party administrators.  So, they are doing the claims processing

17   and payment of claims, and then we're in the background with the

18   technology as well as our advocacy, should we have any pushback from a

19   provider, but at the end of the day, we are bending the cost curve down

20   on medical

21        [00:05:00]

22        spend by an average of 22% over the last ten years, and that's

23   with 800,000 members on our plan in over 700 employers nationally, and

24   we're in all 50 states from a claims experience perspective.  As far as

25   the reimbursement rate's concerned, we have a 98% acceptance rate at

3

AbbVie00003634

1    the 140% of Medicare, and it's really what… the way we're able to get

2    such a high acceptance rate is when we came into the space ten years

3    ago, leveraging the technology was very key.  What we wanted to do was

4    get in front of the claims as much as we can.  So, under our approach,

5    anything that requires a pre-certification, like a knee procedure, we

6    actually go out and tell the hospital upfront what the price is before

7    medical services are rendered, and I'll take you through that process

8    as we go through the deck, but overall, we're achieving a 72.3%

9    discount off of bill charges, and to give you some perspective on that,

10   if you look at, say, you know, a PPO network, you know, [INDISCERNIBLE]

11   PPO network, you may see somewhere between 50-55% discount off for bill

12   charges, sometimes a little bit higher, but that's pretty much the

13   range that we see, and then you see there what our average saving is

14   per member and then return on investment.  Next slide, please.  Now,

15   here I wanted to show you, you know, the pricing variance that you see

16   currently with the PPO.  So, hospitals, they have what's called their

17   charge master, and they can charge, you know, whatever they want, and

18   it's going to vary amongst the providers.  So, here you see, two you

19   know, common procedures with chest x-ray and knee replacement, you see

20   a significant variance from the low end to the high end almost around

21   300% variance from that, and if you take it a step further to the next

22   slide with a pregnancy, you see 1,300% variance in this example here.

23   So, look at that.  You see $3,200 on the low end, $43,000 on the high

24   end, and then you get a 50% discount off these charges, and you could

25   be paying a significant amount above Medicare, and if we go to look at

4

AbbVie00003635

1    the total across the United States, this heat map here really shows you

2    that that 50% discount doesn't look so good anymore.  So, if you look

3    at New York State, for example, 750-1,000% times Medicare is what a

4    provider's going to charge.  50% discount there is getting me down to,

5    you know, 300-500% of Medicare, which is significantly higher than what

6    you should be paying, and hospitals are making money off of Medicare at

7    100%.  So, we apply 40% above that.  It's a very reasonable rate to pay

8    a provider, and again, we have a high acceptance rate at that level.

9    If you go to the next slide, here, it just shows you the bottom-up

10   approach that we use.  So, we use Medicare as a benchmark, we apply 40%

11   above that, and that's typically where us and our competitors tend to

12   tend to stay at.  There are others out there that do 120% of Medicare.

13   There's even some that do Medicare flat.  We could do that if we wanted

14   to.  We just think that you're going to have a higher pushback rate the

15   lower you're going to pay the provider, and then, of course, if you get

16   it up to 140, we do get a great acceptance rate at that level, but it's

17   also not the end all/be all for us.  If we do get pushback from a

18   provider, we actually have the latitude with most of our clients to go

19   up to 200% of Medicare.  So, we'll work with providers within reason,

20   but if they don't want to play ball with us, especially if it's on the

21   frontend, we may redirect members to alternative facilities.  Next

22   slide, please.  Mike alluded to what we really want to do here is

23   control trend.  So, we benchmark off of Medicare.  If you're a self-

24   funded employer or fully insured, you see what the average inflationary

25   rate is there.  So, self-funded, you're somewhere around 5%, and

5

AbbVie00003636

1    employee insured, obviously, 8%, sometimes maybe 10%. Off of Medicare,

2    you're going to be somewhere between 1-2%, and if you look at the long-

3    term impact here over five years, you're going to really have

4    basically, you know, almost a flat line with your trend. You look at

5    the compounded effect on that, a lot of clients, or a lot of prospects

6    that we talk to when they look at this, they really make their decision

7    based off the projections that we make off of this trend curve here,

8    and they also see an opportunity to share the savings with their

9    employees. So, you know, we live in this world where it's increasing

10   deductibles and coinsurance. When you are able to lower the bar on

11   what you're paying for medical claims here, employers will share some

12   of the savings with the employees by lowering that deductible and

13   coinsurance. They'll even lower payroll contribution. So, it's a win-

14   win for both the employer and the employee, helps with retention of

15   employees and recruitment when you have a high value, low-cost health

16   plan. Next slide, please. Now, this slide here is very busy. What I

17   would ask is just maybe focus on the green boxes there. That's

18   everything that HST does. So, as I mentioned, we're a technology

19   company, and if you look at those first two boxes, those are our

20   proprietary technologies. They're Pathfinder and HST Connect.

21   Pathfinder is what we use during the pre-certification process. When a

22   member is going

23        [00:10:00]

24        into a facility, the nurses who are doing the medical necessity

25   review actually use our Pathfinder technology to generate a pre-

6

AbbVie00003637

1          certification pre-pricing letter that goes over the facility, and all

2          the information is pulled from 16 objective databases. Medicare is the

3          primary database that we pull from, and we're looking at Medicare

4          reimbursement rates cost. We also look at quality metrics. So, we'll

5          look at number of procedures, done, readmission rates, those sort of

6          things, so that we have the most transparent information for the member

7          from both the cost and quality perspective. We also share the same

8          information through the HST Connect app, where members can go on an

9          iPhone or Android and actually look up within 50 miles where they can

10          go to a facility. They'll see the star ratings, they'll see acceptance

11          rates, whether it's red, yellow, or green. It's almost like Yelp for

12          hospitals, really give the member a lot of good transparency

13          information for them to make an informed decision, and then behind the

14          scenes, what we do is we actually will validate all the Medicare, I'm

15          sorry, all the claims, by applying Medicare and cost pricing

16          benchmarks. We'll do the coding and bill review, and there's a lot of

17          stuff we capture behind the scenes where we may actually push back on a

18          particular claim if it's not properly billed, but a majority of the

19          claims tend to be clean claims. We'll reprice them at 140 in Medicare

20          and push them back to the TPA within eight hours, and we get these

21          feeds daily. So, it's a very efficient process, and then we have

22          direct to employer contracting. So, if it makes sense, we may get a

23          safe harbor in place, like we have here in Chicago with Advocate

24          Healthcare, we have a direct to employer contract with them, where're

25          they're tier one, and then their competitors may be tier two, where

7

AbbVie00003638

1  it's a higher out of pocket for the members.  So, the hospitals have

2  actually really been buying into partnering with us, so that they can

3  offer their own hospital sponsored health plan, and then behind the

4  scenes, we have what's called our PAC, P-A-C, it's Patient Advocacy

5  Center.  They'll handle any pre-service and post-service negotiations,

6  should we get an appeal or a balanced bill with regards to a claim with

7  the provider.  We'll work on the plan or the member's behalf to

8  negotiate with the facility, take them out of the middle, try and find

9  a middle ground, and get these claims resolved as quickly as we can.

10  So, that's the technology, and then on the bottom there, you see all of

11  our partners.  So, there's a lot of moving parts, you know, and you

12  have maybe, you know, a group that's coming from bundled to unbundled.

13  So, we want to educate them on what it looks like.  Most of our clients

14  have a concierge.  It makes it a lot easier for the employees that one

15  point of contact to call, and they'll help them navigate the system.

16  Then we have the preferred care management nurses that do that medical

17  necessity review that I talked about that are tied into our system, and

18  then we have particular TPAs that do a very good job of handling open

19  enrollments, payment and processing of claims, and then if there's any

20  sort of issues, they partner well with us as far as looping us in if we

21  need to step in for a balance billing situation, and as I mentioned,

22  there is a physician-only PPO network that's for most of our groups.

23  You can do a full replacement and have us do the physician pricing as

24  well.  I just don't recommend it.  It can be highly disruptive, because

25  again, these are high volume claims, and you can see a little bit more

8

AbbVie00003639

1    pushback on the doctor's side if you don't have a network in place, and

2    then you have a PBM.  Our TPAs are very flexible.  So, they are

3    agnostic when it comes to a PBM, but of course, that's a huge

4    component, and I'm sure Michael will talk more about that, and then we

5    have preferred stop loss partners.  So, they've really bought into

6    this, where we have partners that will discount the premium typically

7    by 20%, and then they also will work within our corridor where we

8    negotiate between 140-200% of Medicare and even beyond that.  Next

9    slide, please.  So, this is where we could show you the member

10    experience.  So, if you look at the ten steps that we have on the on

11    the pathway on the next slide, it starts out with education.  So, our

12    TPAs are doing do an excellent job of open enrollment.  They're going

13    to have their ID card.  It's going to be explained on where they look

14    for their physicians, similar to what they have now with their current

15    PPO network, and then we'll explain to them what happens in the

16    hospital setting.  There's no network.  It's open access.  You can go

17    wherever you want to go to, and then [INDISCERNIBLE], in step two, they

18    could actually look that [INDISCERNIBLE] procedure that I mentioned a

19    moment ago.  If they don't, that's fine.  Their doctor may recommend

20    they have to have knee replacement.  They forward over the member's ID

21    card to the facility, who's then going to call for pre-certification in

22    step three.  So, that's where the nurses do the review.  They send over

23    the letter that has the price on it, and hospitals can respond in one

24    of three ways in this step, in step three, and again, 140 Medicare is

25    accepted 98% of the time.  So, that's the first situation.  So, we have

9

AbbVie00003640

1    a high acceptance rate at that level, but they may come back and say,

2    look, we're a center of excellence for orthopedics. We feel we should

3    be paid a little bit higher. That's where it gets routed over to our

4    patient advocacy center, where we'll negotiate between that quarter of

5    140-200% of Medicare. Let's say we come to 170 as an agreement, the

6    member will go in for those services. The third

7         [00:15:00]

8         thing that can happen is they tell us they're not going to work

9    within 140-200% of Medicare, and this is where the member would have an

10   outreach call, and we will provide them with alternative facilities,

11   taking into account acceptance rates and quality metrics, to give them

12   solid alternative facilities to go to if they want to choose that path,

13   and it's up to them. We don't tell them they have to go there, but

14   we're just giving them more information to make a well-informed

15   decision, and then step four, of course, medical services are rendered.

16   We pull in here, [PH] emergency and urgent services, and then once the

17   services are rendered, the TPA is going to receive a bill from the

18   provider. Again, they'll pull, push a file feed over to us on a daily

19   basis. We'll validate those claims, make sure they're clean, and if

20   they are, we'll reprise them at 140 Medicare, push them back to the

21   TPA, who pays out the facility within seven to ten business days, and

22   then the explanation of benefits will be issued. This is where the

23   member will validate any bills that comes from the provider, and if

24   they have a bill in excess of their member responsibility on the

25   explanation of benefits, that's where they're to call HST or their

                                    10

AbbVie00003641

1   concierge to get started on their case to work with the facility on

2   their behalf. Next slide, please. This, I'm not going to spend too

3   much time on here, but this just shows a sample ID card. So, here, you

4   have the HST logo on there. That's typically where you have your

5   physician [INDISCERNIBLE] network. So, say a PHDS multi-plan or Health

6   Smart or some common networks we use, and then of course,

7   [INDISCERNIBLE] could be any PBM in there, but we have specific plan

8   language that's on the ID card, on the explanation of benefits, and

9   then also in the summary plan document, so that when our patient

10  advocacy center gets involved, they know that that language is there to

11  refer the provider in order to protect the plan and the member when

12  they're negotiating with a particular facility. Next slide, please,

13  and this is just the app that I talked about. I'm not going to spend

14  much time on this as well, but again, it's just a great tool for

15  members to on and look at within 50 miles the nearest providers, what

16  the acceptance rates are. One thing I will say, though, is they could

17  actually see what their estimated out of pocket is, because our TPAs

18  are pushing us accumulators for the deductible on a regular basis. The

19  member has a good idea from a financial standpoint what kind of skin

20  they have in the game, and then the other thing too is if they do get a

21  bill from the provider, that's a balance bill. They can take a picture

22  of it and open it up on the app to have our team get started on working

23  with that case, to minimize any sort of turnaround time. Next slide,

24  please, and this just shows the quality metrics that we look at. So,

25  these are the seven different categories that we pull from. In

11

AbbVie00003642

1    addition to that, there's 59 different data points that we pull from,

2    and we continue to try and build out on these quality metrics, and

3    what's interesting for us is, you know, you could have some of the

4    hospitals out there that are really good at marketing talking about how

5    good they are for a particular service.  We actually have information

6    on there that will show them, you know, sometimes these providers are

7    charging some of the highest rates out there, but they may not

8    necessarily have the greatest quality of care, and vice versa.  We

9    could see you know, a four-or-five-star rated facility that's charging

10   a reasonable rate.  So, again, just making better informed decisions

11   for the member with these quality metrics.  Next slide, please.  So,

12   the patient advocacy center, again, it's there for the member, and then

13   we also use it to work with the provider.  So, if a member does get a

14   bounced bill, they're going to be able to reach out to the patient

15   advocacy center typically by phone, and if they go through the

16   concierge, that's fine.  They'll talk to someone live, and then we'll

17   send a letter out to them, and the whole process will be explained to

18   them.  In turn, we're going to call the provider, explain who we are,

19   refer to the plan language, and start to negotiate with them, and then

20   we have ACA regulations that support reference based pricing for

21   emergency situations, and then occasionally, you may have a member that

22   gets sent to collections.  We'll make them aware of the Fair Credit

23   Reporting Act and ask that that facility put the member's account on

24   hold as we try to negotiate this particular claim, but all during this

25   time, we're going to notify the member every seven to ten business days

AbbVie00003643

1    of how things are progressing with their claim.  If they want more

2    frequent communication, we can call them every other day, or we even

3    have text messaging capabilities.  We'll email them, whatever their

4    preferred method of communication, is we can do that for them.  Next

5    slide, please.  So, everyone always asks, what happens?  What are the

6    results that you have with that 2%?  So, here, it's a really good

7    breakdown.  What's interesting is a third of the time, the hospital

8    just needs an explanation of how the plan reimburses, and they actually

9    accept the 140 of Medicare.  A quarter of the time, we negotiate within

10   that quarter of 140-200% of Medicare that I talked about, and then 9%

11   of the time, we actually have to get plan approval to negotiate above

12   that 200%, and that's very

13        [00:20:00]

14        common for a lot of our plans, and then you see the 18% of

15   appeals and 13% of provider [PH] exhausting rights for appeals.

16   Hospitals have 60-day appeal windows after they're appealing with the

17   plan paid, and then if they're balance billing a member, they have 180

18   days to exhaust their rights under ARISA.  So, if they don't respond to

19   us in that timeframe, we're able to close these claims out. and then 1%

20   of the time. we refer it to legal.  So, we have legal partner legal,

21   our partner, Louis [INDISCERNIBLE], the law firm that we use.  If we

22   are having maybe a, you know, spec claim headed to significant dollar

23   claim, the plan may elect to refer it over to legal, where they're

24   coming in to secure a settlement and not litigate.  We've never had a

25   client go to litigation, knock on wood. but we may pull in extra

13

AbbVie00003644

```
 1      resources after our patient advocacy center has exhausted all their
 2      resources in, you know, HST.  Next slide, please.  So, here's a case
 3      study.  This is actually a client of ours that's been with us for three
 4      years now.  They're are a hotel management company.  They had 2,200
 5      employees when they first started out.  They've grown to 2,700
 6      employees, and if you looked at the 12 months of paid claims, we were
 7      actually able to achieve just under $10.8 million in paid claims, and
 8      the projections were that, if they'd stayed with their PPO, they
 9      would've paid $14.3 million.  So, we were able to achieve savings of
10      around $3.6 million, but also, as I mentioned, stop loss looks at this
11      very favorably too.  So, you see that they saved an additional $.5
12      million dollars on their stock loss premium, and then the third area
13      where there's an opportunity to save is administrative fees.  So,
14      sometimes the TPA administrative fees may be lower than what they have.
15      So, they saved an additional $300,000 here.  So, for overall savings of
16      $4.4 million for this group.  Next slide, please.  Now, some of the
17      common industries that we work in, you know, it's a lot of blue collar,
18      so manufacturing, transportation, in particular trucking companies,
19      they tend to be, you know, very interested in this model, because their
20      truckers are always out in the road.  They don't get to see their
21      doctors a lot.  So, they end up in the hospital setting, and that's
22      where we've really save a lot of dollars.  Retail, we've definitely
23      seen an uptick there, especially with COVID.  There's a lot of retail
24      companies out there that are either on board as a client, or they're
25      looking to come on board.  Hospitality, as I mentioned, hotel
```

14

AbbVie00003645

1   management companies, restaurants they're really trying to manage their

2   margins, of course, with furloughs and layoffs.  Construction's been

3   big for us, and then ironically, healthcare.  Skilled nursing

4   facilities, in particular, they actually, they get reimbursed on a

5   Medicare rate.  So, it makes a lot of sense for them to pay for their

6   own health plan based off of Medicare, and we have a lot of clients in

7   that space that are, you know, and we have new clients coming on board

8   with regards to that as well, and then hospitals, too.  You may have

9   small hospital systems where they have a lot of non-domestic claims,

10  and we have a number of clients there where it makes sense to do a

11  value-based payment health plan.  Energy is very good too.  Obviously,

12  right now, they're struggling.  So, that's another one where we've seen

13  a lot of interest.  Private equity, they're looking to improve the

14  valuations of their companies.  We've worked with the likes of TPG

15  Carlisle, Welsh Carson, to name a few, and then nonprofits have been

16  big for us as well, and then obviously, [PH] Public Enemy and TF

17  Hartley, we have a number of clients in those spaces as well, and then,

18  as far as pain points are concerned, significant high cost claimants.

19  I mean, that's definitely, you know, at the top of the list.  We've

20  reduced clients of ours, you know, significant high-cost claimants by

21  50% in the first year, because if you look at it, you see the higher

22  the dollars get, if you're under a PPO, your discount if it's 50 or 55%

23  the larger the dollar gets may be diminished to say 45 or 40%, whereas

24  ours gets stronger.  As I mentioned, we're in the low 70's, typically.

25  As the dollars get higher, we can creep up into the 80's, maybe 90's,

15

AbbVie00003646

1    sometimes, for these high-cost claimants.  Significant rate increases,

2    high deductible health plans, low wage employees, high turnover, low

3    margin businesses are some others, and then, obviously, financially

4    distressed.  There's a lot to follow with that bucket right now.  So,

5    we've been very busy trying to help folks get comfortable with this

6    approach and see if it makes sense for them in the next plan year, and

7    then just to bring it all back in, as I mentioned, we have 700 employer

8    groups nationally, 800,000 members on our plan.  We want to have a very

9    collaborative approach.  So, as I mentioned, some of the other models

10   out there, what they do is they will price claims after the fact.  We

11   want to take a proactive approach, be very upfront, let the provider

12   know what it is, pay them at a reasonable rate, at 140 in Medicare, and

13   when we talked to a lot of health systems, they really are responsive

14   to our model.  Because of

15        [00:25:00]

16        that, we also pay them promptly within two weeks.  Whereas, with

17   PPOs, they're typically getting paid out in two months.  So, if you're

18   paying them promptly, a lot of providers really appreciate that, and

19   then we have a 95% retention rate.  So, again, we're trying to be, you

20   know, there's definitely a little bit of disruption when you move to

21   this plan, but we want to be very collaborative with the providers, and

22   then, of course, you see there, a testimonial from our, from of our

23   clients, and then one thing that I didn't mention too is we base our

24   fees off of a per employee per month fee, typically 875, 8,075 cents

25   for hospital repricing, $3.50 cents for physician out of network

16

AbbVie00003647

1    repricing.  So, $12.25 all in.  There's other models out there that do

2    a percentage of build charges, sometimes 10% or 12% of build charges,

3    that actually can be significantly higher, typically around 80 or 90%.

4    So, if you have a million dollars in build charges, you could be paying

5    $100,000-$120,000 in fees, and it's also considered a claims expense.

6    So, it could potentially hit your stop loss.  That's why the stop loss

7    carries really like our mile versus some of the other approaches out

8    there.  So, just wanted to make that a point as well, and then as far

9    as next steps, typically, most groups, you know, we'll get them

10   comfortable with the concept.  At the same time, we may do a savings

11   analysis.  It's very easy for us to generate one of these.  It takes us

12   about three to five business days, and we'll show that group, based off

13   their own claims dollars, how much they're leaving on the table from a

14   savings perspective.  We'll also give them a projection on how much the

15   member could have saved from an out-of-pocket perspective, because

16   it's… we're lowering the co-insurance, we're lowering the ticket item

17   on their co-insurance.  So, it could be significantly less for them

18   from an out-of-pocket perspective as well, and then if they're

19   interested in pursuing it further, that's where we'll pull in TPA

20   partners, let the group know about our preferred stop loss panel as

21   well, and then if they want to move forward, we'll start the

22   implementation timeline.  Typically, we need about 60-90 days to get a

23   group up and running.  We've done it in a shorter timeline, but

24   obviously, there's a little bit of education here.  So, we want to make

25   sure we have as much lead time as we possibly can.  Any questions?

17

AbbVie00003648

1    MICHAEL GRANT:  You know, we have a couple of questions, Matt,

2    that have come in on the chat line on the… why don't we wait until the

3    second presentation, just in the interest to time, so that we give

4    Michael time which we've committed to, but thank you very much for

5    that.  I know, to our audience, we covered a lot in a short period of

6    time.  I want to remind folks that this is an alternative to the

7    commercial insurance carriers' programs and products, and it's one that

8    is specifically targeted for those employer groups that are currently

9    self-insured or considering to go self-insured.  You probably, and no

10   doubt, like all of us, have heard some bad press regarding reference-

11   based pricing.  Much of that is driven by the four large national

12   commercial insurance carriers: Empire Blue Cross, United, Cigna, and

13   Aetna, because this is a way for us to be much more transparent in the

14   pricing, and it also exposes some of the profitability that they've

15   been able to obtain over the years, and so, several of the group

16   representatives that I've spoken to at United, Cigna and Aetna, the

17   first thing out of the mouth is, oh, reference based pricing doesn't

18   work.  Well, we have some track records where it has.  Is it for

19   everyone?  No.  It is a concept at first, maybe hard to get your arms

20   around when you understand the actual negotiation and the patient

21   advocate call center who will help an employee with any balance billing

22   issues, but it certainly, as you saw in the presentation by Matt, can

23   save an employer group 20% over the prior year spend, and so, the slide

24   that Matt referred to is Next Steps, which was number one, was to

25   request a savings analysis.  Your risk strategies representative, along

18

AbbVie00003649

1    with Matt, are happy to walk you through that process and reprice the

2    claims doing a scenario.  So, if we were to have reference-based

3    pricing, what would the savings have been, and I think you'll all be

4    pleasantly surprised.  It's substantial, and it's real dollars to each

5    of your bottom line and to your earning statement and EBITDA.  So, in a

6    short period of time, we covered a lot.  The risk strategies

7    representatives are all educated and informed regarding reference-based

8    pricing and HTS's product, and we'd be happy to follow up with you, and

9    we'll answer some of those questions that came in in a few minutes

10        [00:30:00]

11        on the [INDISCERNIBLE]. Let's go to our next topic.  We certainly

12   have heard lots of information in the media, and no doubt, many of you

13   have experienced large increases in utilization in specialty

14   medications, and so, we're going to ask Michael Jordan from Payer

15   Matrix to talk a little bit about some of the unique programs that he

16   and his company have, again, to make certain that individuals are

17   receiving the proper medication at the right price and at the right

18   time, and so, Michael, let me pass it over to you.

19        MICHAEL JORDAN:  All right, thanks, Michael, and appreciate

20   everyone's time, and Jess, thanks for running this, and Kate, for the

21   invitation.  You know, following, you know, Matt's discussion around an

22   alternative approach, Payer Matrix is along the same lines.  It's

23   really asking a plan sponsor to think a little differently about how

24   they approach brand specialty drug utilization, and Michael mentioned

25   it earlier, this is clearly one aspect of the drug spend of your, you

19

AbbVie00003650

1    know, your PBM spend that is growing and growing significantly, and

2    what Payer Matrix is doing is we're an advocacy model that's tapping

3    into the manufacturer systems programs around the country, and I'll get

4    into a little more detail, with your employees, your members, however

5    you want to term them, and in doing so, there's going to be a benefit

6    to the employee, but just as significant, a benefit to you as the

7    employer.  What makes Payer Matrix a little different in terms of

8    experience?  We've been in the specialty drug world for over 30 years.

9    Patient assistance programs have been around since the 1950's, but

10    frankly, brand specialty drug utilization hasn't been as impactful.

11    Really, until the last five or ten years, where it's really started to

12    show up at renewals, and when you sit down and look at your quarterly

13    spend analysis.  We have a pharma consulting arm of our organization,

14    and that really led us to a better understanding of, you know, Merck

15    and Pfizer and how these manufacturers are putting programs on the

16    street that can be accessed.  They just don't make it easy, and what

17    Payer Matrix represents is a model by which we can connect your

18    employees to those programs at a significant cost reduction.  Go ahead,

19    Jess.  Next slide.  Let's see.  All right, thanks, Jess.  In terms of

20    dilemma, and Mike will reference this earlier, if you look at your drug

21    spend, you probably only have two or 3% of your members, maybe in some

22    instances 4%, driving anywhere from 35 to 70% of your drug spend.  So,

23    we're really talking about those high-ticket, single-sourced, specialty

24    brand drugs that are Humira or Emeral or Skyrizi or some of the drugs

25    for Hep C.  Again, small percentage driving big costs, and up to this

AbbVie00003651

1      point, the PBM world really hasn't had a solution.  They can report all

2      this to you.  These drugs are effective, especially for the conditions

3      that, you know, these individuals are being treated for, but there's no

4      solution to the out-of-control cost.  What we're doing is we're

5      focusing in on a very small set of drugs that are driving that cost,

6      and unlike other changes you've made in the past, which typically have

7      been on the backs of the employees, so, as you, if you came into a

8      renewal, you had a significant increase as an employer, you know, or as

9      a consultant sitting with the employer, a lot of that had to be

10     shouldered by the… by you, and then, you know, a fair amount was

11     shouldered by the employee.  These programs, the way they're developed

12     and structured is we can not only reduce the cost for the plan, but for

13     the employee, they pay nothing out of pocket, and in doing so, when

14     we're able to reduce the cost of the plan, it has a significant impact

15     on the renewal action.  So, whether that's your stop loss pricing or

16     overall pricing, and you'll see with one example we give, with over a

17     $55 per member per month decrease in spend, it's probably the most

18     significant thing you'll do on the pharmacy side.  Next slide.  So, who

19     are the manufacturers that we're tapping into?  The household names in

20     front of you?  So, you know, whether it's Amgen, that actually makes

21     Humira, Humira is probably the most popular specialty brand drug on

22     market, or any of these other manufacturers, they create programs.  So,

23     when a new drug hits the street, these manufacturers are putting it,

24     you know, kind of down two, two runways, if you will.  One is the

25

21

AbbVie00003652

1    traditional plan sponsor access system, by which you're paying probably

2    1,000 times what it

3         [00:35:00]

4         costs them to make the drug, and then there's another pathway you

5    can follow, which is the Manufacturer Assistance Program, and really,

6    what these big pharma organizations are doing is they're allowing

7    access on both sides, but frankly, a lot of people don't know how to

8    get access to the side that's significantly reduced in cost, and they

9    do it for a variety of reasons, which I'll get into, but the bottom

10   line is we're a model that's actually helping plans tap into these

11   programs, which are overfunded and underutilized.  So, there's a lot of

12   runway ahead in order to actually get access to dollars.  Next slide.

13   So, Payer Matrix.  So, we're not a PBM.  We're really a specialty

14   carveout that's focused on brand specialty drug, not generic specialty,

15   just brand specialty.  We're a single source [INDISCERNIBLE] drug, but

16   there's really no competitors to that particular medication.  I know I

17   say this [INDISCERNIBLE] times we'll work with all PBMs, but really

18   when it comes down to it, some of the PBMs, especially the big three,

19   aren't always happy to see us show up, because although we're

20   representing great opportunities for the plan to save money, we cost

21   them money, you know, and Mike [INDISCERNIBLE]  have talked about it

22   before, with reference based pricing, you get pushback by the Blues and

23   United and Aetna and Cigna.  Well, some of those organizations are the

24   same ones that own the largest [INDISCERNIBLE] in this country, and

25   when we're getting our program inserted into a plan sponsored benefit,

22

AbbVie00003653

1    and specialty drugs are down, it costs them money on rebates. It costs

2    them money on spec pricing, and in some instances, dispensing fees, and

3    when they're growing at, you know, 20% top line and 10% bottom line,

4    and we're ripping out a big part of their revenue component, they push

5    back. So, we work with 19 PBMs today, but I will tell you, you know,

6    CVS is one we don't work with. ESI is, we work with some of their

7    groups, but not all their groups. They can't make up their mind

8    whether they want us to play ball with them, and Optum will work with

9    us indirectly, so through one of their, you know, intermediaries.

10    Beyond that, every other PBM, for the most part out there, does work

11    with us, and I think that's because, as a PBM, they're saying, "I am a

12    pharmacy benefit manager. So, even if it's going to cost me money, I

13    need to adopt and adhere and pull in programs that are going to help me

14    help my plan sponsors save money." Our drug list is a little over 300

15    specialty brands and covers 1,500 NDCs, various chronic conditions.

16    I'll get into some of those drugs. We're primarily tapping into what's

17    called manufacturer assistance. So, that's Merck creating a program by

18    which they're giving the drug away for free based on an application

19    process, but there's also copay assistance programs. There's

20    potentially foundations we can tap into. So, there's a variety of ways

21    where we're looking out into the marketplace to see, is there a better

22    opportunity for this patient to get them drug at a reduced cost. Now,

23    by and large, we charge 30% savings. So, it's, it's a, you know, kind

24    of a flat, no fixed fee, no other revenue component, but I always like

25    to say we're probably saving closer to 50%. For some of you, you may

AbbVie00003654

1    actually be getting rebates on these drugs.  If these programs, you

2    know, if we put in our program, and a drug comes through patient

3    assistance, there is no rebate dollar.  So, suffice it to say, I always

4    like to say, very conservatively, if you spent a half a million dollars

5    last year on brand specialty, we can turn it into $250,000.  You spent

6    a million, we can turn it into a half a million, very conservatively,

7    because some of you are not getting the same rebate share that maybe

8    some very, very large employers are out there, and as I said earlier,

9    it also reduces the out-of-pocket cost for the member.  So, for 99% of

10   the drugs that we're tapping into, if the member is eligible for

11   patient assistance, they pay nothing.  So, there's no out-of-pocket

12   cost, there's no copay, there's no co-insurance, there's no deductible.

13   It's zero cost to the employee or member, which obviously, you know,

14   depending on client design, gives them a lot of incentive to engage

15   with us in a discussion in an application to that pharmaceutical

16   manufacturer.  Next slide.  So, a couple things to [INDISCERNIBLE]

17   here.  We work both on the PBM side, which typically, is coming through

18   a specialty pharmacy vendor, but we'll also work with the third-party

19   administrator, or TPA, because there are percentage of these drugs that

20   not just getting shipped and administering yourself.  You may need to

21   be in a physician's office.  Remicade is a great example.  That

22   administered in a physician's office.  It may be administered in the

23   outpatient department of a hospital.  We can work with the plan to make

24   sure those drugs are actually dispensed through the manufacturers

25   direct, as opposed

24

AbbVie00003655

1          [00:40:00]

2          to the traditional PBM system and see a significant reduction in

3     cost.  Our reimbursement care coordinators, and this is a big

4     differentiator for Payer Matrix compared to our competitors out there

5     in the marketplace, we are only staffing our inbound and outbound calls

6     with nurses, pharma techs, pharmacists, and social workers, and we

7     pride ourselves on that, because they have a better understanding of

8     the medical environment, the conditions that these individuals that

9     we're talking to are under, some of the drug interaction, but, you

10    know, bottom line, we're paying more for the individuals we have that

11    are doing the work, but they also have a good clinical and medical

12    background, which I think is so important.  Beyond the compassion and

13    empathy for understanding what someone's going through when they need

14    to be on one of these drugs, it's the understanding of what they're

15    going through beyond that, and I mentioned there's no fees unless we

16    actually achieve  savings.  So, in essence, we're going to work with

17    the membership, if we can get them into patient assistance programs,

18    we're compensated, plan saved significantly.  If we are unsuccessful,

19    we do not get paid, and those drugs are going to flow right back

20    through the PBM no differently than they did before.  Next slide.  One

21    of the things that always, or questions that comes up, is around, you

22    know, turnaround time, and I'll get into, you know, when we're looking

23    at a new plan sponsor and working with them on their existing, you

24    know, patients or employees that are on brand specialty drugs, but say,

25    we went live, and now, we have a participant that's new.  So, Michael

                                        25

AbbVie00003656

1    Jordan and his doc says he needs to be on yHumira going forward.  Our

2    turnaround time with the drug manufacturer is typically seven to ten

3    business days, but we have workarounds in between that time if I need

4    to get on the drug right away.  So, we'll work closely with the PBM.

5    We may tap into what are called copay assistance programs, where that

6    first fill for that first 30 days, we can still access a significant

7    discount, but I'd just always like to talk about this, because there is

8    an application process.  We're going to lead the charge on that.  We're

9    going to help the patient or employee through that process, but it does

10   take, you know, a couple days there in between to manage that.  Next

11   slide.  So, in terms of a process, now.  Typically, if given the

12   opportunity to work with risk strategies and some of you on the phone,

13   we'd look at your summary plan description, and we'd ask for six months

14   of data.  This allows us to actually look at your most recent brand

15   specialty drug spend and then run a report, typically takes us 48 to 72

16   hours, and in that report, we'll show you, you know, here are the brand

17   specialty drugs that your employees or members are on, and here's the

18   ones that we can actually manage, and ultimately, here's what the cost

19   savings looks like.  If then you're interested in moving forward, we'd

20   go through a contracting phase, get the BAA signed, because typically,

21   the information we're looking at upfront is there is no PHI.  You know,

22   post moving forward, we need to know who the employees are that are

23   being impacted, so we can do outreach.  We've, you know, brought groups

24   on in as little as 30 days when it's only a handful of members that we

25   need to manage, but for some of the larger groups where we have 400-500

26

AbbVie00003657

1    individuals to manage, we needed to go with a 90-day implementation

2    period.  Next slide.  So, this is a little busy, but it at least gives

3    you a perspective on how the process flows, how the process works.  You

4    know, once Payer Matrix is told, yes, we want to move forward with you,

5    we're going to get a letter out to impacted members with you as the

6    employer.  There'll be a welcome packet.  They'll include some HIPAA

7    forms, because we are going to be discussing PHI.  We get those forms

8    back, we find out what drug the participant's on, we research what

9    options are out there that we can tap into.  So, are there manufacturer

10   assistance programs?  Are there foundations?  What's out there that we

11   can tap into to, to reduce costs?  We then engage the employee through

12   that application.  So, I'll pause here, because this is going to be an

13   important point.  As part of the application process, there will be

14   some income verification.  The bulk of the programs offered by big

15   pharma have some income component associated with it.  So, whether you

16   need to provide a copy of a pay stub, whether you have to provide a

17   page off of a tax return, but there is some income verification, and

18   what we'll do is, through that application process, we'll pull that in.

19   We'll send, you know, submit that to the drug manufacturer foundation,

20   and then if approved, members are going to get the drug shipped by the

21   specialty pharmacy that works with that foundation.  That could be

22   through the same PBM you're working with today, or if it's a limited

23   funding or a limited distribution

24        [00:45:00]

25

27

AbbVie00003658

```
 1              drug, you may have to come through one vendor, but you should

 2      know drug manufacturers don't ship this stuff directly.  They need to

 3      use a third party to do it.  We follow up every month to make sure that

 4      the individual got their drug, and then we invoice the plan that way.

 5      Now, say we had an individual where we went through the whole process,

 6      and they were denied, and I'll give you an example.  With Humira, a

 7      household of four making more than $150,000 or $160,000 a year is not

 8      going to be eligible for patient assistance.  That's kind of their

 9      income cutoff based on that family unit.  We'll appeal it, but

10      ultimately, if it's upheld, this is where the interaction with the PBM,

11      your current PBM, is so important, because now we go back to the PBM

12      and say, "Michael Jordan wasn't eligible for Humira.  You need to

13      dispense that drug."  So, now, when the PBM dispenses the drug, you're

14      getting the rebate again, but you're also obviously spending more

15      money, because it's going through the traditional system.  Ultimately,

16      if we got that appeal overturned, it then would fall back into the flow

17      in that kind of second level of this procedure chart.  Next, before I

18      go to the next slide, the only thing I'll say is sometimes people are

19      like, I don't, I don't know if my employees are necessarily going to

20      want to provide any type of financial information.  We have a 95%

21      success rate.  I think a lot of it comes down to once employees

22      understand, or members, you know, depending on who we're talking to,

23      that they can reduce their out-of-pocket costs to zero, a lot of them

24      are going to want to engage, and it came to if we had a kid going to

25      college, and we're applying for financial aid to that institution,
```

28

AbbVie00003659

1     we're going to have to provide some information to help through that

2     process, and that's really the way we look at it, and that's why we get

3     such a high level of employee engagement. Next slide, please. So, in

4     terms of a commitment, and these are what I'll call more housekeeping

5     items, we have a flexible timeline. So, you are not tied to the

6     anniversary date of your plan. In essence, you could put this in the

7     extreme. We see a lot of employers doing that, because they're six

8     months into their plan here. They now see that they have a couple very

9     high-cost drugs that are driving significant cost, and if they could

10    put our program in halfway through their policy period, as they

11    approach the renewal, the stop-loss company is going to look at the

12    risk profile much differently. So, if we've been to take a $100,000

13    drug and turn it into $30,000, it's obviously going to have a

14    significant or a material impact on the stop-loss pricing going

15    forward, which is also going to have an overall impact on member

16    contribution or employee contribution to plan. So, it's kind of a mix.

17    We see some going off the month anniversary and others waiting for

18    anniversary. I mentioned this before. We can work both on the PBM and

19    TPA side. On the TPA side, the specialty drugs are typically termed as

20    J-codes, but again, we can pull in manufacturer assistance to help with

21    those as well. Summary plan description review, and this is important,

22    because as we review the summary plan description, your plan doc, we're

23    going to be making sure that there is language in there to help support

24    our program, which adheres to the manufacturer assistance rules, and

25    I'll give you kind of a Reader's Digest version of how that reads.

29

AbbVie00003660

1      "Employer X, Y, Z has put in fair to help us manage our brand drug

2      specialty costs. As a participant, if you are eligible for

3      manufacturer assistance, you'll receive a phone call from Payer Matrix,

4      and if you're eligible, you pay nothing out of pocket. If Payer Matrix

5      contacts you, goes through the process with you, and you are

6      ineligible, then you'll receive that drug at the current copay or

7      whatever the plan, you know, doc, speaks to." The last bucket, and

8      this is very important, "if as an employee, you refuse to engage with

9      Payer Matrix, you'll be subject to 100% of the cost of the drug." So,

10     akin to a prior authorization or a pre-cert program or any, really, of

11     the management programs that are part of your core medical or pharmacy,

12     we're asking the employer to make this a, you know, a management

13     program that they must follow. It's that language that will dictate

14     and adhere to the rules from Merck and Pfizer and J&J and allow us to

15     get access to those drugs, vis-a-vis, you know, they're very discounted

16     or zero-cost programs. The other thing that, you know, is obviously

17     important is stop loss. If you are carving out these drugs, it's

18     important that the stop loss provider recognizes that and looks at our

19     fee as a claim cost, because if you think about it, we're going to turn

20     a $100,000 drug into a $30,000 cost, but there is no claim cost. It's

21     really our cost avoidance fee. The stop loss companies that we're

22     working with, and it seems to grow every week, are saying, "wow, you,

23     you can reduce cost that much. I'm going to call your fee a claim

24     cost. I'll let it accrue

25        [00:50:00]

30

AbbVie00003661

1    towards my deductible, and if someone pierces their deductible,

2    again, on the stop loss side, then we'll pay your fee." So, it's

3    important that we have that integration. Next slide. So, again, if

4    you're looking at your drug spend, you know, these are the top ten

5    drugs that we've been managing. It'll show kind of a pre-Payer Matrix

6    plan cost. So, on, on Humira, the average 30-day cost was $6,500.

7    Once we get patients into patient assistance, we're able to reduce that

8    cost down to $1,957. So, I won't go through every drug here, but I

9    guarantee if you look at your brand specialty drug spend, you're going

10   to see some of these brand names at the top of your list as well, and

11   that's where there's a, you know, significant opportunity for savings.

12   Next slide. So, you may have also heard through your current PBM copay

13   assistance. So, let me just spend a minute on the difference here.

14   Copay assistance primarily benefits the member or the patient. So, we

15   turn our TV on, we're watching ABC or NBC, some drug commercial comes

16   up, we have no idea what it's for, but someone's running around the

17   field or the beach at Alabama Creek. At the bottom of the screen, it's

18   always going to talk about something around, if you cannot afford this,

19   there's programs to help you do so. The bulk of that is directed at

20   copay assistance. So, helping the employee or member or participant

21   reduce their out-of-pocket costs, but it's not helping you as the plan

22   sponsor. So, what this chart kind of exhibits is there's a large PMB.

23   They have a program called SaveOnSp, and what that program does, it

24   taps into co-pay assistance. We tap into pure patient assistance. So,

25   you can see there's significant additional savings to the right when

31

AbbVie00003662

1    you're tapping into our program versus theirs.  So, it's important that

2    you have a kind of a baseline understanding between patient assistance

3    and copay assistance, because patient assistance is significantly

4    greater in terms of cost reduction.  Next slide.  So, the next couple

5    of slides are just going to get into a case study.  This happened to be

6    a Long Island based plan.  It's a pretty large TAF Harley fund.  They

7    put Payer Matrix in 1/1 of 2019.  I'd like to show the membership, you

8    know, year over year, because if I came in and gave you a story around

9    a plan reducing a drug spend by 30%, and they lost 50% of their

10   employees, well yeah, that makes sense.  They lost half their

11   membership.  In this group, they actually grew membership year over

12   year by a little under 10%.  They did nothing else.  They had Magellan

13   as their PBM.  All they did was put Payer Matrix in to manage their

14   brand specialty drug utilization, and they reduced their cost year over

15   year by $1.6 million, or $55 per member per month.  That's a 30%

16   reduction without any type of trend adjustment, because we all know

17   that there is a 5-10-15% a trend in pharmacy in general.  So, if you

18   think about it, the effective savings here is probably closer to 39-

19   40%.  Next slide.  So, this just breaks down this group a little

20   further.  You know, I had mentioned 3,100 to 3,400 employee lives.

21   They had 77 people of that total population on brand specialty.  So,

22   surprise, surprise, 2-3%. . . they had 444 claims.  They had 2.6

23   million in brand specialty costs that we could address.  Now, what this

24   plan did is they said, you know what, we believe we're going to have a

25   significant amount of savings by putting in this program.  We're going

32

AbbVie00003663

1    to tell our employees that, regardless if you're eligible for patient

2    assistance, you'll pay nothing out of pocket for this drug class,

3    because we know that we're going to have a high level of success.  So,

4    the 2.6 million, there was 200,000 of that where there were people

5    ineligible for our program, but the plan paid 100% anyway.  That left

6    2.4 million.  Of the 2.4 million, we charged 30% of savings.  So, the

7    plan saved 1.6 million.  Again, the employees paid nothing more out of

8    pocket in most instances, or actually in all instances, they paid

9    nothing out of pocket for brand specialty.  They just had to follow the

10   program.  Next slide, and if we had the opportunity to look at your

11   utilization, this is the type of reporting you'd get back on what I'll

12   call a presale basis.  So, we'll look at your drugs that we can manage,

13   you know, how many members, how many claims, what you spent as a plan

14   sponsor last year, what we could save you, and then roll it up to the

15   bottom.  So, in essence, on either a pre-sale, or if you move forward

16   with Payer Matrix, we're going to produce a lot of reporting that's

17   actually going to, you know, kind of dive in and show you, product by

18   product, member by member, what the savings looks like.  Next slide,

19   and that's our story at Payer Matrix.  [INDISCERNIBLE].

20        [00:55:00]

21        MICHAEL GRANT:  Great, Michael.  Thanks so much.  That puts us

22   just at 3:00 o'clock.  I do want to be sensitive to folks' time.  We

23   did start a few minutes late.  So, what I'd like to do is, actually, a

24   handful of questions have come in.  Why don't I ask maybe each of you

25   to address two of them, in the interest of time.  When we look at Payer

33

1    Matrix, I think it's important to identify as a specialty, you know,

2    they clearly are identifying, there's a 50% savings with their

3    engagement, and I think we all would agree that through the television

4    advertisements and print advertisements for Humira and for Enbrel and

5    Remicade, many more of these medications are being prescribed by

6    physicians, and the costs are staggering, and so, I encourage you to

7    take advantage of the opportunity to work with Michael and your risk

8    strategies individual to do a repricing and to do a review of your plan

9    working with your current PBM, and again, as is reference based

10   pricing, the pharmacy specialty model is for those clients who are

11   self-insured.  So, that savings goes right directly to you, and they

12   also have a phenomenal patient advocate center.  So, let me go to the

13   two questions for each of you.  I'll go in reverse order.  So, Michael,

14   I'm going to start with you.  The question reads, "I've never heard

15   about foundations paying for specialty drugs.  Could you give me a few

16   further explanation on who these foundations are?"

17       MICHAEL JORDAN:  Sure, and the bulk of what we're accessing,

18   Michael, is actually the manufacturers themselves.  So, it's Merck and

19   it's J&J, and BristolMeyers Squibb, and this question does come up a

20   lot.  They're like, wait a minute.  I'm charging you a ton of money on

21   this side.  Why would you provide an opportunity for someone to get it

22   free on this side?  And really, a lot of it comes down to two or three

23   key points.  One is we know that the drug manufacturers in general have

24   gotten a pretty bad reputation in the marketplace because of what they

25   do charge, and I was on the phone a couple weeks ago with general

34

AbbVie00003665

1      counsel and a CFO at a mid-sized pharma, and they're like, look, the

2      reality is we're charging 1,000 times what it costs us to make this

3      drug.  Now, we'll hide behind, there's R&D costs.  We'll hide behind,

4      there are drugs that never make it to market, but the bottom line is if

5      it costs us a dollar, we're charging you $1,000.  We have a corporate

6      responsibility to establish programs by which individuals that either

7      don't have access have limited access or plans that put in a management

8      process to help in that.  We can offer that.  Second to that is that,

9      even when they're giving the stuff, and I'm using quotations, for free,

10     through one of these programs, they're taking the tax deduction.  So,

11     either way, they win from a financial standpoint.  One, they're going

12     to win a little more than the other.  The third reason is, really, if

13     it's Humira or Enbrel, I'm a drug manufacturer.  The more people I can

14     get on a particular drug, regardless of the cost structure, the better

15     off I'm going to be long term.  So, they look at these programs as

16     opportunities to expand the net of who they're getting onto these

17     particular drugs.

18         MICHAEL GRANT:  That's great, and the last question, just in the

19     interest to the time, is, are you able to address hemophiliac

20     situations?  I recently had an individual who was in excess of a

21     million dollars for the medication.  Would you be able to help us?

22         MICHAEL JORDAN:  Yes.  So, and we've worked on these factor drugs

23     a couple times.  I will say on those drugs where it's a million,

24     whereas [INDISCERNIBLE] is 2 million, it is hard to get those at no

25     cost, but we've been successful in taking a million dollars down

AbbVie00003666

1    $400,000 or $300,000.  Again, it all depends on the characteristics of

2    the situation, but there are access to those types of programs, and we

3    are actively working on those today.

4        MICHAEL GRANT:  That's great.  Thanks so much.  I'll pass it to

5    you, Matt, for these two questions, which I think are very good and

6    interesting.  Number one, can my members still see their same doctors

7    that they're currently seeing, if we were to move to reference-based

8    pricing and HST?

9        MATTHEW KENNEDY:  Yeah, in most cases, they can.  What'll happen

10    is, is our TPAs will do a physician's disruption analysis, and many of

11    the times, it's not going to have as good a coverage as a Blue Cross or

12    United, but most of the time, their doctors are already within those

13    networks, and if they fall outside that network, HST will wrap around

14    that and apply reference-based pricing or value-based payments there,

15    and if we ever have any pushback, we'll get our patient [INDISCERNIBLE]

16    app center involved and

17        [01:00:00]

18    negotiate with the provider.  We may even get a letter of

19    agreement put in place, and one of the reasons why we get better buy-in

20    is the fact that we pay them maybe at 120 Medicare, we can go up to

21    130-140, which again, is more than what they get paid under a PPO

22    network, which is typically about, typically 110%, and then we're

23    building in some other new things like prompt payment, where we could

24    have a one-time use credit card, where we could pay the provider on

25    site, so we get better, better buy-in to minimize that disruption.

36

1    MICHAEL GRANT:  Great.  You actually… it's a good lead, segue

2    into the next question, which reads, what kind of member disruption can

3    an employer expect moving to a reference-based pricing type of health

4    plan?

5    MATTHEW KENNEDY:  Yes.  So, similar to changing networks, there's

6    going to be some disruption in transition, but what it's all about is

7    setting up the implementation.  So, typically, we're going to have

8    weekly calls leading up to the go-live date, and we're going to also

9    craft the open enrollment according to the needs of the client.  So, we

10   have a wealth of resources, but you have to level set when you are

11   telling groups about the savings, that there are, that there's going to

12   be a couple bumps in the road, and typically, it's in the first quarter

13   to two quarters of the plan year, and that's where we're dialing in

14   with those doctors, as I just mentioned a moment ago, but as you get

15   deeper into the plan year, you'll see the call volume on, you know, on

16   those, you know, those physician issues die down, and really, when you

17   talk to our clients too, they tell you there's not really many bumps

18   with the hospitals.  It's more with the doctors in transition to that

19   PPO network.  So, we have a lot of, you know, good TPAs that we work

20   with to collaborate with us, and the employer group to minimize some of

21   that disruption.  So, it just, it does take a little bit of time, but

22   once we get it homed in, you know, they're going to reap the full

23   rewards of the savings, but also, have a good quality health plan.

24   MICHAEL GRANT:  That's great, thank you.  I'm going to pause

25   there for those individuals who submitted questions through the chat

37

AbbVie00003668

1    bar.  We will work with Matt and Michael and reply back to you through

2    email.  We have your email addresses through the invitation.  To all of

3    the participants today,0 thank you so very much for taking the time

4    during these uncertain times.  We know that cost is a huge driver in

5    the delivery of your employee benefits program.  At Risk Strategies,

6    our guiding light at every turn is to make certain that we are

7    assisting and partnering with you to provide a high quality, cost

8    effective, compliant benefit program, and today, we focused on cost

9    through two unique programs: reference-based pricing and specialty

10   pharmacy, and while they may be new to you, they have been around.

11   We've worked with these two organizations and have very positive

12   experiences, and our clients who work with them are equally as pleased.

13   So, thank you for taking the time to be part of our continuing

14   educational webinar series.  We have an upcoming webinar that will take

15   place in the latter part of July, and we look forward to your

16   participation, as again, we strive to make certain we are exceeding

17   your expectations in high-quality, cost-effective healthcare delivery.

18   Thanks so much.  Be safe.  Wear those masks, and we'll see you all

19   soon.  Thank you.

20       MICHAEL JORDAN:  Thanks.

21       MICHAEL GRANT:  Thanks, Matt.

22

23

24

25

38

AbbVie00003669

# Filed Under Seal

# Exhibit 4

# Filed Under Seal

# Exhibit 5

# Filed Under Seal

# Exhibit 6

# Exhibit 7

Draft Transcript prepared by TransPerfect Legal Solutions


Ep #345: Strategies for Managing Specialty Drug Costs with Sherri Tetachuk,

Senior Vice President of National Sales at Payer Matrix


January 18, 2021


https://shiftshapers.libsyn.com/ep-345-strategies-for-managing-specialty-
drug-costs-with-sheri-tetachuck

AbbVie00003432

1       DAVID SALTZMAN:  If pharmacy costs are the fastest growing

2    components of claim spend, specialty drugs are the biggest driver.

3    What can plans do to better manage these breathtakingly expensive

4    drugs?  We'll find out on this episode of Shift Shapers.

5       FEMALE 1:  Change either paralyzes or energizes.  The choice is

6    yours.  You're listening to the Shift Shapers podcast.  You're about to

7    learn firsthand from businesses and entrepreneurs who have successfully

8    shaped the shifts in their industries.  Get ready to become the change

9    you want to see.  This episode is brought to you by Shift Shapers

10   Strategies.  In sales, if you confuse, you lose.  Clarify your message,

11   so you win more clients, crush your sales goals, and build your

12   practice.  Learn more at schaferstrategies.com, and now, here's your

13   host, Story Brand certified guide and chief transformation strategist,

14   at Shift Shapers Strategies: David Saltzman.

15      DAVID SALTZMAN:  On this episode of Shift Shapers, we're speaking

16   with Sherri Tetachuck, who is senior vice president of national sales

17   at Payer Matrix.  Now, we all know from our clients and everything else

18   that we're doing that one of the single biggest drivers of healthcare

19   costs right now is pharmacy, but within that driver, there's one thing

20   that stands out, and that's specialty drugs, and it is just pushing

21   costs to notches unknown, and we invited Sherri to talk about what's

22   going on in that industry, what are the cost drivers, and what are the

23   options for trying to control them?  With that, welcome Sherri.

24      SHERRI TETACHUCK:  Thank you.

25

1

AbbVie00003433

1          DAVID SALTZMAN:  So, let's level set a little bit.  I know that

2    drug spend is now, for a lot of companies, reaching 25 or 30% of

3    overall spend.  What portion of that is specialty drugs?

4          SHERRI TETACHUCK:  Well, a good portion of that is the specialty

5    drugs.  What we see, when we do our savings analysis on the actual data

6    received by the plans, is there's about 2 to 3% of the members on the

7    plan using about 30 to 70% of the pharmaceutical spend.  So, it's quite

8    expensive, and it's not getting any better.

9          DAVID SALTZMAN:  And you attribute most of that spend to

10   specialty drug?

11         SHERRI TETACHUCK:  It is specialty drug, absolutely.

12         DAVID SALTZMAN:  Now, are these predominantly folks with either

13   chronic conditions or multiple chronic conditions?

14         SHERRI TETACHUCK:  Absolutely, chronic and multiple chronic and

15   genetic conditions.

16         DAVID SALTZMAN:  Well, can you give us a few examples?

17         SHERRI TETACHUCK:  Sure.  So, like the Spinraza and Zolgensma,

18   those are to treat spinal muscular atrophy.  The Zolgensma is a gene

19   therapy drug.  It's hitting about $2.2 million annually, and then what

20   we see is if that doesn't work, then they switch the patient over to

21   Spinraza, which is $750,000 the first year, and then approximately

22   $375,000 the second, third, fourth, and forever, for the life of that

23   patient.

24         DAVID SALTZMAN:  Well, that will certainly bring tears to your

25   eyes.  Now, you say they start on A, and they switch on B.  One of the

2

AbbVie00003434

1    things we've talked about on the program a couple of times is this,

2    it's not new, but apparently, it's new to some folks.  It's called

3    pharmacogenetic testing.  So there's a way to assay the patient's

4    genetic makeup and determine in advance which drug will work best for

5    them.  Is that available on specialty drugs, or is that just more

6    confined to regular pharma?

7        SHERRI TETACHUCK:  That absolutely is available on specialty

8    drugs.  It just doesn't happen, because a lot of plans don't know about

9    it.

10        DAVID SALTZMAN:  Really?  That's interesting, and yet, they're

11    willing to take a million-dollar flyer for a year on a drug that may or

12    may not work for a patient.  The patient's condition gets worse, their

13    quality of life gets worse, and ultimately, they've thrown that money

14    down the drain, because they have to switch to a different drug and

15    start determining the efficacy all over again.  It's surprising for me

16    to hear you say that they don't know about that.  What can we do to

17    raise awareness?

18        SHERRI TETACHUCK:  Well, there are companies out there that

19    clinically manage the, not just the prescription drugs, but the

20    specialty drugs, and there are also PBMs.  There are some PBMs that do

21    that as well.  It's just very rare, but there are companies that will

22    put the patient through kind of that, maybe that step therapy, but

23    also, the clinical steps to ensure that that member is right for that

24    particular treatment with that particular drug.

25

3

AbbVie00003435

1          DAVID SALTZMAN:  So, why are the, to the extent that you can

2     illuminate us, why are these drugs so danged expensive?  It's not like

3     we're talking about drugs for orphan diseases.

4          SHERRI TETACHUCK:  Well, some of them are for orphan diseases,

5     but what happens is Big Pharma says, you know, that they spend most of

6     their money on research and development, and so, they say that,

7     because, you know, they're spending so, much money

8          [00:05:00]

9          on research and development to develop these drugs, that they

10    really need to drive the cost of the drugs when they introduce them to

11    the market.  Now they have to petition Congress, and in Washington DC,

12    there's two lobbyists for every congressman for the pharmaceutical

13    industry.  In 2018, they spent nearly $280 million on lobbying, and

14    part of that lobbying includes "we need to charge this much for this

15    new specialty drug that's coming out into the market, because we spent

16    so much money on research and development," but actually, when you look

17    at the cost of sales and marketing to the cost of research and

18    development, it's about 50% more that they spend on sales and

19    marketing.  All those commercials you see on TV for like the Humira,

20    the Skyrizi, the Enbrel, ask your doctor if this drug is right for you.

21    That's the sales and marketing approach, and then also, you know, being

22    heavily in the provider's face to keep track of, you know, are you

23    prescribing our medication?  So, they do a really good job of that as

24    well.

25

4

AbbVie00003436

1      DAVID SALTZMAN:  Is there any cost benefit analysis relative to

2    overall lifetime patient care that factors into this value proposition

3    that they push?  In other words, are they saying, "well, you may be

4    spending X for this drug, but if you didn't have this drug, you'd be

5    spending 2X for patient care?"

6      SHERRI TETACHUCK:  I don't have that analysis, but I can tell you

7    that these drugs are life-altering.  So, they're very much needed.

8    It's just the expense of these drugs is ridiculous, and it's basically,

9    you know, the drug manufacturers profiteering on these particular

10    specialty drugs.

11      DAVID SALTZMAN:  When we parse claims out for clients, one of the

12    biggest areas that we know is musculoskeletal.  That drives an awful

13    lot of claims spent.  Let's come down from the stratosphere a little

14    bit and get into just the high clouds, I guess.  You mentioned a few

15    drugs, and a lot of that is arthritis or psoriasis or psoriatic

16    arthritis.  Those drugs have been around for a while, and frankly, I

17    was on Enbrel years ago, and over the time that I took that drug, I

18    watched the cost go up.  What's that all about?  How does that happen?

19    How do they even justify that?

20      SHERRI TETACHUCK:  Specialty drug costs increase about 20% every

21    year.  Again, they petition Congress, and they're saying that they, you

22    know, they're cleaning up and redefining the specialty drug.  So, a

23    good example of that is Humira.  So, Humira is for Crohn's, ulcerative

24    colitis, psoriatic arthritis, and the cost of that is depending on the

25    dosage, anywhere from $5,000 to $11,000 a month.  Now, what they've

AbbVie00003437

1    done is, as the patents start to run out, they go through and they

2    clean up the drug and/or develop, maybe by changing one ingredient, and

3    so, then they raise the cost of that.  Or they'll develop a cleaner

4    version of the drug.  So, like Humira, what happened, is they developed

5    Skyrizi.  Well, they market that as, okay, after a double loading dose,

6    you only have to have this injection every three months.  So, it makes

7    it more attractive to the member.  It's essentially doing the same

8    thing as the lower-cost Humira, but it's a way for them to increase the

9    cost, and Skyrizi is about triple the cost of Humira per dose.

10        DAVID SALTZMAN:  So, even though it's taken less frequently, at

11   the end of a 12-month period, is there actually a huge delta in cost?

12        SHERRI TETACHUCK:  Absolutely.  It's about 50% more when you look

13   at it at the end of the day.

14        DAVID SALTZMAN:  All for the patient convenience and maybe some

15   additional efficacy.

16        SHERRI TETACHUCK:  Maybe some, yes.

17        DAVID SALTZMAN:  Wow.  So, if we mere mortals who are out here

18   practicing in this world and watching employers get just bushwhacked by

19   these costs, what can we do?  What are the strategies that you know

20   about that are working to try to help employers keep these costs in

21   check and still deliver a great product and a good quality of life to

22   their employees?

23        SHERRI TETACHUCK:  Well, one of the things, you know, that a lot

24   of employers aren't aware of is those specialty drugs that run through

25   the medical side, so the TPA side.  They see them on the PBM side,

6

AbbVie00003438

1    because that's easily reported.  You know, the PBMs usually give you

2    the top-20 spend under a specialty drug category, but on the medical

3    side, you can also be effective with the IV infusions, for the

4    outpatient IV infusions.  So, there's ways to control the costs on both

5    sides, PBM and the TPA.  You can do it by plan design, by excluding the

6    specialty drugs, and then working directly with a company that can

7    provide alternative funding at 100% removal of that cost of the drug

8    when they actually can get a member into one of the patient assistance

9    programs or other alternative funding programs that the pharmaceutical

10   companies offer, but they don't readily make it

11       [00:10:00]

12       available.  They do make the ease of the copay card in the

13   coupons readily available.  The specialty pharmacist will tell the

14   members about those, but those really only offset the cost of the drug

15   mostly for the member, because it waives their copay.

16       FEMALE 1:  And now, a word from our sponsor.  It's a fact:

17   salespeople and organizations lose opportunities because they don't

18   clearly communicate their value.  In today's market, your story is your

19   message.  It should be crystal clear, perfectly arranged, and precisely

20   targeted to attract the clients you want.  As a certified Story Brand

21   guide, we use the exclusive SB-7 process to create that story and the

22   websites and collateral that deliver it.  If your message isn't cutting

23   through the noise, we can help.  Visit us at shiftshaperstrategies.com

24   to learn how we can help you find, clarify, and deliver a message that

25   wins clients, crushes sales goals, and builds your practice.  In sales,

7

AbbVie00003439

1   if you confuse, you lose.  So, learn more and schedule that call today

2   at schaperstrategies.com.  That's shiftshaperstrategies.com, and now,

3   back to our discussion.

4       DAVID SALTZMAN:  Right, but it doesn't do anything to help the

5   underlying cost of the drug, because a dollar bill can only have one

6   person's name on it at a time, and you know, I had an Enbrel copay card

7   and was thrilled to death to have it, but I always wondered, you know,

8   okay, is this the reason why these costs never come down, because we're

9   just shifting money from, you know, if you're playing Three Card Monty,

10  you're just moving the pea from, you know, under one card and into the

11  third card.  I mean, I just don't, I don't see how that actually helps

12  the overall cost of the drugs, even though it does help the patients.

13      SHERRI TETACHUCK:  Right.  So, the pharmaceutical companies do

14  offer the patient assistance programs.  You can do plan design by

15  having a specialty drug carveout, which essentially says that the drugs

16  aren't covered, and that they have to go through a company that can

17  assist with the cost of the specialty drug and then work directly with

18  the manufacturers who offer these programs, and they offer the

19  programs, because they use the patient assistance programs, meaning

20  they will cover the cost of those specialty drugs.  They use those

21  programs to petition Congress to say, "you know, we understand that

22  these drugs are very expensive.  It costs us a lot of money in research

23  and development to develop these drugs.  However, we do offer patient

24  assistance programs and foundational monies to pay for the drugs for

25

8

AbbVie00003440

1   those members that can't afford the drug or have lack of coverage for

2   that drug."

3        DAVID SALTZMAN:  So, we're doing good by doing well.

4        SHERRI TETACHUCK:  Yes, and so, like I said, to navigate the

5   patient assistance programs can be very difficult.  They don't make it

6   really easy to navigate that process.  So, if you're a member trying to

7   do it yourself, it's very difficult.  Plus, if your plan design has

8   coverage for specialty drugs, you automatically will not qualify for

9   their patient assistance program.

10       DAVID SALTZMAN:  But if you're even a non-cynical employer, and

11  let's say you've got a self-funded plan, so, you're actually getting

12  meaningful data that you can look at and understand and try to use to

13  make smart decisions, at some point, you have to say to yourself, this

14  is doing nothing for me, for the plan.  It's just continuing to find a

15  way to keep the costs high.  Is there a way to actually move the lever

16  on cost besides beating your congressman over the snout with a rolled-

17  up newspaper?

18       SHERRI TETACHUCK:  The congressmen have two pharmaceutical

19  lobbyists in their ear, every congressman does, in their ear.  So, it's

20  not going to change through Congress.  I know they're working on, you

21  know, helping the Medicare population and trying to lessen the burden

22  on the Medicare Trust, but the commercial market is getting nailed by

23  these things.  So, you know, really the best way to approach it is for

24  an employer to take that proactive step to carve out the specialty

25  drugs, make them not covered, and then work with the company that can

9

AbbVie00003441

1    get the alternative funding in place and get the drug sourced directly

2    through the manufacturer and where that drug cost doesn't even go

3    through the plan.

4         DAVID SALTZMAN:  I had a PBM rep on who was critical of the

5    industry a few years ago, and he said, it almost sounds like an offer

6    that's made by somebody who's both a mafiosi and an academic.  They're

7    making you an offer you can't understand.  I mean, so, what … let's

8    talk about plan design for a moment, because that may be, you know,

9    maybe that's a great area to look at.  You just simply, in your SPD,

10   you just simply carve them out, say they're not available under the

11   base medical plan, but you can go here, or you have to go here if you

12   want these?

13        SHERRI TETACHUCK:  That's correct, yes.

14        DAVID SALTZMAN:  And so, what's that patient experience like?

15   Does the patient have to, is that something the patient's physician

16   deals with, or does the patient have to call into a clinician or a

17   nurse or whatever on

18        [00:15:00]

19        a hotline and arrange this themselves?  What's the burden on the

20   patient to do this?

21        SHERRI TETACHUCK:  So, the members are identified at the

22   implementation process.  All of the members that are on the specialty

23   drugs that are on that excluded list, those members are identified.

24   They're assigned a care coordinator who's clinical, who has background

25   in specialty pharmaceuticals, understands the disease, and they're very

AbbVie00003442

1    sensitive to the member, because you got to understand, these members

2    are sick, and to have to quote/unquote jump through hoops to try to

3    get, you know, the alternative funding, it can be burdensome for them.

4    So, what the care coordinator does is fills out the application form

5    for the member over the phone by asking questions, gathers most of the

6    information from the claims data and the eligibility file first, before

7    they reach out and do the welcome call and ask the questions that's

8    required on the application.  Then that application is sent to the

9    member to sign off on and this consent form is sent, and then the care

10    coordinator coordinates everything with the physician, the member, and

11    the manufacturer, and then once that manufacturer says, "okay, this

12    member qualifies, this member is eligible for our program for a year,"

13    then that drug is going to be sourced either directly from the

14    manufacturer to the member, not running through the plan, or the member

15    will be told, you can stay at your regular specialty pharmacy, and the

16    pharmacy will actually bill the manufacturer for that drug, not the

17    plan, and then every month, that care coordinator's going to reach out

18    to that member to make sure that they receive their drug, they track

19    the drug right when it leaves the manufacturer, and when it ends up in

20    the patient's hands, they call the patient and make sure that they

21    received it, provide any kind of support that they may need, and

22    provide reassurance that they are going to get that drug every month on

23    time when they're supposed to, and that's pretty crucial, to provide

24    that reassurance right now, because, you know members are kind of

25

AbbVie00003443

1    hoarding their drugs because of COVID and being afraid that they're

2    going to lose that coverage.

3         DAVID SALTZMAN:  Is there a way to interface with physicians or

4    their staffs, because my experience is that an awful lot of physicians

5    have absolutely no idea, or at best, a vague idea of what this stuff

6    costs.  Is there … I'm just trying to figure out a better way to do

7    this than one at a time.  Is there a way to educate staffs and doctor's

8    offices to say, hey, this drug has a copay program, or check your plan

9    because you may do this or that, or the next thing, or are they just,

10   they just got to know the plan and figure it out?

11        SHERRI TETACHUCK:  Well, you know, most of the, time physicians

12   aren't even aware, only about 40% of them are aware that there may be

13   some sort of patient assistance program in place, but you got to

14   understand the qualifications to qualify for a patient assistance

15   program is you can't have coverage for that drug if you want to get

16   into a patient assistance program.  So, it really has to be led by the

17   plan and the plan design and to carve out the specialty drugs to start

18   the process, and then, you know, when you reach out to the member to

19   get them started on the program, the coordination begins with the

20   physician, because the physician has a little bit that they have to

21   fill out of the application process.  It's usually only about a half a

22   page.  So, we work with the physician to get all the application pieces

23   filled out, and most of the time they're very, very cooperative.

24

25

AbbVie00003444

1      DAVID SALTZMAN:  That's a little different than the copay plans,

2   because at least on the ones that I've seen, you have to have private

3   insurance in order to qualify for the copay plans.

4      SHERRI TETACHUCK:  Yeah, it is.  It's a lot different.  So, what

5   you think about is 100% removal of the cost of the drug from the plan.

6   The copay cards, they provide savings for the member, but, you know, on

7   a Humira, they're still going to have to, the plan's still going to

8   have to pay about $5,000 each month.

9      DAVID SALTZMAN:  It's a great distinction.  It's a terrific thing

10  to know.  Unfortunately, we're out of time, but we'd love to have you

11  back.  Sherri Tetachuck, senior vice president of national sales at

12  Payer Matrix.  Sherri, great information.  Thank you so much for

13  sharing with the audience.

14     SHERRI TETACHUCK:  You're welcome, thank you for having me.

15     FEMALE 1:  The Shift Shapers Podcast is a production of Shift

16  Shapers Strategies and may not be reproduced or quoted in whole or in

17  part without our express written permission.  Copyright 2020, all

18  rights reserved.

19

20

21

22

23

24

25

AbbVie00003445

# Filed Under Seal

# Exhibit 8

# Filed Under Seal

# Exhibit 9

# Filed Under Seal

# Exhibit 10

# Filed Under Seal

# Exhibit 11

# Filed Under Seal

# Exhibit 12

**Filed Under Seal**

**Exhibit 13**

# Filed Under Seal

# Exhibit 14

# Filed Under Seal

# Exhibit 15

# Filed Under Seal

# Exhibit 16

# Filed Under Seal

# Exhibit 17

# Filed Under Seal

# Exhibit 18

# Filed Under Seal

# Exhibit 19

# Filed Under Seal

# Exhibit 20

# Filed Under Seal

# Exhibit 21

# Exhibit 22



Payer Matrix        PATIENTS    PARTNERS    **EMPLOYERS**    TECHNOLOGY    RESOURCES ⌄    **CONTACT**

# How **we** do it



### High-Touch Care Management

Our team has decades of experience in specialty pharmacy, home infusion, and employee benefits management. We understand the unique needs of the specialty patient, as well as how important it is to manage those complex conditions effectively. This helps you save money on benefits and your employees maintain their clinical treatment plan.



### Care coordinators

Our Care Coordinators are at the heart of our operation and work directly with members, plan sponsors, and any other vendors as required to complete program enrollment.

We also maintain the prior authorization process to ensure appropriate clinical care. As a result, members are not disrupted and always receive their medications. There is no interruption in supply, no requirements to change brands or dosing, the only difference is the source of the medication, and of course the reduced cost.

# Exhibit 23



# Payer Matrix Specialty Drug List

As of December 2022

| Specialty Brands | | | | | | |
|---|---|---|---|---|---|---|
| ABRAXANE | CINQAIR | GRANIX | LUMIZYME | PALFORZIA | SOMATULINE | VELCADE |
| ACTEMRA | CINRYZE | HARVONI | LUMOXITI | PALYNZIQ | SOMAVERT | VELETRI |
| ACTHAR | COMPLERA | HEMLIBRA | LUPKYNIS | PEMAZYRE | SOTYKTU | VELPHORO |
| ADAKVEO | COPIKTRA | HERCEPTIN | LUPRON | PERJETA | SOVALDI | VEMLIDY |
| ADBRY | COSENTYX | HERZUMA | LUXTURNA | PERTZYE | SPINRAZA | VENCLEXTA |
| ADCETRIS | COTELLIC | HUMATROPE | LYNPARZA | PHESGO | SPRYCEL | VERZENIO |
| ADCIRCA | CREON | HUMIRA | MAKENA | PIFELTRO | STELARA | VIGADRONE |
| ADEMPAS | CRESEMBA | IBRANCE | MARGENZA | PIQRAY | STIVARGA | VIMIZIM |
| AFINITOR | CRYSVITA | ICLUSIG | MAVENCLAD | PLEGRIDY | STRENSIQ | VITRAKVI |
| AFSTYLA | CUVITRU | IDHIFA | MAVYRET | POLIVY | STRIBILD | VITRAKVI |
| AIMOVIG | CYRAMZA | ILARIS | MAYZENT | POMALYST | SUCRAID | VIVITROL |
| AKYNZEO | DANYELZA | ILUMYA | MEKINIST | PRALUENT | SUSVIMO | VONVENDI |
| ALECENSA | DARZALEX | ILUVIEN | MEKTOVI | PREVYMIS | SUTENT | VOSEVI |
| ALIMTA | DAURISMO | IMBRUVICA | MVASI | PREZCOBIX | SYMDEKO | VOTRIENT |
| ALPROLIX | DELSTRIGO | IMCIVREE | MYCAPSSA | PREZISTA | SYMTUZA | VOXZOGO |
| ALUNBRIG | DESCOVY | IMFINZI | NERLYNX | PROCYSBI | SYNAGIS | VPRIV |
| AMONDYS-45 | DOPTELET | IMLYGIC | NEULASTA | PROLASTIN | TAFINLAR | VUMERITY |
| AMVUTTRA | DOVATO | INCRELEX | NEUPOGEN | PROLIA | TAGRISSO | VYEPTI |
| APOKYN | DUPIXENT | INFLECTRA | NEXAVAR | PROMACTA | TAKHZYRO | VYNDAMAX |
| APTIOM | EDURANT | INGREZZA | NEXVIAZYME | PULMOZYME | TALTZ | VYONDYS 53 |
| ARALAST | ELAPRASE | INLYTA | NINLARO | PYRUKYND | TALZENNA | VYVGART |
| ARANESP | ELITEK | INQOVI | NITYR | RADICAVA | TARGRETIN | VYXEOS |
| ARCALYST | ELOCTATE | INREBIC | NIVESTYM | RAPAMUNE | TASIGNA | WAKIX |
| ARISTADA | EMFLAZA | ISENTRESS | NORDITROPIN | RAVICTI | TAVALISSE | WELIREG |
| ASPARLAS | EMPLICITI | ISTODAX | NORTHERA | REBIF | TAVNEOS | XALKORI |
| AUBAGIO | ENBREL | JADENU | NPLATE | REBLOZYL | TAZVERIK | XATMEP |
| AUSTEDO | ENHERTU | JAKAFI | NUBEQA | RELYVRIO | TECENTRIQ | XELJANZ |
| AVASTIN | ENJAYMO | JEMPERLI | NUCALA | REMICADE | TECVAYLI | XEOMIN |
| AVONEX | ENTYVIO | JEVTANA | NULOJIX | REMODULIN | TEPEZZA | XERMELO |
| AVSOLA | EPIDIOLEX | JIVI | NUTROPIN | RENFLEXIS | TEPMETKO | XGEVA |
| BALVERSA | EPOGEN | JULUCA | NUWIQ | REPATHA | TEZSPIRE | XOLAIR |
| BANZEL | ERBITUX | JUXTAPID | NUZYRA | RETACRIT | THALOMID | XOSPATA |
| BENDEKA | ERIVEDGE | JYNARQUE | NYVEPRIA | RETEVMO | THIOLA | XPOVIO |
| BENLYSTA | ERLEADA | KADCYLA | OCALIVA | REVATIO | THIOLA EC | XTANDI |
| BERINERT | ESBRIET | KALBITOR | OCREVUS | REVCOVI | TIBSOVO | XYREM |
| BESREMI | EVENITY | KALYDECO | ODEFSEY | REVLIMID | TIVDAK | XYWAV |
| BETASERON | EVKEEZA | KANJINTI | ODOMSO | REZUROCK | TIVICAY | YERVOY |
| BIKTARVY | EVRYSDI | KANUMA | OFEV | RIABNI | TORISEL | YONDELIS |
| BOSULIF | EXKIVITY | KESIMPTA | OLUMIANT | RINVOQ | TRACLEER | YONSA |
| BRAFTOVI | EXTAVIA | KEVEYIS | OMNITROPE | RITUXAN | TRAZIMERA | ZARXIO |
| BREYANZI | EYLEA | KEVZARA | ONCASPAR | RIXUBIS | TREMFYA | ZEJULA |
| BRINEURA | FABRAZYME | KEYTRUDA | ONPATTRO | RUBRACA | TRIKAFTA | ZELBORAF |
| BRIVIACT | FASENRA | KINERET | ONTRUZANT | RUKOBIA | TRIUMEQ | ZEPATIER |
| BRUKINSA | FEIBA | KISQALI | ONUREG | RUXIENCE | TRODELVY | ZEPOSIA |
| BYOOVIZ | FIRAZYR | KORLYM | OPDIVO | RYBREVANT | TRUVADA | ZIEXTENZO |
| CABENUVA | FIRDAPSE | KOSELUGO | OPSUMIT | RYDAPT | TURALIO | ZIRABEV |
| CABLIVI | FOTIVDA | KOVALTRY | OPZELURA | SABRIL | TUKYSA | ZOKINVY |
| CABOMETYX | FRAGMIN | KRYSTEXXA | ORENCIA | SANDOSTATIN | TURALIO | ZOLADEX |
| CALQUENCE | GALAFOLD | KUVAN | ORENITRAM | SAPHNELO | TYKERB | ZOLGENSMA |
| CAMPTOSAR | GAMIFANT | KYMRIAH | ORGOVYX | SARCLISA | TYMLOS | ZOLINZA |
| CAPRELSA | GATTEX | KYPROLIS | ORILISSA | SCEMBLIX | TYSABRI | ZYDELIG |
| CARBAGLU | GAZYVA | LENVIMA | ORKAMBI | SELZENTRY | TYVASO | ZYKADIA |
| CAYSTON | GENOTROPIN | LEUKINE | ORLADEYO | SENSIPAR | TYVASO DPI | ZYNLONTA |
| CELLCEPT | GENVOYA | LEXIVA | OTEZLA | SIGNIFOR | UDENYCA | ZYNTEGLO |
| CEREZYME | GILENYA | LIBTAYO | OXBRYTA | SILIQ | ULTOMIRIS | ZYTIGA |
| CHENODAL | GILOTRIF | LONSURF | OXERVATE | SIMPONI | UPTRAVI | |
| CHOLBAM | GIVLAARI | LORBRENA | OXLUMO | SKYRIZI | VABYSMO | |
| CIBINQO | GLASSIA | LUCENTIS | OZURDEX | SKYSONA | VALCHLOR | |
| CIMZIA | GOCOVRI | LUMAKRAS | PADCEV | SOLIRIS | VECTIBIX | |

# Filed Under Seal

# Exhibit 24

# Filed Under Seal

# Exhibit 25

# Filed Under Seal

# Exhibit 26

# Filed Under Seal

# Exhibit 27

# Filed Under Seal

# Exhibit 28

# Filed Under Seal

# Exhibit 29

# Filed Under Seal

# Exhibit 30

# Filed Under Seal

# Exhibit 31

# Filed Under Seal

# Exhibit 32

# Filed Under Seal

# Exhibit 33

# Filed Under Seal

# Exhibit 35

# Filed Under Seal

# Exhibit 35(a)

# Filed Under Seal

# Exhibit 36

# Filed Under Seal

# Exhibit 37

# Filed Under Seal

# Exhibit 38

# Filed Under Seal

# Exhibit 39

# Filed Under Seal

# Exhibit 40

# Filed Under Seal

# Exhibit 41

# Filed Under Seal

# Exhibit 42

# Filed Under Seal

# Exhibit 44

# Filed Under Seal

# Exhibit 45

# Filed Under Seal

# Exhibit 46

# Filed Under Seal

# Exhibit 51

# Filed Under Seal

# Exhibit 52

# Filed Under Seal

# Exhibit 53

# Filed Under Seal

# Exhibit 54

# Filed Under Seal

# Exhibit 55

# Filed Under Seal

# Exhibit 56

# Filed Under Seal

# Exhibit 57

# Filed Under Seal

# Exhibit 58

# Filed Under Seal

# Exhibit 60

# Filed Under Seal

# Exhibit 61

# Filed Under Seal

# Exhibit 62

# Filed Under Seal

# Exhibit 63

# Exhibit 65

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:23-cv-02836 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| PAYER MATRIX, LLC, | ) | Hon. Magistrate Young B. Kim |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF EXPEDITED INTERROGATORIES

Pursuant to Fed. R. Civ. P. Rules 26 and 33 and the Local Rules of the United States District Court for the Northern District of Illinois (the "Local Rules"), Defendant Payer Matrix, LLC ("Defendant" or "Payer Matrix"), by and through its undersigned attorneys, asserts the following responses and objections to Plaintiff AbbVie Inc.'s ("Plaintiff" or "AbbVie") First Set of Expedited Interrogatories (each individually, an "Interrogatory," and collectively, the "Interrogatories") as follows:

## GENERAL OBJECTIONS

The General Objections are incorporated into the specific objections and responses to each Interrogatory, including each and every amendment, supplement, or modification to any response as may be made subsequently, and are set forth here to avoid excessive duplication and repetition. Any future response to each Interrogatory, including each and every amendment, supplement, or modification to any response as may be made subsequently, is made subject to the General Objections set forth herein.

-1-



1.      Defendant objects to the Interrogatories, and each of them, as overly broad, unduly burdensome, unnecessary, and not proportional to the needs of the case.

2.      Defendant objects to the Interrogatories as unduly burdensome to the extent that they call for information that may be derived or ascertained from business records, compilations, abstracts, or summaries that Defendant has produced or will produce in this action.

3.      Defendant objects to each Interrogatory to the extent it seeks information that is protected from discovery by the attorney-client privilege or the work-product doctrine, or which constitutes or discloses the mental impressions, conclusions, opinions, or legal theories of an attorney in this or any other litigation, or which is protected from disclosure by any other privilege or immunity.  Defendant reserves and retains any and all claims of privilege and protection and asserts each privilege and/or protection to the fullest extent provided by law.

4.      Defendant's inadvertent disclosure of any information protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection is not intended to be and shall not be (i) a waiver of such privilege and/or protection in whole or in part or (ii) a waiver of the right to object to any use of such document or information in this or any other proceeding.

5.      Defendant objects to the Interrogatories to the extent they call for information within Plaintiff's knowledge or to which Plaintiff has equal access, or the identification or production of documents which Plaintiff already has in its possession or control or which are otherwise publicly available or equally accessible to Plaintiff, on the grounds that they are unduly burdensome, oppressive, harassing, and vexatious, and go beyond any legitimate need of Plaintiff for discovery.

-2-

6.      Defendant objects to the Interrogatories to the extent they seek to elicit discovery of documents and tangible things prepared in anticipation of litigation or for trial by Defendant.

7.      Defendant objects to the Interrogatories to the extent they seek disclosure of information that constitutes trade secrets, proprietary information, or other confidential materials of Defendant.

8.      Defendant objects to each Interrogatory to the extent that it seeks an answer regarding "each," "all," "every" or "any" person(s), document(s), communication(s), or fact(s), as overly broad and unduly burdensome.

9.      Defendant objects to the term "You" to the extent that it creates an obligation to search for and/or respond with information not in Payer Matrix's possession, custody or control, such as the information in the possession of affiliates, predecessors, successors, former employees, or third parties.

10.     Defendant objects to the definition of Payer Matrix's Program to the extent that it describes Payer Matrix as an alternate funding vendor.  Payer Matrix offers advocacy services to Client's members, which include assisting those members with identifying and applying for alternate sources of funding for their specialty drugs.

11.     Defendant objects to the definition of "Patients" to the extent that its reference to "health insurance plans" refers to any commercial insurers or fully-funded health plans.

12.     Defendant objects to the definition of "Clients" as vague and ambiguous to the extent that it incorporates any third-parties that "enter into a written agreement" with Payer Matrix.

13.     Defendant objects to the Interrogatories to the extent that they seek information from January 1, 2021, to the present.

-3-

14.     The fact that Defendant has responded to a particular Interrogatory shall not be interpreted as implying that Defendant acknowledges the appropriateness of such Interrogatory.

15.     To the extent that Defendant responds to an Interrogatory via production of documents, such production shall not constitute an admission as to any document's admissibility, relevance, or authenticity. Defendant reserves the right to redact material that is irrelevant and non-responsive from any such document that Defendant determines to produce.

16.     Nothing herein waives, or is intended to waive, Defendant's right to object to the relevancy, materiality, and/or admissibility of any information or documents that Defendant provides in response to the Interrogatories.

17.     Defendant's responses and objections herein are based upon information now known to Defendant. Given that fact discovery is ongoing as of the date of these responses and objections, Defendant's investigation and search for information responsive to the Interrogatories (to the extent not objected to) remains ongoing. Defendant will provide supplemental response(s) to the Interrogatories, if any, to which objection is not being made, as that information is located. Defendant reserves the right to supplement and amend their responses and objections, if necessary, to reflect additional information. The within responses reflect Defendant's knowledge and objections to the extent now known.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1:

For Clients who "carve out" specialty drugs from their health insurance plans shortly before or after joining the Payer Matrix Program, explain each step of that process of which you are aware, including (i) your role in advising Clients to implement the carve-out and your involvement in the carve-out's execution, (ii) the role of the Pharmacy Benefit Manager and your Clients in the

carve-out process, and (iii) any written or electronic system changes that are made to the health insurance plans as part of that process, including but not limited to whether the plan modifications entail changing the status of the specialty drugs from essential health benefits to non-essential health benefits, whether the prior authorization requirements change, and whether certain Patients are exempt from or otherwise not included in the carve-out due to their household incomes or for any other reason. The relevant time period for Interrogatory No. 1 is January 1, 2023, to the present.

**RESPONSE TO INTERROGATORY NO. 1:**

Defendant incorporates its General Objections set forth above. In particular, and without limitation of the foregoing, Defendant objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome to the extent that it seeks information related to every single Client and is not limited in scope to AbbVie Drugs. Defendant objects to this Interrogatory on the grounds that it is compound and represents separate requests or discrete subparts as set forth in Fed. R. Civ. R. 33(a)(1). Defendant also objects to this Interrogatory to the extent that it creates an obligation to search for and/or respond with information not in Payer Matrix's possession, custody, or control, such as the information in the possession of third parties. Payer Matrix also objects to this Interrogatory on the grounds that it assumes facts not in the record. Defendant further objects to this Interrogatory to the extent it uses and/or relies on the word "health insurance plans" to describe commercial health insurance or fully-funded health plans.

Subject to and without waiving the foregoing objections, Defendant responds to this Interrogatory as follows: **Execution and implementation of specialty drug "carve-outs" are determined and managed at the Client and/or Pharmacy Benefit Manager ("PBM") level. Payer Matrix provides prospective Clients and existing Clients with Payer Matrix's "drug**

list" for reference. The "drug list" identifies all specialty drugs that have manufacturer supported assistance or another funding program available and for which Payer Matrix provides advocacy services. The Client and/or PBM determine which specialty drugs will be covered by plan benefits and which specialty drugs will not be covered by plan benefits, which could include making no further changes to prior existing specialty drug "carve-outs." Each Client's specialty "carve-outs" are unique to that Client and are within its sole discretion.

Payer Matrix does not have control nor does it make decisions regarding which of the specialty drugs a Client will "carve-out." The Client and/or PBM notify Payer Matrix of its specialty drug "carve-outs" and Payer Matrix implements that Client's determination into its own systems solely for the purposes of being able to track Payer Matrix's services to that Client and comply with the Client's requirements.

Payer Matrix is generally "aware" that Clients may make written or electronic system changes as part of implementing specialty drug "carve outs" (whether before or after their engagement with Payer Matrix). While Payer Matrix has a suggested plan language template it can share with Clients, the decision regarding whether and how the plan documents need to be amended is the Client's decision to administer together with the PBM and the third-party administrator. To the extent that the Client and/or PBM make changes that affect *Payer Matrix's* processes (*e.g.*, changes regarding which specialty drugs Payer Matrix should or should not provide advocacy services for), Payer Matrix is notified of those changes by the Client and/or PBM. The decision as to whether drugs are essential or non-essential health benefits or whether prior-authorization is changing or required is not

something that Payer Matrix has any control over or makes any recommendations regarding.

Payer Matrix is not aware of any Clients whose specialty drug "carve-outs" are dependent upon whether or not the members' household income exceeds the PAP eligibility threshold. As far as Payer Matrix is aware, its Clients' specialty drug "carve-outs" apply equally to all members regardless of income or other characteristics and, traditionally, are subject to each plan sponsor's typical benefit reconsideration policies, which vary by plan sponsor.

**INTERROGATORY NO. 2:**

For Clients who have health insurance plans that continue to Provide specialty drug coverage to Patients if the Patients have household incomes that exceed the PAP eligibility threshold or otherwise were denied admission into the PAP, explain in detail what, if any, written or electronic changes are made to the health insurance plan documents or systems to account for this continued coverage. The relevant time period for Interrogatory No. 2 is January 1, 2023, to the present.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant incorporates its General Objections set forth above. In particular, and without limitation of the foregoing, Defendant objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome to the extent that it seeks information related to every single Client. Defendant also objects to this Interrogatory to the extent that it creates an obligation to search for and/or respond with information not in Payer Matrix's possession, custody, or control, such as the information in the possession of third parties. Payer Matrix also objects to this Interrogatory on the grounds that it assumes facts not in the record. Defendant further objects to this Interrogatory

-7-

to the extent it uses and/or relies on the word "health insurance plans" to describe commercial health insurance or fully-funded health plans.

Subject to and without waiving the foregoing objections, Defendant responds to this Interrogatory as follows: **Payer Matrix is not aware of any Clients whose specialty drug "carve-outs" are dependent upon whether or not the members' household income exceeds the PAP eligibility threshold. As far as Payer Matrix is aware, its Clients' specialty drug "carve-outs" apply equally to all members regardless of income or other characteristics and, as usual, are subject to each plan sponsor's typical benefit reconsideration policies, which vary by plan sponsor.**

**With respect to Patients that are denied admission into the PAP, each Client has its own processes by which it addresses those denials (if at all). Decisions regarding how to address those denials (if at all) are made by the Client and vary by Client. Payer Matrix does, however, inquire who at the plan sponsor will be making benefit determinations if someone is denied enrollment into the PAP or if there is no program for the medication.**

**Payer Matrix is not involved in making any written or electronic changes to any plan documents, and with the exception of only four of the PBMs that it works with, does not have access to its Clients' or their PBMs' systems. For those PBMs to whose systems Payer Matrix does have access, Payer Matrix is able to place an override for plan coverage directly only after an override is approved by the Client. Payer Matrix is otherwise generally aware that Clients and/or PBMs do make changes from time to time to their own policies and based on their specific needs. To the extent that the Client and/or PBM make changes that affect Payer Matrix's processes (_e.g._, the process by which Payer Matrix should notify the Client**

**and/or PBM about a PAP denial), Payer Matrix would be notified of those changes by the Client/PBM.**

**INTERROGATORY NO. 3:**

Identify every presentation you have made to Clients, prospective Clients, or other third parties in 2023 in which you have mentioned AbbVie, the PAP, or AbbVie's Drugs, either orally or in a PowerPoint, including but not limited to references to AbbVie as your partner or a manufacturer with which you work, including the date of the presentation, the names of the individuals or groups attending the presentation, the names of the Payer Matrix representative(s) giving the presentations, and whether a PowerPoint or written literature were part of the presentation.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant incorporates its General Objections set forth above. In particular, and without limitation of the foregoing, Defendant objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome to the extent that it seeks "every" presentation made and the names of all the individuals attending those presentations, many of which are never known to Payer Matrix. Defendant further objects to this Interrogatory on the grounds that it is vague and ambiguous to the extent that it seeks all presentations that "mentioned" AbbVie. Defendant also objects to this Interrogatory to the extent that it creates an obligation to search for and/or respond with information not in Payer Matrix's possession, custody, or control, such as the information in the possession of third parties.

Subject to and without waiving the foregoing objections, Defendant responds to this Interrogatory as follows: **Payer Matrix's outdated marketing presentation materials made reference to AbbVie Drugs and/or AbbVie as a high-cost specialty manufacturer. AbbVie**

and AbbVie's Drugs appeared alongside its competitors on a slide featuring the largest pharmaceutical companies and products on the market that are driving increases in plan spend. Other than that passing reference, none of the presentations otherwise focused on AbbVie, AbbVie's Drugs, or AbbVie's PAP other than to say that Payer Matrix had experience with assisting its Clients' members in accessing the AbbVie PAP. Starting in the second quarter of 2023, Payer Matrix began updating its presentation materials to remove references to AbbVie Drugs and/or AbbVie. To the extent that Payer Matrix's representatives noted orally during the updated presentations that they no longer offer advocacy services in connection with AbbVie Drugs, these presentations have been noted below as well. All versions of the presentations referenced below have been included in Payer Matrix's document production. The presentations described above, from January 1, 2023 to the present, include:

- Presentation by Michael Jordan, Chief Business Officer, to LP Insurance on January 3, 2023.

- Presentation by Mr. Jordan to ECBM Insurance Brokers & Consultants on January 4, 2023.

- Presentation by Mr. Jordan to Publix on January 4, 2023.

- Presentation given by Heather Schiappacasse, Vice President of Sales, to EBS (TPA) on January 4, 2023.

- Presentation by Mr. Jordan to PillarRX on January 5, 2023.

- Presentation given by Ms. Schiappacasse to Legacy Benefits on January 6, 2023.

- Presentation given by Ms. Schiappacasse to PDX Rx on January 9, 2023.

- Presentation given by Ms. Schiappacasse to Ins Group on January 11, 2023.

- Presentation by Mr. Jordan to QBE Re on January 11, 2023.

- **Presentation by Mr. Jordan to Gallagher on January 11, 2023.**

- **Presentation by Mr. Jordan to USI Insurance Services on January 12, 2023.**

- **Presentation given by Ms. Schiappacasse to ERS Wireless on January 13, 2023.**

- **Presentation by Mr. Jordan to NYC Building & Construction Trades Council on January 13, 2023.**

- **Presentation by Mr. Jordan to Whitmore Group on January 17, 2023.**

- **Presentation by Mr. Jordan to Long Island Building Trades on January 19, 2023.**

- **Presentation by Mr. Jordan to One Digital on January 23, 2023.**

- **Presentation by Mr. Jordan to Laborers Local 190 on January 24, 2023.**

- **Presentation by Mr. Jordan to AEC-RX on January 25, 2023.**

- **Presentation by Mr. Jordan to USI Insurance Services – Diocese of Toledo on January 27, 2023.**

- **Presentation by Mr. Jordan to Long Island Employee Benefits Group Ltd. on January 27, 2023.**

- **Presentation given by Ms. Schiappacasse to Radion on January 30, 2023.**

- **Presentation by Mr. Jordan to IBEW Local 3 on January 31, 2023.**

- **Presentation given by Ms. Schiappacasse to Wallstreet Group on February 2, 2023.**

- **Presentation by Mr. Jordan to Lockton on February 1, 2023.**

- **Presentation given by Ms. Schiappacasse to International Specialty Underwriters (ISU) on February 13, 2023.**

- **Presentation given by Ms. Schiappacasse to Sugar Foods Corporation on February 16, 2023.**

- **Presentation given by Mr. Jordan at the National Labor & Management Conference on February 20, 2023.**

- **Presentation by Mr. Jordan to Keenan on February 24, 2023.**

- **Presentation by Mr. Jordan to Lockton on February 27, 2023.**

- **Presentation given by Ms. Schiappacasse to CMAS on March 2, 2023.**

- **Presentation given by Ms. Schiappacasse to Prescription Network on March 3, 2023.**

- **Presentation by Mr. Jordan at NYC Building & Trades Council Conference on March 10, 2023.**

- **Presentation by Mr. Jordan to PSG Consultants on March 17, 2023.**

- **Presentation given by Ms. Schiappacasse to Forvis LLP on March 17, 2023.**

- **Presentation given by Ms. Schiappacasse to Gibson Group March 20, 2023.**

- **Presentation by Mr. Jordan to Prime Therapeutics on March 21, 2023.**

- **Presentation given by Ms. Schiappacasse to JGS Insurance on March 23, 2023.**

- **Presentation by Mr. Jordan to Aon on April 3, 2023.**

- **Presentation given by Ms. Schiappacasse to Novo on April 14, 2023.**

- **Presentation given by Frank Bisignano, Regional Account Executive, at the Customer Owned Banking Association ("COBA") on April 18, 2023.**

- **Presentation given by Mr. Bisignano at Atlantic Aviation Annual Review on April 20, 2023.**

- **Presentation by Mr. Jordan at ACP Fusion Conference on May 2, 2023.**

- **Presentation given by Ms. Schiappacasse to IBEW Local 25 on May 23, 2023.**

- **Presentation given by Ms. Schiappacasse to Virgin Valley Water on May 30, 2023.**

- **Presentation given by Ms. Schiappacasse to Wallstreet Benefits on June 2, 2023.**

- **Presentation given by Ms. Schiappacasse to Marshall Sterling on June 6, 2023.**

- **Presentation given by Ms. Schiappacasse to Lockton on June 14, 2023.**

- **Presentation given by Ms. Schiappacasse to Boon Chapman on June 15, 2023.**

- **Presentation given by Ms. Schiappacasse to One Digital on June 30 2023.**

-12-

- **Presentation given by Mr. Jordan to the Board of Trustees of Las Vegas Laborers on July 19, 2023.**

- **Presentation given by Ms. Schiappacasse to Healthcomp on August 2, 2023.**

**INTERROGATORY NO. 4:**

Other than manufacturers' patient assistance programs, identify every other alternate funding source you utilize on behalf of Patients, including but not limited to charitable organizations, foundations, grant programs, and overseas sources, and the frequency with which you utilize these alternate funding sources. The relevant time period for Interrogatory No. 4 is September 1, 2022, to the present.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendant incorporates its General Objections set forth above. In particular, and without limitation of the foregoing, Defendant objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Defendant responds to this Interrogatory as follows: **In addition to manufacturers' assistance programs, Payer Matrix also assists Clients' members in accessing, as appropriate, (1) copay assistance, (2) bridge programs; (3) foundations; (4) clinical trials; (5) samples; and (6) one-month trial vouchers.**

**INTERROGATORY NO. 5:**

Identify the date you first learned and how you learned of (1) the January 2, 2023, updated PAP eligibility requirements on the myAbbVie Assist website and (2) the January 30, 2023 updates to AbbVie's Patient Terms of Participation in the PAP applications, what you did in response to learning about the ban on Payer Matrix's continued involvement in the PAP, including both efforts to cease or modify your involvement and/or conceal your continued involvement from AbbVie, and when you took the identified actions.

-13-

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant incorporates its General Objections set forth above. In particular, and without limitation of the foregoing, Defendant objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome to the extent that it seeks information regarding every action or reaction that Payer Matrix had in response to the updated PAP eligibility requirements or the updates to the Patient Terms of Participation in the PAP application. Defendant further objects to the extent that it seeks information subject to the attorney-client privilege, work-product privilege, or other applicable privilege or immunity. Defendant further objects to this Interrogatory to the extent that it characterizes the updated eligibility requirements and Terms of Participation as a "ban on Payer Matrix's continued involvement in the PAP." Defendant further objects to this Interrogatory as to its use of the work "conceal" as it assumes facts not in the record.

Subject to and without waiving the foregoing objections, Defendant responds to this Interrogatory as follows:

**Payer Matrix learned about the January 2, 2023 updated PAP requirements on or around January 4, 2023. Payer Matrix learned of this change through multiple different sources, including but not limited to, Payer Matrix's review of the updated PAP requirements and notification from Clients and their members that members were getting PAP denials based solely on the fact that the health insurance plans offered Payer Matrix as a benefit. Payer Matrix's first priority was ensuring that its Clients' members were not suddenly left without their much-needed medications. Payer Matrix began assisting Clients' members with appeals of their PAP denials; advising Clients' members to call AbbVie directly to address their PAP applications; coordinating with Clients' Medical Providers to take over the PAP application process and/or, initiating discussions with the Medical**

-14-

Providers regarding whether more appropriate and affordable replacement therapies were available; and working with Clients' to help put in place one-time emergency overrides to ensure that members' treatments were not disrupted while these issues were being resolved. The decision regarding whether or not to offer emergency overrides was solely within the Clients' discretion. In addition, Payer Matrix asked its team to pause any calls to AbbVie regarding currently pending applications and/or renewals until it could determine why AbbVie made this sudden change and attempt to educate AbbVie on its business model.

Payer Matrix learned about the January 30, 2023 updated PAP Terms of Participation on or around February 3, 2023. Shortly after learning about the updated PAP Terms of Participation, in addition to continuing the above efforts, Payer Matrix leadership also notified its team that it should no longer submit applications on behalf of its Clients' members going forward for Humira, Skyrizi and Rinvoq. Because no other AbbVie Drugs had updated Terms of Participation that made reference to Payer Matrix, applications for those drugs were not halted. In connection with ongoing educational outreach efforts, which included outreach by the Payer Matrix business team to the AbbVie business team, on March 28, 2023, Payer Matrix's counsel also sent an educational letter to AbbVie's General Counsel, Perry Siatis, to discuss Payer Matrix's business model and allay any of AbbVie's concerns. AbbVie did not respond to this correspondence or any other outreach from Payer Matrix.

Shortly after the Complaint was served, Payer Matrix's leadership notified its team that it would no longer be assisting Clients' members with *any* AbbVie Drugs, including all drugs that do not have Terms of Participation that make reference to Payer Matrix. Thereafter, Payer Matrix removed AbbVie Drugs from its drug list and notified its Clients and PBMs of the removal.

**Defendant did not "conceal" any "involvement" in the PAP.**

Dated: August 16, 2023

Respectfully submitted,

PAYER MATRIX, LLC

*/s/ David M. Poell*
David M. Poell (6302765)
**SHEPPARD MULLIN RICHTER &
HAMPTON LLP**
321 N. Clark St., 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
dpoell@sheppardmullin.com

Danielle Vrabie (*pro hac vice*)
Meghan M. Stuer (*pro hac vice*)
**SHEPPARD MULLIN RICHTER &
HAMPTON LLP**
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 634-3081
Fax: (917) 438-6162
dvrabie@sheppardmullin.com
mstuer@sheppardmullin.com

Kathleen M. Stratton (*pro hac vice*)
Calla N. Simeone (*pro hac vice*)
**SHEPPARD MULLIN RICHTER &
HAMPTON LLP**
2099 Pennsylvania Ave., NW
Suite 100
Washington, D.C. 20006
Tel: (202) 747-1956
Fax: (202) 747-9456
kstratton@sheppardmullin.com
csimeone@sheppardmullin.com

*Counsel for Payer Matrix, LLC*

-16-

## VERIFICATION

I, Jennifer Hoefner, Executive Vice President, Operations, at Payer Matrix, solemnly declare and affirm under penalty of perjury that the **DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** are true and correct to the best of my knowledge, information, and belief.

DATE: August 16, 2023

_____
Jennifer Hoefner

-17-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 16, 2023, a copy of the foregoing document was served on the following counsel of record via email:

Valarie Hays
Daniel E. Raymond
Stephanna F. Szotkowski
Nicholas Zebrowski
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
valarie.hays@arnoldporter.com
daniel.raymond@arnoldporter.com
stephanna.szotkowski@arnoldporter.com
Nicholas.Zebrowski@arnoldporter.com

*Counsel for Plaintiff AbbVie Inc.*

/s/ *David M. Poell*
*Counsel for Defendant*

-18-

# Filed Under Seal

# Exhibit 66

# Filed Under Seal

# Exhibit 67

# Filed Under Seal

# Exhibit 68

# Exhibit 69

   
   
     
    
    
    
   

August 17, 2023

Payer Matrix
1400 N. Providence Road
Building 2, Suite 5000
Media, PA 19063
customerservice@payermatrix.com

**Via Electronic Email**

**Re: Payer Matrix identifying itself as both a 'Patient Advocacy Company' and a 'Leading Patient Advocate' is untrue and misleading to consumers**

Dear Payer Matrix Leadership:

The undersigned organizations are advocacy groups that represent patients across 34 organizations, representing 14 disease communities including Arthritis, Autoimmune disorder, Bleeding and Clotting disorders, Cancer, Cystic Fibrosis, Liver Disease, Lupus, Hepatitis, Hemophilia, HIV/AIDs, Neurological Conditions, Multiple Sclerosis, Psoriasis, Rare Disorders, and Spondylitis. We are writing to share our concerns regarding

AbbVie00024621

Payer Matrix's recent self-classification as both a 'Patient Advocacy Company' as well as a 'Leading Patient Advocate.' [1]

Patient advocacy groups are organizations that are developed to represent, support, and advocate on behalf of patients, caregivers, and families living with rare, chronic, complex, or specific conditions.[2] These organizations often retain 501(c)(3) or 501(c)(4) status designations as non-profit organizations. These organizations aim to advocate on behalf of their community to ensure *their voices, concerns, and stories,* are heard and responded to by actors within the health care system including, but not limited to, hospitals, health care providers, employers, health insurers, legislatures, and regulators. Patients, caregivers, and consumers rely on patient advocacy organizations to help them navigate the health care system and help ensure they can access their necessary care and treatments. Managing a chronic illness and receiving a new diagnosis can be very challenging experiences for individuals and their families, thus, patients need to have trusted organizations that they can turn to and rely on to act *in their best interest.*

Payer Matrix is not the type of organization described above; in fact, Payer Matrix profits each time it successfully enrolls a patient in a patient assistance program (PAP). As such, we believe it is highly inappropriate and misleading to consumers for Payer Matrix to classify itself as either a 'Patient Advocacy Company' or a 'Leading Patient Advocate.' Payer Matrix is a **for-profit** business representing the interest of employers and itself, not patients. Payer Matrix's business model requires unwitting patients to share personal information such as income, health status, and other personal data, so that Payer Matrix can enroll the patient in a PAP. Notably, these programs are already available to patients without Payer Matrix's participation. Payer Matrix's complex process often results in delaying patients' access to their treatments, forcing them to experience symptoms without relief, and disease progression. Moreover, unlike traditional patient advocacy organizations that are patient-centered to support patients' needs, preferences, and priorities, Payer Matrix mandates employees engage in this byzantine process or lose coverage for their medication, thereby requiring the patient to be responsible for the full cost of the drug. This demonstrates that Payer Matrix is a self-serving for-profit company, not a patient-centered advocacy organization representing the needs, preferences, and priorities of patients, caregivers, and families.

We strongly urge Payer Matrix to stop identifying as either a 'Patient Advocacy Company' or a 'Leading Patient Advocate' to ensure patients properly understand that Payer Matrix advocates for employer cost savings which lead to profits for Payer Matrix, not employees' health and access to treatments. Thank you for your consideration of our letter.

Please address any questions to Kim Czubaruk, Associate Vice President of Policy, Cancer*Care* (kczubaruk@cancercare.org) and Kollet Koulianos, Senior Payer Provider Consultant, National Hemophilia Foundation (Kollet@3hbc.com).

Sincerely,

Aimed Alliance
Arthritis Foundation
Autoimmune Association
Bleeding Disorders Foundation of North Carolina
Cancer*Care*
Colorectal Cancer Alliance
Community Liver Alliance

---

[1] Payer Matrix, *Leading Patient Advocate Slams AbbVie's Moves to Deny Vital Drugs to Needy Patients,* https://www.kget.com/business/press-releases/cision/20230523PH07874/leading-patient-advocate-slams-abbvies-moves-to-deny-vital-drugs-to-needy-patients/.
[2] Rare Beacon, *What Are Patient Advocacy Groups,* https://www.rarebeacon.org/rare-diseases/why-patient-groups-matter/ .

Crohn's & Colitis Foundation
CSNK2a1 Foundation
Cystic Fibrosis Research Institute
Eastern Pennsylvania Bleeding Disorders Foundation
EveryLife Foundation for Rare Diseases
Foundation for Sarcoidosis Research (FSR)
Hemophilia Council of California
Hemophilia Federation of America
HIV+Hepatitis Policy Institute
Infusion Access Foundation
Juju and friends CLN2 Warrior Foundation
Little Hercules Foundation
Lupus and Allied Diseases Association, Inc.
Lupus Foundation of America
Multiple Sclerosis Association of America
National Consumers League
National Hemophilia Foundation
National Niemann-Pick Disease Foundation
National Psoriasis Foundation
Pacific Northwest Bleeding Disorders Foundation
Patient Access Network (PAN) Foundation
Spondylitis Association of America
STAC3.org
The AIDS Institute
The Akari Foundation
The Sumaira Foundation
Western Pennsylvania Bleeding Disorders Foundation

AbbVie00024623

# Filed Under Seal

# Exhibit 70

# Filed Under Seal

# Exhibit 71

## CERTIFICATE OF SERVICE

I, Valarie Hays, one of the attorneys for Plaintiff AbbVie Inc., hereby certifies that on October 11, 2023, I caused the foregoing **AMENDED DECLARATION OF VALARIE HAYS IN SUPPORT OF ABBVIE INC.'S MOTION FOR PRELIMINARY INJUNCTION** to be filed through the CM/ECF system of the United States District Court for the Northern District of Illinois thereby serving all counsel of record electronically.

By: */s/ Valarie Hays*
Valarie Hays