THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AbbVie Inc., | |
|     *Plaintiff*, | Civil Action No. 1:23-cv-02836 |
| v. | Hon. Elaine E. Bucklo |
| Payer Matrix, LLC | |
|     *Defendant*. | |

## DECLARATION OF CRAIG GARTHWAITE, PHD IN SUPPORT OF ABBVIE'S MOTION FOR PRELIMINARY INJUNCTION

I, Craig Garthwaite, declare under penalty of perjury that the following is true and correct:

1. I am the Herman R. Smith Research Professor in Hospital and Health Services and a tenured Professor of Strategy at the Kellogg School of Management, Northwestern University. I am also the Director of the Program on Healthcare at Kellogg. At Kellogg, I teach courses in the economics of strategy, health care strategy and the economics of the biotechnology market. I organize the Program on Healthcare at Kellogg—which involves coordinating the school's healthcare business curriculum. In addition, I am a Research Associate at the National Bureau of Economic Research, and a Faculty Associate at the Institute for Policy Research at Northwestern University. Moreover, I serve on the Congressional Budget Office Panel of Healthcare Advisers.

2. I received a PhD in Economics from the University of Maryland at College Park, a Masters in Public Policy from the Gerald R. Ford School of Public Policy at the University of Michigan, and a BA in Political Science from the University of Michigan.

3. Prior to my graduate studies, I was an Economist at Public Sector Consultants in Lansing, MI, and the Director of Research and Chief Economist at the Employment Policies Institute, in Washington, DC.

4. My research and teaching focuses on a variety of issues including the potential impacts of health policy, the changing health market on the operations of private health firms such as hospitals and insurers, and questions of innovation in the biopharmaceutical sector and health insurance expansions. My research has been published in journals such as the Quarterly Journal of Economics, the American Economic Review, the Review of Economics and Statistics, the Journal of Health Economics, the New England Journal of Medicine, the Annals of Internal Medicine, and Health Affairs and has been profiled in media outlets such as the New York Times, the Wall Street Journal, the Washington Post, and Vox. I have testified before the United States House of Representatives, the United States Senate, and state legislatures on matters related to the minimum wage, health care reform, and pharmaceutical markets.

5. I understand that AbbVie Inc. ("AbbVie") alleges, among other things, that Payer Matrix, LLC ("Payer Matrix") enrolls insured patients into AbbVie's Patient Assistance Program ("PAP")—a program intended to provide access to medications for financially eligible individuals who lack sufficient insurance coverage for AbbVie's specialty pharmaceuticals (including, Skyrizi, Rinvoq, and Humira).[1] Further, I understand that it is alleged that Payer Matrix advertises that its program reduces health insurance costs for employers and diminishes the amount paid out-

---

[1] AbbVie Inc., Plaintiff, v. Payer Matrix, LLC, Defendant, Complaint, Civil Action No. 1:23-cv-02836, United States District Court, for the Northern District of Illinois, Easter Division, May 5, 2023 ("Complaint"), ¶ 2 ("Payer Matrix operates a fraudulent and deceptive scheme to enrich itself by exploiting AbbVie's PAP through the enrollment of *insured* patients into a charitable program not intended for them."); Complaint ¶ 1 ("AbbVie developed and manufactured the ground-breaking drugs SKYRIZI® ('Skyrizi'), RINVOQ® ('Rinvoq'), and HUMIRA® ('Humira'). Since these medicines treat serious, life-altering diseases, AbbVie wants to make sure they are available to all appropriate patients irrespective of financial ability. AbbVie provides the drugs for free, with no co-payments, deductibles, or shipping costs, to financially qualifying *uninsured and underinsured* patients through the myAbbVie Assist Patient Assistance Program").

2

of-pocket by insured members via co-payment or coinsurance amounts.[2] To achieve this, Payer Matrix represents to AbbVie that PAP applicants are uninsured for certain specialty drugs (i.e., the drug is "excluded" from the plan) and thus qualify for the PAP.[3] However, these applicants do have insurance coverage because the patients' plans continue to pay for their specialty drugs if needed. Therefore, the patient's status as represented to AbbVie does not match the economic concept of someone who lacks health insurance for these specialty drugs.[4]

6. I have been asked by counsel for AbbVie to provide a description of the economics of health insurance, and to opine whether patients who enroll in Payer Matrix's program experience a change in their actual insurance status.

A. **Health insurance**

7. Health insurance is a contractual agreement between an individual and an insurer, where the individual pays a fixed monthly premium payment, and in exchange the insurer pays for at least a portion of the individual's actual future medical expenses.[5] Health insurance, like other forms of insurance, is a financial product that limits the costs of a negative shock and thus reduces the loss of utility an individual experiences when the shock occurs. Ideally, health insurers pool individuals together who have similar risks of future illness.[6] Since only a portion of these

---

[2] Complaint, ¶ 60 ("A video on its website claims that Payer Matrix' program 'dramatically reduces costs' for employers, 'reduces [the employer's] specialty drug spending by up to 50%, and significantly mitigates member co-pays while maintaining a high level of service.'").

[3] Complaint, ¶ 138 ("Payer Matrix engages in deceptive practices by falsely representing to AbbVie that PAP applicants are uninsured for Skyrizi, Rinvoq, and Humira and thus qualify for the PAP when in fact the specialty drug exclusions in the employers' plans are a sham.").

[4] Complaint, ¶ 139 ("The representation that these applicants lack insurance coverage is false because Payer Matrix knows that the patients' employers will continue to provide specialty drug coverage if AbbVie does not admit the patients into the PAP."); Complaint, ¶ 104 ("If Payer Matrix is unable to obtain secure alternative funding, then coverage will revert to your traditional coverage.").

[5] HealthCare.gov "Health insurance," available at https://www.healthcare.gov/glossary/health-insurance/#:~:text=A%20contract%20that%20requires%20your,in%20exchange%20for%20a%20premium.

[6] For example, employer-based insurance promotes natural risk pooling as individuals generally choose employers for reasons unrelated to their health status. *See* Blumberg, Linda J. and John Holahan, "Don't Let the

individuals will eventually become sick, the premiums paid by most enrollees help pay the healthcare costs for the small share of enrollees with relatively high medical expenses that exceed their premiums.[7]

8. Health insurance is intended to protect individuals financially by providing resources when they face unexpected large medical expenses. The value of health insurance is rooted in the unpredictability of medical expenses and an individual's degree of risk aversion—i.e., the preference (and, therefore a willingness to pay a premium) to avoid uncertainty and potential extraordinary losses (e.g., large medical expenses) even if those losses are unlikely to occur.[8] Individuals do not know with certainty the amount they will spend on future medical care at the time they enroll in health insurance coverage. Health insurance benefits individuals, who may be risk-averse, by limiting the amount they must pay if their future medical expenses are higher than expected. In other words, the benefits from health insurance are derived from the mitigation of financial risk, and the more risk-averse an individual is, the more they value the protection against potentially high future medical expenses. A compelling body of evidence demonstrates that health insurance substantially reduces the risk of an individual having large out-of-pocket expenditures.[9] Risk-averse individuals gain utility from health insurance even if they do not actually suffer a negative health shock because of the certainty that they are not at meaningful financial risk if one occurred.

---

Talking Points Fool You: It's All About the Risk Pool," *Health Affairs*, March 15, 2016, available at https://www.healthaffairs.org/content/forefront/don-t-let-talking-points-fool-you-s-all-risk-pool.

[7] Pollitz, Karen "High-Risk Pools For Uninsurable Individuals," Health Reform available at https://www.kff.org/health-reform/issue-brief/high-risk-pools-for-uninsurable-individuals/.

[8] Krugman, Paul and Robin Wells, *Microeconomics*, McMillan, Second Edition, 2008, Chapter 21; Cutler, David M. and Richard J. Zeckhauser, "The Anatomy of Health Insurance," *Handbook of Health Economics,* Vol. 1, Elsevier, 2000, pp. 563–643.

[9] *See,* for example, Finkelstein, Amy et al., "What Does (Formal) Health Insurance Do, and for Whom?", *Annual Review of Economics,* Vol. 10, 2018, pp. 261–286.

9. A second benefit from health insurance that is distinct from other forms of insurance is providing access to expensive treatments that may be unobtainable for liquidity constrained customers. This "access motive" of insurance provides a means for sick patients facing liquidity constraints to still gain access to life saving treatments that otherwise would not be available to them because of the cost of those treatments.[10]

10. Individuals may obtain health insurance coverage through a private or public insurer. Private insurance is primarily provided through employer or union sponsored plans as part of an employee's compensation package.[11] These health insurance benefits serve as a form of non-cash compensation for employees. Thus, employers are concerned that the health insurance benefits they offer provide sufficient value to the employee to justify their expense and go to great lengths to balance the cost of these plans with the benefits that they provide. Government health insurance allows qualified individuals to enroll in federal programs, such as Medicare, Medicaid, and the Veterans Administration.

**B.    Cost sharing and access to health services**

11. While health insurance typically pays for much of an individual's future medical expenses, insured individuals are often responsible for paying at least some portion of their actual medical expenses in the form of cost sharing. Cost sharing refers to a patient's out-of-pocket responsibility for a health insurance claim.[12] Cost sharing is comprised of deductibles,

---

[10] Nyman, John A., "The Value of Health Insurance: The Access Motive," *Journal of Health Economics,* Vol. 18(2), 1999, pp. 141–153.

[11] Keisley-Starkey, Katherine and Lisa N. Bunch, "Health Insurance Coverage in the United States: 2021," Current Population Reports, U.S. Department of Commerce, U.S. Census Bureau, September 2022.

[12] Moral hazard is a situation in which individuals take greater risks because they have insurance that can offset some of the adverse effects in the event of a negative outcome. In some cases, cost sharing serves as a mechanism to mitigate moral hazard by steering patients towards more cost-effective care. However, excessively high-cost sharing may be a burden preventing patients receiving necessary medical care. *See* Krugman, Paul and Robin Wells, *Microeconomics*, McMillan, Second Edition, 2008, pp. 561–562.

coinsurance, and copays. A deductible is an amount a patient must pay for medical expenses before the insurer contributes toward the amount owed, coinsurance is a percentage of the cost of a service or drug, and a copay takes the form of a fixed cost for a service or drug.[13]

12. The extent and nature of an insured individual's cost sharing requirements and payments for healthcare expenses depend on the individual's health insurance policy.[14] In general, a patient pays a fixed monthly premium that depends on their chosen level of insurance coverage which is independent of their actual future healthcare expenses. A patient's level of insurance coverage reflects two main components: (1) the cost sharing responsibility, which is the patient's share of their actual healthcare expenses that they are required to pay; and (2) the patient's access to care, which may include factors such as the provider and pharmacy network where the insurer will pay a portion of the individual's expenses and the types of prescription medications that will be reimbursed.[15] Although numerous factors may influence an individual's ultimate determination of plan choice, insurance plans associated with higher premium payments will typically provide broader coverage to providers, pharmacies, and drugs, and will do so with lower patient cost sharing requirements.

13. Patients are allowed to select among the set of health insurance plans offered by their employer or federal programs for which they qualify. Once enrolled, a health insurance plan's

---

[13] Kaiser Permanente, "Understand your costs," available at https://healthy.kaiserpermanente.org/shop-plans/deductible-plans/understanding-plan-costs#:~:text=How%20a%20deductible%20works,you%20pay%20for%20a%20service.

[14] Health Insurance, "What is health insurance?", available at https://www.healthinsurance.org/glossary/health-insurance/.

[15] DeLeire, Thomas and Caryn Marks "Consumer Decisions Regarding Health Plan Choices in the 2014 and 2015 Marketplaces," Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, 2015, available at https://aspe.hhs.gov/reports/consumer-decisions-regarding-health-plan-choices-2014-2015-marketplaces-0.

formulary determines the level of coverage it will offer for each drug dispensed.[16] Coverage in the formulary may depend on factors such as a drug's effectiveness and cost saving potential, and formulary access to the drug may be categorized into tiers associated with varying levels of patient cost sharing responsibility.[17] All patients enrolled in a given health insurance plan are subject to the same formulary, regardless of patient characteristics such as income or pre-existing conditions.

14. Higher levels of health insurance can increase the medical care available to patients where it would not otherwise be affordable.[18] In this way, insurance enables access to medical products such as specialty drugs that a patient may not be able fund without seeking financial assistance. For example, an insured individual may only be able to afford a high-priced specialty drug due to plan coverage and the individual's limited cost-sharing responsibility. Uninsured individuals, in comparison, are substantially more likely than insured individuals to delay getting a needed prescription drug due to cost.[19]

15. Individuals with and without health insurance may at times not be able to pay the cost sharing payments associated with their necessary prescriptions. While these individuals may lack access to the drug, they are not uninsured. These individuals may also face delayed access to care that can at times impact their health.[20] In cases where individuals may otherwise have

---

[16] A formulary is the list of prescription drugs covered by a prescription drug plan or insurance plan offering prescription drug benefits. *See* HealthCare.gov "Formulary," available at https://www.healthcare.gov/glossary/formulary/.

[17] Werble, Cole, "Health Policy Brief: Formularies," *Health Affairs*, September 14, 2017, available at https://www.healthaffairs.org/do/10.1377/hpb20171409.000177/full/hpb_2017_09_14_formularies.pdf; United Healthcare, "What is a tiered formulary and what does it mean for me," available at https://www.uhc.com/medicare/medicare-articles/what-is-a-tiered-formulary-and-what-does-it-mean-for-me.html.

[18] Nyman, John A., "The Value of Health Insurance: The Access Motive," *Journal of Health Economics,* Vol. 18(2), 1999, pp. 141–153.

[19] Tolbert, Jennifer et al., "Key Facts About the Uninsured Population," December 19, 2022, available at https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/.

[20] Chandra, Amitabh et al., "The Health Costs of Cost-Sharing," National Bureau of Economic Research, Working Paper 28439, 2023.

difficulty affording their medication, they may receive additional assistance from manufacturers or independent charities. Patient Assistance Programs are designed to help financially needy patients access necessary medications, either by assisting uninsured patients to obtain prescription drugs, or by assisting insured patients to pay their out-of-pocket costs for the prescriptions. Patient Assistance Programs are operated by state governments, independent charities, and pharmaceutical manufacturers, each with their own eligibility requirements. Manufacturer-operated Patient Assistance Programs may provide drugs to uninsured individuals and provide financial assistance to insured patients who face unaffordable cost sharing.[21] Similarly, independent charities and state Patient Assistance Programs often provide "needs-based" programs that assist lower-income insured and uninsured patients access needed medications.[22]

### C. Payer Matrix program and patient insurance coverage for specialty drugs

16. I understand that Payer Matrix directed partner pharmacy benefit managers ("PBMs") to carve out specialty drugs from employers' health insurance plans.[23] I further understand that Payer Matrix directed health insurance plans on how to provide alternative mechanisms for patient access to specialty drugs.[24] While Payer Matrix presented these patients as being uninsured for AbbVie's specialty drugs to AbbVie's PAP for the purpose of obtaining free drugs, the extent of *de facto* insurance coverage experienced by the patients was unchanged—i.e., they did not face additional risk or uncertainty about access to specialty drugs. Nor did they lose access to these medications because of their liquidity constraints.

---

[21] Kirchhoff, Suzanne M., "Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)," Congressional Research Service Report R44264, September 12, 2022, pp. 15–16.

[22] Kang, So-Yeon et al., "Financial Eligibility Criteria and Medication Coverage for Independent Charity Patient Assistance Programs," *Journal of the American Medical Association*, Vol. 322(5), August 20, 2019, pp. 422–429.

[23] Complaint, ¶¶ 52–57.

[24] Complaint, ¶ 58 ("These [Payer Matrix's employer client] plans promise or imply continued specialty drug coverage for patients under the plan if they are ineligible for the PAP").

17. Quite simply, Payer Matrix's program does not impact the patient's actual level of insurance coverage. A patient pays a monthly premium for insurance coverage that provides access to AbbVie's specialty pharmaceuticals. As stated above, that insurance coverage reflects two main components: (1) the patient's cost sharing responsibility for the drug; and (2) the patient's ability to access the drug. When patients were switched from their traditional insurance coverage for specialty drugs to Payer Matrix's program, they did not experience any actual change in either component of insurance coverage. In fact, Payer Matrix made clear representations to plans and patients that their access and cost sharing for specialty drugs would be unchanged, or even that their costs would decrease.[25] This means that these individuals continued to enjoy the utility benefits of knowing that they were not at risk of high costs or a lack of access to specialty drugs. Despite Payer Matrix's representation to AbbVie's PAP that the patients were uninsured for AbbVie's specialty drugs, if AbbVie did not admit a patient into the PAP, then Payer Matrix claimed they would make the drug available to the patient at the same cost sharing obligation the patient had prior to enrollment with Payer Matrix.[26] Importantly, this means that these patients were not uncertain about access to the medication. The extent of insurance coverage experienced by the patients is therefore unchanged, but Payer Matrix falsely presents these patients as having gone from insured for AbbVie's drugs to uninsured for these specialty drugs for purposes of applying to AbbVie's PAP.

---

[25] Payer Matrix emphasized that coverage is unchanged for patients. *See* Complaint, ¶ 10 ("Payer Matrix assures patients that under its program '[t]he plan will still pay for your medication with no increase in co-pay or cost share…If Payer Matrix is unable to…secure alternative funding, then coverage will revert to your traditional coverage.'").

[26] *See*, for example, Complaint, ¶ 10 ("Payer Matrix assures patients that under its program '[t]he plan will still pay for your medication with no increase in co-pay or cost share… If Payer Matrix is unable to… secure alternative funding, then coverage will vert to your traditional coverage."); Complaint ¶ 84, ("[Question:]'Is my medication still covered?' [Answer:]'The method of obtaining the medication has changed. Instead of going through the Pharmacy Benefit Manager, fulfillment will now go through Payer Matrix.'").

18. Insured patients enrolled in the same employer provided health plan are typically subject to the same drug formulary and coverage eligibility for specialty drugs, regardless of income. It is my understanding that, on the one hand, Payer Matrix required lower income patients to utilize AbbVie's PAP for their specialty drugs as these patients fell under the income cutoff to qualify for AbbVie's PAP eligibility.[27] On the other hand, higher income patients who did not qualify for the PAP would continue receiving specialty drugs under their employers plan's usual cost sharing responsibilities.[28] Should a drug access restriction, such as a prior authorization, quantity limit, or step edit, exist in a health insurance plan, all enrolled patients, regardless of income, would typically be restricted from coverage.[29]

19. It is my understanding AbbVie identified "approximately 200 instances of patients affiliated with Payer Matrix being denied admission into the PAP in 2023 and then promptly redeeming co-pay assistance through a separate AbbVie program *for only commercially insured patients*."[30] A truly uninsured patient would not be able to apply for co-pay assistance soon after failing to qualify for a program reserved for uninsured or underinsured patients. After all, if patients are truly not insured for a drug, then they would have no copayments to make if they were

---

[27] Complaint, ¶ 89 ("If the patient's household income is low enough to qualify financially for the PAP, Payer Matrix requires the patient to engage in the next burdensome task of assisting in the completion of a PAP application").

[28] Complaint, ¶ 91 ("If Payer Matrix successfully maneuvers the insured patients into AbbVie's PAP, they will remain classified *on paper* through the sham exclusion as uninsured for specialty medications (despite the insurance premiums they pay) and will suffer all of the resulting inconveniences and potential medicine delays that those who are actually uninsured sometimes experience, whereas their higher income colleagues (whose household incomes exceed the ceiling for PAP eligibility) will continue to have drug insurance coverage paid by their employers' plans.").

[29] A prior authorization refers to a requirement by health plans for patients to obtain approval of a service or medication before it is provided. A quantity limit occurs when a plan sets a limit on the amount of prescription drugs they cover over a certain period of time. Step edits, or step therapy, requires patients to try lower-cost medications before stepping up to more expensive drugs. *See* Baum, Jason, "What is Prior Authorization, Step Therapy, and Quantity Limit," eHealth, February 4, 2023, available at https://www.ehealthinsurance.com/medicare/coverage/what-are-prior-authorizations-quantity-limits-and-step-therapy/.

[30] Complaint, ¶ 11.

denied access to the PAP. From an economic perspective, such an example illustrates that these patients therefore did effectively have insurance coverage that provided them access to AbbVie's specialty drugs and covered a portion of the patients' costs of these drugs. The patients purchased health insurance in part to receive coverage for medically necessary drugs and received that coverage irrespective of Payer Matrix's representation to AbbVie.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 30, 2023

_____
CRAIG GARTHWAITE

## CERTIFICATE OF SERVICE

I, Valarie Hays, one of the attorneys for Plaintiff AbbVie Inc., hereby certifies that on October 11, 2023, I caused the foregoing **DECLARATION OF CRAIG GARTHWAITE, PHD IN SUPPORT OF ABBVIE'S MOTION FOR PRELIMINARY INJUNCTION** to be filed through the CM/ECF system of the United States District Court for the Northern District of Illinois thereby serving all counsel of record electronically.

By: */s/ Valarie Hays*
Valarie Hays