# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| AbbVie Inc., | |
| *Plaintiff*, | Civil Action No. 1:23-cv-02836 |
| v. | Hon. Jorge L. Alonso |
| Payer Matrix, LLC, | Hon. Magistrate Young B. Kim |
| *Defendant*. | |

## DEFENDANT PAYER MATRIX, LLC'S BRIEF IN OPPOSITION
## TO PLAINTIFF ABBVIE INC.'S MOTION FOR PRELIMINARY INJUNCTION

<u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS.................................................................................................... 5

I. HIGH-COST SPECIALTY DRUGS & PAYER MATRIX'S ROLE ............................. 5

    **A.** The Rising Costs of Specialty Drugs Threaten the Sustainability of Self-Funded Healthcare Plans That Payer Matrix Serves.................................................. 5

    **B.** Payer Matrix's Business Model ............................................................................ 6

II. ABBVIE'S BUSINESS, INVESTIGATION INTO ALTERNATE FUNDING PROGRAMS, AND EVOLVING PAP ELIGIBILITY REQUIREMENTS.................................... 9

    **A.** AbbVie's Biggest Pharmaceutical Moneymakers and Their Crushing Price Tags ......... 9

    **B.** AbbVie's Campaign Against Alternative Funding Providers ....................................... 10

    **C.** AbbVie Changes its PAP Eligibility Requirements......................................................... 12

III. THIS LAWSUIT AND ABBVIE'S EXTENSIVE MISREPRESENTATIONS REGARDING PAYER MATRIX ....................................................................................................... 17

    **A.** The "Override" Process and AbbVie's Misconceptions................................................. 17

    **B.** Payer Matrix's Supposed Misrepresentations Regarding Insurance Status Are Not Supported by the Documentation.............................................................................. 19

    **C.** AbbVie's Ignores the Realities of Payer Matrix's Assistance with the Copay Program ...................................................................................................................... 21

    **D.** Drug-Switching is Commonplace and Sometimes Necessary to Ensure Members Get Continued Access to Affordable Drug Therapies ................................................. 23

ARGUMENT ....................................................................................................................... 26

I. STANDARD FOR PRELIMINARY INJUNCTION.......................................................... 26

II. THIS COURT LACKS THE POWER TO ISSUE A NATIONWIDE INJUNCTION UNDER ILLINOIS STATE LAW ............................................................................................... 27

III. ABBVIE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.............................. 29

    A. AbbVie Does Not Prove a Likelihood of Success on the Merits of Any of Its Causes of Action ............................................................................................................ 29

        1. AbbVie Is Not Likely To Succeed on the Merits of Its ICFA Claim ..................... 29

        2. AbbVie Does Not Present Any Affirmative Argument or Evidence Supporting Its Likelihood of Success on the Merits of Counts II and III................................... 35

    B. AbbVie Has An Adequate Remedy at Law and Is Not Likely to Suffer Any Cognizable Irreparable Harm Before a Trial on the Merits ........................................... 37

        1. AbbVie Has an Adequate Remedy at Law For Each Allegedly Fraudulent PAP Enrollment Submitted by or on Behalf of Payer Matrix's Members ...................... 37

2.   AbbVie Does Not Establish a Likelihood of Irreparable Harm Based on Its Groundless Claims of Reputational Harm and Loss of Goodwill .......................... 41

C.   The Balance of Equities Weigh Heavily in Payer Matrix's Favor Because AbbVie's Proposed Injunction Is Vague and Will Expose Defendant to Liability for the Independent Acts of Third Parties ................................................................................. 57

D.   The Public Interest Does Not Favor AbbVie's Sweeping Injunction Burdening Payer Matrix's Free Speech Rights................................................................................. 63

CONCLUSION.......................................................................................................................... 65

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Abbott Labs. v. Mead Johnson & Co.*
971 F.2d 6 (7th Cir. 1992) ...................................................................................59

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*
930 F.3d 812 (7th Cir. 2019) ..............................................................................36

*Alemite Mfg. Corp. v. Staff*
42 F.2d 832 (2d Cir. 1930) (L. Hand, J.) ............................................................62

*Alexander v. Chi. Park Dist.*
709 F.2d 463 (7th Cir. 1983) ..............................................................................35

*Allergan USA Inc. v. Imprimis Pharms., Inc.*
2019 WL 3029114 (C.D. Cal. July 11, 2019) .....................................................28

*Alvarez v. City of New York*
2 F. Supp. 2d 509 (S.D.N.Y. 1998) .....................................................................50

*AM Gen. Corp. v. DaimlerChrysler Corp.*
311 F.3d 796 (7th Cir. 2002) ..............................................................................58

*Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*
780 F.2d 589 (7th Cir. 1986) ..............................................................................45

*Am. Pet Motels v. Chi. Veterinary Med. Ass'n*
435 N.E.2d 1297 (Ill. App. Ct. 1982) ..................................................................64

*Ameritech v. Voices for Choices, Inc.*
2003 WL 21078026 (N.D. Ill. May 12, 2003) .....................................................64

*Archey v. Osmose Util. Servs., Inc.*
2022 WL 3543469 (N.D. Ill. Aug. 18, 2022) ......................................................31

*Arjo, Inc. v. Handicare USA, Inc.*
2018 WL 5298527 (N.D. Ill. Oct. 25, 2018)........................37, 40, 42, 44, 45, 50, 56

*ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*
192 F. Supp. 3d 943 (N.D. Ill. 2016) ..................................................................30

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*
471 F.3d 745 (7th Cir. 2006) ..............................................................................35

*Bank of Am., N.A. v. Cartwright*
545 F. Supp. 3d 666 (N.D. Ind. 2021) ...........................................................43, 53

*Barbara's Sales, Inc. v. Intel Corp.*
    879 N.E.2d 910 (Ill. 2007) ................................................................31

*Bedrossian v. Nw. Mem'l Hosp.*
    409 F.3d 840 (7th Cir. 2005) ............................................................43

*BellSouth Telecoms., Inc. v. Mintz*
    2005 WL 8155198 (N.D. Ga. Mar. 4, 2005)..................................44, 58

*Benisek v. Lamone*
    138 S. Ct. 1942 (2018) ......................................................................26

*Bidi Vapor, LLC v. Vaperz LLC*
    543 F. Supp. 3d 619 (N.D. Ill. 2021) .....................26, 27, 30, 35, 39, 55, 57, 58, 59, 60, 61, 63

*Bonaparte v. Camden & Amboy R.R. Co.*
    3 F. Cas. 821 (C.C.D.N.J. 1830) ........................................................3

*Borden, Inc. v. Kraft, Inc.*
    1984 WL 1458 (N.D. Ill. Sept. 28, 1984) .......................................56, 58

*Brightstar Franchising, LLC v. N. Nev. Care, Inc.*
    2018 WL 4224454 (N.D. Ill. Sept. 4, 2018) ......................................46

*Checker Car Club of Am.*, 262 F. Supp. 3d 621 (N.D. Ill. 2017) ...........................54, 57

*Chi. Bd. of Educ. v. Substance, Inc.*
    354 F.3d 624 (7th Cir. 2003) .........................................................61, 62

*Ciba-Geigy Corp. v. Bolar Pharm. Co.*
    747 F.2d 844 (3d Cir. 1984)..............................................................28

*Citibank, N.A. v. Citytrust*
    756 F.2d 273 (2d Cir. 1985).............................................................56

*City of Chi. v. Barr*
    961 F.3d 882 (7th Cir. 2020) .......................................................28, 29

*Club Gene & Georgetti Ltd. P'ship v. La Luna Enters.*
    889 F. Supp. 324 (N.D. Ill. 1995) ....................................................45

*Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*
    887 F.3d 803 (7th Cir. 2018) ...........................................................30

*CogniTest Corp. v. Riverside Publ'g Co.*
    1995 U.S. Dist. LEXIS 8721 (N.D. Ill. June 22, 1995)....................64, 65

*Consol. Grain & Barge Co. v. Ports of Ind.*
    2021 WL 9958475 (S.D. Ind. Nov. 29, 2021) ..................................51, 55

*Cooney v. Chi. Pub. Sch.*
    943 N.E.2d 23 (Ill. App. Ct. 2010) ...................................................................41

*Courthouse News Serv. v. Brown*
    908 F.3d 1063 (7th Cir. 2018) .........................................................................58

*Creative Fin. Staffing LLC v. Kubacki*
    2023 WL 1818560 (N.D. Ill. Feb. 8, 2023) ...............................37, 38, 40, 54

*Curry v. Revolution Labs., LLC*
    2022 WL 225877 (N.D. Ill. Jan. 26, 2022) ...............................29, 30, 41

*D.U. v. Rhoades*
    825 F.3d 331 (7th Cir. 2016) ...........................................................................40

*Darif v. Holder*
    739 F.3d 329 (7th Cir. 2014) ...........................................................................30

*De Bouse v. Bayer AG*
    235 Ill. 2d 544 (2009) ......................................................................................33

*DISH Network LLC v. Cox Media Grp., LLC*
    2020 WL 4053604 (N.D. Ill. July 20, 2020) ..................................................40

*Doe v. Univ. of S. Ind.*
    43 F.4th 784 (7th Cir. 2022) ...............................................................29, 36, 37

*Downstate Stone Co. v. United States*
    651 F.2d 1234 (7th Cir. 1981) .........................................................................39

*Edward D. Jones & Co. v. Kerr*
    415 F. Supp. 3d 861 (S.D. Ind. 2019) ......................................................54, 63

*EPA v. Envt'l Waste Control*
    917 F.2d 327 (7th Cir. 1990) ...........................................................................59

*Ervin Equip. Inc. v. Wabash Nat'l Corp.*
    187 F. Supp. 3d 968 (N.D. Ind. 2016) .....................................................41, 42, 53

*Fasti USA v. Fasti Farrag & Stipsits GmbH*
    2002 WL 31664494 (N.D. Ill. Nov. 26, 2002) ..........................................52, 63

*Faust v. Vilsack*
    519 F. Supp. 3d 470 (E.D. Wis. 2021).............................................................29

*In re Fed. Bureau of Prisons' Execution Protocol Cases*
    980 F.3d 123 (D.C. Cir. 2020) .........................................................................36

*Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*
   2013 WL 5973938 (C.D. Ill. Nov. 8, 2013) ................................................................62

*Finch v. Treto*
   606 F. Supp. 3d 811 (N.D. Ill. 2022) ......................................................................57

*Fleetwood Packaging v. Hein*
   2014 WL 7146439 (N.D. Ill. Dec. 15, 2014) ..........................................................40

*Foodcomm Int'l v. Barry*
   328 F.3d 300 (7th Cir. 2003) ..................................................................................46

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*
   35 F.3d 1134 (7th Cir. 1994) ..................................................................................52

*H-D USA LLC v. P'ships & Unincorporated Assocs. Identified on Schedule "A"*
   2021 WL 4459472 (N.D. Ill. Sept. 24, 2021) .........................................................45

*Holbrook Mfg. LLC v. Rhyno Mfg.*
   497 F. Supp. 3d 319 (N.D. Ill. 2020) ......................................................................45

*Horne v. Elec. Eel Mfg. Co.*
   987 F.3d 704 (7th Cir. 2021) ..................................................................................31

*Humira Cost & Savings*
   https://www.humira.com/cost (last visited Nov. 29, 2023) .....................................10

*Hyatt Corp. v. Hyatt Legal Servs.*
   610 F. Supp. 381 (N.D. Ill. 1985) ..........................................................................28

*iFreedom Direct Corp. v. McCormick*
   2016 WL 9049647 (C.D. Cal. 2016) .......................................................................50

*Ill. Bell Tel. Co. v. Ill. Commerce Comm'n*
   740 F.2d 566 (7th Cir. 1984) ..................................................................................43

*Ill. Republican Party v. Pritzker*
   973 F.3d 760 (7th Cir. 2020) ............................................................................26, 29

*Int'l Profit Assocs. v. Paisola*
   461 F. Supp. 2d 672 (N.D. Ill. 2006) ......................................................................42

*IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*
   304 F. Supp. 3d 746 (N.D. Ill. 2018) ......................................................................31

*Kelly Toys Holdings, LLC v. 19885566 Store*
   2023 WL 4288356 (S.D.N.Y. June 29, 2023) .........................................................62

*Kim v. Carter's Inc.*
  598 F.3d 362 (7th Cir. 2010) ................................................................41

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*
  735 F.3d 735 (7th Cir. 2013) ...............................................................45

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*
  2011 WL 5325545 (N.D. Ill. Nov. 3, 2011) ........................................51

*Kurowski v. Rush System for Health*
  2023 WL 2349606 (N.D. Ill. Mar. 3, 2023).........................................46

*Lancaster Found., Inc. v. Skolnick*
  1992 WL 211063 (N.D. Ill. Aug. 21, 1992) .........................................64

*Lawson Prods., Inc. v. Avnet, Inc.*
  782 F.2d 1429 (7th Cir. 1986) ..............................................................54

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*
  809 F. Supp. 2d 857 (N.D. Ill. 2011) (St. Eve, J.) ......................27, 31, 36

*Logansport Mach. Co. v. Neidlein-Spannzeuge GmbH*
  2012 WL 1877854 (N.D. Ind. May 22, 2012) ......................................61

*Lumbermen's Mut. Cas. Co. v. Sykes*
  890 N.E.2d 1086 (Ill. App. Ct. 2008) ..................................................41

*M1 Holdings Inc. v. Members 1st Fed. Credit Union*
  2022 WL 17487942 (N.D. Ill. Dec. 7, 2022)........................................49

*Machlett Labs., Inc. v. Techny Indus., Inc.*
  665 F.2d 795 (7th Cir. 1981) ................................................................42

*Mays v. Dart*
  974 F.3d 810 (7th Cir. 2020) ..........................................................29, 65

*Mazurek v. Armstrong*
  520 U.S. 968 (1997) (per curiam)........................................................26

*MB Fin. Bank, N.A. v. MB Real Estate Servs., LLC*
  2003 WL 22765022 (N.D. Ill. Nov. 21, 2003) .....................................56

*MBM Holdings LLC v. City of Glendale*
  843 F. App'x 5 (7th Cir. 2021) .............................................................36

*McCarthy v. Fuller*
  810 F.3d 456 (7th Cir. 2015) ................................................................65

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*
128 F.3d 1111 (7th Cir. 1997) ........................................................................................37

*Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.*
312 U.S. 287 (1941)........................................................................................................65

*Mishkin v. Kenney & Branisel, Inc.*
609 F. Supp. 1254 (S.D.N.Y. 1985)................................................................................44

*Motor Werks Partners, L.P. v. BMW of N. Am., Inc.*
2001 WL 1136145 (N.D. Ill. Sept. 24, 2001) ................................................................47

*Near v. Minnesota*
283 U.S. 697 (1931)........................................................................................................64

*Nebraska Press Ass'n v. Stuart*
427 U.S. 539 (1976)........................................................................................................64

*Nw. Pallet Supply Co. v. Peco Pallet, Inc.*
2016 WL 8671902 (N.D. Ill. May 13, 2016) ......................................................37, 44, 58

*Ohio Art Co. v. Lewis Galoob Toys, Inc.*
799 F. Supp. 870 (N.D. Ill. 1992) ..................................................................................63

*Oliveira v. Amoco Oil Co.*
201 Ill. 2d 134 (2002) ....................................................................................................33

*Org. for a Better Austin v. Keefe*
402 U.S. 415 (1971)........................................................................................................65

*Pampered Chef v. Alexanian*
804 F. Supp. 2d 765 (N.D. Ill. 2011) ........................................................................45, 49

*Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*
2020 WL 6265133 (N.D. Ill. Aug. 20, 2020) ......................................................42, 50, 56, 57

*Patel v. Zillow*
2018 WL 2096453 (N.D. Ill. May 7, 2018) ....................................................................30

*Penske Truck Leasing Co. v. Cent. States, Se. & Sw. Areas Pension Plan* (N.D. Ill. Apr. 6, 2022) ......................................................................................................................54

*Redbox Automated Retail, LLC v. Xpress Retail LLC*
310 F. Supp. 3d 949 (N.D. Ill. 2018) ..............................................................................56

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*
80 F. Supp. 3d 829 (N.D. Ill. 2015) ..........................................................................39, 52

*Rinvoq Cost & Savings*
    https://www.rinvoq.com/cost (last visited Nov. 29, 2023) ....................................................10

*Roland Mach. Co. v. Dresser Indus., Inc.*
    749 F.2d 380 (7th Cir. 1984) ................................................26

*Schmidt v. Lessard*
    414 U.S. 473 (1974) (*per curiam*) ........................................61

*Se. Promotions, Ltd. v. Conrad*
    420 U.S. 546 (1975)........................................................65

*Shaffer v. Globe Prot., Inc.*
    721 F.2d 1121 (7th Cir. 1983) ..............................................56

*Skyline Int'l Dev. v. Citibank*
    702 N.E.2d 942 (Ill. App. Ct. 1998) .......................................30

*Skyrizi Cost and Savings*
    https://www.skyrizi.com/psoriasis-psoriatic-arthritis/cost-and-savings (last visited
    Nov. 29, 2023) ...........................................................10

*Small Bus. Lending, LLC v. Pack*
    2019 WL 3430551 (S.D. Ind. July 30, 2019).................................52

*SMC Corp. v. Lockjaw, LLC*
    481 F. Supp. 2d 918 (N.D. Ill. 2007) ......................................45

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*
    1987 WL 6300 (N.D. Ill. Jan. 30, 1987) ...................................56

*Thrasher-Lyon v. Ill. Farmers Ins. Co.*
    861 F. Supp. 2d 898 (N.D. Ill. 2012) ......................................41

*Turnell v. CentiMark Corp.*
    796 F.3d 656 (7th Cir. 2015) ..............................................42

*Ty, Inc. v. Jones Grp., Inc.*
    237 F.3d 891 (7th Cir. 2001) ..........................................27, 38

*United States v. Carrazco-Martinez*
    2023 WL 7325885 (N.D. Ill. Nov. 7, 2023) .................................36

*Urban One, Inc. v. Tucci*
    2018 U.S. Dist. LEXIS 168582 (N.D. Ill. Sept. 30, 2018) ...................54

*Valencia v. City of Springfield*
    883 F.3d 959 (7th Cir. 2018) ..........................................26, 27

*Vienna Beef, Ltd. v. Red Hot Chi., Inc.*
  833 F. Supp. 2d 870 (N.D. Ill. 2011) ..................................................................60

*W.A. Mack, Inc. v. Gen. Motors Corp.*
  260 F.2d 886 (7th Cir. 1958) ..............................................................................65

*Walgreens Co. v. Peters*
  2021 WL 3187726 (N.D. Ill. July 28, 2021) .......................................................46

*Winter v. Natural Resources Def. Council, Inc.*
  555 U.S. 7 (2008) ...........................................................................................26, 42

*YourNetDating, Inc. v. Mitchell*
  88 F. Supp. 2d 870 (N.D. Ill. 2000) ....................................................................46

Statutes

720 ILCS 5/14-6(1)(a) ...........................................................................................43

815 ILCS 505/1(e) .................................................................................................29

815 ILCS 505/10a(a) ..............................................................................................41

815 ILCS 505/10a(c) ........................................................................................41, 43

815 ILCS 510/3 .......................................................................................................43

Other Authorities

ABBVIE, *AbbVie Reports First-Quarter 2023 Financial Results Press Release* (Apr. 27,
  2023), https://investors.abbvie.com/static-files/5ee232f8-f714-422b-8b8e-
  9f475f7ad4e2 .....................................................................................................11

ABBVIE, *Patient Assistance: Frequently Asked Questions,*
  https://www.abbvie.com/patients/patient-support/patient-assistance/patient-
  assistance-frequently-asked-questions.html (last visited Nov. 27, 2023) ..............10

*AbbVie's 2022 Annual Report on Form 10-K,* https://investors.abbvie.com/static-
  files/e3047152-75b3-44b3-95a8-18e4fa991768 ....................................................9

Fed. R. Civ. P. 12(b)(6) .....................................................................................31, 36

Fed. R. Civ. P. 30(b)(6) .......................................................................................8, 13

Fed. R. Civ. P. 65 ........................................................................................3, 57, 62

Fed. R. Civ. P. 65(d) ..............................................................................................61

Fed. R. Civ. P. 65(d)(2) ............................................................................................3

https://www.nytimes.com/2023/01/28/business/humira-abbvie-monopoly.html ..........................48

Rebecca Robbins, *How a Drug Company Made $114 Billion by Gaming the U.S. Patent System*, N.Y. Times (Jan. 28, 2023) ........................................................................................47

## **INTRODUCTION**

███████████████████████████████████████████

███████████████████████ That was the opinion of Anne Najjar, AbbVie Inc.'s Head of Patient Assistance Programs, in ***May 2022***.  And, in AbbVie's view, just as a cancerous tumor ravages the human body if left untreated, the alternate-funding industry—including but certainly not limited to Payer Matrix—threatened to decimate AbbVie's gargantuan profits if left unchecked.  Framing the stakes for AbbVie's vigorous campaign against the alternate funding industry, Ms. Najjar did not mince words: ███████████████████████████

██████████████████ Time was of the essence if AbbVie hoped to neutralize the alternate-funding menace.  Or so it seemed.

Despite Ms. Najjar's dire warnings in May 2022, however, more than a year passed before AbbVie sought judicial relief.  Now, Plaintiff seeks a sweeping nationwide injunction that would effectively bind nonparties, muzzle Payer Matrix's free speech on matters of public concern, and enjoin activities Payer Matrix has not engaged in since May 2023.  No doubt sensitive to Payer Matrix's voluntary cessation of the conduct AbbVie considers illegal, AbbVie desperately seeks to generate evidence of ongoing harm by pointing to PAP applications that were submitted independently by patients or their healthcare providers ("HCPs") without Payer Matrix's knowledge or involvement.  But the notion that Payer Matrix continues to thumb its nose at AbbVie by intentionally facilitating the submission of patient PAP applications for Humira, Skyrizi, and Rinvoq is implausible.  As of July 1, 2023, Payer Matrix washed its hands of dealing with AbbVie and officially implemented a policy it had set in motion shortly after the Complaint was filed to stop assisting Members with PAP applications and copay assistance for AbbVie's drugs.  Consistent with this decision, Payer Matrix advises patients that it cannot assist them in

applying for any AbbVie programs designed to help cover the exorbitantly high costs of essential specialty drugs. And yet, AbbVie still doggedly presses for an injunction.

AbbVie's gross delay in seeking an injunction does not support its claim that there is some sort of impending irreparable harm or emergency of any sort. Courts in this Circuit have consistently denied injunctions where the plaintiffs waited only a few months to seek an injunction. Here, AbbVie has known **well over a year** about the supposed clear and present danger—**malignancy**—posed by the alternate-funding services such as the ones that Payer Matrix provides to employers with self-funded health insurance plans. But AbbVie did not file its initial motion for a preliminary injunction in this case until May 31, 2023. AbbVie's brief leaves this critical issue unaddressed, but the Court cannot: Settled law holds that AbbVie's delay undermines its claim of impending, irreparable harm from alleged illegal conduct that has supposedly damaged AbbVie—financially and reputationally—on an uninterrupted basis since 2021. A litigant who waits more than one year to move for an injunction, notwithstanding the alleged scourge of ongoing harm, is not entitled to injunctive relief as a matter of law.

Additional flaws abound plaguing AbbVie's motion. Paramount among them is the sheer novelty and unprecedentedly broad scope of AbbVie's proposed injunction. Specifically, AbbVie asks this Court to issue a **nationwide** injunction predicated solely on **Illinois** state law. Because AbbVie does not allege any violation of federal law, however, it lacks a sound statutory hook for an injunction applicable coast to coast. This Illinois court cannot issue national edicts *ex nihilo*.

Earlier this month, AbbVie supplemented its expedited discovery production with more documents that it contends show Payer Matrix's continued involvement in the submission of PAP applications for Humira, Skyrizi, and Rinvoq in recent months. Clearly, AbbVie believes it needs to showcase additional evidence that implicates Payer Matrix in ongoing wrongful conduct to enjoin. But there are no gamechangers in AbbVie's recent productions that warrant this Court's

-2-

resort to the "strong arm of equity." *Bonaparte v. Camden & Amboy R.R. Co.*, 3 F. Cas. 821, 827 (C.C.D.N.J. 1830) (No. 1617). These newly produced documents are just more of the same.

*First*, there is no evidence that Payer Matrix assisted with ***any*** of the supplemental PAP applications AbbVie produced in November 2023. In fact, the evidence suggests otherwise. These PAP applications appear to involve individual patients that submitted these publicly-available applications on their own or with their HCP's or pharmacy's assistance. AbbVie cannot legitimately contend that the submission of a PAP application by any patient whose employer partners with Payer Matrix is enough, without more, to implicate Payer Matrix in the alleged wrongdoing. Without evidence linking Payer Matrix to the voluntary actions of nonparties who recently submitted PAP applications for AbbVie specialty drugs—***and there is none***—AbbVie cannot demonstrate it will suffer irreparable harm from Payer Matrix in the interim prior to a final resolution on the merits. Since Payer Matrix is no longer submitting or assisting with the submission PAP applications to AbbVie (and has not done so for several months), there is quite simply nothing for the Court to enjoin.

*Second*, to the extent AbbVie contends it need not prove Payer Matrix's recent involvement as a prerequisite to showing irreparable harm, that position is untenable. AbbVie essentially wants this Court to order a universal injunction that "binds the world" and prohibits the submission of PAP applications by nonparty patients whose employers have partnered with Payer Matrix—***even if the patient submits the PAP application on their own without Payer Matrix's knowledge or help***. It would be impossible for the Court to enforce an injunction on such wide-ranging terms. Federal law is clear: An injunction in this case can bind ***only*** Payer Matrix; its officers, employees, agents and attorneys; and other persons who are "in active concert or participation with" Payer Matrix ***and*** who receive actual notice of the injunction. Fed. R. Civ. P. 65(d)(2). An injunction cannot, consistent with Rule 65, restrict the actions of nonparties (*e.g.*,

patients, HCPs, pharmacists) who choose to submit PAP applications to AbbVie on their own, because they would not be "in active concert or participation" with the Defendant.

AbbVie's obstacles to achieving extraordinary injunctive relief do not end there. In a key concession, AbbVie acknowledges it has an adequate remedy at law—monetary damages—to compensate it for the lost revenue it attributes to Payer Matrix's submission of allegedly fraudulent PAP applications from 2021 until now. Taking AbbVie's concession to its logical endpoint, monetary damages will make it whole for *any* fraudulent PAP applications submitted by Payer Matrix *at any time—past, present, or future*.

Seeking to thwart the demise of its motion, AbbVie insists it has suffered reputational harm and loss of goodwill among consumers of its specialty drugs and the doctors who prescribe them. This argument lacks merit—for three reasons. *First*, AbbVie only offers evidence of alleged *past* damage to its reputation and goodwill; it provides no grounds for the Court to believe Payer Matrix is *likely* to inflict such harms in the future (if it ever did). *Second*, AbbVie fails to offer persuasive evidence of any material damage to its reputation in the marketplace proximately caused by Payer Matrix; AbbVie instead relies on conjecture and nonparties' hearsay statements to prop up its bogus claims of reputational harm. *Third*, to the extent AbbVie roots loss of goodwill in Payer Matrix's dissemination of publicly available AbbVie-related information, such conduct is not actionable. AbbVie cannot muzzle Payer Matrix's representatives and prevent them from speaking freely and openly on healthcare topics such as the affordability of specialty drugs, AbbVie's PAP, the expiration of AbbVie's Humira patent, and/or the pros and cons of switching a patient to an alternative and more affordable biosimilar medication. Such issues are prominent in this Nation's discourse and have been discussed in Congressional reports and news articles.

With an adequate remedy and no irreparable harm, AbbVie's Motion cannot succeed. Accordingly, the Court should deny its request for nationwide preliminary injunction.

## STATEMENT OF FACTS

I. **HIGH-COST SPECIALTY DRUGS & PAYER MATRIX'S ROLE**

A. **The Rising Costs of Specialty Drugs Threaten the Sustainability of Self-Funded Healthcare Plans That Payer Matrix Serves[1]**

Specialty drugs such as AbbVie's Humira, Rinvoq, and Skyrizi—which are at the center of this litigation—treat complex and chronic conditions, but unlike traditional brand or generic medications, they come with a very high (and ever-increasing) price tag. (Niarchos Decl. ¶¶ 11-12.) Indeed, the costs of these already expensive medications continue to grow at staggering rates.[2] (*Id.*) For example, the price of an annual treatment for Humira has ***increased by over 570%***—costing more than $77,000 per year—approximately the same as the median U.S. household income in 2022. (*Id.* ¶ 12; *see also* Declaration of Elena M. Massarotti, M.D., dated November 29, 2023, submitted with this Opposition ("Massarotti Decl."), ¶ 15). Although approximately 2% of the U.S. population relies on these specialty drugs, these prescriptions account for ***more than 50% of total pharmacy spending***. (Niarchos Decl. ¶ 13.)

This trend is particularly troubling for the employer-sponsored self-funded health plans and Taft-Hartley Plans (*i.e.*, multi-employer plans) that Payer Matrix serves (the "Plans" or "Self-Funded Plans"). Unlike fully-insured commercial health plans, these Self-Funded Plans assume the financial risk for the medical and pharmacy claims of their employees' and their dependents' (collectively, "Members"), which are funded in part, or in some instances in whole, through employee plan contributions. (*Id.* ¶¶ 14, 23 n. 46.) Employer groups therefore work closely with their third-party administrators ("TPAs"), including pharmacy benefit managers ("PBMs"), that help administer the plan, manage prescription drug benefits, and closely monitor the spend

---

[1] Payer Matrix refers the Court to the Declaration of Michael Niarchos, dated Nov. 28, 2023, submitted with this Opposition (the "Niarchos Decl."), for a detailed explanation of the rising costs of specialty drugs and the threat they pose to the sustainability of self-funded healthcare plans.

[2] The cost of specialty drugs has increased 43% since 2016. (Niarchos Decl. ¶ 11.)

associated with prescription drug claims.  (*Id.* ¶ 18.)  One way to manage the scourge of highly expensive pharmacy costs is to "carve out" or "exclude" high-priced specialty drugs from the plan benefit (*i.e.*, rendering the drug not covered by the plan).  (*Id.* ¶ 24.)  This is often necessary because even a handful of specialty drug claims threaten the Plan's (and employer's) continued viability.  (*Id.* ¶ 14.)  These carve-outs are entirely permissible under the Employee Retirement Income Security Act ("ERISA"), which regulates these Self-Funded Plans.[3]  (*Id.* ¶ 19.)

### B.    Payer Matrix's Business Model

Payer Matrix refers the Court to the Declaration of Jennifer Hoefner, dated Nov. 29, 2023, submitted with this Opposition (the "Hoefner Decl."), for a detailed explanation of Payer Matrix's business model and how it operates.  Put simply, Payer Matrix allows Self-Funded Plans to manage the rising costs of specialty drug while simultaneously providing support to Members that rely on expensive specialty drugs.  (Hoefner Decl. ¶ 9.)  Specifically, because the Plans have decided to remove these drugs from coverage, Payer Matrix assists their Members in identifying and applying for sources of funding, including (as relevant here) pharmaceutical-sponsored patient assistance programs ("PAPs"), so that these Members are not forced to choose between the financial ruin resulting from paying for their drugs out of pocket or forgoing their much-needed drug therapies altogether.  (*Id.* ¶ 10.)  There are currently over seventy competitors that offer similar services as Payer Matrix and PBMs have also recently started offering similar services.  (*Id.*)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[3] ERISA does not mandate that Self-Funded Plans provide specific benefits.  Self-Funded Plans are generally free to design their group health coverage to meet their needs (subject to regulations regarding Heath Savings Account contributions and consideration of health, disability and other protected status). Given the latitude under ERISA, an employer plan may carve out drugs from its specialty pharmacy benefits as a means of reducing the pharmacy expenses borne by the Members and the Plan as a whole.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████

██████████████████████████████ ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ ████████ ██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

    Yet Payer Matrix does more than "simply complete an online application for these [M]embers that the [M]embers could do on their own," as AbbVie suggests. (Mem. at 12.)[5] ██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ In short, Payer Matrix empowers Plans to control their pharmaceutical spend, while still providing support to their

---

[4] The process of how Payer Matrix onboards new clients is outlined in the Hoefner Declaration. (Hoefner Decl. ¶¶ 12-38.)

[5] Throughout this brief, AbbVie's memorandum of law in support of its amended motion for a preliminary injunction (Dkt. 110, filed under seal) shall be referenced as "Mem."

Members in accessing their treatments without the extra financial burden.  (*Id.* ¶¶ 9-10, 12.)

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

In short, overrides are not "automatic." ████████████████████

████████████████████████████████████

████████████████████████████████████

██

## II. ABBVIE'S BUSINESS, INVESTIGATION INTO ALTERNATE FUNDING PROGRAMS, AND EVOLVING PAP ELIGIBILITY REQUIREMENTS

### A. AbbVie's Biggest Pharmaceutical Moneymakers and Their Crushing Price Tags

AbbVie is one of the largest pharmaceutical companies in the world, with self-reported net revenues of more than $58 billion in 2022.[6] For years, AbbVie has profited (and continues to profit) immensely from its three blockbuster immunology drugs: Humira, Skyrizi, and Rinvoq. Humira entered the market in 2002 to treat rheumatoid arthritis. (Niarchos Decl. ¶¶ 11-12.) In 2022, AbbVie reported *over $21 billion* in global net revenue for Humira alone.[7] As of January 2023, the list price for a patient's four-week supply of Humira was $6,922.62. (Poell Decl. ¶ 2,

---

[6] *See* ABBVIE, *AbbVie's 2022 Annual Report on Form 10-K*, https://investors.abbvie.com/static-files/e3047152-75b3-44b3-95a8-18e4fa991768 (last visited Nov. 27, 2023) ("AbbVie's 2022 Annual Report").
[7] *Id.*

Ex. 1, Najjar Tr. 86:8-14.)[8]  Skyrizi entered the market in 2019 to treat plaque psoriasis.[9]  In 2022, AbbVie reported **over $5 billion** in global net revenue for Skyrizi.[10]  As of January 2023, the list price for **one dose** of Skyrizi is $19,734.61.  (Poell Decl. ¶ 2, Ex. 1, Najjar Tr. 80:17-23.)[11]  Rinvoq entered the market in 2019 to treat rheumatoid arthritis.  (Niarchos Decl. ¶ 11.)  In 2022, AbbVie reported over **$2.5 billion** in global net revenue for the drug.[12]  As of January 2023, the list price for a thirty-day supply of Rinvoq is $6,124.96.  (Poell Decl. ¶ 2, Ex. 1, Najjar Tr. 84:10-15.)[13]

Acknowledging the reality that those without coverage cannot afford such prices, AbbVie has offered PAPs through its charitable foundation, myAbbVie Assist, which provides free drugs for financially eligible patients who are either uninsured or underinsured.[14]  AbbVie offers PAPs for many of its drugs, including Humira, Skyrizi, and Rinvoq—its best sellers.  AbbVie sets its own criteria for admission into the PAP, which includes that the applicant: (1) have a valid prescription; (2) is uninsured or has "limited" insurance for the particular drug; (3) resides in the United States; and (4) demonstrates qualifying financial need based on certain enumerated thresholds.  (*Id.* Tr. 25:21-26:11.)

## B.     AbbVie's Campaign Against Alternative Funding Providers

Prior to 2023, Payer Matrix (and its competitors) worked openly with AbbVie to help coordinate the processing of PAP applications for Members.  ███████████████████████

████████████████████████████████████████████████████████████

---

[8] *See also* HUMIRA ADALIMUMAB, *Humira Cost & Savings*, https://www.humira.com/cost (last visited Nov. 29, 2023)

[9] *See* SKYRIZI RISANKIZUMAB-RZAA, *Skyrizi Cost and Savings*, https://www.skyrizi.com/psoriasis-psoriatic-arthritis/cost-and-savings (last visited Nov. 29, 2023) ("Skyrizi Cost and Savings").

[10] *See supra* AbbVie's 2022 Annual Report, FN. 7.

[11] *See also supra* Skyrizi Cost and Savings, FN. 9.

[12] *See supra* AbbVie's 2022 Annual Report, FN. 7.

[13] *See also* RINVOQ UPADACITINIB, *Rinvoq Cost & Savings*, https://www.rinvoq.com/cost, (last visited Nov. 29, 2023).

[14] *See* ABBVIE, *Patient Assistance: Frequently Asked Questions*, https://www.abbvie.com/patients/patient-support/patient-assistance/patient-assistance-frequently-asked-questions.html (last visited Nov. 27, 2023).

███████████████████████████████████████████████████

██████████████████████████████  ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

Unbeknownst to Payer Matrix, however, AbbVie's attitude towards Payer Matrix and its competitors began to shift in late 2021 when AbbVie retained consultants to analyze alternative funding providers ("AFPs") and the financial impact they were having on AbbVie. This resulted in a January 11, 2022 presentation created by Hayden Consulting Group ("HCG") that provided a detailed analysis of AFPs, which was extensively discussed within AbbVie throughout 2022 and 2023. (*Id.* ¶ 3, Ex. 2.) ████████████████████████████████████

████████████████████████████████████

***More than a year before this lawsuit was filed***, AbbVie viewed AFPs (including Payer Matrix) as a threat to its gargantuan profits. Many of AbbVie's internal presentations throughout 2022 focused on how AFPs had a negative financial impact on AbbVie's bottom line and how AbbVie must "take action" against AFPs. ███████████████████████████████████

███████████████████████████████████████████████████

████████████████ █ ███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████  ██████████████████

---

[15] After knowingly working with, processing, and approving PAP applications submitted by Payer Matrix for four years, AbbVie seemingly turned against Payer Matrix and other AFPs, because they were (marginally) impacting AbbVie's revenue, which reached $2.948 billion in the first quarter of 2023 based on Humira sales alone. *See* ABBVIE, *AbbVie Reports First-Quarter 2023 Financial Results Press Release* (Apr. 27, 2023), https://investors.abbvie.com/static-files/5ee232f8-f714-422b-8b8e-9f475f7ad4e2, attached to Poell Decl. ¶ 10, Ex. 9.)

-11-



(*Id.*)

### C.  AbbVie Changes its PAP Eligibility Requirements

During the course of January 2023, Payer Matrix was aware that Members began receiving denial letters from AbbVie on the basis that the Member's employer had contracted with Payer Matrix.  And, at the end of January/early February 2023, AbbVie updated its PAP eligibility terms on the PAP application form itself—but only with respect to Humira, Skyrizi, and Rinvoq—to specifically reference Payer Matrix and several other of its competitors by name.  (*Id.* ¶ 82.)  Specifically, the new terms state:

> Patients with insurance plans or ***employers participating in an alternate funding program (also sometimes referred to as patient advocacy***

---

[16] Humira's patent expired in early 2023, which meant that low-cost biosimilars were entering the market, thus adding pressure on AbbVie to capture plan dollars and maximize its Humira-driven profits.  (Niarchos Decl. ¶ 30.)

> *programs, specialty networks*, SHARx, Paydhealth, or *Payer Matrix*, among other names) requiring them to apply to a manufacturer's patient assistance program or otherwise pursue *specialty drug* prescription coverage through an alternate funding vendor as a condition of, requirement for, or prerequisite to coverage of relevant *AbbVie products*, or that otherwise denies, restricts, eliminates, delays, alters, or withholds any insurance benefits or coverage contingent upon application to, or denial of eligibility for, *specialty drug* prescription coverage through the alternate funding program are not eligible for the myAbbVie Assist program. You agree to inform myAbbVie Assist if you are a member of such an insurance plan or if you are applying to myAbbVie Assist on behalf of a patient who is a member of such an insurance plan.

(*Id.*, Ex. 13 (emphasis added).)  Although Payer Matrix was expressly named, the terms still reflected a deep misunderstanding of the Member's lack of coverage and how Payer Matrix operated.  (*Id.* ¶ 82)  To add to the confusion, the new PAP terms applied *only* to PAP applications for AbbVie's most lucrative drugs: Humira, Skyrizi, and Rinvoq.  (*Id.*)  The new terms did not apply to any of the other 47 drugs for which AbbVie offered PAPs.  (*Id.*)

Payer Matrix tried to obtain clarification from AbbVie directly about this confusing and drastic policy change, but AbbVie refused to provide any.[17] ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Payer Matrix also began to implement a company-wide policy to drastically reduce—and ultimately eliminate—

---

[17] Payer Matrix reached out to AbbVie several times to understand what precipitated the change in terms and to discuss how to ensure Members were not unfairly penalized.  (Poell Decl. ¶ 13, Ex. 12, Hoefner Tr. 266:4-8; Hoefner Decl. ¶ 86, Ex. 16.)  AbbVie rebuffed those efforts.  (*Id.*, Ex. 16.)  On March 28, 2023, Payer Matrix's outside counsel sent a letter to AbbVie's General Counsel to clarify the nature of Payer Matrix's operations.  (Poell Decl. ¶ 31, Ex. 30, Hoefner Decl. ¶ 87.)  AbbVie never responded.  (*Id.*)  On April 5, 2023, Payer Matrix's Chief Business Officer, Michael Jordan, again tried to engage in discussions with AbbVie regarding the revised PAP eligibility terms.  (Hoefner Decl. ¶ 88, Ex. 17.)  Despite Mr. Jordan's numerous follow-ups "looking for direction," AbbVie did not respond.

the submission of PAP applications to AbbVie for Humira, Skyrizi, and Rinvoq. (Hoefner Decl. ¶ 89, Ex. 18.)

This was not an easy process. Indeed, AbbVie's implementation of the updated PAP eligibility terms in January 2023 unleashed widespread chaos. Suddenly, hundreds of Members were left in limbo, including those with pending applications, applications in process, and upcoming renewals with no understanding as to what they were supposed to do to get access to their medications.[18] (*Id.* ¶ 84.) ███████████████████████

███████████████████████████████████████████

██████████████████████████ The determination of whether Payer Matrix was involved with an application was an *ad hoc*, manual process, requiring that AbbVie representatives call Members, HCPs, and Plans to see if Payer Matrix was affiliated with them. (*Id.* ¶ 2, Ex. 1, Najjar Tr. 173:21-176:24.) And as late as May 2023, AbbVie employees *still* did not know whether to deny applications where Payer Matrix was listed as a HIPAA contact.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

---

[18] AbbVie accuses Payer Matrix of "concealing" its involvement in PAP applications suggesting some nefarious intent. Payer Matrix did no such thing. In order to ensure Members were best positioned to get their medications, Payer Matrix began to extract itself from PAP applications so that Members were not penalized simply because their employer contracted with Payer Matrix. For example, RCCs removed their names (with white out) on a handful of applications that were already in progress to transfer those applications to the Member to complete and submit, rather than having them restart those applications from the beginning. (Hoefner Decl. ¶¶ 118-122.) In addition, a handful of RCCs requested that PAP applications be submitted by a Plan's pharmacy, which is a common practice and was intended simply to help the Member. (*Id.* ¶ 123.) Moreover, the majority of these efforts AbbVie complains about now stem from a *single* individual in a *single* market (New York and New Jersey—*not* Illinois) *only between January and May 2023*, with 38 Members (across 13 of the over 750 Plans Payer Matrix serves). In other words, this individual only works with .37% of all of Payer Matrix's Members, and *there have been no further similar instances since May 2023*. (*Id.* ¶ 124.) When Payer Matrix learned about these actions, it counseled all the individuals involved to cease those activities. (*Id.*)

-14-

AbbVie's half-cocked review process also led to the denial of PAP applications in instances where Payer Matrix (or another AFP) was **_not_** involved with the submission. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ )

Throughout 2023 AbbVie continued to deny PAP applications even for those Members that submitted PAP applications **_on their own_** without Payer Matrix's assistance—simply because the Member's employer contracted with Payer Matrix. (*See* Hoefner Decl. ¶ 133.) To address this confusion (and as damage control), AbbVie developed "Talking Points" for its employees to explain what was happening to the disgruntled patients. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████ ████████████████████████████

████████████████████████████████████████

████████████████████████

AbbVie's attempts to manipulate and mischaracterize the extent of Payer Matrix's conduct after it updated the PAP eligibility requirements are not only contrary to the facts,[19] but also

---

[19] This is evident from the very first sentence of AbbVie's brief. (Mem. at 1.) AbbVie cherry-picked an out-of-context statement regarding a 2023 PAP submission to suggest that Payer Matrix was trying to evade the new PAP eligibility rules. Not so. ████████████████████████████████

████████████████ █████████████████████

████████████████████ █████████████████

████████████████████████████████████████

████████████████

inconsistent and inaccurate.[20]  The evidence uncovered during the course of expedited discovery, when distilled down to fact rather than AbbVie's fiction, demonstrates the following:

- Over 116,000 patients are currently enrolled in AbbVie's PAP for Skyrizi, Rinvoq, or Humira.  (Mem., at 10; Najjar Decl. ¶ 12, [Dkt. 111].)

-  Payer Matrix's 2023 PAP submissions are limited to the actions of Payer Matrix employees **all located outside of Illinois** and pertain to only **12** Members in Illinois—no Illinois Member's PAP application was submitted after **April 2023** and **no Illinois Members were approved for PAP**.[22]  (*Id.* ¶ 103.)

- AbbVie's accusation that Payer Matrix was involved in a September 2023 PAP submission is meritless, as there is no evidence to suggest that Payer Matrix assisted in the application process.[23]

- Only **10 non-Illinois Members** were enrolled in the PAP with Payer Matrix's direct or indirect assistance.[24]

- As of **July 1, 2023**, Payer Matrix implemented a policy across all Plans and PBMs that Payer Matrix would no longer assist Members with AbbVie's PAP or copay card applications.  (*Id.* ¶ 90.)

---

[20]  According to the Hays Decl., Payer Matrix supposedly assisted **29** Members with PAP applications in 2023 (Mem. at 5), while the Bates Decl. claims that it was only **22** Members.  (Mem. at 14 n.4.)  Not only does AbbVie present inconsistent evidence, both numbers are inaccurate.  AbbVie's lack of due diligence is staggering—many of the Members it claims Payer Matrix snuck into the PAP actually had denial letters in the files that **AbbVie produced in this litigation**.  *See* Hoefner Decl. Ex. 23.

[21]  AbbVie produced 81 additional documents on November 14th, 17th, and 21st of 2023, including 51 newly identified PAP applications that AbbVie denied due to suspected Payer Matrix affiliation.  Payer Matrix reviewed these documents and confirmed that Payer Matrix was **not** involved with **any** of these newly identified PAP applications.  *Id.*, ¶ 104, Ex. 25.

[22]  *See* Hoefner Decl. ¶ 103, Ex. 24 – While AbbVie claims 68 Illinois residents "applied to AbbVie's PAP with Payer Matrix's assistance," the facts do not support the claim.  AbbVie cites 10 Members that were terminated as early as October 13, 2021 and as late as May 12, 2023, 21 Members that did not even apply for PAP in 2023, 20 Members that applied for PAP before AbbVie updated the eligibility terms, and 5 Members that applied without Payer Matrix's involvement.  (*Id.* ¶ 103.)

[23]  *See id.* ¶ 91, Ex. 20.  AbbVie assumes Payer Matrix's involvement simply because Payer Matrix submitted a PAP for this Member in 2022.  (*Id.*)  But Payer Matrix had **no** involvement with this 2023 PAP application, which was submitted independently by the Member and their HCP.  (*Id.*)

[24]  *See id*. ¶ 102, Ex. 23.

Therefore, of the 116,000 patients currently admitted into AbbVie's PAP for Skyrizi, Rinvoq, or Humira program, only **10** of those patients were enrolled in 2023 with Payer Matrix's direct or indirect assistance and ***none of them were Illinois residents***, which AbbVie now claims threaten the sustainability of their PAP. (*Id.* ¶ 102.)

### III.   THIS LAWSUIT AND ABBVIE'S EXTENSIVE MISREPRESENTATIONS REGARDING PAYER MATRIX

AbbVie's motion is plagued with gross mischaracterizations of Payer Matrix's business model, testimony, and documentation produced during expedited discovery. Payer Matrix focuses here on those issues that figure most prominently in AbbVie's request for injunctive relief:

### A.   The "Override" Process and AbbVie's Misconceptions

AbbVie's case centers around the so-called "override" process and ***Payer Matrix's*** alleged authorizations of overrides of the Plan's specialty drug exclusion every time AbbVie denies a PAP application. AbbVie also claims that ***Payer Matrix*** knows that it would engineer an override before a decision on the PAP application is submitted. Not so. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

---

[25] AbbVie also misstates what a "true exclusion" means and grossly mischaracterizes Ms. Hoefner's testimony in doing so. The "true" aspect refers to whether the Plan or PBM places the specialty drug on or off the Plan's drug formulary. It does ***not*** refer to "situations where a client does not allow overrides." (Mem. at 16-17.) If the specialty drug is on the formulary, then the benefit is referred to as 100% Member, which means the Member is responsible for the entire cost of the drug—*i.e.*, it is not covered. ████████████

████████████████████████████████████████

████████████████

Because Payer Matrix has no control over whether the Plan or PBM actually grants an override request for a Member, the fact that a Member may be left without specialty drug coverage following a PAP application denial by AbbVie is a real and well-documented possibility. (*Id.* ¶ 59.) Contrary to AbbVie's contention, overrides are *not* automatic and there are Plans and PBMs that either do not permit overrides *at all* or use their discretion to deny override requests. For example:

- A Member affiliated with the Local 713 IBOTU Plan which does not allow *any* overrides for its Members, was denied from AbbVie's PAP. ████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████

- A Member affiliated with the Ball Enterprises Plan, which *does* allow overrides, was denied from AbbVie's PAP. ████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████

- Another Member affiliated with the plan, Local 713 IBOTU, was denied admission into AbbVie's PAP. ████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████

- ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████

- ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████

As the evidence clearly shows, Payer Matrix does *not* decide whether an override is granted. That decision is left solely to the Plan or the Plan's PBM.

### B. **Payer Matrix's Supposed Misrepresentations Regarding Insurance Status Are Not Supported by the Documentation**

AbbVie also claims that Payer Matrix misrepresented the insurance status of Members. As an initial matter, Payer Matrix does not make *any* representations to AbbVie. ██████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████ Furthermore, despite AbbVie's complaint that Payer Matrix misrepresents a Member's insurance status, nowhere on the updated January 2023 PAP application does AbbVie require the Member (or any entity for that matter) to specifically attest or "represent" the Member's insurance status—rather, a Member's insurance card is provided with the application, which clearly discloses their insurance status and provides the requisite information for AbbVie to confirm the lack of coverage through its benefits investigation. (*Id.* ¶ 106; *see also* Poell Decl. ¶¶ 23-25, Exs. 22, 23, 24.)

On numerous occasions, AbbVie falsely asserts that Payer Matrix "represents" Members as "uninsured" on the PAP application. (*See, e.g.*, Mem. at 1-3, 13, 20, 33-35.) This is wrong. ██ ████████████████████████████████████████████████████████████████████████████ ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

Furthermore, AbbVie conducts a "comprehensive" benefits investigation for every PAP submission to determine the patient's eligibility (and has done so for as long as Payer Matrix has been assisting Members with AbbVie's PAP, dating back to at least 2019).  (*Id.* ¶ 68; Poell Decl. ¶ 2, Ex. 1, Najjar Tr. 194:8-13.) ████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████  ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



The Members that Payer Matrix assisted did, in fact, have health benefits, but they did not have coverage for the particular drugs prescribed and at issue in this litigation. By AbbVie's own definition, these Members were considered underinsured and therefore PAP-eligible at the time of submission. (*Id*. 47:18-20.) The Plan's design documents—which the Plan is required to keep pursuant to Federal law—prove it.[27] (*See* Niarchos Decl. ¶¶ 24, 27, 29, 41.)

### C.    AbbVie's Ignores the Realities of Payer Matrix's Assistance with the Copay Program

The evidence further shows that AbbVie's claim that Payer Matrix directed Members to apply for copay assistance[28] either (1) while their PAP application was pending, or (2) after their PAP application was denied to further evidence that the Members had insurance is inaccurate.

---

[26]  When a Plan carves out specialty drugs, ***all*** Members become underinsured and therefore eligible for the PAP. (*See* Hoefner Decl. ¶ 18.)

[27]  AbbVie relies on statements made by Payer Matrix's Chief Business Officer, Michael Jordan, during a presentation aired on June 30, 2020 (almost 4 years ago) to bolster its argument that Payer Matrix makes "misleading representations" regarding PAP eligibility. (Mem. at 11.) The non-verified, partial transcript of that presentation is not reliable and does it reflect Payer Matrix's business model. As just one example, AbbVie claims in this presentation, "Payer Matrix refers to itself as a 'specialty carve-out." (Hoefner Decl. ¶ 113,) Payer Matrix ***is not a "specialty carve-out"*** because it is not a Plan or a PBM, nor does it have any control over or decision-making authority for either the Plan or PBM. (*Id*.) Carve-out decisions must be made, implemented, and managed at the Plan or PBM level. (*Id*.)

[28]  AbbVie describes its copay assistance program as the "I-do-have-insurance program," created exclusively for patients that do have insurance coverage, while AbbVie describes the PAP as the "I-don't-have-insurance program," created exclusively for "qualifying uninsured patient[s]." (Mem. at 2.) AbbVie's reference to the PAP as the "I-don't-have-insurance program" is therefore over-exclusive and contradicts its Corporate Representative's testimony.

██████████████████████████████████████████████ ██████████████

██████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ █████ █████████

████████████████████████████████████████████████

██████████████████████████████████████

By way of illustration, AbbVie points to an underinsured Member that applied for PAP on January 17, 2023, and included all insurance documentation reflecting their insurance status in the application.  (*See* Declaration of Valarie Hays, dated October 11, 2023 [Dkt. 114] ("Hays Decl."), Ex. 37, Dkt. 114.)  This patient was out of medication, but needed his next dose on January 22, 2023.  (*Id.*) ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ ████████████████████

██████████ This one-time exception did not change the Member's underinsured status for PAP

---

[29] ████████████████████████████████████████████████
████████████████████████████████████████████████
██████████  Payer Matrix has no involvement in this process and sometimes, no awareness either.  The pharmacy is not obligated to notify Payer Matrix.

purposes. (Hoefner Decl. ¶ 128.) Therefore, the Member's Plan still did not cover the medication and had only approved an emergency override to cover one dose. (*Id.*)

Second, a Plan's decision to cover a Member's medication *after* AbbVie's denial of a PAP application is not a misrepresentation of insurance coverage. (*Id.* ¶ 130.) AbbVie references a Member whose PAP application (accurately) stated on January 24, 2023 that the Member was underinsured because although the Member had health benefits through their employer, the Plan did not cover Skyrizi. (*Id.*) ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████  ████████████████████████████████████[31] There was therefore nothing inaccurate about the January 24, 2023 statement that the Member was underinsured and lacked coverage for Skyrizi (nor does the subsequent override alter that fact). (*Id.*.) However, because the Plan's subsequent authorization to permanently override the exclusion on March 6, 2023 did free up plan dollars for the drug, the Member became eligible for copay assistance at that time. (*Id.*)

### D.     Drug-Switching is Commonplace and Sometimes Necessary to Ensure Members Get Continued Access to Affordable Drug Therapies

After AbbVie changed its PAP eligibility terms, Plans reached out to Payer Matrix for guidance on the different options available to their Members in light of the launch of biosimilars

---

[30] (Poell Decl. ¶ 2, Ex. 1, Najjar Tr. 80:20-22.)
[31] While AbbVie argues that every employer "guaranteed coverage" for their Members' medication, that is not supported by the facts. (Hoefner Decl. ¶¶ 57, 60-61; Niarchos Decl. ¶ 23.)

into the market after Humira's patent expired in early 2023. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

         ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[32] This happens even more frequently when specialty drugs patents expire (like it did with Humira) and low-cost biosimilars become increasingly available on the market.  (*Id.* ¶ 17.)  This can also happen when patients switch jobs or insurance plans.  (*Id.* ¶ 18.)



."[33]

Second, Payer Matrix's drug switching discussions, led by its clinicians, are always focused on what is best for the Member, ***not*** what is best for Payer Matrix. And drug switching does not only allow for a patient to afford its medication, but it is also possible that they may find that the new therapy may have a better efficacy, and/or more favorable treatment regimen. (Massarotti Decl. ¶ 26.) Thus, contrary to AbbVie's position, this decision was not financially motivated, but rather, was focused solely on getting appropriate, effective, and cost-affordable drugs to Members.

Third, AbbVie's accusation that Payer Matrix distributed an "inaccurate" and "misleading" one-page flyers to HCPs comparing AbbVie's drugs with alternative medications, is unfounded. The flyers at issue was not circulated outside the handful of individuals who received Dr.

---

[33] Clients pay Payer Matrix a "cost avoidance fee" if Payer Matrix is able to successfully assist in enrolling a Member into an assistance program. The cost avoidance fee typically ranges from 22-30% of the cost the Plan would have otherwise had to pay if it had, in fact, covered that drug under a plan benefit. If, however, Payer Matrix does not, or cannot, enroll a Member into an assistance program, it does not get paid a cost avoidance fee for that Member.

Burrascano's initial draft; it was never utilized by Payer Matrix in any way.[34]  (Hoefner Decl. ¶ 135.)

## ARGUMENT

### I.    STANDARD FOR PRELIMINARY INJUNCTION

The Supreme Court holds that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (stating "there is no absolute right to an equitable remedy" and citing controlling precedent).  Rather, as an "equitable, interlocutory form of relief, a preliminary injunction in an exercise of a very far-reaching power, never to be indulged in except in a case ***clearly demanding it***." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (cleaned up & emphasis added).  Because "a preliminary injunction is an extraordinary and drastic remedy," the Court should not grant the instant motion unless AbbVie "by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  In determining whether to grant preliminary injunctive relief, the Court conducts its analysis in two separate phases: the *threshold* phase and the ***balancing*** phase.  *See Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp. 3d 619, 625 (N.D. Ill. 2021) (citing *Valencia*, 883 F.3d at 965).

At the threshold phase, AbbVie must make three showings.  ***First***, it must demonstrate "a *strong* showing that [it] is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (emphasis added) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  ***Second***, that "absent a preliminary injunction [it] will suffer irreparable harm prior to the final

---

[34] AbbVie also accuses Payer Matrix of making misleading statements about PAPs generally, such as describing PAPs as "overfunded and underutilized" or stating that the assistance programs "benefit" the pharmaceutical company.  (Mem. at 12-13.)  These statements are not misleading. ████████████

resolution of its claims." *Vaperz*, 543 F. Supp. 3d at 625 (citing *Valencia*, 883 F.3d at 965). **Third**, that traditional legal remedies are inadequate. *Id.*

Only if the applicant meets these requirements does the Court move to the balancing phase where it "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia*, 883 F.3d at 966 (citation & quotations omitted). In conducting this analysis, the Court employs a "sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (quoting *Roland Mach.*, 749 F.2d at 387). The Court also considers the public interest in granting or denying the injunction. *See, e.g.*, *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## II.   THIS COURT LACKS THE POWER TO ISSUE A NATIONWIDE INJUNCTION UNDER ILLINOIS STATE LAW

As a threshold matter, the Court should reject AbbVie's demand for nationwide injunctive relief predicated solely on Illinois law. While AbbVie's opening brief fails to address this issue, AbbVie has asserted (in its opposition to Payer Matrix's motion to dismiss) "it is well-established that nationwide injunctions are an appropriate remedy available under the IDTPA for nationwide schemes." (Dkt. 84 at 23.) But AbbVie's contention misconceives the limited territorial reach of IDTPA and ICFA, as defined by the Illinois Supreme Court, "and ignores the larger comity- and potentially Constitution-based limitations on extraterritorial application of state law, which do not always allow a court to issue a nationwide injunction based on a violation of state law." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 861 (N.D. Ill. 2011) (St. Eve, J.) (denying motion for nationwide preliminary injunction under IDTPA). No Illinois court has extended the reach of either statute beyond Illinois' borders. And for good reason.

-27-

A nationwide injunction issued pursuant only to state law raises grave constitutional concerns and violates two bedrock principles of commerce clause jurisprudence: "(1) that states cannot directly regulate interstate commerce; and (2) that incidental regulations of interstate commerce cannot be excessive in light of local interests furthered by the law." *Hyatt Corp. v. Hyatt Legal Servs.*, 610 F. Supp. 381, 383 (N.D. Ill. 1985) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982)). Indeed, in *Hyatt Corp.*, this Court held that a nationwide injunction arising out of Illinois' Anti-Dilution Act would violate the commerce clause. *See id.* at 385 (holding that injunction "should constitutionally remain within the borders of Illinois"). *Cf. Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 854 n.6 (3d Cir. 1984) (stating that if plaintiff only succeeded on the merits of its New Jersey state-law claims, "the injunction issued by the district court will, in accordance with the full faith and credit clause, be valid only in New Jersey"). Here, an injunction reaching Payer Matrix's actions nationwide would directly affect interstate commerce. The affordability and access of prescription drugs is unquestionably a vital aspect of interstate commerce. Thus, "the imposition of such an injunction pursuant to state law would constitute precisely the direct state interference with interstate commerce that is forbidden by the commerce clause." *Hyatt Corp.*, 610 F. Supp. at 383–84. *See also Allergan USA Inc. v. Imprimis Pharms., Inc.*, 2019 WL 3029114, at *7–8 (C.D. Cal. July 11, 2019) (declining to issue nationwide injunction based solely on California state law).

AbbVie may invoke the Seventh Circuit's decision in *City of Chicago v. Barr* to argue that nationwide injunctions are permissible, but *Barr* only concerned alleged violations of *federal* law. *See City of Chi. v. Barr*, 961 F.3d 882, 911–20 (7th Cir. 2020). *Barr* is thus readily distinguishable and does not bolster AbbVie's demand for nationwide relief tethered only to **state** law. Moreover, the Court in *Barr* declined to order nationwide relief, finding that an injunction "limited to providing complete relief to the plaintiff alone" (*i.e.*, Chicago) sufficed under the circumstances.

*See id.* at 920 –21 (holding that a narrower injunction would "ameliorat[e] the equitable concerns" at issue "without the need to extend injunctive relief beyond the plaintiff itself to non-parties").[35]

## III.   ABBVIE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

### A.   <u>AbbVie Does Not Prove a Likelihood of Success on the Merits of Any of Its Causes of Action</u>

Proving a "strong showing" of likelihood of success on the merits "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Pritzker*, 973 F.3d at 763; *see also Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020) (courts require a "strong showing" of likelihood of success on the merits).  This first step in the analysis "is often decisive," and it is decisive here.  *See Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (citing *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022)).  Here, AbbVie utterly fails to demonstrate a likelihood of success on the merits of any of its claims.

#### 1.   <u>AbbVie Is Not Likely To Succeed on the Merits of Its ICFA Claim</u>

##### a.   *AbbVie Does Not Provide Evidence to Support Standing Under ICFA*

AbbVie first argues that, "[i]n order to establish a likelihood of success on the merits under the ICFA," it "need only show that it is likely to prove" the four *prima facie* elements of an ICFA claim.  Mem. at 31.  But that is wrong because AbbVie is not a "consumer" under ICFA.  *See* 815 ILCS 505/1(e).  ICFA claims brought by non-consumer businesses must meet the "consumer nexus" test to establish statutory standing.  *See, e.g.*, *Curry v. Revolution Labs., LLC*, 2022 WL 225877, at *7 (N.D. Ill. Jan. 26, 2022) (citations omitted).  This non-consumer standing requirement stems from Illinois courts' skepticism toward "business-v-business ICFA claims

---

[35] Even in cases where courts have granted or upheld nationwide injunctions, those cases arose under federal law and provide no solace for AbbVie's extreme request here.  *See, e.g.*, *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) (issuing TRO to enjoin alleged federal equal protection violations).

where, as here, neither party is actually a consumer in the transaction." *Cmty. Bank of Trenton v. Schnuck Mkts., Inc*. 887 F.3d 803, 823 (7th Cir. 2018).

Thus, for AbbVie to maintain an ICFA claim, the alleged misconduct must have a "consumer nexus" that "involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 955 (N.D. Ill. 2016) (citation omitted); *see also Skyline Int'l Dev. v. Citibank*, 702 N.E.2d 942, 946 (Ill. App. Ct. 1998); *Patel v. Zillow*, 2018 WL 2096453, at *8 (N.D. Ill. May 7, 2018). AbbVie's discussion of its ICFA claim, however, ignores the consumer nexus requirement. *See* Mem. at 31–35. Because AbbVie does not address the elements of its ICFA claim under the proper legal test in its motion, it cannot demonstrate a likelihood of success on the merits as a matter of law. *See Curry*, 2022 WL 225877, at *7 (denying non-consumer plaintiff's motion for summary judgment on ICFA claim because he did not address the consumer-nexus test or the 'primarily-and-substantially in Illinois' test).

Where the movant's opening brief fails to raise an argument in support of its request for injunctive relief, "its later pivot" to another legal theory "is too-little-too-late." *Vaperz*, 543 F. Supp. 3d at 629 (holding plaintiff waived argument it did not raise until its reply brief); *see also Darif v. Holder*, 739 F.3d 329, 337 (7th Cir. 2014) ("Darif didn't pivot to an argument under these statutes and regulations until his reply brief. The argument is therefore waived.") So, the Court should not allow AbbVie to change its tune mid-song and argue—*for the first time*—in its reply brief that it meets the consumer and geographic nexuses after all. That ship has sailed. AbbVie has waived its arguments on both fronts. *See also Vaperz*, 543 F. Supp. 3d at 629–32 (holding plaintiff's "insufficiently clear showing about its likelihood of success on the merits" to be "fatal"

to plaintiff's motion for preliminary injunction).[36]   Nor can the Court offer a life raft and make AbbVie's argument for it.   *See Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 727 (7th Cir. 2021) ("Courts generally do not craft new arguments for a party, especially in civil cases and especially when the party is represented by counsel.").   Because AbbVie has failed to make a case for a consumer nexus to support its standing as a non-consumer business, it is not likely succeed on the merits of its ICFA claim.

> ### b.   AbbVie Is Not Likely to Show the Alleged Fraudulent Conduct Occurred Primarily and Substantially in Illinois

Even if AbbVie somehow managed to establish a consumer nexus (it failed to try), it is not likely to succeed in demonstrating an Illinois-centric nexus for Payer Matrix's allegedly fraudulent scheme.   *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 860 (N.D. Ill. 2011) (St. Eve, J.) ("[A] plaintiff might meet the consumer nexus test … and yet lack the right to pursue a private right of action if those practices did not occur 'primarily and substantially in Illinois.'"). The Illinois Supreme Court has determined that ICFA "applies only to fraudulent transactions which take place 'primarily and substantially' in Illinois."   *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 919 (Ill. 2007) (citation omitted).   And, even an Illinois resident, such as AbbVie, must prove that the disputed transactions occurred predominantly in Illinois.   *See, e.g.*, *Archey v. Osmose Util. Servs., Inc.*, 2022 WL 3543469, at *5 (N.D. Ill. Aug. 18, 2022) (dismissing Illinois resident's ICFA claim for failure to allege sufficient Illinois nexus).   In evaluating this geographic test, courts consider three factors: (1) the plaintiff's residency, (2) the defendant's residency, and (3) the location of the alleged deceptive conduct.   *See IPOX Schuster, LLC v. Nikko Asset Mgmt.*

---

[36] As Payer Matrix explains in its Rule 12(b)(6) papers, AbbVie's Complaint fails to allege facts plausibly demonstrating a "consumer nexus" and therefore lacks standing.   To avoid redundancy, Payer Matrix directs the Court's attention to its discussion of this issue in Payer Matrix's opening memorandum of law and reply brief filed in support of its motion to dismiss, and incorporates those arguments here by reference to the extent the Court is inclined to analyze the consumer nexus issue in the context of Plaintiff's motion for a preliminary injunction.   (*See* Dkt. 73 at 4–12; Dkt. 98 at 1–7.)

*Co.*, 304 F. Supp. 3d 746, 765 (N.D. Ill. 2018) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 100, 188 (2005)).  The first two factors are a wash: AbbVie is an Illinois resident and Payer Matrix is not.  Here, the third factor—***locational***—proves dispositive.

The evidence shows Payer Matrix's alleged wrongful conduct was *not* centered primarily and substantially in Illinois.  As an initial matter, Payer Matrix is based in Pennsylvania and has no physical offices or employees based in Illinois.  (*See* Hoefner Decl. ¶ 3.)  Further, overwhelmingly the facts here indicate that Illinois was not the locus of Payer Matrix's purported scheme:

- AbbVie claims that in 2023, Payer Matrix submitted 573 PAP applications on behalf of Members.  (Mem. at 5.)  However, ***only 12*** applications involved Illinois residents, the most recent of which was submitted in ***April 2023***.[37]  (*Id.* ¶ 103.)

- Of those 12 Illinois resident PAP applications submitted in 2023, ***none were approved into PAP***.  (*Id.* ¶ 103.)

- Only ***10 non-Illinois Members*** were enrolled in the PAP with Payer Matrix's direct or indirect assistance.[38]  (*Id.* ¶ 102.)

As with AbbVie's silence of the standing element, it has forfeited any argument that Payer Matrix's alleged conduct occurred primarily and substantially in Illinois.  *See* § III.A.1.a, *supra*. That aside, only a smattering of Illinois residents affiliated with Payer Matrix (12) submitted PAP applications to AbbVie in 2023—***and none were approved***.  (Hoefner Decl. ¶ 103.)  This fact alone refutes any notion that Payer Matrix's alleged deceptive acts were centered in Illinois.

    *c.*  *AbbVie Is Not Likely to Show that Payer Matrix Engaged in Any Fraudulent or Deceptive Conduct Violative of ICFA*

AbbVie fiercely targets Payer Matrix's allegedly nefarious assistance in helping everyday people submit PAP applications that ***accurately*** state the Member is currently ***underinsured*** for three specialty drugs, as well as representations Payer Matrix has allegedly made to employer

---

[37] *See supra*, at Section II(C); Hoefner Decl. Ex. 24.
[38] *Id.* ¶ 102, Ex. 23.

groups concerning AbbVie's PAP and Member's continued access to medications. (Mem. at 31–35.) But as Magistrate Judge Kim observed last summer: "[S]o what? What's the unlawfulness of that particular practice?" (*See* July 19, 2023 Hrg. Tr. at 4:14–15.) Indeed, not even a plaintiff *consumer*, let alone another business, could maintain an ICFA claim based on communications exchanged between Payer Matrix and its employer clients or other third parties. *See De Bouse v. Bayer AG*, 235 Ill. 2d 544, 555 (2009) (holding "a consumer cannot maintain an action under the [ICFA] when the plaintiff does not receive, directly or indirectly, communication or advertising from the defendant"). Here, AbbVie does not claim it relied upon (or was even aware of) any statements that were contained in Payer Matrix's program implementing documents, webinar, plan descriptions, brochures and the like, ***many of which Payer Matrix did not author or approve***. *See, e.g.*, *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 140 (2002). This "market theory" of causation has also been rejected by the Illinois Supreme Court. *Id.*

Insofar as AbbVie predicates its theory of ICFA liability on the purported falsity of the Benefit Clarification Letters ("BCLs") also fails. AbbVie argues those BCLs "contained language indicating that the patient's specialty drug was 'excluded' and that the Member 'would be responsible for 100% of the cost' of the specialty drug." (Mem. at 31.) AbbVie maintains "[t]hese were false statements." (*Id.*) But AbbVie is wrong. The BCLs merely restated the plan benefits for the drug as contained in the plan design documents. The mere fact that a Plan or PBM (not Payer Matrix) could (but did not have to) grant overrides does not render the BCLs false or misleading. Further, while a BCL may have been submitted by Payer Matrix to AbbVie, the BCL itself was provided and/or approved ***by the Plans or PBMs***. Payer Matrix was not attesting to the "language indicating [] the patient's specialty drug was 'excluded;'" the Plans or PBMs were.

AbbVie invokes testimony from its expert, Dr. Garthwaite, positing that this override practice "is inconsistent with the well-established industry meaning of a specialty drug insurance

exclusion" and thereby renders Payer Matrix's representations to AbbVie about Members' insurance coverage false. (Mem. at 33 (citing the Declaration of Craig Garthwaite, dated May 30, 2023 [Dkt. 119], ¶¶ 5, 16-17).) But as explained above, an override is not the Bogeyman AbbVie makes it out to be. Rather, "a [M]ember can obtain an override of restricted coverage for a non-covered drug if deemed medically necessary." (Niarchos Decl. ¶ 22.) Overrides simply "allow certain medically necessary drugs to be covered by a health insurance plan on a case-by-case basis." (*Id.*)

In a nutshell, "the fact that an employer may ultimately decide to grant an employee an override based on medical necessity if the employee cannot obtain the medication through AbbVie's PAP does not mean that the employee always had coverage for that drug." (*Id.* ¶ 38.) This conclusion rebuts Dr. Garthwaite's claim that every patient who received an override (upon denial of admission to AbbVie's PAP) also had "***de facto*** insurance coverage" at the time the PAP application was submitted. (*See id.* (emphasis added).) As Mr. Niarchos explains, an override is only necessary ***where there is no coverage for the drug in the first place***. (Niarchos Decl. ¶¶ 13, 35, 39.) Further, Payer Matrix's plan sponsors do not universally grant overrides whenever employees are denied admission into AbbVie's PAP; while some plan sponsors strictly forbid overrides altogether. (*Id.*; Hoefner Decl. ¶¶ 57, 60-61; Niarchos Decl. ¶ 22; Statement of Facts § III.A, *supra* (citing several instances where Plans *denied* overrides notwithstanding AbbVie's PAP denials).)

Given these considerations, AbbVie's override-driven fraud theory falls apart. Here, a Member's lack of coverage for any particular specialty drug can readily be established by the plan documents Self-Funded Plans must maintain to comply with ERISA. (*Id.*) Therefore, Payer Matrix will have no trouble proving that Member's BCLs truthfully and accurately represented the lack of coverage for specialty drugs ***at the time of the PAP submission***.

Simply put, the evidence shows that AbbVie is not likely to succeed on the merits of its claim that Payer Matrix made false statements in BCLs. Even if the statements concerning a Member's insurance status were viewed as ambiguous, that would not prove falsity. *See Vaperz*, 543 F. Supp. 3d at 626–27 ("As the Seventh Circuit has explained, a literally false statement is one that is '***indisputably* false**' or 'bald-faced egregious, ***undeniable***, [and] over the top.'" (quoting *Schering-Plough Healthcare Prod., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512–13 (7th Cir. 2009)) (emphasis in original)). As this strident language suggests, "the 'standard for proving literal falsity is rigorous' and thus, only an ***unambiguous*** message can be literally false.'" *Id.* (quoting *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (cleaned up)). And as applied here, AbbVie does not present any evidence that Payer Matrix made a ***literally false*** statement to AbbVie at any time. That factor is dispositive and further demonstrates that AbbVie is not likely to succeed on the merits of its ICFA claim, which strongly weighs against an injunction here. *See Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 747 (7th Cir. 2006) (affirming denial of preliminary injunction where "there was no evidence to demonstrate a likelihood of success on the merits"); *Alexander v. Chi. Park Dist.*, 709 F.2d 463, 465 (7th Cir. 1983) (same).

2. <u>AbbVie Does Not Present Any Affirmative Argument or Evidence Supporting Its Likelihood of Success on the Merits of Counts II and III</u>

In conclusory fashion, AbbVie also asserts it "has a high likelihood of success on its claims for violations of the IDTPA and tortious interference with business opportunity, which rely on the same evidence as the ICFA claim." (Mem. at 35.) That threadbare statement certainly does not establish the "strong showing" of success for its two remaining claims.

As an initial matter, the elements of an ICFA claim are not coextensive with the elements of an IDTPA claim or a tortious interference claim; and further, each theory of relief is subject to its own unique set of affirmative defenses. So, just because the IDTPA and tortious interference

-35-

claims *rely* on the same evidence as the ICFA claim does not mean that same evidence ***establishes a likelihood of success*** on those other claims. Unsupported assertions do not satisfy the first element of the injunction test. And as this Court recently stated, "[t]he Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived." *United States v. Carrazco-Martinez*, 2023 WL 7325885, at *5 (N.D. Ill. Nov. 7, 2023) (citing cases); *see also MBM Holdings LLC v. City of Glendale*, 843 F. App'x 5, 8 (7th Cir. 2021) ("It is the responsibility of the litigants to raise coherent legal claims, produce factual support, and develop reasoned arguments supported by citation to legal authority.") (citing cases). AbbVie has accordingly waived its opportunity to demonstrate a likelihood of success as to Counts II and III.[39]

In a striking display of procedural confusion, AbbVie "incorporates by reference its Opposition to Payer Matrix's Motion to Dismiss for further detail on these causes of action." (Mem. at 35 (citing Dkt. 84).) But the outcome of Payer Matrix's Rule 12(b)(6) motion to dismiss will not necessarily be dispositive on whether AbbVie is ***likely to succeed*** on either cause of action based on the evidentiary record. The standards are not equivalent.

As the Seventh Circuit has explained in the injunction context, "[i]n assessing the merits, we do not accept [plaintiff's] allegations as true, nor do we give him the benefit of all reasonable inferences in his favor, as would be the cased in evaluating a motion to dismiss on the pleadings." *Doe*, 43 F.4th at 791; *see also Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 823 (7th Cir. 2019) (finding that although plaintiffs pled a "plausible" claim "because of the favorable inferences we afford[ed] to them under a Rule 12(b)(6) analysis," plaintiffs had not "demonstrated a likelihood of success on the merits"); *In re Fed. Bureau of Prisons' Execution*

---

[39] AbbVie's failure to satisfy the 'primarily and substantially' test will further preclude it from prevailing on the merits of its IDTPA claim. *See LG Elecs.*, 809 F. Supp. 2d at 850 (holding that IDTPA plaintiffs must satisfy the same Illinois nexus as ICFA plaintiffs).

*Protocol Cases*, 980 F.3d 123, 134 (D.C. Cir. 2020) (preliminary injunction inquiry is a "decidedly far more searching inquiry" than a motion to dismiss). And courts "also do not give [AbbVie] the benefit of conflicting evidence, as [they] would in reviewing a grant of summary judgment." *Doe*, 43 F.4th at 791–92 (citing *Imaging Bus. Mach., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006) (contrasting "significantly different burden" in moving for preliminary injunction with what is required to defeat summary judgment")). AbbVie seems oblivious to these foundational principles governing issuance of a preliminary injunction. Without affirmative evidence from AbbVie that gives credence to its bare assertions of success on the merits of Counts II and III—it offers none—it cannot possibly demonstrate a likelihood of success for either claim.

**B.** **AbbVie Has An Adequate Remedy at Law and Is Not Likely to Suffer Any Cognizable Irreparable Harm Before a Trial on the Merits**

Separately, AbbVie's failure to prove a likelihood of irreparable harm proves dispositive. *See, e.g.*, *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *10 (N.D. Ill. Oct. 25, 2018) (denying preliminary injunction even though plaintiff proved a likelihood of success on the merits, because it did not face ongoing irreparable harms nor show that its legal remedies are inadequate).

It is well-settled that "[t]he analyses of inadequate legal remedies and irreparable harm often merge." *Creative Fin. Staffing LLC v. Kubacki*, 2023 WL 1818560, at *3 (N.D. Ill. Feb. 8, 2023) (citing *Roland Mach. Co.*, 749 F.2d at 386). Indeed, "[a] injury is 'irreparable when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard.'" *Nw. Pallet Supply Co. v. Peco Pallet, Inc.*, 2016 WL 8671902, at *5 (N.D. Ill. May 13, 2016) (citations omitted); *see also Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997).

    1.     AbbVie Has an Adequate Remedy at Law For Each Allegedly Fraudulent PAP Enrollment Submitted by or on Behalf of Payer Matrix's Members

The Seventh Circuit has identified four scenarios that could result in an inadequate remedy:

> [1] when a damages award may come too late to save the plaintiff's business; [2] where the lost revenues would make it impossible to finance the lawsuit; [3] where defendant's subsequent insolvency would foreclose the collection of damages; and [4] where the nature of the loss incurred by the plaintiff would make it difficult to calculate damages.

*Creative Fin. Staffing*, 2023 WL 1818560, at *3 (citing *Girl Scouts*, 549 F.3d at 1095 n.8, *abrogated on other grounds by Pritzker*, 973 F.3d at 762–63).

Only the fourth scenario—the difficulty of calculating damages—is presented here. AbbVie must prove "it is virtually impossible to ascertain the precise economic consequences" stemming from Payer Matrix's alleged tortious conduct. *Ty, Inc.*, 237 F.3d at 902. Without such showing, AbbVie does not deserve injunctive relief.

The crux of AbbVie's Complaint in this case hinges on whether Payer Matrix facilitated the submission of "fraudulent" PAP applications by Members taking Humira, Rinvoq or Skyrizi. At the outset of AbbVie's inadequate remedy discussion, it acknowledges "***monetary damages can compensate AbbVie*** for the fraudulent applications Payer Matrix has submitted to the PAP to date." (Mem. at 36 (emphasis added).)[40] AbbVie then spends several pages asserting Payer Matrix cannot be trusted to cease its involvement with AbbVie's PAP without an injunction. (*See* Mem. at 36–39.) But its myopic focus on whether Payer Matrix has shown a propensity to evade AbbVie's PAP requirements ignores the dispositive issue here—*i.e.*, whether damages would constitute an adequate legal remedy for any PAP applications Payer Matrix may submit (directly or indirectly) ***in the future***. Perhaps because it has boxed itself into a corner, AbbVie does not address this question in its brief. And no principled distinction exists: If damages can adequately compensate AbbVie for fraudulent applications submitted in the past, why would monetary

---

[40] AbbVie also claims that damages cannot compensate it for Payer Matrix's alleged "ongoing harm to AbbVie's reputation and goodwill, its current and prospective business relationships, or AbbVie's PAP," (*see* Mem. at 36), but AbbVie fails to satisfy its evidentiary burden to prove these alleged harms are irreparable under the circumstances. (*See* § III.B.2, *infra*.)

damages be *inadequate* compensation for fraudulent applications submitted before a trial on a merits? AbbVie has no answer.

But the law does. Any losses AbbVie sustains as a result of granting PAP applications Payer Matrix submits in the future would amount to lost profits, which "generally do not constitute irreparable injury, barring exceptional circumstances." *Vaperz*, 543 F. Supp. 3d at 632 (internal quotations omitted); *see also Downstate Stone Co. v. United States*, 651 F.2d 1234, 1241 (7th Cir. 1981); *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 80 F. Supp. 3d 829, 836 (N.D. Ill. 2015) (no inadequate remedy at law because "any harm the [plaintiff] may suffer between now and a preliminary injunction hearing is entirely financial in nature, ascertainable, and calculable"). This inference is bolstered by AbbVie's own expert, Heather Bates, who "calculated the annual cost to AbbVie, separately for Skyrizi, Rinvoq, and Humira, for prescriptions dispensed by the PAP to patients whose PAP applications were improperly submitted or caused to be submitted by Payer Matrix." (*See* Declaration of Heather Bates, dated Oct. 10, 2023 [Dkt. 117] ("Bates Decl."), at ¶12.) Bates concluded that "[t]he financial impact to AbbVie for each PAP prescription dispensed to a Payer Matrix Patient" who submitted a PAP application and subsequently enrolled "is comprised of two elements: (1) AbbVie's cost to administer the PAP and provide product to the patient for free, and (2) AbbVie's lost profits that would have been realized if the patient had received product coverage under their existing benefit plan." (*Id*. at ¶ 13; *see also id.* at ¶¶ 14–15 (employing mathematical formula to calculate alleged financial impact on AbbVie).) So clearly, it would be a straightforward arithmetical exercise for Bates to calculate AbbVie's damages resulting from "ineligible" Members who somehow managed to enroll in AbbVie's PAP between now and trial. She only needs to factor into her equation the additional Payer Matrix PAP enrollees, if any, to determine AbbVie's future supplemental lost profits.

In short, any negative financial impact AbbVie may sustain ***going forward*** due to the submission of allegedly fraudulent PAP applications is quantifiable and compensable by monetary damages—same as ***past*** applications.  *See, e.g.*, *Creative Fin. Staffing*, 2023 WL 1818560, at *4 ("Even with imperfect data, harm can be quantifiable if the parties 'can reasonably estimate the value of lost profits.'" (quoting *DM Trans, LLC v. Scott*, 38 F.4th 608, 617–18 (7th Cir. 2022))); *Arjo*, 2018 WL 5298527, at *9–10 (concluding that "to the extent the defendants are allegedly still luring business away from [plaintiff], it offers no reason that money damages in the amount of lost profits would not be an adequate remedy"); *Fleetwood Packaging v. Hein*, 2014 WL 7146439, at *10 (N.D. Ill. Dec. 15, 2014) (discussing adequacy of money damages to remedy injuries caused by defendant's alleged ongoing efforts to lure business away from plaintiff).  Indeed, AbbVie's evidence shows that the financial impact for each PAP prescription for Humira, Skyrizi or Rinvoq AbbVie dispenses to a Member "can be reasonably measured and later awarded as damages" should additional Members enroll.  *DISH Network LLC v. Cox Media Grp., LLC*, 2020 WL 4053604, at *8 (N.D. Ill. July 20, 2020) (denying preliminary relief and holding plaintiff had an adequate remedy at law for any loss of subscribers); *see also D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016) ("Because money damages could make [plaintiff] whole again should she prevail in her lawsuit, she does not meet the standard for irreparable harm."); ██████████████

████████████████████████████████████████████████████████████████

██████████████  Because damages constitute an adequate remedy at law for ***all*** of AbbVie's PAP-related financial injuries—past or future—the lost profits it attributes to Payer Matrix's alleged fraudulent conduct does not inflict an irreparable injury.

The structure and purpose of ICFA also dispel any notion that monetary damages will not adequately compensate AbbVie for lost profits attributable to Payer Matrix's allegedly fraudulent scheme.  Only a "person who suffers ***actual damage*** as a result of" an ICFA violation may bring

a private action. *See* 815 ILCS 505/10a(a). The Seventh Circuit has held that "[t]he actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010); *see also Cooney v. Chi. Pub. Sch.*, 943 N.E.2d 23, 31 (Ill. App. Ct. 2010) ("actual damages must arise from purely economic injuries"); *Curry v. Revolution Labs., LLC*, 2022 WL 225877, at *7 (N.D. Ill. Jan. 26, 2022). Further, an ICFA plaintiff's actual damages "must be calculable and measured by the plaintiff's loss." *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 913 (N.D. Ill. 2012) (cleaned up). So here, the "actual damage" AbbVie has (or will) sustain due to Payer Matrix's alleged fraud (*i.e.*, lost profits) is the exact type of economic injury that ICFA is intended to remedy. *See* 815 ILCS 505/10a(a) (authorizing court to "award actual economic damages" for ICFA violation). And as explained in Bates' Declaration, AbbVie's financial PAP-related losses (from 2021 onward) are ascertainable, calculable, and capable of precise measurement. (*See* Bates Decl. ¶¶ 10–15.) This is a quintessential scenario where an adequate law exists to compensate the Plaintiff for purely economic harm. Consequently, an injunction is not necessary to remedy AbbVie's ICFA claim.[41]

### 2. AbbVie Does Not Establish a Likelihood of Irreparable Harm Based on Its Groundless Claims of Reputational Harm and Loss of Goodwill

AbbVie also fails to show it will likely suffer irreparable harm from intangible injuries. AbbVie "needs to show irreparable harm is *likely* to occur in the absence of an injunction." *Ervin Equip. Inc. v. Wabash Nat'l Corp.*, 187 F. Supp. 3d 968, 979 (N.D. Ind. 2016) (emphasis in original) (citing *Winter*, 555 U.S. at 22). Critically, "[t]he mere risk of irreparable harm is not

---

[41] AbbVie does not cite a single instance where a federal court has granted a preliminary injunction as a remedy for an alleged ICFA violation. Although ICFA gives courts discretion to "grant injunctive relief where appropriate", *see* 815 ILCS 505/10a(c), it is clear that injunctive relief is *not* appropriate given the present facts where AbbVie has an adequate legal remedy (damages) afforded by Illinois law. *See, e.g.*, *Lumbermen's Mut. Cas. Co. v. Sykes*, 890 N.E.2d 1086, 1106 (Ill. App. Ct. 2008) ("It is only when money is insufficient to compensate the injury, or when the injury cannot be properly quantified in terms of money, that injunctive relief is necessary.").

sufficient." *Id.*; *see also Winter*, 555 U.S. at 22 (holding that "issuing a preliminary injunction based only on a possibility of irreparable is inconsistent with…injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). Timing bears heavily upon the irreparable harm analysis. Specifically, "the plaintiff must demonstrate that it '**will suffer**'—that is, in the future, 'irreparable harm in the interim prior to final resolution.'" *Arjo*, 2018 WL 5298527, at *9 (emphasis in original) (citing *Turnell v. CentiMark Corp*., 796 F.3d 656, 661 (7th Cir. 2015)). Whereas "[i]f 'the damage is done,' allegations of past irreparable harm, no matter how plausible, are insufficient to support a preliminary injunction." *Id.* (quoting *Traffic Tech Inc. v. Kreiter*, 2015 WL 9259544, at *17 (N.D. Ill. Dec. 18, 2015)); *see also Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 797–98 (7th Cir. 1981) (no irreparable harm where "the alleged injury to goodwill, if any, has already occurred" and "there has been no showing that [plaintiff] cannot be compensated through monetary damages"). So even if AbbVie conjures evidence of purported damage to its reputation or goodwill in the past, that is not enough here. AbbVie meets its burden **only if** it presents credible evidence of "impending irreparable harm." *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, 2020 WL 6265133, at *11 (N.D. Ill. Aug. 20, 2020) (denying preliminary injunction where "no or little threat of irreparable harm"); *see also Turnell*, 796 F.3d at 662. And the evidence shows it .

      a.    *The Court Cannot Presume Irreparable Harm for ICFA or IDTPA Claims*

AbbVie incorrectly insists that "[s]ince [it] has made a strong showing of likelihood of success on the merits, irreparable harm **should be presumed** as to AbbVie's ICFA and IDTPA claims." (Mem. at 36 n.15 (emphasis added).) In support, AbbVie cites only *dicta* from a case where the court stated "irreparable harm may be presumed" because "**the Illinois eavesdropping statute** provides for injunctive relief." *Int'l Profit Assocs. v. Paisola*, 461 F. Supp. 2d 672, 680

(N.D. Ill. 2006) (emphasis added). The *Paisola* case is inapposite, however, because the Eavesdropping Act ***requires*** injunctive relief to remedy ongoing, illegal eavesdropping. *See* 720 ILCS 5/14-6(1)(a) (injured parties "shall be entitled" to an injunction). In contrast, injunctive relief is not mandatory under either ICFA or IDTPA.

Contrary to AbbVie, no Illinois court has held that irreparable harm may be presumed so long as the plaintiff establishes a likelihood of success on the merits of an ICFA or IDTPA claim. That is because both ICFA and IDTPA allow courts wide discretion in assessing whether to grant an injunction. *See* 815 ILCS 510/3 ("A person likely to be damaged by a deceptive trade practice of another ***may*** be granted injunctive relief ***upon terms that the court considers reasonable***.") (emphasis added); 815 ILCS 505/10a(c) ("the Court ***may*** grant injunctive relief *where appropriate* . . . .") (emphasis added). The plaintiff must still prove irreparable harm when the statute at issue does not ***mandate*** injunctive relief. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005) ("unless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ traditional equitable considerations (***including irreparable harm***) in deciding whether to grant such relief.") (emphasis added); *Bank of Am., N.A. v. Cartwright*, 545 F. Supp. 3d 666, 671 (N.D. Ind. 2021) (rejecting movant's argument "that irreparable harm needn't be shown at all" when there is an ongoing unlawful act). As one court in this Circuit has noted, "though there are instances when the court may bypass the irreparable harm requirement, that is limited to when a statute explicitly authorizes it." *Cartwright*, 545 F. Supp. 3d at 671 (citing *Bedrossian*, 409 F.3d at 843 n.1). Holding otherwise "would be inconsistent with a district court's discretion to grant injunctive relief." *Id.* (citation omitted). And AbbVie does not point to any law permitting a federal court to forego the irreparable harm analysis—because no such law applies here. *Cf. Ill. Bell Tel. Co. v. Ill. Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir. 1984) (irreparable harm may be presumed where claim was brought under *federal* law providing for injunctive relief).

-43-

AbbVie also does not cite a single case where an Illinois court granted an injunction based on the plaintiff's allegations of a fraudulent scheme. Because once again, no Illinois court has done so. AbbVie instead cites two cases from beyond this Circuit where the defendants undertook "extensive and elaborate steps" to render themselves judgment-proof and insolvent. *See BellSouth Telecoms., Inc. v. Mintz*, 2005 WL 8155198, at *9 (N.D. Ga. Mar. 4, 2005); *Mishkin v. Kenney & Branisel, Inc.*, 609 F. Supp. 1254, 1256 (S.D.N.Y. 1985) (irreparable harm found in RICO case where defendants were "currently engaged in efforts to dispose of their assets" and their "course of conduct, if not restrained, threatens to denude [defendant] of its rapidly diminishing assets"). Unlike in those cases, AbbVie does not base its irreparable harm allegations upon any purported risk of Payer Matrix's imminent insolvency. Neither *BellSouth* nor *Mishkin* supports AbbVie's request for an injunction in a case like this where alleged damages are measurable and Payer Matrix is not attempting to "frustrat[e] satisfaction of any judgment." *Mishkin*, 609 F. Supp. at 1256.

> **b.** *AbbVie Is Not Likely to Endure Any Reputational Harm or Loss of Goodwill in the Future Because of Payer Matrix's Conduct*

In conclusory fashion, AbbVie claims Payer Matrix has caused "ongoing harm to AbbVie's reputation and goodwill, its current and prospective business relationships, or AbbVie's PAP." (Mem. at 36 (no citation).) But even if that claim were true (it is not), AbbVie would not necessarily satisfy the irreparable harm requirement. *See, e.g.*, *Arjo*, 2018 WL 5298527, at *10 (holding that plaintiff's "allegation that it will continue to suffer a loss of customer good will does not entitle it to an injunction"). The Seventh Circuit "has specifically disclaimed a 'per se rule' that ongoing 'loss of consumer goodwill and relationships' based on past wrongful acts is irreparable." *Id.* (citing *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1441 (7th Cir. 1986)). AbbVie must instead come forth with **evidence** showing "that such losses are likely, not merely possible, in the absence of an injunction." *Nw. Pallet Supply Co.*, 2016 WL 8671902, at *6 (citing

*Winter*, 555 U.S. at 22); *see also Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 595 (7th Cir. 1986). Without proof that AbbVie's competitive position or goodwill is likely to be compromised barring an injunction, it fails the irreparable harm burden.[42] *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 804–06 (N.D. Ill. 2011) (no irreparable harm where no evidence that plaintiff's goodwill amongst its customers would be adversely affected by defendant); *Arjo*, 2018 WL 5298527, at *10 (finding plaintiff's "oblique references to the continuing threat of future loss" insufficient to support a preliminary injunction).

Although AbbVie cites cases where courts presumed irreparable harm due to a company's loss of goodwill or reputation, most of those cases involved alleged trademark infringement. *See, e.g.*, *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) (noting "irreparable harm is especially likely in a trademark case"); *H-D USA LLC v. P'ships & Unincorporated Assocs. Identified on Schedule "A"*, 2021 WL 4459472, at *4 (N.D. Ill. Sept. 24, 2021) ("Without injunctive relief, Plaintiff would have no way to protect its registered marks and goodwill."); *Holbrook Mfg. LLC v. Rhyno Mfg.*, 497 F. Supp. 3d 319, 333–34 (N.D. Ill. 2020) (finding "consumer confusion and the loss of goodwill to be irreparable" in trademark infringement case); *Club Gene & Georgetti Ltd. P'ship v. La Luna Enters.*, 889 F. Supp. 324, 327 (N.D. Ill. 1995) ("The lack of an adequate remedy at law and irreparable harm are generally presumed in trademark infringement cases.") But there is no infringement claim at issue here, and thus, those inapposite cases do not advance AbbVie's irreparable harm argument.

---

[42] AbbVie wrongly asserts that its loss of reputation and goodwill can be "presumed irreparable" here. *See* Mem. at 41 (citing *SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918 (N.D. Ill. 2007)). In *SMC Corp.*, however, the evidence showed that one of plaintiff's key customer relationships may have already been damaged as a result of defendant's actions. *See* 481 F. Supp. 2d at 928. Here, AbbVie does not offer specific evidence indicating Payer Matrix severed key relationships between AbbVie and its customers or damaged such relationships to an irreparable degree.

Nor can AbbVie piggyback on cases involving an alleged breach of an enforceable legal duty. *See, e.g.*, *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303–04 (7th Cir. 2003) (finding irreparable harm due to breach of fiduciary duty); *Brightstar Franchising, LLC v. N. Nev. Care, Inc.*, 2018 WL 4224454, at *7–8 (N.D. Ill. Sept. 4, 2018) (finding irreparable harm to business and client relationships due to defendant's breach of franchise agreement); *Walgreens Co. v. Peters*, 2021 WL 3187726, at *5 (N.D. Ill. July 28, 2021) (irreparable harm where former employee misappropriated trade secrets). Payer Matrix obviously does not owe any fiduciary duty or legal obligation to AbbVie. AbbVie has not mustered any authority where a court **presumed** irreparable harm in a similar factual context.[43]

At a high level, AbbVie accuses Payer Matrix of a vast "coordinated smear campaign" that "continues to cause irreparable harm to AbbVie's reputation and goodwill." Mem. at 40. More specifically, AbbVie claims "Payer Matrix's scheme tarnishes AbbVie's goodwill and reputation" in four ways. *See* Mem. at 41–44. But AbbVie fails to back up its allegations with corroborating evidence. None of the four trends AbbVie discusses has caused it to suffer reputational harm.

          c.        *No Irreparable Harm From Payer Matrix's Statements to Clients*

***First***, AbbVie claims "Payer Matrix falsely represents to its current and prospective clients that AbbVie runs the PAP for self-interested purposes, such as receiving grant money and tax benefits and expanding its patient base." (Mem. at 42.) In support of this claim, AbbVie relies solely on: (1) a ***deleted*** benefits guide plucked from a plan sponsor's website that does not even mention AbbVie nor indicate that Payer Matrix actually drafted, reviewed, or approved this guide; and (2) statements made by Payer Matrix's Chief Business Officer, Michael Jordan, during a

---

[43] In *Kurowski v. Rush System for Health*, the court merely held that plaintiff **stated a claim** for injunctive relief arising out of defendant's use of a third-party source code that allegedly disclosed patients' private data—the court did **not** grant an injunction. *See* 2023 WL 2349606, at *8 (N.D. Ill. Mar. 3, 2023). And in *YourNetDating, Inc. v. Mitchell*, the defendant maliciously hacked plaintiff's website to divert visitors to a porn site. *See* 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000). Neither fact pattern resembles this case.

presentation made on **June 30, 2020**. (*See* Hays Decl. ¶¶ 5 & 11.) Citing only the self-serving declaration of its Corporate Representative, Ms. Najjar, AbbVie asserts "[t]hese statements are false and diminish goodwill towards the PAP in immeasurable ways." (Mem. at 42.) But Ms. Najjar did not say that. The portions of her declaration cited by AbbVie only contain her understanding of ***allegations in the Complaint*** and end with this vague and indefinite conclusion: "These statements are not accurate." (*See* Najjar Decl. ¶¶ 68–69.) Of course, allegations are not evidence. And her declaration is otherwise devoid of facts supporting AbbVie's conclusory claims of harm to its goodwill.

Moreover, AbbVie fails to prove that any of these past statements about its self-interested motives in administering the PAP are false or resulted in adverse consequences. Most basically, those statements are not false. (*See* Niarchos Decl. ¶ 31.) And even if they were, AbbVie cites no complaints by patients, physicians, business partners, or other industry players to support its claim of past or future reputational harm and damage to its goodwill. ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ But opinionated bluster like this does not suffice to prove loss of goodwill on a motion for injunction. *See, e.g.*, *Motor Werks Partners, L.P. v. BMW of N. Am., Inc.*, 2001 WL 1136145, at *2 (N.D. Ill. Sept. 24, 2001) (plaintiff's failure to offer evidence "beyond bare assertions" supporting claim defendant's alleged false statements damaged plaintiff's goodwill were insufficient to prove irreparable harm).

In a similar vein, AbbVie insists Payer Matrix damaged AbbVie's reputation by sending emails to third parties that referenced or discussed a recent *New York Times* article focused on the expiration of AbbVie's patent for its golden goose, Humira. *See* Rebecca Robbins, *How a Drug*

-47-

*Company Made $114 Billion by Gaming the U.S. Patent System*, N.Y. Times (Jan. 28, 2023).[44]

But first things first: AbbVie does not support its claim that "goodwill" attached to the relationship between AbbVie and healthcare plans **or** AbbVie and the patients who are dependent on its high-priced specialty drugs. In addition to the *Times* article, federal government investigations and consumer class actions related to AbbVie's unfair and unconscionable inflation of drug prices in the U.S. (including Humira), indicate that the general public does not hold AbbVie's reputation in high regard in the first place. (Poell Decl. ¶ 18, Ex. 17; Hoefner Decl. ¶ 114, Ex. 28, April 2023 Illinois Consumer Class Action, Case: 1:23-cv-02589, Dkt. 1.)

Tellingly, AbbVie does not contest any aspect of the *Times*' reporting or aver that the article is false or defamatory. And AbbVie does not cite evidence showing that Payer Matrix's emails regarding the *Times* article actually damaged AbbVie's reputation in the eyes of any third-party recipient. Nor could AbbVie make such showing. Payer Matrix's dissemination of a truthful, timely article (published by the newspaper of record) concerning a pressing public health issue cannot buttress AbbVie's fraud claim or serve as a basis to hold Payer Matrix responsible for any loss of goodwill may AbbVie attribute to the *Times* article. After all, the *Times* article may be read by anyone, and thus, to the extent the article harmed AbbVie's reputation (despite the dearth of evidence to the contrary), AbbVie could never trace such harm back to Payer Matrix.

Moreover, nothing in the record indicates Payer Matrix made any statement to any current or prospective client that materially decreased AbbVie's goodwill or damaged its reputation. AbbVie's speculation that unflattering statements concerning its "self-interested purposes" for the PAP—whether made directly by Payer Matrix or reported by the *Times*—hurt its image deserve

---

[44] https://www.nytimes.com/2023/01/28/business/humira-abbvie-monopoly.html. As the article explains, in pellucid detail, "[t]hrough its savvy but legal exploitation of the U.S. patent system, Humira's manufacturer, AbbVie, blocked competitors from entering the market" and thereby made Humira "the most lucrative franchise in pharmaceutical history." *Id.*

-48-

no credence.  *See, e.g.*, *Pampered Chef*, 804 F. Supp. 2d at 804 (finding no irreparable harm where plaintiff offered no proof its goodwill would likely be compromised without an injunction).

> ### d.  No Irreparable Harm From Payer Matrix's Statements to Doctors or Patients

*Second*, AbbVie asserts Payer Matrix has made "false statements to doctors and patients indicating that AbbVie has reduced its PAP benefits and that the PAP is providing drugs to a narrower subset of patients."  (Mem. at 42 (citing Hays Decl. Ex. 54, Tabs 5, 9, 10, 15-17).)  As a matter of fact, however, AbbVie's updated PAP eligibility terms have resulted in a narrower subset of patients receiving PAP assistance—*i.e.*, all those patients whose employers partner with Payer Matrix are no longer receiving PAP assistance.  No surprise as that was AbbVie's intention.  There is nothing untoward about Payer Matrix telling HCPs (truthfully) "that AbbVie has recently changed their requirements for their [PAP] assistance and have been limiting their access for self-funded [M]embers."  (*See* Hays Decl. Ex. 54, Tab 15 (quoting PMX0159538).)  And while AbbVie asserts that Payer Matrix made these PAP-related statements "to try to convince doctors and payments to switch to a drug on which Payer Matrix can continue to profit and to provide an excuse for why its PAP activities are being restricted by AbbVie," AbbVie again fails to provide *evidence* that these statements "are damaging to AbbVie's reputation and goodwill."  (Mem. at 43.)  Instead, it begs the question and assumes no evidentiary support is required to meet its burden.  But AbbVie is mistaken.  *See, e.g.*, *M1 Holdings Inc. v. Members 1st Fed. Credit Union*, 2022 WL 17487942, at *11 (N.D. Ill. Dec. 7, 2022) (no irreparable harm where plaintiff provided "no objective evidence of its own standing in the market" to support claim that it will suffer damage to its reputation and goodwill).

Further, even if the Court construed any of Payer Matrix's past statements to Members or HCPs as false or misleading (they are not), all the statements AbbVie identifies were made ***before***

AbbVie filed its initial motion for preliminary injunction on May 31, 2023. (*See* Hays Decl. Ex. 54, Tabs 1–20 (listing communications Payer Matrix made between January 18 and May 31, 2023).) AbbVie's motion alleges no recent statements purportedly damaging its goodwill in the last six months.[45] So, even if the Court assumed, *arguendo*, AbbVie has shown reputational harm, "the damage is done." *Arjo*, 2018 WL 5298527, at *10 (citation omitted). Because preliminary injunctions afford prospective relief only, AbbVie "must show that *continued* irreparable harm is *likely*." *Id.*; *see also Park Ridge Sports, Inc.*, 2020 WL 6265133, at *11 (noting that preliminary injunction "is designed to protect against future harm, not harm that has already passed"); *iFreedom Direct Corp. v. McCormick*, 2016 WL 9049647, at *4 (C.D. Cal. 2016) ("Plaintiff has not shown why issuing a preliminary injunction would prevent any irreparable harm beyond the damage already done."); *Alvarez v. City of New York*, 2 F. Supp. 2d 509, 514–15 & n.5 (S.D.N.Y. 1998) (rejecting irreparable harm to plaintiff's reputation where the underlying investigation was already publicized, so "any 'damage' [was] already done"). And AbbVie fails this test. The record lacks evidence indicating AbbVie will likely suffer reputational harm due to statements Payer Matrix may make to patients or doctors in the future, and therefore, no injunction is warranted on those grounds.

> e.    *No Irreparable Harm From "One-Page Flyers" Payer Matrix Never Sent*

*Third*, AbbVie claims that Payer Matrix prepared one-page flyers to send to HCPs that contained "false and misleading" drug comparisons between AbbVie's Humira, Skyrizi, and Rinvoq and other non-AbbVie drugs. (Mem. at 43; *see also id.* at 28–29.) But notably, AbbVie

---

[45] Perhaps cognizant of this shortcoming, AbbVie cites a September 21, 2023 letter stating "AbbVie has now made the decision to block assistance for those patients whose employers work with any patient advocacy programs, which includes Payer Matrix." *See* Hays Decl. Ex. 54, Tab 21. But this statement gets AbbVie nowhere because the statement is ***true***—AbbVie's official policy is to prohibit PAP assistance for such patients. And true statements are not injurious to AbbVie's reputation or goodwill.

does not assert Payer Matrix ever **sent** the flyers to any physicians.  ██████████ ████████████████████████ AbbVie's goodwill could not possibly have been adversely affected by flyers that Payer Matrix never disseminated.  Therefore, it makes no difference what the one-page flyers said or did not say.

> f.  *No Irreparable Harm From Patients' Alleged Frustration with AbbVie*

*Fourth*, AbbVie asserts that "Payer Matrix representatives have misled some patients into believing that the medicine delays they are experiencing as the result of PAP denials in 2023 are AbbVie's fault."  (Mem. at 43.)  AbbVie bases this accusation on nothing but speculation and guesswork.  The only evidentiary support AbbVie cites is the biased declaration of Ms. Najjar, who predicated her suspicions on double-hearsay and self-interested inferences: "Based on the PAP team's communications with these patients, **it appears** Payer Matrix is telling them that the PAP is their only source for AbbVie drugs."  (Najjar Decl. ¶ 58 (emphasis added).)  But AbbVie needs to do better than that to prove it will **likely** sustain irreparable harm **in the future**.  Mere speculation will not do.  *See, e.g.*, *Consol. Grain & Barge Co. v. Ports of Ind.*, 2021 WL 9958475, at *8 (S.D. Ind. Nov. 29, 2021).  Considering Payer Matrix has stopped working with patients taking Humira, Skyrizi or Rinvoq, AbbVie can only conjure the **possibility** of irreparable harm.  *See EnVerve*, 779 F. Supp. 2d at 845 (finding plaintiff's worst-case scenarios of reputational harm were "mere speculative possibilities" and denying injunctive relief); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 2011 WL 5325545, at *6 (N.D. Ill. Nov. 3, 2011) (holding "any harm to [plaintiff's] reputation is too speculative to warrant the 'extraordinary remedy'" of an injunction).

But even if AbbVie dealt with negative feedback and fielded calls from frustrated patients who believed AbbVie had treated them unfairly, that would not establish loss of goodwill sufficient for irreparable harm.  Specifically, AbbVie fails to show Payer Matrix's alleged communications

with patients "is ongoing or has irreparably damaged its business." *Fasti USA v. Fasti Farrag & Stipsits GmbH*, 2002 WL 31664494, at *4 (N.D. Ill. Nov. 26, 2002) (no irreparable harm where plaintiff had only lost one order as a result of defendant's alleged tortious activity and a damages recovery would adequately address the alleged harm). AbbVie does not assert that any patients who complained to AbbVie stopped taking its drugs due to their momentary frustration or concerns about receiving drugs on time. And even if that happened, such harms would amount to "relatively minor economic losses which do not portend the collapse of [AbbVie] and are therefore not enough to justify an injunctive relief." *Small Bus. Lending, LLC v. Pack*, 2019 WL 3430551, at *9 (S.D. Ind. July 30, 2019); *see also Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (noting "economic loss generally will not sustain an injunction," but that "a damages remedy may be inadequate if it comes too late to save plaintiff's business"); *Right Field Rooftops*, 80 F. Supp. 3d at 837 (holding that without evidence plaintiff will be foreclosed upon or become insolvent in the absence of immediate injunction, "any alleged irreparable injury is too speculative to warrant the imposition of injunctive relief"). Nor does AbbVie cite authority finding irreparable harm based on consumer frustration or discontent alone. Indeed, such harm "is a far cry from constituting a serious risk to [AbbVie's] goodwill, both in terms of scope and character." *SBL, LLC*, 2019 WL 3430551, at *9. AbbVie cannot show a likelihood of lost goodwill by merely deflecting patients' general sense of dissatisfaction onto Payer Matrix.

> g. *AbbVie Does Not Establish a Likelihood of Irreparable Harm to Its PAP*

As a last-ditch attempt to show irreparable harm, AbbVie insists Payer Matrix's conduct "puts the PAP's sustainability at risk." (Mem. at 45.) But this argument fails for two chief reasons. First, to the extent Payer Matrix "contributed to AbbVie's PAP exceeding its budget in 2022," AbbVie has an adequate remedy at law—monetary damages. (*See* Mem. at 46; Najjar Decl. ¶ 61

("Approximately $2,000,000 of the overage was caused by patients affiliated with alternate funding programs, and a significant portion of those applicants were Payer Matrix-affiliated applicants . . . .").)[46]   Financial losses attributable to PAP budget overruns **in 2022** are compensable, so no injunction is necessary to prevent irreparable harm to AbbVie's PAP.  *See Bank of Am.*, 545 F. Supp. 3d at 673 (holding plaintiff had adequate remedy because "[a]ny monetary damages he may suffer are calculable and sufficient" and denying preliminary injunction); *Ervin Equip.*, 187 F. Supp. 3d at 980 (finding plaintiff did not present enough facts "to show that irreparable harm is **likely** to occur in the absence of an injunction," even though defendant's conduct "is a blow to [plaintiff's] business").

Second, AbbVie is simply wrong in its claim that "the potential for irreparable harm to AbbVie's PAP is growing."  (Mem. at 46.)  The evidence strongly suggests that the opposite is true.  Crucially, Payer Matrix's most recent direct **and** indirect submission of a PAP application occurred in May 2023.  (Hoefner Decl. ¶ 100.)

While AbbVie claims Payer Matrix was involved in the submission of a PAP application in September 2023, no evidence suggests that Payer Matrix assisted the Member in the application process or even knew about the submission.  To be clear, Payer Matrix had no involvement with the September 2023 PAP application.  (*Id*. ¶ 91.)  That submission was completed independently by the Member unbeknownst to Payer Matrix.  (*Id*.)  And, in any case, an isolated submission of a PAP application does not help AbbVie prove that Payer Matrix-affiliated Members are likely to submit additional PAP applications to AbbVie.  Moreover, Payer Matrix no longer provides any assistance to Members in connection with AbbVie's PAP or copay assistance program for **all** of AbbVie's drugs—including Humira, Skyrizi, and Rinvoq.  (*Id.* ¶ 90.)  Without evidence that Payer

---

[46] ███████████████████████████████████████████████████████
███████████████████████████████

Matrix's conduct has escalated in recent months (none exists), Payer Matrix's voluntary cessation demonstrates that it poses no continuing threat to AbbVie's PAP.  *See also Checker Car Club of Am.*, 262 F. Supp. 3d 621, 629–30 (N.D. Ill. 2017) (no irreparable harm based on loss of goodwill because "even assuming that defendants' conduct has indeed escalated in recent weeks, defendants' voluntary cessation effectively addresses this concern").

Even if the Court credits AbbVie's speculative fears of its PAP's demise at the hands of Payer Matrix, AbbVie has "failed to show [the] incalculability" of such harm.  *See Creative Fin. Staffing*, 2023 WL 1818560, at *5 (finding no irreparable harm where plaintiff "fails to explain how its goodwill or reputation will falter or how its business relationships will be 'damaged or destroyed'"); *Lawson Prods.*, 782 F.2d at 1441 (finding loss of goodwill could be "adequately compensated in lost profit damages").  For instance, even if an errant PAP application from a "blacklisted" Member whose employer group contracts with Payer Matrix somehow slips through AbbVie's gauntlet from time to time, such isolated and infrequent occurrences will not result in any irreparable harm to AbbVie necessitating injunctive relief.  *See, e.g.*, *Edward D. Jones & Co. v. Kerr*, 415 F. Supp. 3d 861, 876 (S.D. Ind. 2019) ("When, as here, the loss of business can be attributed to an isolated event or events, rather than an ongoing phenomena that risks causing future harm, any 'goodwill lost' can likely be compensated by monetary damages.").

Finally, AbbVie cannot bootstrap its claims of irreparable injury to the purported harms of "[t]he specialty drug patients who are most at risk of losing the benefit of AbbVie's PAP due to Payer Matrix's scheme."  (Mem. at 46.)  While courts "may also consider the harm to third parties and public policy concerns ***as part of its balancing analysis***," this consideration plays no role in the irreparable harm inquiry.  *Penske Truck Leasing Co. v. Cent. States, Se. & Sw. Areas Pension Plan*, at *16 (N.D. Ill. Apr. 6, 2022) (emphasis added); *see also Urban One, Inc. v. Tucci*, 2018 U.S. Dist. LEXIS 168582, at *82 (N.D. Ill. Sept. 30, 2018) ("As the last step of the preliminary-

injunction analysis, the Court must balance the irreparable harms with the public interest, including the impact of granting or denying a preliminary injunction on nonparties to the litigation.") (citation omitted). AbbVie has no standing to seek an injunction based on speculative future harms that would be suffered only by nonparty patients. What's more, AbbVie presents no evidence indicating it will discontinue its PAP for Humira, Skyrizi or Rinvoq patients if an injunction is not entered. AbbVie instead "has merely relied on 'bare assertions' that are difficult to sustain." *Vaperz*, 543 F. Supp. 3d at 633 (no preliminary injunction where plaintiff did not provide the court "with enough information about market dynamics to understand how or why [plaintiff] would be irreparably injured" by defendant's conduct); *Ports of Ind.*, 2021 WL 9958475, at *7–8 (finding no likely irreparable harm where plaintiff offered no data backing up fears of business failure and declining to credit witnesses' speculation about the "long-term viability" of the business).

      h.     *AbbVie's Gross Delay in Seeking Injunctive Relief Belies Its Claims of Irreparable Injury*

Even if the Court presumes irreparable harm or otherwise believes AbbVie has provided *some* evidence of irreparable harm, that presumption would be firmly rebutted by AbbVie's gross and unexplained delay in seeking injunctive relief. As of December 2021—approximately *one year and a half* before this lawsuit was initiated—AbbVie already knew about Payer Matrix's alleged "scheme" and considered Payer Matrix a clear and present threat to its maximization of profits from sales and dispenses of Humira, Skyrizi, and Rinvoq to commercially insured patients. (Poell Decl. ¶ 3, Ex. 2 (Dec. 20, 2021 calendar invitation meeting regarding "Hayden/AbbVie Alt funding discussion"), ¶ 4, Ex. 3 (May 20, 2022 AbbVie-generated presentation discussing the "current and potential future impact of the alternate funding practice" on "AbbVie sales"). That same month, Ms. Najjar (AbbVie's Head of PAP), curated a slide deck characterizing the AFP phenomenon as a "██████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████

But AbbVie did not heed Ms. Najjar's plea to take immediate action. Instead, AbbVie moved at a plodding pace and waited to file suit for a whole year. Established law holds that "a significant delay in filing a motion for preliminary injunction undermines the moving party's argument that it will suffer irreparable harm without an injunction." *Arjo*, 2018 WL 5298527, at *9; *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.") And that principle governs here. Courts have found that a delay as short as ***three months*** indicates "a lack of a need for the extraordinary remedy of a preliminary injunction." *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987); *see also Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (finding ***two-month*** delay before requesting injunctive relief was "inconsistent with a claim of irreparable injury"); *Park Ridge Sports*, 2020 WL 6265133, at *11 (finding ***three-month*** delay "undermines plaintiffs' claim of impending irreparable harm" and denying injunction); *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, at *16 (N.D. Ill. Sept. 28, 1984) (***five-month*** delay defeated request for preliminary injunction); *MB Fin. Bank, N.A. v. MB Real Estate Servs., LLC*, 2003 WL 22765022, at *8 (N.D. Ill. Nov. 21, 2003) (presumption of irreparable harm rebutted given ***ten-month*** delay in seeking preliminary injunction). And further, courts have consistently held that an unexplained delay in seeking injunctive relief, "standing alone," precludes a finding of irreparable harm. *See Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018).

Here, AbbVie had been aware of Payer Matrix's alleged wrongful conduct *for more than a year* and was clearly contemplating legal action throughout 2022. But AbbVie "sat on its rights" and declined to seek an injunctive remedy until May 31, 2023. In the end, AbbVie's strategic rationale is irrelevant: "Given this delay in taking action, [AbbVie's] claim of irreparable harm is unpersuasive." *Checker Car Club of Am.*, 262 F. Supp. 3d at 629. AbbVie's delay does not support its claim of an impending irreparable harm that warrants the "extraordinary" remedy of a preliminary injunction. "That's just common sense, as court after court has found." *Park Ridge Sports*, 2020 WL 6265133, at *11 (citing cases). Without facts supporting a *likelihood* of ongoing reputational harm, the Court must deny AbbVie's request for injunctive relief. *See also Checker Car Club of Am.*, 262 F. Supp. 3d at 630 n.7 (concluding court "need not consider the other prongs of the standard where plaintiff "has failed to make a showing of irreparable harm").

### C. The Balance of Equities Weigh Heavily in Payer Matrix's Favor Because AbbVie's Proposed Injunction Is Vague and Will Expose Defendant to Liability for the Independent Acts of Third Parties

Right off the bat, the Court should know it does not have to balance the harms because AbbVie does not meet the jurisdictional prerequisites for a Rule 65 injunction. *See Vaperz*, 543 F. Supp. 3d at 633; *Park Ridge Sports*, 2020 WL 6265133, at *12. But even if the Court undertakes this inquiry, "balancing all of the relevant harms would still provide an independent basis to deny [AbbVie's] proposed injunction." *Vaperz*, 543 F. Supp. 3d at 633.

In this Circuit, "[t]he Court balances harms on a sliding scale, which is to say that 'the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side[.]'" *Id.* (quoting *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013)). In doing so, the Court also "considers the 'public interest,' including the effects of a preliminary injunction on 'people and institutions that are not parties to the case.'" *Finch v. Treto*, 606 F. Supp. 3d 811, 835 (N.D. Ill. 2022). Where the plaintiff's chance of success

on the merits is slight, "the sliding scale requires that the balance of harms weigh heavily" in plaintiff's favor. *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002); *see also Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

Here, the evidence shows the balance of harms weighs firmly ***against*** AbbVie's proposed injunction. To start, "the Court 'must consider the irreparable harm that the ***nonmoving party*** will suffer if preliminary relief is granted[.]'" *Vaperz*, 543 F. Supp. 3d at 633 (quoting *Scala's Original Beef & Sausage Co. v. Alvarez*, 2009 WL 5183799, at *2 (N.D. Ill. 2009)) (emphasis added). And if the requested injunction would irreparably damage the defendant, the Court should deny it. *See, e.g.*, *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, at *18 (N.D. Ill. 1984) (denying preliminary injunction in part "because the impact upon [defendant] would be devastating"); *EnVerve*, 779 F. Supp. 2d at 845 (courts consider the harm the defendant "will suffer if preliminary relief is granted improvidently, balancing such harm against the harm that [plaintiff] will suffer if relief is denied") (citing *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)). It would be inequitable and extraordinarily excessive for the Court to enter the injunction sought by AbbVie.

AbbVie's arguments concerning the balance of harms are unavailing. AbbVie first claims that the balance of harms weighs "heavily" in its favor "because Payer Matrix's business model is based on a fraudulent scheme." (Mem. at 47.) But this faulty reasoning does not get AbbVie far.[47]

A plaintiff does not automatically "win" the balancing-of-harms test just because it establishes a likelihood of success on the merits. Further, AbbVie has not demonstrated a likelihood of success on ***any*** of its claims here. And therefore, the cases AbbVie cites in support fail to persuade. *See BellSouth Telecoms., Inc.*, 2005 WL 8155198, at *2–3 (N.D. Ga. Mar. 4,

---

[47] AbbVie's circular argument also "fails to show how an award of damages will be 'seriously deficient as a remedy for the harm suffered.'" *Nw. Pallet Supply Co.*, 2016 WL 8671902, at *7 (N.D. Ill. May 13, 2016) (quoting *Roland Mach. Co.*, 749 F.2d at 386).

2005) (finding injunction would not cause defendants hardship because, in part, the evidence in the record met the elements of a common-law fraud claim); *EPA v. Envt'l Waste Control*, 917 F.2d 327, 331–32 (7th Cir. 1990) (ordering ***permanent*** injunction ***after trial*** where evidence established defendant willfully violated federal environmental laws). Because AbbVie is not likely to prevail on the merits of its statutory fraud claims, there is no basis for the Court to assume the hardships favor AbbVie. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (holding injunction must be denied if the movant fails to establish likelihood of success or irreparable harm).

The Court should not be swayed by AbbVie's attempt to downplay the draconian relief it demands here. AbbVie flippantly insists that the injunction it seeks "only would stop Payer Matrix from doing what it already claims it is no longer doing, and therefore, it would impose no hardship on Payer Matrix." (Mem. at 48.) But AbbVie's proposed order granting a preliminary injunction—which has not been publicly filed with the Court—indicates otherwise. (Poell Decl. ¶ 33, Ex. 32.)

AbbVie's proposed remedy "is way too drastic to call for the ***preliminary*** relief [it] looks for" here. *Vaperz*, 543 F. Supp. 3d at 633–34. If granted, the injunction would severely disrupt Payer Matrix's operations and wreak havoc on its employees, its clients, and the Members it serves.

Make no mistake: AbbVie wants an injunction imposing radical measures that would discombobulate Payer Matrix's everyday business functions and force Payer Matrix to abide by several onerous commandments—to wit:

- Thou shalt not accept "cost avoidance fees" or any other forum of remuneration for any services related to AbbVie's PAP (Proposed Order ¶ 3);

- Thou shalt not submit applications or application-supporting materials to AbbVie's PAP, either directly ***or indirectly through third parties*** (*Id.* ¶ 4);

- Thou shalt not direct or advise its clients' Members, either directly or through its clients, on how to apply to AbbVie's PAP (*Id.* ¶ 5);

- Thou shalt not ask or direct HCPs to submit PAP applications to AbbVie on behalf of Payer Matrix's clients' Members or prospective clients' Members (*Id.* ¶ 6);

- Thou shalt not make "false statements" to HCPs, patients, employers, plan sponsors, or other third parties about AbbVie's PAP and co-pay assistance program ("CAP") coverage, including that AbbVie no longer has a PAP or a CAP, that it no longer allows 'third party' involvement in the PAP, or that the January 2023 updates to its PAP eligibility requirements restricted its PAP coverage in any way other than to prohibit the involvement of vendors seeking and/or providing funding sources, like Payer Matrix (*Id.* ¶ 7);

- Thou shalt not make "false or misleading representations" to HCPs, patients, employers, plan sponsors, or other third parties about how non-AbbVie drugs compare to AbbVie drugs (*Id.* ¶ 8);

- Thou shalt not solicit HCPs and encourage them to switch its clients' Members' prescription from an AbbVie drug to a non-AbbVie drug ***without first disclosing*** to both the HCPs and their respective patients that Payer Matrix may receive compensation when the patient is switched from an AbbVie drug to a different drug with an available PAP or CAP (*Id.* ¶ 9); ***and***

- Thou shalt not solicit HCPs and encourage them to switch their patients' prescriptions from an AbbVie drug to a non-AbbVie drug based on the representation that the Members' currently prescribed an AbbVie drug that has been 'excluded' from plan coverage ***without also fully disclosing*** to both the HCPs and the Members that Payer Matrix's program includes an "override" process, meaning their plan design allows Payer Matrix and its partner PBMs to "override" the specialty drug "exclusion" and have the plan cover payment of the Members' specialty drugs, including for patients who refuse to participate in Payer Matrix's program and for patients whose HCPs declined to switch their medication to a non-AbbVie drug (*Id.* ¶ 10) (emphasis added).[48]

AbbVie's proposed injunction would fundamentally "alter the status quo rather than maintain it to prevent harm to the parties." *Vienna Beef, Ltd. v. Red Hot Chi., Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011)). As its list of demands makes clear, the injunction would require Payer Matrix "to take a whole panoply of affirmative actions that are likely to change the nature of its business." *Vaperz*, 543 F. Supp. 3d at 634. Such consequences would be "contrary to the ordinary purpose of preliminary injunctions and not supportable because the proposed injunction

---

[48] The Proposed Order also asks the Court to prohibit Payer Matrix from (1) using AbbVie's name, logo, or products in Payer Matrix' marketing materials, specialty drug list, or its website; and (2) advertising to third parties that it partners with AbbVie. (Proposed Order ¶¶ 1 & 2.) ███████████████████

could have a devastating impact on [Payer Matrix's] business by forcing it to alter its entire business strategy before there has been any adjudication on the merits." *Id.*; *see also Logansport Mach. Co. v. Neidlein-Spannzeuge GmbH*, 2012 WL 1877854, at *12 (N.D. Ind. May 22, 2012) (balancing of harms requires courts to consider potential effects to "the interests of nonparty customers and their rights to conduct business freely"). And here, AbbVie's Proposed Order is "especially problematic where, with limited opportunity for fact-finding, the Court is being asked to fundamentally jeopardize [Payer Matrix's] business." *Vaperz*, 543 F. Supp. 3d at 634 (finding plaintiff's requests "are simply a bridge too far" and finding defendant business would suffer greatly from injunction). The Court should not dramatically alter the status quo by jeopardizing the future of Payer Matrix, its employees, and its clients for no apparent reason other than to preserve AbbVie's financial pipeline. *See id.* (denying motion for preliminary injunction).

The balance of harms also favors Payer Matrix because it will likely suffer irreparable harm if the Court grants the exceedingly vague injunction sought by AbbVie. Rule 65(d) dictates that injunctions "shall be specific in terms" and "shall describe in reasonable detail … the act or acts sought to be restrained." *See also Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631–32 (7th Cir. 2003); *Schmidt v. Lessard*, 414 U.S. 473, 476–77 (1974) (*per curiam*). In AbbVie's view, a Payer Matrix employee need not "directly" assist a Member in the PAP application process to run afoul of the injunction; mere "indirect" assistance is also forbidden. But what constitutes indirect assistance? For instance, if a Payer Matrix sends a Member a blank copy of a PAP application with the disclaimer that Payer Matrix no longer does business with AbbVie, would that be a violation of the injunction? And how is the Court supposed to police every statement a Payer Matrix representative makes to nonparties to gauge whether it falsely represents AbbVie's PAP or mischaracterizes how an AbbVie drug compares to a non-AbbVie drug? Such restrictions flunk

Rule 65(d)'s test resoundingly. *See Chi. Bd. of Edu.*, 354 F.3d at 632 (vacating "appallingly bad injunction" containing opaque instructions and lacking an evidentiary basis for broad relief).

As AbbVie's latest document productions make clear, Payer Matrix is "on the hook" for any PAP application submitted by any Member whose employer contracts with Payer Matrix, *even if the Member submits the PAP application independently*. In AbbVie's view, that scenario would establish Payer Matrix's indirect involvement and thus make it subject to contempt for the actions of nonparties beyond its control. But enjoining Members (or their doctors) from submitting PAP applications on their own without Payer Matrix's involvement "would violate the fundamental principle that courts may not grant an injunction 'so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law.'" *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, 2013 WL 5973938, at *12 (C.D. Ill. Nov. 8, 2013) (quoting *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13 (1945)). Nor can the Court "bind the world at large through a broadly worded injunction." *Kelly Toys Holdings, LLC v. 19885566 Store*, 2023 WL 4288356, at *5 (S.D.N.Y. June 29, 2023) (quoting *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129 (2d Cir. 1979)). But that is effectively what AbbVie asks this Court to do—prevent "the world" from independently submitting a PAP application whenever the applicant's *employer's* is affiliated with Payer Matrix. And, even if the Court issued an injunction purporting to bind the independent conduct of nonparties, "the persons enjoined are free to ignore it." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.). In sum, the Court cannot enter an injunction that would forbid the independent actions of nonparties and unfairly subject Payer Matrix and patients alike to potential contempt proceedings for future violations. *See Kelly Toys Holdings*, 2023 WL 4288356, at *6 (finding court lacked authority to enjoin independent actions of a nonparty via injunction and refusing to hold nonparty in contempt).

**D.** **The Public Interest Does Not Favor AbbVie's Sweeping Injunction Burdening Payer Matrix's Free Speech Rights**

Turning to the public interest, courts are loathe to enter injunctions that inflict deleterious effects upon businesses' ability to compete in the free market. AbbVie has targeted its ire at Payer Matrix because it believes (wrongly) that AFPs pose an existential threat to the fabulous profits it reaps from the sales of exorbitantly priced specialty drugs like Humira, Skyrizi, and Rinvoq. And AbbVie undoubtedly believes an all-encompassing injunction will be financially beneficial while also harming Payer Matrix's bottom line and reputation—a splendid financial windfall for AbbVie. But not the outcome courts prefer to entertain: "Injunctive relief is not available where a party is simply trying to obtain a commercial advantage." *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F. Supp. 870, 887 (N.D. Ill. 1992); *see also Fasti USA*, 2002 WL 31664494, at *5 ("[T]he public interest benefits from increased competition.") As discussed above, if AbbVie prevails, not only will nonparties—*i.e.*, Members and HCPs—be forbidden from submitting PAP applications, but in a cruel twist, Payer Matrix will be subject to contempt for applications made "indirectly through third parties" without Payer Matrix's knowledge or awareness. (*See* Proposed Order ¶ 4.) The Court should not endorse outcomes "contrary to the Court's respect for the 'traditional policies of a competitive market' and the idea that the 'public substantially benefits from competition.'" *Vaperz*, 543 F. Supp. 3d at 635 (quoting *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998)).

Additionally, the public interest does not support an injunction that imposes a prior restraint on speech and stifles the free exchange of information between nonparties on health-related topics. As a general matter, courts are reluctant to restrict communications between consumers and those who assist them in an advisory capacity. *See Edward D. Jones & Co.*, 415 F. Supp. 3d at 876–77 (noting courts are "very wary" of preliminary injunctions that restrict communications by financial

advisors with their clients). AbbVie's proposed injunction seeks aggressive restrictions on Payer Matrix's ability to communicate freely with third parties on matters of public concern. Established law forecloses AbbVie's ham-fisted attempt to muzzle Payer Matrix by injunction: "Words that would otherwise be actionable are privileged where society has a need for the information." *Am. Pet Motels v. Chi. Veterinary Med. Ass'n*, 435 N.E.2d 1297, 1303 (Ill. App. Ct. 1982); *accord Lancaster Found., Inc. v. Skolnick*, 1992 WL 211063, at *5 (N.D. Ill. Aug. 21, 1992) ("Public health is an issue of great public concern, worthy of open debate.") (citing *Farnsworth v. Tribune Co.*, 253 N.E.2d 408 (Ill. 1969)).

Further, it is no retort for AbbVie to argue an injunction ***restricting speech*** is warranted because it wants to eliminate all purportedly false statements from Payer Matrix to third parties. Such remedy paints with far too broad a brush. The Supreme Court has forcefully held that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Even in the defamation context where reputational damage is at stake, "after-the-fact sanctions, ***and not prior restraint***, is the appropriate remedy." *Ameritech v. Voices for Choices, Inc.*, 2003 WL 21078026, at *1 (N.D. Ill. May 12, 2003) (emphasis added); *see also Stuart*, 427 U.S. at 559 (cautioning that a prior restraint "has an immediate and irreversible sanction" that "freezes" speech for a time). Here, AbbVie "ask[s] this court to enjoin future, as-yet unspoken and unidentified speech which [AbbVie] assert[s] will be false if spoken." *CogniTest Corp. v. Riverside Publ'g Co.*, 1995 U.S. Dist. LEXIS 8721, at *5 (N.D. Ill. June 22, 1995). But a prior restraint like that "would inevitably be either unconstitutionally overbroad in that it would proscribe permissible speech, or unconstitutionally vague in that it would hinge upon the speaker making a difficult legal conclusion as to whether his speech was merely negative or false and unprotected." *Id.* The First Amendment forbids AbbVie's proposed approach. *See, e.g.*, *Near v. Minnesota*, 283 U.S. 697,

713–14 (1931) (rejecting injunction as prior restraint); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable"). For these foundational reasons, "the First Amendment and the law of injunctions impose a high standard of specificity before such relief may be warranted." *CogniTest Corp.*, 1995 U.S. Dist. LEXIS 8721, at *5.

So naturally, any request for prior restraint "comes to this Court with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Needless to say, AbbVie fails to carry its "heavy burden of showing justification for the imposition of such a restraint." *Id.* AbbVie instead ignores the grave First Amendment concerns entirely. A "gag order" injunction freezing Payer Matrix's communications on the terms proposed by AbbVie would contravene the First Amendment. *See also Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 296 (1941) (stating that in the "exceptional cases warranting restraint upon normally free conduct, the restraint ought to be defined by ***clear and guarded language***") (emphasis added); *McCarthy v. Fuller*, 810 F.3d 456, 461–63 (7th Cir. 2015) (vacating injunction in defamation case "so broad an vague" that it threatened to silence defendants completely).

The Court cannot impose a prior restraint on Payer Matrix's ability to speak freely with clients, Members, and HCPs. Nor can the Court ***compel*** it to make statements to third parties that parrot AbbVie's company line, chapter, and verse. (*See* Proposed Order ¶¶ 9 & 10.) Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "ordinarily cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

## CONCLUSION

For the foregoing reasons, the Court should deny AbbVie Inc.'s Amended Motion for a Preliminary Injunction. AbbVie fails to prove it is entitled to extraordinary injunctive relief.

Dated: November 29, 2023        Respectfully submitted,

PAYER MATRIX, LLC

*/s/ David M. Poell*
David M. Poell (#6302765)
Kenneth E. Rechtoris (# 6190285)
K. Hope Harriman (#6342138)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark St., 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
dpoell@sheppardmullin.com
krechtoris@sheppardmullin.com
hharriman@sheppardmullin.com

Danielle Vrabie*
Meghan M. Stuer*
Katherine Anne Boy Skipsey*
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York 10112
Tel: (212)-634-3081
Fax: (917)-438-6162
dvrabie@sheppardmullin.com
mstuer@sheppardmullin.com
kboyskipsey@sheppardmullin.com

Kathleen M. Stratton*
Calla N. Simeone*
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
2099 Pennsylvania Ave., NW, Suite 100
Washington, D.C. 20006
Tel: (202)-747-1956
Fax: (202)-747-9456
kstratton@sheppardmullin.com
csimeone@sheppardmullin.com
*Admitted *Pro Hac Vice*

*Counsel for Payer Matrix, LLC*