THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| AbbVie Inc., <br><br> Plaintiff, <br><br> -against- <br><br> Payer Matrix, LLC <br><br> Defendant. | Civil Action No. 1:23-cv-02836 <br><br> Hon. Judge Georgia N. Alexakis <br><br> Hon. Magistrate Young B. Kim |

**DECLARATION OF ELENA M. MASSAROTTI, M.D. IN SUPPORT OF DEFENDANT PAYER MATRIX, LLC'S OPPOSITION TO PLAINTIFF ABBVIE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Elena M. Massarotti, M.D., declare as follows:

1. I submit this Declaration on behalf of Defendant Payer Matrix, LLC ("Payer Matrix") in support of Payer Matrix's Opposition to Plaintiff AbbVie Inc.'s ("AbbVie") Motion for a Preliminary Injunction in the above-captioned litigation.

2. I have been retained as an expert by Payer Matrix to opine on the various factors that influence a medical doctor's prescribing practices, including the decision to change a patient's medication, and to provide rebuttal testimony in connection with the testimony offered by AbbVie's expert, Philip L. Cohen, M.D., in the *Declaration of Dr. Philip L. Cohen in Support of Plaintiff's Motion for Preliminary Injunction*, dated October 18, 2024 (the "Cohen Declaration"). I have personal knowledge of the matters set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

-1-

**Background**

3. I am a medical doctor specializing in rheumatology, which encompasses inflammatory autoimmune diseases. I have a particular interest in inflammatory arthritis, lupus, and vasculitis. My professional time is divided between patient care, education, clinical research, and administration. I routinely treat inflammatory, autoimmune disease patients with disease modifying therapies including biologic agents, and have done so throughout my more than thirty years of clinical experience.

4. I graduated from Tufts University School of Medicine in 1984. I completed my internship and residency in internal medicine at New England Medical Center (now known as Tufts Medical Center) between 1984 and 1987. I completed a fellowship in Rheumatology / Immunology at New England Medical Center from 1988 to 1990. I was then the Chief Medical Resident at New England Medical Center from 1990 to 1991.

5. I am board certified in Internal Medicine and in Rheumatology. I am a member of the American College of Rheumatology.

6. Between 1990 and 2007, I had clinical academic positions at two different hospitals. From 1991 to 1993, I was the director of house staff training at the Mt. Auburn Hospital in Cambridge, Massachusetts (a Harvard Medical School affiliate). From 1993 to 2002, I was the director of clinical rheumatology training at Tufts Medical Center. From 2001 to 2002, I was the acting division chief of rheumatology at Tufts Medical Center. From 2002 to 2007, I was the clinical director of rheumatology at Tufts Medical Center.

7. Since 2007, I have been an Associate Professor at Harvard Medical School and an Associate Physician at the Brigham and Women's Hospital ("BWH") in Boston. I am Director of Clinical Trials at the Lupus Center at BWH and Co-Director of the Clinical Trials Center in the

-3-

BWH Division of Rheumatology. Over the course of my career, I have held a number of major committee assignments and appointments at BWH and Tufts-New England Medical Center. I have also received a number of professional and teaching honors and awards, including recognition by Boston Magazine and U.S. News and World Report. Since 2016, I have been the Vice Chair of Clinical Affairs in the Department of Medicine at BWH.

8. I have been or currently serve as an ad hoc reviewer for a number of medical journals, including the New England Journal of Medicine, Infectious Diseases in Clinical Practice, Lupus, Annals of the Rheumatic Diseases, Arthritis and Rheumatism, and the Journal of the American Medical Association. I am on the Executive Committee of the Lupus Nephritis Trials Network.

9. I have been an invited speaker at dozens of conferences and courses, and have authored or co-authored over ninety peer-reviewed articles, review articles, book chapters, and abstracts. These publications include reports of clinical trials, epidemiologic studies, and clinical observations in the areas of autoimmune disease. I have also been or am currently an investigator on at least over 30 clinical trials and studies.

10. I am an expert in rheumatic disorders, including rheumatoid arthritis, psoriatic arthritis, and other related inflammatory autoimmune disorders. Among other things, I have extensive experience and expertise using immunosuppressive agents, including biologic agents.

11. I have a large, referral-based practice comprised of patients with a wide range of rheumatic diseases, including rheumatoid and psoriatic arthritis, and am highly experienced in prescribing disease modifying agents and biologic agents, including, AbbVie's drugs Humira (adalimumab), Skyrizi (rizankizumab) and Rinvoq (upadicitinib).

12. A true and correct copy of my curriculum vitae, which accurately reflects my educational background and professional experiences, is attached hereto as **EXHIBIT 1**.

13. IMS Consulting and Expert Services, through which I have been retained by Payer Matrix, is being compensated at a rate of $935 per hour ($985 per hour for deposition and trial testimony) for my work on this matter. This compensation is not contingent on the nature of my findings or the outcome of this matter.

### Overview of the Drugs at Issue

14. There is a wide variety of medications on the market that are used to treat patients with rheumatic diseases. For patients with rheumatoid arthritis, methotrexate, a disease-modifying anti-rheumatic drug ("DMARD"), is generally considered to be first line therapy. Rheumatoid arthritis is also often treated with tumor necrosis factor ("TNF") inhibitors, biologic drugs that are also known as targeted therapies. TNF inhibitors are most commonly added to a patient's medication regimen when treatment failure with methotrexate has occurred. On occasion, TNF inhibitors are prescribed as monotherapy. Currently, there are five FDA approved TNF inhibitors that are indicated for the treatment of many rheumatic illnesses, including rheumatoid arthritis ("RA"), psoriatic arthritis, uveitis, and ankylosing spondylitis. These TNF inhibitors include AbbVie's Humira. Other classes of biologic drugs prescribed by rheumatologists commonly include interleukin-6 inhibitors, costimulatory blockers, and anti CD-20 inhibitors. Additionally, in the last decade, a number of "small molecule" drugs have been approved to treat rheumatic diseases like rheumatoid arthritis, including the JAK inhibitors tofacitinib and upadicitinib. In addition to Humira, a TNF inhibitor, AbbVie also manufactures Rinvoq (upadicitinib), a JAK inhibitor and small molecule that is FDA approved for rheumatoid arthritis, ankylosing spondylitis, and psoriatic arthritis. Skyrizi (rizankizumab) is a biologic drug targeting interleukin 23A that is FDA approved for psoriatic arthritis and is also manufactured by AbbVie.

15. TNF inhibitors and similar biologic drugs used to treat rheumatic illnesses are what are referred to as "specialty medications" – high-cost medications that treat complex chronic health conditions. Biologics typically cost from $50,000 to $90,000 annually, with significant out of pocket co-payment costs for patients.[1]

**A Physician's Decision To Prescribe / Switch Medications**

16. As a general matter, a wide variety of factors go into a physician's decision to prescribe a particular medication. Fundamentally, safety and efficacy are the primary factors a physician uses to select the drug of choice for a patient. With respect to rheumatic diseases, the decision to start a particular medication, including, for example, a TNF inhibitor, is based upon a number of clinical factors, including prior response to other medications, disease severity, and the presence of co-morbid medical conditions. Currently, there are different classes of biologics that are FDA approved to treat various rheumatic diseases, including RA and psoriatic arthritis. In my experience, when choosing a biologic, rheumatologists will select the agent based upon several factors, including personal experience with the drug. For example, because TNF inhibitors were one of the first biologics approved for rheumatic diseases like RA, they are often prescribed prior to other classes of biologics because there has been the greatest experience with them. This is true even though there is general consensus that the available biologic agents approved for RA are equally effective (although differ in mode of action, method, side effects, and frequency of administration).[2]

---

[1] Gannon F. The cost of living. EMBO Rep. 2023 Aug 3;24(8):e57637. doi: 10.15252/embr.202357637. Epub 2023 Jun 21. PMID: 37341571; PMCID: PMC10398643.

[2] Fraenkel L, Bathon JM, England BR, St Clair EW, Arayssi T, Carandang K, Deane KD, Genovese M, Huston KK, Kerr G, Kremer J, Nakamura MC, Russell LA, Singh JA, Smith BJ, Sparks JA, Venkatachalam S, Weinblatt ME, Al-Gibbawi M, Baker JF, Barbour KE, Barton JL, Cappelli L, Chamseddine F, George M, Johnson SR, Kahale L, Karam BS, Khamis AM, Navarro-Millán I, Mirza R, Schwab P, Singh N, Turgunbaev M, Turner AS, Yaacoub S, Akl EA. 2021

17. In the United States, the costs of the medication and whether the patient's insurance[3] covers the medication are also important factors that must be taken into account by a physician when prescribing all medications. After all, a prescription will not do a patient any good if the patient cannot obtain the medication prescribed. Because third-party payers cover drug costs and access to specific drugs for the overwhelming majority of patients, physicians—particularly those that prescribe expensive specialty medications—are accustomed to the need to select appropriate medications for a patient from a list of covered medications presented to them by the insurer. Similarly, all physicians know that prescribing an expensive specialty medication like a biologic for RA will require a prior approval process that includes third-parties reviewing eligibility criteria. Insurance companies may differ with respect to the individual drugs within a class that will be covered, as well as classes of drugs covered. In addition, insurance companies may dictate which drugs or categories of drugs will need to be used for a specific indication. It is not uncommon for a rheumatologist to prescribe etanercept, for example, for RA and receive notice that approval has been denied, requiring that the patient try an alternative TNF inhibitor, or a biologic in a different class—abatacept for example.

18. Nor is it uncommon for a patient to have to switch medications after being prescribed and taken a certain drug. Again, in the United States, third-party payers determine which drugs are covered (i.e. paid) for specific conditions. It is common for physicians to be

---

American College of Rheumatology Guideline for the Treatment of Rheumatoid Arthritis. Arthritis Care Res (Hoboken). 2021 Jul;73(7):924-939. doi: 10.1002/acr.24596. Epub 2021 Jun 8. PMID: 34101387; PMCID: PMC9273041.

[3] This includes fully-funded health insurance plans, employer-sponsored self-funded plans (which often work closely with third-party administrators ("TPAs") including pharmacy benefit managers ("PBMs")), and Taft-Hartley plans (i.e., multi-employer plans). Under each type of plan, a third-party payer (whether the insurance company or employer-sponsored plan/PBM) is responsible for managing prescription drug coverage and paying for prescription drug costs.

presented with a scenario in which a patient's insurance coverage for a prior approved medication is discontinued. This is a function of the incredibly high drug costs and healthcare payer system we have in the United States. For example, insurers may exclude coverage for high-cost specialty drugs once "biosimilar" drugs become increasingly available on the market. A biosimilar is a biologic product that is highly similar to, and has no clinically meaningful difference from, an existing FDA approved biologic, called a reference product.[4] Compared with the reference product, biosimilars are made with the same types of living sources, and have the same strength, dosage, potential treatment benefits, and potential side effects. One of the key benefits of biosimilars is that they offer patients lower cost alternatives to the reference product—with little to no differences in efficacy and/or risks. Biosimilars have been more widely used in Europe than in the US because of patent laws in the US, but clinical experience and the published literature to date has not shown any meaningful clinical differences between biologics and corresponding biosimilars.

19. Patients also commonly experience changes in medication coverage when switching jobs, as their new employer may have a different insurance plan with different prescription drug benefits. In each case, the change in prescription drug coverage requires that the physician and patient together review the treatment options for which coverage is available, and select an alternative treatment that the physician believes is a suitable alternative. I regularly have these conversations with my patients.

20. While it is not uncommon for a physician's prescribing decision to be affected by the list of medications covered by the patient's insurance, no insurance company (or any other third-party, for that matter) has the ultimate power to force a patient or their doctor to select or

---

[4] *See* FDA.gov/drugs/biosimilars/overview-health-care-professionals

switch to a particular medication. Rather, both the initial prescribing decision and any decision to switch medications is a decision left entirely to the patient and their doctor. Thus, if a recommended drug is not included in the list of covered drugs, the physician and patient will together decide the options: use another recommended biologic that is covered, or have the patient assume the out-of-pocket costs for the medication. In my experience, the latter option is untenable for the overwhelming majority, as the out-of-pocket costs for these medications are exorbitant.

21. If, however, the professional opinion of the prescriber is that the available, covered medications do not include a safe and effective alternative, or if there are contraindications that preclude safely switching a patient to any one of the covered medications believed to be medically contraindicated, then it is common practice for the prescriber to decline to switch the patient's medication and more formally appeal to the insurance company, and/or request a peer to peer consultation with the insurance company. An example of this might be an RA patient with a first degree relative with multiple sclerosis. Because TNF inhibitors are contraindicated in such situations, the prescriber would appeal to the insurance provider to provide full coverage for an alternative biologic with a different mechanism of action (e.g. abatacept). In my experience with this specific example, such letters of appeal are generally accepted by insurers, provided that the insurer is provided with well-documented reasons why the patient should not be switched to a covered medication. By the same token, if the out-of-pocket co-payment cost is cost prohibitive for the patient, the prescriber would investigate other solutions: a patient assistance program, or alternative medication covered by the patient's insurance.

**Specific Rebuttals to the Cohen Declaration**

22. In the Cohen Declaration, Dr. Cohen makes a number of statements to the effect that, if a patient is experiencing "success" with a specific TNF inhibitor or other medication, he

would not change the medication unless there is a medically necessary reason to do so.[5] I do not necessarily disagree with Dr. Cohen—in a perfect world, medications that are working for a patient would not be switched absent medical necessity. However, as discussed above, the reality in the United States is that cost and insurance coverage issues must be taken into consideration both when initially prescribing these and other similarly expensive medications, as well as when deciding whether to switch a patient to a different medication. Again, it is not uncommon for patients to be informed that insurance coverage for biologics change, requiring that the patient and rheumatologist together discuss whether to appeal to the insurance company for continued coverage, or search for alternative payment assistance programs, or switch to medications that are covered, given the extraordinary high costs of biologics.

23. Dr. Cohen also discusses that mandated switches in medications can result in unacceptable delays in treatment that are harmful to the patient because delays in receiving scheduled doses of medication increase the risk of disease flares.[6] However, in my experience, switching a patient to a new medication generally does not immediately result in the patient not receiving their scheduled doses of medication. When third-party payers stop covering a medication, the discontinuation is usually not immediate—i.e. days. Patients are usually informed in advance so that alternatives may be pursued. Typically, the discontinuation may be weeks, or at the start of the calendar year, coinciding with changes in insurance plans. And, if, for some reason, the date of discontinuation is unacceptable, then it is customary for the physician to appeal to the insurance company to extend coverage for a mutually-agreed period of time. If that is not possible, then the physician may provide the patient with samples of the medication (if available)

---

[5] Cohen Declaration ¶ 7.
[6] Cohen Declaration ¶ 20.

to hold the patient over, or contact their manufacturer representative to secure a small number of doses of the medication for the patient while the doctor and patient discuss an appropriate switch.

24. In Paragraph 7 of the Cohen Declaration, Dr. Cohen states that "some TNF inhibitors have greater efficacy for some patients than others." While that is sometimes true for some diseases, as discussed above, the medical literature generally states that TNF inhibitors are roughly equal in terms of safety and efficacy for the treatment of rheumatoid arthritis. For example, a head-to-head study of certolizumab (a TNF inhibitor) plus methotrexate was not superior to adalimumab (Humira) plus methotrexate in patients with rheumatoid arthritis.[7] Similarly, in a head-to-head trial comparing abatacept (a biologic) to adalimumab (Humira) in RA patients with an inadequate response to methotrexate, the efficacy of both biologics were equivalent (although Humira had a slightly higher rate of serious infections).[8] Thus, while it is preferred that a patient continue a medication that has resulted in clinical benefit, if a RA patient were to be switched to a different TNF inhibitor or alternative biologic drug, for example because the originally prescribed drug is no longer covered by the patient's insurance, most RA patients can expect a comparable treatment response to the alternative TNF inhibitor.

25. In Paragraphs 12 through 14 of the Cohen Declaration, Dr. Cohen cites a fax sent to a doctor treating a patient for rheumatoid arthritis, which lists eight medication alternatives

---

[7] Smolen JS, Burmester GR, Combe B, Curtis JR, Hall S, Haraoui B, van Vollenhoven R, Cioffi C, Ecoffet C, Gervitz L, Ionescu L, Peterson L, Fleischmann R. Head-to-head comparison of certolizumab pegol versus adalimumab in rheumatoid arthritis: 2-year efficacy and safety results from the randomised EXXELERATE study. Lancet. 2016 Dec 3;388(10061):2763-2774. doi: 10.1016/S0140-6736(16)31651-8. Epub 2016 Nov 15. Erratum in: Lancet. 2017 Feb 4;389(10068):e2. PMID: 27863807.

[8] Schiff M, Weinblatt ME, Valente R, *et al*. Head-to-head comparison of subcutaneous abatacept versus adalimumab for rheumatoid arthritis: two-year efficacy and safety findings from AMPLE trial. Ann Rheum Dis. 2014;73:86–94. doi: 10.1136/annrheumdis-2013-203843.

included in the insurance plan's formulary, and discusses specific differences between these medications and Humira, which was no longer to be covered. I largely agree with the statements Dr. Cohen makes regarding the differences between Humira and the alternative drugs. However, Dr. Cohen does not mention the two alternative TNF inhibitors that were still covered (Simponi and Enbrel), which are in the same biologic class as Humira. Though there are some differences between these TNF inhibitors and Humira, given that the patient had a successful response to Humira, it is expected that the alternatives would provide the same effect as Humira (albeit with a different dosage regimen). Moreover, while Dr. Cohen refers to certain "approved" uses and European guidelines, nothing prohibits a doctor from prescribing medication for a use that is not "approved" by the FDA or does not fall within a non-binding guideline. For example, there are few FDA approved drugs for lupus. Many immunosuppressive agents are used off-label to treat various manifestations of lupus, including methotrexate and biologic agents like abatacept or rituximab. Physicians are accustomed to prescribing drugs for unapproved—or "off-label" use— when clinically indicated. The decision to do so is ultimately a matter between the doctor and the patient.

26. In paragraphs 15-17 of Dr. Cohen's declaration, Dr. Cohen suggests that Payer Matrix misled health care providers regarding overrides and drug switching when trying to facilitate conversions for medications after a denial of coverage. I do not agree that Payer Matrix misled health care providers regarding drug switching and potential overrides. As discussed above, doctors are regularly confronted with the need to discuss changes to medications as a result of changes in drug coverage. Rheumatologists, in particular, are accustomed to discussing and rationalizing medication preferences with third-party payers, as it is well understood that the high cost of biologic therapies almost always requires prior approval of a third-party payer.

Rheumatologists also understand that third-party payers contract with specific pharmaceutical companies to provide different biologics to patients. For example, of the five TNF agents currently on the market to treat rheumatoid arthritis, a third-party payer may have a contractual agreement with just one manufacturer of a TNF agent. Brand name "reference" drugs are also commonly excluded form coverage once lower-cost biosimilars become available on the market. However, as previously discussed, if a rheumatologist is presented with a situation whereby the rheumatologist is informed that the originally prescribed TNF drug is not covered, but the rheumatologist believes it is in the patient's best interest to be administered the unapproved TNF agent, the rheumatologist would appeal the third-party payer's denial. Indeed, rheumatologists commonly appeal medication denials by insurance companies. It is not uncommon for such an appeal to be granted with supportive data and information. Rheumatologists who prescribe medications know and understand this process, and the potential availability for an appeal – and ultimately coverage – for the originally prescribed drug, despite the fact that the drug is otherwise generally excluded from coverage. If the appeal is denied, the rheumatologist will work with the patient to identify a viable alternative.

27. In Paragraph 18 of the Cohen Declaration, Dr. Cohen posits that drug switching for reasons other than medical necessity is harmful to patients because it could lead to three health risks—the new medication may not be as effective, could have a less desirable treatment regimen, and could cause the patient increased side effects. While I do not disagree that switching medications may carry the risks outlined by Dr. Cohen, a certain amount of unpredictability exists for any medication change made by a physician. As discussed above, a switch to a biosimilar drug is likely to have little to no difference in efficacy and/or risks. It is also possible that a patient may find that the alternate biologic has better efficacy, and/or a more favorable treatment regimen (for

example, if the patient is tired of injections and preferred pills). One of the most common side effects experienced by patients taking TNF inhibitors include injection site reactions, characterized by pain, itchiness, and localized hives. Many times, these can be managed without switching medications. In my experience, some patients have experienced fewer injection site reactions when switched to an alternative TNF inhibitor for non-medical reasons. However, in the event that the risks described by Dr. Cohen did come to fruition, the physician and patient would use "shared decision making" to decide upon the most acceptable strategy for the patient—which could involve the doctor submitting an appeal on the patient's behalf.

28. In Paragraph 19 of the Cohen Declaration, Dr. Cohen states that he has reviewed evidence indicating that Payer Matrix takes a "financial" rather than a clinical approach to conversion efforts. In my experience, it is not unusual for an insurer or third-party payer (or their representative) to look at prescription drug coverage from a financial perspective, as they are the party that is responsible for the high costs of the specialty medications if coverage is provided. On the other hand, it is the role of the doctor to manage the patient's clinical care. And, given the "overrides" that AbbVie claims Payer Matrix facilitates when doctors, exercising their clinical expertise, do not feel that switching to a covered drug is appropriate for the patient, it appears that the patients' clinical care is being appropriately managed by their doctors. While Dr. Cohen states that actions of Payer Matrix constitute "unethical interference" in doctor-patient relationships, Dr. Cohen ignores the reality that changes to specialty drug coverage and the need to explore switching to lower cost alternatives is commonplace given the extremely high cost of the specialty medications. And, again, no third-party has the power to force a doctor to make a prescribing decision with which they do not agree.

29. In Paragraphs 22-26 of the Cohen Declaration, Dr. Cohen discusses a number of "one-page info flyers." My understanding is that these "one-page info flyers" were never distributed. I was not asked to opine on the flyers for purposes of this declaration. I reserve the right to do so in the future if asked.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of December, 2024, at Boston, Massachusetts.

*Dr. Elena Massarotti*
Elena M. Massarotti, M.D.