## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ABBVIE INC.,

     Plaintiff,

v.

PAYER MATRIX, LLC,

     Defendant.

Case No. 23 CV 2836

Judge Georgia N. Alexakis

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff AbbVie, Inc. is a large pharmaceutical company that develops and sells the specialty drugs Humira, Skyrizi, and Rinvoq. AbbVie operates charitable programs to help patients afford the cost of its specialty drugs, including the Patient Assistance Program ("PAP") and Co-Pay Assistance Program ("CAP"). Defendant Payer Matrix, LLC is an alternative funding provider that works with self-funded health plans to lower their specialty drug costs. One way Payer Matrix achieves cost-savings for these plans is by helping the plans' members obtain specialty drugs via pharmaceutical companies' charitable programs, like AbbVie's PAP and CAP.

In January 2023, AbbVie began prohibiting individuals whose health plans are associated with alternative funding providers, including Payer Matrix, from applying to AbbVie's PAP for assistance. Despite this policy change, AbbVie contends that through at least December 2024, Payer Matrix continued to submit PAP and CAP applications in violation of federal and state laws.

AbbVie further contends that Payer Matrix has tortiously interfered with AbbVie's business relationships by attempting to convert patients to drugs sold by other pharmaceutical companies with charitable programs still accessible by Payer Matrix. Finally, AbbVie maintains that Payer Matrix makes false representations related to a program called RxFree4Me that helps patients procure AbbVie-branded specialty drugs from Canada, thereby damaging AbbVie's reputation and customer goodwill.

AbbVie has moved for a preliminary injunction to halt Payer Matrix's conduct in all these respects. [249]. The Court held a three-day evidentiary hearing on the motion in January 2025. [318]; [319]; [320]. For the reasons discussed below, AbbVie has failed to meet its burden of persuasion, and the Court denies its motion for injunctive relief.

## BACKGROUND

### A. AbbVie, Payer Matrix, and the Patient Assistance Program

AbbVie is a large pharmaceutical company headquartered in Illinois that develops the specialty drugs Humira, Skyrizi, and Rinvoq. [325] at 1 ¶ 1.[1] At the center of this dispute is AbbVie's PAP. The PAP provides AbbVie specialty drugs—including Humira, Skyrizi, and Rinvoq—to eligible patients at no cost. *Id.* at 1–2 ¶ 2. To qualify for the program, patients are required to be underinsured or uninsured,

---

[1] Following the evidentiary hearing, the parties filed proposed findings of fact and conclusions of law, [325], [329], [332], and the Court draws from those submissions throughout this opinion. Before citing to any particular finding of fact or conclusion of law, the Court reviewed the underlying material upon which a party relied (*e.g.*, exhibits, testimony, declarations, etc.) and independently confirmed its accuracy. The Court also independently reviewed other aspects of the record.

demonstrate qualifying financial need, reside in the United States, and have a prescription for an AbbVie drug from a licensed U.S. health care provider. *Id.*

Payer Matrix is an alternative funding provider ("AFP") whose clients are employer-sponsored health plans. *Id.* at 3 ¶ 11. Payer Matrix works with employers whose plans are self-funded, meaning that the employer itself (not a third-party insurer) pays the medical and pharmacy claims submitted by the plan's members and bears the risk of fluctuating costs. [329] ¶ 3.

Specialty drugs like Humira, Skyrizi, and Rinvoq tend to cost significantly more than traditional brand or generic medications. *Id.* ¶ 11. To avoid its clients bearing the full cost of these expensive drugs, Payer Matrix works to locate and obtain "alternative funding" for specialty-drug takers. [325] at 3 ¶ 11. The PAPs offered by pharmaceutical companies, including AbbVie, are one source of "alternative funding" that Payer Matrix uses to save its clients money. *Id.* at 4 ¶ 13.

Generally speaking, the process works as follows: Payer Matrix collaborates with its clients to exclude specialty drugs from their members' insurance coverage, if those drugs are not already excluded. *Id.* at 5–6 ¶ 17. The plan amends its summary plan description ("SPD") to indicate the exclusion. [329] ¶ 12. Payer Matrix's Reimbursement Care Coordinators ("RCCs") then assist plan members who take specialty drugs in applying for charitable programs, like AbbVie's PAP. [325] at 8 ¶ 25. In these applications, Payer Matrix represents that the members are responsible for 100% of their specialty drug costs, even though they are otherwise commercially insured. *Id.* at 8 ¶ 26.

If a pharmaceutical company accepts a member into its PAP, it supplies the specialty drugs at no cost to the plan or member. *Id.* at 1 ¶ 2. If the pharmaceutical company rejects a member's application, the plan usually provides an "override," meaning that the plan makes an exception to cover the specialty drug despite the drug being originally excluded from coverage. *Id.* at 7 ¶ 20. Although it is a common practice for a plan to issue overrides upon a PAP denial, some Payer Matrix clients do not allow overrides as a matter of policy. [329] ¶ 28. Payer Matrix maintains that it is the plan—not Payer Matrix—that ultimately decides whether it will provide an override after a PAP denial. *Id.* ¶ 105. (In the same vein, Payer Matrix maintains that the predicate decision to exclude a specialty drug from coverage is made by the plan, not Payer Matrix. *Id.* ¶ 8.)

In exchange for facilitating the members' acceptance into the PAP, Payer Matrix charges most clients a "cost-avoidance" fee, which is typically some percentage of what the plan would have paid had it covered the drug at full cost. [325] at 4 ¶ 14; *see also* [322] at 244:10–18.

Payer Matrix began facilitating its members' applications to AbbVie's PAP as early as 2018, and it submitted thousands of applications to the program between 2018 and 2022. [329] ¶¶ 49–50. During this period, Payer Matrix did not attempt to conceal its role in the application process. *Id.* ¶ 50. For example, it often named itself as a patient representative on PAP applications and openly communicated with AbbVie representatives via phone and email. *Id.*

4

**B. January 2023 Policy Changes to AbbVie's PAP**

AbbVie eventually retained the Hayden Consulting Group ("Hayden") to research the growing number of PAP applicants and the impact of AFPs such as Payer Matrix on the PAP program. [325] at 10–11 ¶¶ 37–38; [329] ¶ 56. In January 2022, Hayden recommended that AbbVie choose among three options to reduce the number of patients eligible for the PAP. DX5 at 35–36. AbbVie could: (1) change the PAP's financial eligibility requirements, (2) close the program to all commercially insured patients, or (3) deny coverage to applicants whose plans work with AFPs such as Payer Matrix. *Id.*

AbbVie chose option three. [329] ¶ 62. On January 2, 2023, it updated the PAP eligibility terms on its website to contain the following limitation:

> Patients with commercial insurance plans requiring them to apply to myAbbVie Assist as a condition of, requirement for, or prerequisite to coverage of relevant AbbVie products commonly know[n] as alternate funding programs, are not eligible for myAbbVie Assist.

PX146 at 2.

On January 30, 2023, AbbVie again updated its PAP eligibility terms, this time identifying Payer Matrix and other AFPs by name on the PAP application itself. The new terms read:

> Patients with insurance plans or employers participating in an alternate funding program (also sometimes referred to as patient advocacy programs, specialty networks, SHARx, Paydhealth, or Payer Matrix, among other names) requiring them to apply to a manufacturer's patient assistance program or otherwise pursue specialty drug prescription coverage through an alternate funding vendor as a condition of, requirement for, or prerequisite to coverage of relevant AbbVie products, or that otherwise denies, restricts, eliminates, delays, alters, or withholds any insurance benefits or coverage contingent upon

application to, or denial of eligibility for, specialty drug prescription coverage through the alternate funding program are not eligible for the myAbbVie Assist program. You agree to inform myAbbVie Assist if you are a member of such an insurance plan or if you are applying to myAbbVie Assist on behalf of a patient who is a member of such an insurance plan.

DX206 at 4.

In the period immediately following this change in policy, it is undisputed that Payer Matrix took certain steps to conceal its involvement in PAP applications to maximize the chances that its clients' members would continue to be accepted into the program. For example, in early January 2023, Jennifer Hoefner, who was then Payer Matrix's Vice President of Operations, sent an email telling RCCs that they could still submit PAP applications so long as they blocked the fax number linking the applications to Payer Matrix. PX199; [325] at 12 ¶ 44; *see also* [322] at 336:15–20. As another example, in March 2023, Hoefner encouraged Payer Matrix colleagues to ask the member or the member's health care provider to submit applications to AbbVie on their own (rather than via a Payer Matrix RCC). PX209; [325] at 12 ¶ 44; [322] at 337:23–338:1. The next month, Payer Matrix also submitted documentation to AbbVie using the fax machine of an affiliated pharmacy to avoid detection. [325] at 12 ¶ 44; *see also* [322] at 341:1–8.

The parties dispute whether Payer Matrix stopped submitting concealed PAP applications on behalf of its clients' members after May 2023. *Compare* [325] at 64 ¶ 76, *with* [329] ¶ 76. The Court more fully addresses this dispute in the analysis that follows.

### C. Drug-Switching Activities

In addition to the concealment efforts just discussed, Payer Matrix responded to the January 2023 PAP policy change by attempting to convert plan members to non-AbbVie alternatives so they could apply to those pharmaceutical companies' PAPs. PX31; *see also* [256] ¶ 20 & Ex. 11 (Hay Declaration and accompanying summary chart).

In one February 2023 email, Payer Matrix's Chief Business Officer, Michael Jordan, referred to these drug-switching efforts as part of a "high-powered offensive strategy" in the wake of AbbVie's policy change. PX30 at 1; *id.* at 3 (further stating that Payer Matrix would "[i]mmediately begin work with physician[s] through clinical outreach to determine if Humira script can be changed to a product that has available access options"). The next month, another Payer Matrix employee created a fax template to send to providers, which read:

> Patients [sic] HUMIRA no longer has coverage under the patient's plan benefits. We are also finding that assistance through the manufacture[r], ABBVIE, is no longer available for those with self-funded plans. Is there another alternative therapy you would like to try? Listed below are the medications/manufacturers that are on our formulary for Rheumatoid Arthritis, and [that] we work with regularly.

PX31.

During the January 2025 evidentiary hearing, Hoefner, who is now Payer Matrix's CEO, testified that Payer Matrix ceased drug-switching activities—what she referred to as "therapeutic conversion" and "therapeutic interchange"—when this suit was filed in May 2023. [325] at 29 ¶ 110; [322] at 226:2–10, 350:4–14. For its part, AbbVie maintains that it has identified "170 Payer Matrix patients who had been

7

taking an AbbVie medicine between November 2022 and June 2023 and were switched to an alternate medicine in 2023." [256] ¶ 20 & Ex. 11; *see also* [325] at 29 ¶ 110.

### D. AbbVie's Copay Assistance Program

In addition to the PAP, AbbVie operates a CAP. [325] at 3 ¶ 8. The CAP helps patients with commercial insurance pay certain out-of-pocket expenses like co-pays and annual deductibles, using a co-pay card that AbbVie loads with funds. *Id.*; [329] ¶ 91. Unlike the PAP, the CAP is available to patients regardless of their household income. [325] at 3 ¶ 8.

Like it did with AbbVie's PAP, Payer Matrix used AbbVie's CAP to save its members and their clients costs on specialty drugs. Payer Matrix used a special code—called "BRAFF"— that caused AbbVie's co-pay cards to pay out more than they otherwise would have by inflating patients' cost-share obligations to be 85%, even when the drugs were not covered at all by their plans. [322] at 409:15–410:11; *see also* PX74 ¶¶ 31–32 (Happe declaration). Payer Matrix called this "maximizing" the co-pay cards to exhaust all available funds from the program. [322] at 392:23–393:1; PX76 at 2. Payer Matrix used the CAP when a member was denied PAP funding or when a member needed to re-fill a specialty drug prescription while her PAP application was pending. [322] at 392:23–393:1.

At the hearing, Hoefner testified that Payer Matrix no longer provides services related to the CAP. *Id.* at 387:25–388:4. She also testified that the last time Payer

Matrix received a cost-avoidance fee from a plan sponsor related to its CAP-related services was June 2023. *Id.* at 414:16–22; [329] ¶ 94.

### E. RxFree4Me and International Drug Sourcing

In April 2024, Payer Matrix began to work with an international drug sourcing company called RxFree4Me. [325] at 18 ¶ 67; [329] ¶ 109. Although RxFree4Me is not itself a pharmacy, it works with Canadian pharmacies to source drugs to patients in the United States. [329] ¶¶ 110, 113. Payer Matrix facilitates the sourcing process by arranging for data-sharing between RxFree4Me and the patient's provider, but Payer Matrix does not itself arrange for international shipping and has no formal agreement with RxFree4Me. *Id.* ¶¶ 108, 111, 115–16.

The drugs sourced through RxFree4Me are indisputably AbbVie-brand drugs, and Hoefner testified that they are acquired from the same manufacturers as AbbVie drugs sold at U.S. pharmacies. [329] ¶ 121; [322] at 317:11–13. But because Canadian AbbVie medicines are intended for sale only in Canada, they have not been approved, nor are they regulated, by the U.S. Food and Drug Administration ("FDA"). [325] at 20 ¶ 74.

### F. Procedural History

On May 5, 2023, AbbVie filed suit against Payer Matrix, alleging violations of (1) the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.*, (2) the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 *et seq.*, and (3) tortious interference with business opportunity. [1]. The claims in AbbVie's original complaint primarily focused on Payer Matrix's conduct related to AbbVie's

PAP. *Id.* Later that month, AbbVie moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, seeking to enjoin Payer Matrix from, among other things, listing AbbVie drugs on its specialty drug list, submitting or causing the submission of patient applications to AbbVie's PAP, and being compensated for any services related to AbbVie's PAP. [21]. A hearing on AbbVie's motion for a preliminary injunction was scheduled to begin on January 18, 2024, following expedited discovery. [54], [130].

The month before the scheduled hearing, the district court previously assigned to this case *sua sponte* questioned whether it had subject matter jurisdiction. [154]. Because AbbVie had only brought state law causes of action, it needed to establish complete diversity of citizenship between the parties to obtain a federal forum. After AbbVie responded to the district court's inquiry with information about one of Payer Matrix's members that called diversity jurisdiction into question, [158] at 9, the January 2024 preliminary injunction hearing was stricken [162]. Then, in March 2024, AbbVie moved for leave to file an amended complaint to add federal claims and establish subject matter jurisdiction via 28 U.S.C. § 1331. [171]; [178].

While AbbVie's motion for leave to file an amended complaint was pending, the case was reassigned to this Court's docket. [215]. In September 2024, the Court granted AbbVie's motion for leave to file a first amended complaint. [229]. The amended complaint added four counts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, two counts under the Lanham Act, 15 U.S.C. § 1125(a)(1), and a common law fraud claim. *See generally* [233]. AbbVie also

10

added new factual allegations regarding Payer Matrix's involvement in AbbVie's CAP, in a drug-switching scheme, and the sourcing of specialty drugs from Canada through RxFree4Me. *Id.* ¶¶ 113–20, 466–73.

In October 2024, AbbVie filed a renewed motion for a preliminary injunction. [249]. AbbVie seeks a broad injunction against Payer Matrix, which would prohibit Payer Matrix from (1) using AbbVie's name, drugs, and their trademarks in its marketing materials, (2) representing that it works with AbbVie or has AbbVie's endorsement, (3) submitting applications, including through third parties, to AbbVie's PAP, (4) providing services related to AbbVie's CAP, (5) making false misrepresentations about AbbVie in its advertising and promotions, (6) suggesting that it is facilitating the importation of drugs that are the same as FDA-approved AbbVie drugs, and (7) otherwise facilitating the importation of AbbVie drugs from any foreign country.

The Court held an evidentiary hearing on the motion for a preliminary injunction on January 29, 30, and 31, 2025. [318]–[320]. As already referenced, Payer Matrix presented live testimony through its now-CEO, Hoefner. AbbVie presented live testimony through Anne Najjar, Vice President of AbbVie Endocrinology. In advance of the hearing, the parties submitted extensive supporting declarations and exhibits, although in resolving AbbVie's motion, the Court focuses primarily on the live testimony and other evidence presented during the hearing.

## LEGAL STANDARDS

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Seventh

Circuit applies a two-part test to determine whether a preliminary injunction is appropriate. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021). As a threshold matter, a party seeking a preliminary injunction must show they will face irreparable harm, that traditional legal remedies would be inadequate, and that the claim is likely to succeed on the merits. *Girl Scouts*, 549 F.3d at 1086. "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Id.* (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). But if the court finds that the moving party has passed this threshold phase, it proceeds to balance "the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* (citing *Abbott Labs*, 971 F.2d at 11–12).

To satisfy its burden on irreparable harm, AbbVie must show that it faces more than a mere "possibility" of irreparable harm. *See Winter*, 555 U.S. at 22. Instead, the "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)); *see also Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme

Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Although "the alleged harm need not be occurring or be certain to occur before a court may grant relief," a plaintiff must show a "presently existing actual threat." *Michigan*, 667 F.3d at 788.

The cessation of allegedly illegal conduct does not render a claim moot, but it "may affect the ability to obtain injunctive relief, as by impacting the ability to show substantial and irreparable injury." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999) (citing *United States v. W.T. Grant*, 345 U.S. 629, 632–33 (1953)). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* (quoting *W.T. Grant*, 345 U.S. at 633).

## DISCUSSION

AbbVie groups Payer Matrix's allegedly wrongful conduct into four categories: activities related to the PAP, activities related to the CAP, drug-switching activities, and activities related to the sourcing of international drugs. *See* [251] at 5–12. Each

of the legal claims AbbVie uses to support its motion for a preliminary injunction is rooted in at least one of these four activities.[2]

Because AbbVie's motion for a preliminary injunction can be almost entirely resolved based solely on its failure to persuasively establish irreparable harm, the Court has organized its analysis by category of allegedly unlawful activity, examining whether, based on the evidence presented, each type of activity is ongoing or presents a threat of future harm to the degree required to warrant injunctive relief. The primary exception to this approach concerns AbbVie's allegations relating to Payer Matrix's participation in the sourcing of international drugs. There, the Court also addresses the likelihood that AbbVie would succeed on the merits of the legal claims associated with that category of activity.

## A. PAP Activities and Irreparable Harm

As noted earlier, there is no dispute that Payer Matrix continued to submit applications to AbbVie's PAP after the January 2023 change in AbbVie policy. But the parties vigorously contest how long after January 2023 Payer Matrix continued to submit applications to AbbVie's PAP, whether any such activity remains ongoing,

---

[2] AbbVie's ICFA and common law fraud claims are based on Payer Matrix's PAP and CAP activities. [325] at 58–62 ¶¶ 60–70. AbbVie's Lanham Act false advertising claim is based on Payer Matrix's statements related to international drug sourcing; representations made on Payer Matrix's website and in plan sponsor presentations related to its PAP and CAP services; and statements related to Payer Matrix's drug-switching activities. *Id.* at 44–52 ¶¶ 8–35. AbbVie's Lanham Act false association claim is based on representations made in plan sponsor presentations related to Payer Matrix's PAP and CAP services. *Id.* at 53 ¶ 38. AbbVie's IDTPA claim is based on the same conduct as the Lanham Act violations, plus conduct related to the international drug sourcing. *Id.* at 54–55 ¶¶ 44–45. Finally, AbbVie's tortious interference claim is based on Payer Matrix's drug-switching and international drug sourcing activities. *Id.* at 57–58 ¶¶ 52–53.

and, even assuming Payer Matrix's PAP-related activities have ceased, whether any prospect of recurrence warrants injunctive relief.

AbbVie maintains the practice is ongoing but that Payer Matrix has largely managed to evade detection through improved concealment methods. *E.g.*, [321] at 6:22–7:1. In support, AbbVie's Najjar testified that AbbVie's PAP team identifies and rejects about 10 applications per month submitted by patients whose plans work with Payer Matrix. *Id.* at 74:7–15. AbbVie also produced a spreadsheet of 126 PAP applications submitted between July 2023 and December 2024 by patients whose plans work with Payer Matrix. *See* PX54; [325] at 35 ¶ 133. In addition, AbbVie has pointed to a November 2023 application that identifies a Payer Matrix RCC, Shelly Powell, as the applicant's "employer liaison." PX56; [325] at 39 ¶ 147.

After considering this evidence (as well as other evidence it turns to further below), the Court is not persuaded that AbbVie has clearly shown that Payer Matrix's activities in connection with AbbVie's PAP are ongoing or that Payer Matrix has engaged in any PAP-related activities since May 2023. The Court is therefore not persuaded that injunctive relief is warranted. Most significantly, although AbbVie has produced evidence that some Payer Matrix-affiliated patients are still applying to AbbVie's PAP, it has provided little to no evidence that Payer Matrix *itself* played a role in submitting these applications. Of the 126 applications AbbVie has highlighted in support of its request for a preliminary injunction, AbbVie's notes on the applications (and corresponding witness testimony) indicate that they were flagged by AbbVie as connected to Payer Matrix because: (1) the applicant used some

15

AFP, (2) the applicant had used Payer Matrix in a prior application, or (3) the pharmacy benefit manager, plan, or pharmacy associated with the application worked with or had vaguely defined "ties" to Payer Matrix.[3] [329] ¶ 87; PX54; [321] at 174:23–187:5. None of this information indicates, however, that Payer Matrix actively assisted these patients in submitting their PAP applications to AbbVie or that Payer Matrix even knew the applications were being submitted. [321] at 174:23–187:5. In addition, Najjar testified that AbbVie receives more than 200,000 PAP applications per year. *Id.* at 174:16–18; [329] ¶ 131. Of the 126 applications to which AbbVie points, only 67 were submitted in 2024. PX54; *see also* [321] at 174:19–22; [329] ¶ 132. This miniscule number of applications, coupled with their tenuous connections to Payer Matrix, falls short of clearly showing that irreparable injury is likely in the absence of an injunction barring Payer Matrix from submitting applications to AbbVie's PAP. *See Winter*, 555 U.S. at 22.

In denying AbbVie relief, the Court also relies on substantial evidence from Payer Matrix that undercuts AbbVie's theory of ongoing activity and irreparable harm. After AbbVie produced its list of 126 PAP applications connected to Payer Matrix, Payer Matrix's Hoefner reviewed its communications related to the individuals for whom those applications were submitted and concluded that Payer

---

[3] For instance, AbbVie points to a May 2024 PAP application in which the applicant submitted an SPD revealing that Payer Matrix worked with the member's plan. [321] at 93:5–94:4.

Matrix was not involved in any of them.[4] [329] ¶ 84; [273-19]. Hoefner testified to that effect at the hearing and further testified that the last time her company assisted with, or submitted an application to, AbbVie's PAP was in May 2023. [322] at 270:9, 286:22–288:6. Payer Matrix took additional steps in mid-2023 to ensure its RCCs did not engage with AbbVie's PAP. For example, Hoefner testified that, as of July 2023, Payer Matrix removed all AbbVie specialty drugs from its drug list. [322] at 288:25–289:1. She further said that, as of September 2023, the company worked with its IT team to disable RCCs' ability to create AbbVie PAP applications within Payer Matrix's systems. *Id.* at 289:4–7. The Court also heard from Hoefner that as of July 2023, plans and pharmacy benefit managers no longer refer their members to Payer Matrix for assistance with AbbVie's PAP, *see* [329] ¶ 78, and that since July 2023, Payer Matrix has not collected cost-avoidance fees for any newly submitted PAP applications to AbbVie, *id.* ¶ 79.

Hoefner's testimony in these respects is credible. It is consistent with the lack of affirmative evidence persuasively showing that Payer Matrix has helped submit PAP applications since May 2023. As Hoefner testified, nothing can stop providers and patients affiliated with Payer Matrix from submitting the publicly available applications on their own, without Payer Matrix's involvement. [322] at 389:8–

---

[4] Before the hearing, AbbVie sought to exclude Hoefner's testimony that Payer Matrix was not involved in these 126 applications because Payer Matrix produced only some of the call and text message summaries upon which Hoefner relied to reach that conclusion. [288]; [273-19]. For the reasons it set forth when denying AbbVie's motion, [317], the Court permitted Hoefner to testify about the 126 applications (and be extensively cross-examined on the topic, *see* [322] at 354:9–366:6), without requiring the additional production of documents before the hearing. If new evidence comes to light during general discovery that casts doubt on Hoefner's sworn testimony, the Court can revisit the issue.

390:11, 421:17–24. AbbVie even advertises its cost-savings programs broadly to the public, including at the end of Super Bowl commercials for Skyrizi and Rinvoq. *Id.* at 414:11–15. The type of wholesale institutional efforts Hoefner described—*e.g.*, Payer Matrix's decisions to remove all AbbVie specialty drugs from its drug list and disable its RCCs' ability to even create AbbVie PAP applications—persuade the Court that what AbbVie's PAP team is continuing to encounter, per Najjar, are independent submissions from individuals loosely affiliated with Payer Matrix rather than a coordinated, ongoing, undercover effort by Payer Matrix to circumvent AbbVie policy.

With respect to the application listing RCC Powell's name, Payer Matrix has offered a plausible explanation: The member who submitted the application simply copied Powell's name from a previous application that Powell had helped the member submit to a different manufacturer's PAP. [329] ¶ 85; [322] at 367:24–368:6. The Court finds this explanation credible for two reasons. First, the evidence shows that the member's plan already covered the AbbVie drug for which the member was seeking PAP coverage, so Powell would have had no reason to submit a PAP application to AbbVie. [329] ¶ 86; [322] at 295:19–21. Second, the member had worked with Payer Matrix (and Powell in particular) for several years before submitting this application, so it is quite believable that the member would have listed Powell's name out of habit based on this preexisting relationship. [329] ¶ 85.

To be sure, AbbVie has also produced evidence that, on five occasions over an 11-month period (from October 2023 to September 2024), Payer Matrix RCCs informed specialty-drug patients and/or their health care providers that they could

submit a PAP application on their own via AbbVie's website or through their provider, thereby effectively encouraging Payer Matrix members to try and circumvent AbbVie's PAP policy. *See* [325] at 35 ¶ 134. And then, even more recently, in December 2024, a Payer Matrix RCC provided a doctor with a benefits clarification letter to submit with a PAP application after the RCC was "hounded with phone calls from [the] provider." [322] at 345:2–21; *see also* [325] at 36 ¶ 138. At the hearing, Hoefner acknowledged these occurrences, *see* [322] at 345:2–21, 346:4–16, but also testified that it is against Payer Matrix policy for RCCs to direct patients to apply on their own and that she has personally given RCCs a directive not to do so, *id.* at 348:11–21.

After considering the sum of these piecemeal occurrences, the Court still is not persuaded that AbbVie has met its burden to show it faces more than a "possibility of irreparable harm" in the absence of a preliminary injunction. *See Winter*, 555 U.S. at 22. Put another way: Based on this handful of occasions—and weighed against Hoefner's testimony, including about the institutional changes Payer Matrix made in 2023—the Court cannot conclude that any harm to AbbVie is sufficiently pervasive or irreparable to warrant the "extraordinary remedy" of a preliminary injunction. *Id.* This is particularly true where AbbVie has proven capable of detecting members whose plans are associated with AFPs, such as Payer Matrix, and denying those members PAP benefits. *See generally* PX54. Although AbbVie has suggested that it should not have to spend its energy and resources trying to uncover Payer Matrix-related PAP applications, *see, e.g.*, [321] at 39:7–20, 171:2–16, detecting fraud is a

common cost of doing business. Even if these costs were compensable, such "increases in the cost of doing business generally do not constitute irreparable harm because a party can be compensated for such losses or increases at a later date." *Limacher v. Hurd*, No. 02CV477MCALCSACE, 2002 WL 35649841, at *6 (D.N.M. July 31, 2002); *see also WCG Clinical, Inc. v. Sitero, LLC*, No. 1:24-CV-01080-JRS-MKK, 2025 WL 107662, at *7 (S.D. Ind. Jan. 15, 2025) (ordinary cost of doing business did not constitute irreparable harm). The Court also anticipates that AbbVie would continue to incur these detection-related costs even if a preliminary injunction were entered, as AbbVie would almost certainly make the effort to monitor Payer Matrix's compliance. Emergency relief, in other words, would not spare AbbVie from incurring expenses related to fraud-detection.

Because AbbVie has failed to establish that Payer Matrix's allegedly unlawful PAP activities are ongoing, AbbVie must show some "presently existing actual threat" that the conduct will recur. *Michigan*, 667 F.3d at 788; *see also Catenacci v. Lightfoot*, No. 21 C 2852, 2021 WL 7708962, at *2 (N.D. Ill. June 18, 2021) ("Solely 'past conduct' … is no basis for a preliminary injunction. After all, in such cases, there is no conduct to be enjoined.") (internal citations omitted). Here, the Court is not persuaded that

there is an actual threat that Payer Matrix will resume its conduct, even considering its concealment efforts in the first half of 2023.[5]

First, although Payer Matrix has never admitted its conduct through May 2023 was illegal, it has been upfront about its business model and the way in which that model relies on the charitable programs of pharmaceutical manufacturers like AbbVie. *See generally* DX38 (Hoefner declaration). Likewise, during the hearing, Hoefner did not deny Payer Matrix's attempts to conceal its continued involvement for several months after the January 2023 policy change (although she did say Payer Matrix was confused about the policy and argued that its intentions were pure in trying to help members access needed drugs). *See, e.g.*, [322] at 336:1–20; 337:23– 338:6; 341:6–8; 341:13–22. This degree of candor does not readily permit an extrapolation that Payer Matrix will resume covert applications to AbbVie's PAP.

In addition, as discussed, Hoefner repeatedly testified under oath that Payer Matrix's PAP-related practices with respect to AbbVie ended as of May 2023, that corporate policy is that Payer Matrix's RCCs are not to assist members with PAP applications, that Payer Matrix's IT team has now made it impossible for an RCC to

---

[5] AbbVie cites to a set of five factors the Seventh Circuit used in *United States v. Benson*, 561 F.3d 718, 724 (7th Cir. 2009), to determine whether an injunction was appropriate to prevent ceased conduct from recurring. [325] at 65 ¶ 80. *Benson*, however, concerned whether the district court had statutory authority to enter an injunction for a violation of 26 U.S.C. § 6700 for promoting an abusive tax shelter. 561 F.3d at 721. As far as the Court can tell, these factors are not traditionally used to determine whether a party is likely to face irreparable harm for an injunction granted pursuant to Rule 65. AbbVie also asks the Court to consider whether Payer Matrix "ceased the challenged conduct for reasons unrelated to the litigation." [325] at 65 ¶ 80 (citing *E.E.O.C. v. Flambeau, Inc.*, 846 F.3d 941, 949 (7th Cir. 2017)). The Court does incorporate this factor in its analysis and recognizes that it weighs in AbbVie's favor.

create an AbbVie PAP application in their system, and that Payer Matrix has collected no cost avoidance fees for any newly submitted PAP applications to AbbVie since July 2023. [322] at 252:3–7; 270:9; 274:18–21; 278:1–5, 289:4–7, 305:1–5. For the reasons it has already given, the Court again credits this testimony from Hoefner, which undermines AbbVie's argument that Payer Matrix will resume its PAP-related activities.

AbbVie also argues that "Payer Matrix's customary business activities involve frequent interaction with AbbVie patients and create a strong threat of future misconduct." [325] at 67 ¶ 85. The Court disagrees that the very nature of Payer Matrix's business model creates a threat of recurring harm, evidence of cessation notwithstanding. Payer Matrix's business is not totally dependent on AbbVie's PAP. Indeed, AbbVie is only one of several drug manufacturers with charitable programs, and Payer Matrix "encourages all underinsured Members to apply for *any available* PAPs." DX38 ¶ 28 (emphasis added); [322] at 413:2–12. Hoefner's declaration also describes that Payer Matrix seeks funding from other sources in addition to PAPs. DX38 ¶ 10. And as described below, Payer Matrix now relies on international drug sourcing to find cost-savings for clients. [329] ¶ 109.

Lastly, AbbVie points out that once a court finds that a plaintiff is likely to succeed on the merits of a Lanham Act claim, a plaintiff benefits from a rebuttable presumption of irreparable harm. *See* 15 U.S.C. § 1116(a). That is, a court "assumes irreparable harm, even if the plaintiff has proffered nothing in support." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022); *see also Eli Lilly & Co. v.*

22

*Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000). Here, even assuming AbbVie could earn the presumption of irreparable harm by establishing a likelihood of success on the merits of its Lanham Act claims, Payer Matrix has rebutted that presumption by producing credible evidence that its PAP activities have ceased and are unlikely to recur.

Because AbbVie has presented insufficient evidence that Payer Matrix's PAP activities are ongoing or likely to recur, AbbVie has not met its burden to show it will be irreparably harmed in the absence of a preliminary injunction. Therefore, to the extent AbbVie's motion for injunctive relief relies on PAP activities, the motion is denied.

### B. CAP Activities and Irreparable Harm

AbbVie next claims that Payer Matrix still relies on AbbVie's CAP to help fund its members' specialty drugs. However, as with the PAP-related category of activity, AbbVie has provided insufficient evidence that Payer Matrix's CAP activities are ongoing or that there is a threat of recurrence.

The sole piece of evidence AbbVie points to is a May 2024 census report from one Payer Matrix client suggesting that a single patient was approved for CAP funds for a Skyrizi Pen. *See* PX179 at 22. When confronted with this evidence at the hearing, Hoefner said she did not "know the circumstances around [the] particular member" and speculated that the member "may have already had [a co-pay card]." [322] at 390:23–25. Hoefner otherwise testified on several occasions that Payer Matrix is no longer providing any services related to AbbVie's CAP. *Id.* at 387:25–

23

388:14. She further stated that the last time Payer Matrix received cost-avoidance fees related to its CAP activities was June 2023. *Id.* at 414:23–415:1. The Court finds this testimony credible, especially given the dearth of other incriminating evidence that the CAP activities are ongoing. AbbVie has not made a clear showing of irreparable harm based on one isolated instance—over a nearly 20-month period[6]— of a Skyrizi patient potentially receiving CAP funds.

For the same reasons just discussed in the context of PAP activities, the Court is also not persuaded that a threat of recurrence exists in connection with the CAP activities. Finally, as with the PAP activities, Payer Matrix has rebutted any presumption of irreparable harm stemming from its CAP-related representations that AbbVie might enjoy courtesy of the Lanham Act. As a result, to the extent AbbVie's motion for injunctive relief relies on CAP activities, the motion is denied.

### C. Drug-Switching Activities and Irreparable Harm

Hoefner testified that Payer Matrix's practice of therapeutic conversion ended when this lawsuit was filed in May 2023, *see* [322] at 350:4–14, and AbbVie has offered no evidence that persuasively rebuts this assertion or that supports a finding that Payer Matrix will resume its allegedly unlawful drug-switching activities. AbbVie only points to evidence indicating that some patients were switched from AbbVie medicines to non-AbbVie medicines in June 2023, even though Payer Matrix insists the practice ended the month before. *See* [256] Ex. 11. Without more, the Court does not view this one-month discrepancy as persuasive evidence that the drug-

---

[6] The Court calculates 20 months from May 2023 (when AbbVie filed its original complaint) through January 2025 (when the preliminary injunction hearing took place).

switching activities are occurring now, more than 20 months later, or that they are likely to recur.

Payer Matrix does admit that it tells health care providers about Humira biosimilars that are available "at a fraction" of Humira's cost.[7] [329] ¶¶ 100, 104. Even so, Payer Matrix maintains it is the health care provider's "clinical decision whether or not to prescribe a different medication to their patient." *Id.* at ¶ 103; *see also* DX32 ¶ 20. In any case, a tortious interference claim based on the conversion of members to Humira biosimilars is unlikely to succeed on the merits. To succeed on a tortious interference claim, AbbVie must show it had a "reasonable expectation of entering into a valid business relationship" with those patients who switched away from Humira. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998). Yet AbbVie cannot reasonably expect members to remain on Humira when a biosimilar is available at a much lower price. *See* DX34 ¶ 26 (Payer Matrix expert Vincent Jackson declaring that biosimilar substitution "is both common and essential for cost management and patient care optimization").

As a result, to the extent AbbVie's request for injunctive relief is based on Payer Matrix's drug-switching activities, AbbVie's request is denied.

---

[7] "Biosimilar" refers to a biologic product that is "highly similar to, and has no clinically meaningful difference from, an existing FDA approved biologic," DX32 at 7, whereas "therapy" refers to a different medicine altogether, [325] at 29 ¶ 110. Although many biosimilars are available for Humira, [329] ¶ 100, there is no biosimilar available for Rinvoq or Skyrizi, [325] at 29 ¶ 110.

### D. International Drug Sourcing

For the final category of conduct—Payer Matrix's allegedly unlawful international drug sourcing activities—the Court assesses both whether AbbVie is likely to succeed on the merits of its legal claims and whether AbbVie is likely to experience irreparable harm as a result of Payer Matrix's conduct. The two inquiries are inextricably intertwined: To show that it will experience irreparable harm in the absence of an injunction ordering Payer Matrix to cease sourcing drugs from international outlets, AbbVie first must show that statements concerning those sourcing efforts and supporting its Lanham Act claims are "materially false or misleading." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018). To state a claim under the IDTPA, AbbVie likewise must show that Payer Matrix's statements concerning sourcing "create[] a likelihood of confusion or misunderstanding" and that Payer Matrix is "likely to be damaged" as a result. *See* 815 ILCS 510/2–3. AbbVie's tortious interference claim is similarly premised on Payer Matrix's alleged false and misleading marketing. [233] ¶ 581. Therefore, in examining this category of conduct, the Court first discusses whether AbbVie is likely to succeed on the merits of its claims before turning to irreparable harm.

### 1. Likelihood of Success on the Merits

Three of AbbVie's claims are at least partially based on its allegations concerning Payer Matrix's sourcing of international drugs via RxFree4Me: (1) its Lanham Act false representation claim, (2) its IDTPA claim, and (3) its tortious interference claim. The Court addresses each in turn.

### a. Lanham Act False Advertising

To prevail on a Lanham Act false advertising claim, a plaintiff must establish that "(1) the defendant made a material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement." *Eli Lilly*, 893 F.3d at 381–82 (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999)). A plaintiff may satisfy the first element by presenting either a literally false statement or a statement that is "literally true but misleading." *Id.* For the latter, "the plaintiff ordinarily must produce evidence of actual consumer confusion," but "hard evidence of actual consumer confusion" is not required at the preliminary injunction stage. *Id.*

In support of its Lanham Act claim, AbbVie challenges two Payer Matrix statements related to drug sourcing. First, it points to a line in a Medication Management Proposal slide sent to one of Payer Matrix's clients. PX85 at 2. Under "Sourcing Methods Summary," the slide reads: "International Sourcing - legitimate and valid sources." *Id.*

One problem for AbbVie, though, is that this statement is not in a "commercial advertisement"; instead, it appears in a proposal personalized for a single potential client. The circumstances here are thus far different from the circumstances at issue in *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 522 (7th Cir. 2012), where the defendant presented negative promotional materials to most of a niche industry's customers during a road show. In addition, each slide of the proposal says "Proprietary and

Confidential" in the footer—the opposite of what one would expect to see in a commercial advertisement directed at the purchasing public. *See Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.*, No. 21 C 3522, 2022 WL 683690, at *7 (N.D. Ill. Mar. 8, 2022) (commercial advertising must be "sufficiently disseminated to the relevant purchasing public").

A second problem is that AbbVie has not shown the statement is literally false or likely to be misleading. AbbVie says the statement is literally false because the imported drugs are not FDA-approved and their importation violates the Food, Drug, and Cosmetics Act ("FDCA"). [325] at 45 ¶¶ 9–10. But generic words such as "legitimate" and "valid" cannot reasonably be construed as synonymous with "FDA-approved" or "FDCA-compliant." Nor is the use of those words so "bald-faced, egregious, undeniable, [and] over the top" to be considered literally false under the Lanham Act. *See Eli Lilly*, 893 F.3d at 382.

The second statement AbbVie relies on comes from a slide titled "About RxFree4Me," which says that "[m]embers receive their same brand medications." JX13 at 2. AbbVie has not identified the source of this slide or to whom it was disseminated. *See* [321] at 191:21–192:16 (Najjar testifying that she does not know where the slide came from, who it was given to, or where it was presented). Without such information, the Court declines to find that the statement was, in fact, made in a commercial advertisement.

Even if it were commercial in nature, the statement that members receive the "same brand medications" is not literally false or likely to mislead. It is undisputed

that members using RxFree4Me received AbbVie-branded medications from Canada. *See* PX130 ¶ 25 (AbbVie's Anne Robinson, who serves as the company's vice president of immunology global regulatory strategy, declaring that "Canadian-Approved AbbVie Medicines have the same brand names as U.S. AbbVie"); [321] at 191:1–8 (Najjar testifying that Canada sells drugs with "the AbbVie brand on them"). The Court is unconvinced that a reasonable person would understand "same *brand*" to mean "same regulatory approval process." To the extent AbbVie's Lanham Act claim in connection with international drug sourcing activities again relies on the fact that the internationally sourced drugs are not FDA-approved, the Court has not been presented with evidence that Payer Matrix makes this representation. Rather, Payer Matrix does not hide that these drugs are sourced from Canadian pharmacies. For example, the line just below the "same brand" statement says that the drugs are sourced "from 23 *Canadian* pharmacies." JX13 at 2 (emphasis added).

In sum, AbbVie has not pointed to a Payer Matrix statement that is both commercial and literally false or misleading. To the extent its motion for injunctive relief relies on statements Payer Matrix made related to international drug sourcing, AbbVie is unlikely to succeed on the merits.

### b. Tortious Interference

To prevail on a tortious interference claim, a plaintiff must prove: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a

valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Dowd*, 181 Ill. 2d at 484.

The Court sees at least two problems with AbbVie's tortious interference claim as it relates to international drug sourcing. First, AbbVie's complaint alleges that Payer Matrix interferes with its business relationships "by *falsely and misleadingly marketing* new, unapproved versions of purported AbbVie medicines that are illegally imported from outside the United States as being the same as FDA-approved versions of AbbVie's medicines." [233] ¶ 581 (emphasis added). But, for the reasons just discussed, AbbVie has not met its burden of clearly showing that the statements Payer Matrix made with respect to international drug sourcing were false or misleading. In context, it should be obvious to Payer Matrix's members that the imported drugs do not undergo U.S. regulatory processes because they are sourced from Canadian pharmacies.

Second, even if the statements were misleading, AbbVie has not met its burden that it had a reasonable expectation of continued business with the Payer Matrix members who have received drugs through RxFree4Me. In particular, AbbVie has not alleged, let alone shown, that if these members were not sourcing their drugs through RxFree4Me, their plans would have covered AbbVie drugs sourced in the United States at full (or higher) cost.

For these reasons, AbbVie is not likely to succeed on the merits of its tortious interference claim to the extent it relies on Payer Matrix's facilitation of imported drugs from Canada.

### c. IDTPA

To prevail on an IDTPA claim, AbbVie must show (1) Payer Matrix engaged in deceptive conduct as defined by the statute; (2) the conduct "creates a likelihood of confusion or misunderstanding"; and (3) the conduct occurred primarily and substantially in Illinois. 815 ILCS 510/2. To qualify for injunctive relief under the IDTPA, AbbVie must also show it was "likely to be damaged" by such false statements or misrepresentations. 815 ILCS 510/3.

To support its IDTPA claim, AbbVie relies, in part, on the same two statements it pointed to in connection with its Lanham Act false advertising claim. *See* [325] at 54–55 ¶ 44. For the reasons already discussed, these statements are not false or likely to mislead. And, because they are not false or misleading, AbbVie cannot show it is "likely to be damaged" by the statements, as required under the statute. 815 ILCS 510/3.

AbbVie otherwise relies on two additional statements related to drug sourcing to support its IDTPA claim. [325] at 55 ¶ 45. First, it points to a statement Payer Matrix makes in its RxFree4Me patient authorization forms that refers to the source of international drugs as "authorized pharmacies and/or government approved dispensaries located in Canada." *Id.* at 55 ¶ 47; PX132 at 1. This statement makes clear that the drugs are sourced from Canadian pharmacies. Thus, a reasonable consumer would assume that the statement refers to the fact that the pharmacies and dispensaries are authorized and approved for sale by the Canadian government. AbbVie faces a very low risk of reputational harm from this statement.

31

Second, AbbVie points to a fax template Payer Matrix sends to providers asking them to send the member's prescription information to RxFree4Me. [325] at 55 ¶ 46; PX22. The template says in small font that RxFree4Me is an "international pharmacy." PX22 at 1. All parties agree that RxFree4Me is not technically an "international pharmacy." [322] at 398:3–10; [325] ¶ 93. Viewed in context, however, this statement is not likely to create confusion. Just below the statement that RxFree4Me is an "international pharmacy," the template instructs the doctor to send the information to "Lenox Community Pharmacy" in Lenox, Michigan. PX22 at 1. In addition, the patient authorization form (which is included with the fax) says that the form governs all sales of products from "*RxFree4Me's authorized pharmacies* and/or government approved dispensaries located in Canada." *Id.* at 2 (emphasis added). Based on these additional statements, a provider receiving the fax form would reasonably conclude that RxFree4Me is not itself a pharmacy. In any case, besides the reputational concerns it has related to importation more broadly, AbbVie has not explained how the specific representation that RxFree4Me is an "international pharmacy" stands to hurt AbbVie. For example, it has not explained why it matters whether RxFree4Me or some other entity is the "international pharmacy" sourcing the specialty drugs. The fax template cannot support AbbVie's IDTPA claim.

In sum, AbbVie has not identified a deceptive practice likely to confuse or mislead that would support a likelihood of success on its IDTPA claim as it relates to Payer Matrix's international drug sourcing conduct.

### 2. Irreparable Harm

Because AbbVie has not shown a likelihood of success on the merits of its Lanham Act claim based on the alleged drug sourcing activities, there is no presumption of irreparable harm in favor of AbbVie. *See Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp. 3d 619, 624 (N.D. Ill. 2021). And in any event, the Court concludes that there has been no showing of irreparable harm in connection with the international drug sourcing at all.

Here, AbbVie bases its irreparable harm argument on the potential reputational harm AbbVie could experience related to the international sourcing program as a whole. For example, Najjar testified as to concerns with counterfeit products and the potential harm if AbbVie's medicines are not kept at the proper temperature during shipment. [325] at 22 ¶ 83; *see also* [321] at 59:25–61:7. However, even accepting that these concerns are legitimate, the irreparable harm supporting a preliminary injunction must be tied to the allegedly unlawful conduct asserted in the complaint. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1094 (7th Cir. 1988) ("[T]he scope of injunctive relief must not exceed the extent of the plaintiff's protectible rights."). Here, although AbbVie asserts that the scheme violates the FDCA, *see* [233] ¶ 747–81, AbbVie does not (and cannot) challenge the existence of the international sourcing scheme as a whole. *See Benson v. Fannie May*

*Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (the "FDCA does not create a private right of action").[8]

In the drug sourcing context, this means that AbbVie's irreparable harm must stem from the allegedly false or misleading statements Payer Matrix has made with respect to the international sourcing program. But besides its broader reputational concerns about patient safety, AbbVie does not explain how it will be irreparably harmed by these particular statements. In any case, the Court sees irreparable harm as unlikely given its earlier findings that the challenged statements are not false or likely to mislead members of the public.

In sum, AbbVie has not established irreparable harm from Payer Matrix's statements related to the international drug sourcing program. As discussed throughout the analysis above, none of the statements AbbVie relies on is false or likely to mislead. Without such a showing, AbbVie cannot show it will be irreparably harmed in the absence of a preliminary injunction.

\* \* \*

Although the Court primarily bases its decision in the analysis set forth above, it makes two final observations. First, "[t]iming bears heavily upon the irreparable harm analysis," and "a significant delay in filing a motion for preliminary injunction

---

[8] In a similar vein, even if the Court were to enter a preliminary injunction based on Payer Matrix's international sourcing program, the injunction would be limited in scope to address only the allegedly illegal conduct that forms the basis of AbbVie's legal claims. Here, that means the injunction would enjoin only the alleged misrepresentations underlying AbbVie's Lanham Act, IDTPA, and tortious interference claims. It would not, as AbbVie suggests in its proposed preliminary injunction order, result in halting Payer Matrix's involvement with international drug sourcing altogether.

undermines the moving party's argument that it will suffer irreparable harm without an injunction." *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at \*9 (N.D. Ill. Oct. 25, 2018) (citing *Traffic Tech Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at \*17 (N.D. Ill. Dec. 18, 2015)). It has been over three years since Hayden recommended barring AFPs from applying to AbbVie's PAP and nearly two years since AbbVie filed this lawsuit. That so much time has already passed suggests that AbbVie and its PAP can endure whatever additional time it takes to see this litigation through.

Second, the Court acknowledges AbbVie's position that, absent judicial intervention, Payer Matrix simply will not stop unlawfully interfering with AbbVie's business in some form or another—indeed, that Payer Matrix's very business model depends on it successfully skirting the law. *See, e.g.*, [321] at 6:1–8:1 (arguing that "Payer Matrix will not stop" and that "AbbVie is always one step behind"); [323] at 429:17–25 ("Payer Matrix has shown in multiple ways for years … that it cannot be trusted to refrain from conduct that harms AbbVie"); *id.* at 519:10–12 (arguing that "Payer Matrix [is] continuing to do more and AbbVie [is] always playing catch-up"). At the end of the day, however, AbbVie has not met its burden to show that any one of Payer Matrix's activities is ongoing and likely unlawful, let alone that Payer Matrix has engaged in a more systematic effort to hurt AbbVie. Ultimately, "such speculation does not rise to the level of irreparable harm that would justify the intervention of a federal court." *Stroman Realty, Inc. v. Martinez*, 505 F.3d 658, 664 (7th Cir. 2007).

## CONCLUSION

For the reasons set forth above, AbbVie's motion for a preliminary injunction is denied.

_____
Georgia N. Alexakis
United States District Judge

Date: 4/14/25