## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AᴮʙVɪᴇ Iɴᴄ.,

     Plaintiff,

     v.

Pᴀʏᴇʀ Mᴀᴛʀɪx, LLC,

     Defendant.

Case No. 23 CV 2836

Judge Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

Plaintiff AbbVie, Inc. is a large pharmaceutical company that develops and sells the specialty drugs Humira, Skyrizi, and Rinvoq. Defendant Payer Matrix, LLC is an alternative funding provider that works with self-funded health plans to lower their specialty drug costs. In this suit, AbbVie brings various federal and state claims against Payer Matrix based on Payer Matrix's alleged involvement with AbbVie's charitable programs, including AbbVie's Patient Assistance Program ("PAP") and Co-Pay Assistance Program ("CAP"). AbbVie also brings claims based on Payer Matrix allegedly facilitating the importation of AbbVie drugs from Canada.

Payer Matrix has moved to dismiss each of AbbVie's claims in its first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the Court grants in part and denies in part Payer Matrix's motion.

### LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.

R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

At the pleading stage, the Court must "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff," as it does in the discussion that follows. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Federal Rule of Civil Procedure 9(b) requires that all allegations of fraud or mistake be pled "with particularity." Fed. R. Civ. P. 9(b). This includes describing the "'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). In fraud cases involving a misrepresentation, the plaintiff must state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation,

and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

## DISCUSSION

The parties are familiar with the procedural history and factual backdrop here, which the Court also laid out in its opinion denying AbbVie's earlier motion for a preliminary injunction. [343] at 2–11. The Court therefore foregoes another recitation of that material and proceeds to assessing the legal sufficiency of AbbVie's claims. The Court starts with the federal claims before proceeding to the state-law claims. Where particular allegations made by AbbVie bear considerably on the parties' legal arguments, the Court highlights these allegations in its analysis.

## I. RICO (Counts I–IV)

In Counts I through IV, AbbVie alleges that Payer Matrix violated § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* [233] ¶¶ 501–36. To establish a violation of § 1962(c), a plaintiff must show by a preponderance of the evidence that the defendant participated in (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985). "A pattern of racketeering activity consists, at the very least, of two predicate acts of racketeering committed within a ten-year period." *Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 659 (7th Cir. 2015) (quoting *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007)).

Payer Matrix challenges the legal sufficiency of AbbVie's allegations in each of these respects; the Court addresses each in turn.

### A. Conduct of an "Enterprise"

"[E]nterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "The Supreme Court has held on multiple occasions that this definition is to be interpreted broadly." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). It has "at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946 (cleaned up).

AbbVie asserts the existence of four association-in-fact enterprises to support its RICO claims. [233] ¶ 69. The first three consist of Payer Matrix and Magellan Rx, EmpiRx, and Capital Rx, respectively. *Id.* Magellan Rx, EmpiRx, and Capital Rx are each pharmacy benefit managers ("PBMs"), "companies that manage prescription benefits for plan sponsors," including by "assist[ing] health insurance plans in creating and managing their drug formularies, which are the lists of drugs the plans cover." *Id.* ¶¶ 5–6. The Court refers to these three alleged association-in-fact enterprises as the "PBM Enterprises." Because the allegations related to the three PBM Enterprises are so similar, the Court addresses collectively whether AbbVie has stated an association-in-fact enterprise between Payer Matrix and each PBM.

4

The Court separately considers the fourth alleged association-in-fact enterprise, which it refers to as the "Superior Biologics Enterprise." This enterprise consists of Payer Matrix, Superior Biologics, Inc. (a specialty pharmacy Payer Matrix refers to as its "sister company," *id.* ¶¶ 79, 81), and its affiliated specialty pharmacies, Affordable Scripts, Inc. and Hometech Advanced Therapies, Inc. (the "Superior Biologics entities"), *see id.* ¶ 69.

### 1. Payer Matrix–PBM Enterprises

Applying the *Boyle* factors, AbbVie properly alleges RICO enterprises between Payer Matrix and each of the three PBMs. AbbVie alleges that Payer Matrix and the PBMs had a common purpose of "defrauding AbbVie's and other manufacturers' patient assistance programs for the Enterprises' economic gain." [233] ¶ 124. AbbVie also alleges sufficient relationships between Payer Matrix and the PBMs. For example, AbbVie alleges that Payer Matrix provided PBMs with templates for benefit clarification letters ("BCLs") that misrepresented members' specialty drug coverage, *id.* ¶¶ 130, 194, 206, and that Payer Matrix directed Magellan and EmpiRx employees to provide false information to AbbVie during benefit investigation calls, *id.* ¶¶ 117, 130, 255–56. The alleged enterprise also existed long enough to "permit [the] associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946; [233] ¶ 123. Under *Boyle's* "liberal view of what it takes to be an association-in-fact for RICO purposes," AbbVie's complaint appears to pass muster. *Walgreen*, 719 F.3d at 854.

In *Walgreen*, the Seventh Circuit cautioned that "[d]espite the expansive nature of [*Boyle's*] definition" of an association-in-fact enterprise, the definition "is

not limitless." *Id.* at 853. And relying on *Walgreen*, Payer Matrix argues there can be no association-in-fact enterprise because Payer Matrix and the PBMs merely had commercial business relationships with one another. 719 F.3d at 856; *see also* [366] at 4 (Payer Matrix argues that "the PBMs provide needed services to Payer Matrix, and that the PBMs are paid for those services"). The Court disagrees that *Walgreen* counsels for dismissal of AbbVie's RICO claims against the PBM Enterprises.

In *Walgreen*, the Seventh Circuit considered whether plaintiff had stated an association-in-fact enterprise between Walgreens and drug manufacturer Par Pharmaceuticals. 719 F.3d at 853–56. Specifically, plaintiff alleged that Par and Walgreens schemed to systemically fill prescriptions with the more expensive form of a drug, even where the prescription called for the less expensive form of the drug. *Id.* at 851–52. Although Par had initially encouraged Walgreens to engage in the scheme, the court of appeals concluded that plaintiff had not plausibly alleged "that Walgreens and Par were conducting the affairs of this [alleged enterprise], as opposed to their own affairs." *Id.* at 854. The complaint lacked allegations that "officials from either company involved themselves in the affairs of the other." *Id.* Ultimately, plaintiff's allegations were "entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filling prescriptions." *Id.* at 855; *see also Green v. Morningstar, Inc.*, No. 17 C 5652, 2018 WL 1378176, at *6 (N.D. Ill. Mar. 16, 2018) (plaintiff "fail[ed] to adequately allege that each member of the alleged enterprise … participated in the enterprise's affairs as opposed to

6

simply pursuing their own affairs"); *Saleh v. Merch.*, No. 14-CV-09186, 2018 WL 287748, at *5 (N.D. Ill. Jan. 4, 2018) (same).

Here, in contrast to *Walgreen*, AbbVie's allegations reflect a high level of coordination between Payer Matrix and the PBMs. AbbVie alleges that both Payer Matrix and EmpiRx "bring clients into the Enterprise's program," "participate in joint pitches to plan sponsors for new business," and "mail out joint promotional materials about the Payer Matrix program to the members of new clients as part of program implementation." [233] ¶¶ 139–40. Once a new plan sponsor joins the program, they have "formal meetings together" with senior leaders from both companies in which they "discuss the status of the alternate funding program." *Id.* ¶ 142. The entities also describe "their specialty cost containment program as having consolidated invoicing for clients and consolidated plan performance reporting." *Id.* ¶ 145. AbbVie further alleges that Payer Matrix encourages new clients to use the PBMs' services. *Id.* ¶¶ 139, 155.

To be sure, these aforementioned activities bear some hallmarks of run-of-the-mill partnerships between commercial entities with similarly aligned interests. Two different companies working together to build a client base is not atypical. But as alleged by AbbVie, these activities only begin to scratch the surface of the interdependence between Payer Matrix and each of the PBMs. For instance, AbbVie contends that Payer Matrix and each of the PBMs share the cost-avoidance fees from plan-sponsor clients—an arrangement that is less likely if the companies were merely going about their own business in parallel. *Id.* ¶ 127. Payer Matrix is eager to

7

discount these allegations as establishing only that each business entity shared the commonplace, commercial goal of making a profit. But that the PBMs received a share of the cost-avoidance fees (as opposed to a flat fee for services rendered) elevates the likelihood that they and Payer Matrix were working toward a shared goal—to enroll as many members as possible into AbbVie's PAP and CAP—from "sheer possibility" firmly into the realm of plausibility. *See Walgreen*, 719 F.3d at 853.

Additional allegations of coordination—extending to the execution of the fraud—feature in the complaint and further support the distinction between the allegations here and those in *Walgreen*. For example, AbbVie describes how each PBM "routinely approved" Payer Matrix's submission to AbbVie of BCLs, printed on the PBM's letterhead, that misrepresented the patients' coverage as uninsured for the drug at issue. *Id.* ¶¶ 146–47, 161–62, 173–74. AbbVie also alleges that Payer Matrix and EmpiRx shared a patient portal where: (1) EmpiRx helped Payer Matrix identify new patients that Payer Matrix could then steer toward its services, (2) Payer Matrix and EmpiRx would instruct the specialty pharmacy's employees about how to respond to AbbVie's benefits investigations, (3) Payer Matrix and EmpiRx would jointly enter overrides that EmpiRx automatically approved, and (4) Payer Matrix provided instructions related to EmpiRx regarding the use of AbbVie's co-pay cards, including "on how to improperly utilize AbbVie's co-pay cards to pay for prescription fills when the members' PAP applications are pending or after PAP enrollment is denied before coverage reverts to the plan." *Id.* ¶¶ 134–38; *see also id.* ¶¶ 150–54 (alleging similar coordination between Magellan Rx and Payer Matrix via a

SharePoint site). AbbVie further alleges that Payer Matrix and Capital Rx "worked jointly on developing application software to enable their clients' members to apply to AbbVie's PAP through 'self service.'" *Id.* ¶ 172.

As alluded to briefly already, AbbVie alleges that Payer Matrix employees directed PBM employees to provide false information to AbbVie during its benefit investigation calls. AbbVie describes how a Payer Matrix employee told a Magellan Rx employee "to call AbbVie and provide health insurance information for a particular patient." *Id.* ¶ 255. The Payer Matrix employee predicted that AbbVie would ask about Payer Matrix and volunteered the following answer: "[C]an you just state that this is processing at [Magellan Rx] through the plan benefits[?]." *Id.* The Payer Matrix employee went on: "If they continue to ask about [Payer Matrix], is it possible to say we are not sure but this is going through the insurance and [Payer Matrix] does not offer funding?" *Id.*

In another similar instance, EmpiRx forwarded to Payer Matrix an email it received from an employee of Benecard, EmpiRx's partner specialty drug pharmacy. *Id.* ¶¶ 133, 256. According to the email, "an AbbVie employee had just called [the Benecard employee] as part of the benefits investigation for a PAP applicant." *Id.* ¶ 256. The Benecard employee falsely told the AbbVie employee that "a 3rd party like Payer Matrix" was unaffiliated with the PAP application "because we were told to never mention the 3rd party vendor." *Id.* But in her email to EmpiRx, the Benecard employee asked: "How should we respond when they specifically ask us[?] I am not comfortable lying and I don't want to ask my team to lie either." *Id.* (alteration in

original). In response, AbbVie alleges that "EmpiRx forwarded the email to Payer Matrix and asked Payer Matrix to 'advise how should they be responding.'" *Id.* In turn, Michael Jordan, Payer Matrix's Chief Business Officer, instructed that the appropriate (and misleading) answer was to say "we are not contracted with any 3rd party[.]" *Id.*; *see also id.* ¶ 16.

In other words, AbbVie cites multiple incidents in which PBM employees received or sought direction—not from within their own commercial organizations— but from Payer Matrix to jointly perpetrate an alleged fraud. AbbVie's allegations thus distinguish this case from the type of "parallel, uncoordinated fraud" at issue in *Walgreen.* 719 F.3d at 855; *see also Wacker Drive Exec. Suites, LLC v. Jones Lang LaSalle Americas (Illinois), LP*, No. 18-CV-5492, 2019 WL 2270000, at *14 (N.D. Ill. May 28, 2019) (distinguishing *Walgreen* based on allegations of cooperation and coordination among the members of the alleged enterprise); *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1095 (N.D. Ill. 2016) (same); *Harris Cnty., Texas v. Eli Lilly & Co.*, No. CV H-19-4994, 2020 WL 5803483, at *9 (S.D. Tex. Sept. 29, 2020) (same). Instead, like in *Bible*, AbbVie's allegations suggest an "unusual degree of economic interdependence" between Payer Matrix and the PBMs. 799 F.3d at 656; *see also id.* (plaintiff sufficiently alleged that the relevant entities did "not operate as completely separate entities" but rather as an association-in-fact enterprise where plaintiff contended, among other things, that one entity "approved and provided input into the wording" of another entity's correspondence; documents from one entity were

transmitted using the fax machine of another entity; and one entity agreed to promote another entity and never use a competitor unless a customer insisted).

Moreover, the coordination between Payer Matrix and the PBMs "appears essential to the success of the alleged scheme." *Shankar v. Fairview Ave. Props. LLC*, No. 23 C 1469, 2023 WL 8451779, at *5 (N.D. Ill. Dec. 6, 2023). Without the PBMs' alleged role identifying patients for services, [233] ¶¶ 139, 155; preparing BCLs on their letterhead, *id.* ¶ 146; processing inflated co-pay amounts, *id.* ¶¶ 313, 316; and providing cover during AbbVie's benefits investigations, *id.* ¶ 18, Payer Matrix's PAP and CAP activities may not have been possible at all. At bottom, this is not a case where the "nub of the complaint is that [the defendant] operates *itself* unlawfully." *Walgreen*, 719 F.3d at 855 (quoting *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)). AbbVie plausibly states that Payer Matrix and the PBMs acted as "truly joint enterprise[s] where each individual entity act[ed] in concert with the others to pursue a common interest." *Bible*, 799 F.3d at 655–56.

Payer Matrix separately argues that AbbVie has not sufficiently alleged that Payer Matrix participated in the "operation or management of the enterprise itself"— a requirement under RICO's "conduct" element. *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993); *see also* [351] at 7–8. But AbbVie alleges plenty to suggest that Payer Matrix operated or managed the enterprise. For example, AbbVie alleges that Payer Matrix directed the PBMs on what to include on the BCLs and when to issue overrides if its clients' members were rejected from AbbVie's PAP. [233] ¶¶ 137, 146, 152, 161, 164; *see also id.* ¶ 174 (alleging that "Capital Rx [ ] routinely prepared BCLs *at Payer*

11

*Matrix's request* for submission to AbbVie") (emphasis added). And as already described, AbbVie further alleges that Payer Matrix "coaches its PBM partners on how to obstruct AbbVie's benefits investigations." *Id.* ¶ 18. At this stage, these allegations are enough to meet *Reves'* operation or management test.

### 2. Payer Matrix–Superior Biologics Enterprise

Payer Matrix argues that the Superior Biologics Enterprise fails for the same reason as in *Walgreen*: that the complaint does not adequately allege that the Superior Biologics entities "were conducting the affairs of [the enterprise], as opposed to their own affairs." *Walgreen*, 719 F.3d at 854; *see also* [351] at 8. For this alleged enterprise, the Court agrees with Payer Matrix.

AbbVie alleges that the specialty pharmacies "well exceed the bounds of normal pharmacy activities" in part by "process[ing] inflated charges on AbbVie's co-pay saving cards … at the direction of Payer Matrix." [356] at 11. Yet AbbVie does not explain how the processing of charges on co-pay cards goes beyond what would be expected of any other specialty pharmacy. *See D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*, No. 10 C 8159, 2013 WL 1286696, at *10 (N.D. Ill. Mar. 28, 2013) (complaint failed to show that software licensers had any "apparent objective aside from encouraging and enabling" the use of their software); *Walgreen*, 719 F.3d at 856 (alleged coordination "describe[d] virtually every prescription pharmaceutical distribution chain"). In contrast to the PBM Enterprises, AbbVie's allegations here suggest "only that the defendants had a commercial relationship, not

that they had joined together to create a distinct entity for purposes of" defrauding AbbVie. *Walgreen*, 719 F.3d at 855.

AbbVie insists the purpose of the Superior Biologics Enterprise is the same as the other enterprises: namely, to "defraud[] AbbVie's and other manufacturers' patient assistance programs for the Enterprises' economic gain." [322] ¶ 124. And AbbVie later refers to enriching the enterprise's members through cost-avoidance fees. *Id.* ¶ 125. Still, AbbVie does not allege that the Superior Biologics entities received a share of Payer Matrix's cost-avoidance fees or otherwise stood to gain from Payer Matrix's alleged scheme. *See Walgreen*, 719 F.3d at 855 (finding no basis to conclude that alleged enterprise members were "conducting the enterprise's affairs" where the complaint did not "suggest that profits from the illegal drug-switching scheme were siphoned off to the [enterprise] or to individual enterprise members"). Without articulating a plausible incentive for the Superior Biologics entities to participate in the scheme, AbbVie has not sufficiently articulated that they joined with Payer Matrix for the common purpose of defrauding AbbVie.

AbbVie points to two additional allegations it says go beyond "normal pharmacy activities." [356] at 11. First, it alleges that Affordable Scripts allowed Payer Matrix to use its fax machine to submit PAP applications, concealing Payer Matrix's involvement. *Id.*; *see also* [233] ¶ 181. Second, it alleges that Superior Biologics' Medical Director prepared flyers comparing AbbVie's medications to other medicines, which were "[a]t a minimum" circulated internally to Payer Matrix supervisors. [233] ¶ 383; *see also* [356] at 11. Although these isolated activities

suggest some degree of coordination, they do not make it plausible (as opposed to merely possible) that they formed a separate enterprise with Payer Matrix for the shared purpose of defrauding AbbVie. *Walgreen*, 719 F.3d at 855 (although complaint did not "entirely rule out" that the companies were acting as an enterprise, "there [was] ultimately not enough in [the] complaint to elevate that inference from a 'sheer possibility' to something that is 'plausible on its face'") (quoting *Iqbal*, 556 U.S. at 678).[1] For these reasons, AbbVie has not stated a RICO enterprise between Payer Matrix and the Superior Biologics entities.

### B. Continuity

To plead a pattern of racketeering activity, a plaintiff must meet the "continuity plus relationship" test, which requires that they "demonstrate a relationship between the predicate acts as well as a threat of continuing activity." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 337 (7th Cir. 2019) (quoting *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011)). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past

---

[1] Payer Matrix also argues there can be no Superior Biologics Enterprise because the "Superior Biologics entities lack a meaningful existence separate from Payer Matrix." [351] at 8; *see also* [366] at 7 (arguing that AbbVie's allegations "fail to demonstrate how the Superior Biologics Entities are 'distinct' from Payer Matrix in the RICO sense"). In doing so, Payer Matrix points to AbbVie's allegations that the Superior Biologics Entities share business locations, share employees, and have at least some common ownership. [351] at 8 (citing [322] ¶¶ 79–82). But neither of the two cases Payer Matrix cites precludes the possibility that entities with such shared characteristics can be distinct for the purposes of forming a RICO enterprise. *See, e.g.*, *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 228 (7th Cir. 1997) ("Maybe a manufacturer could use its dealers or other agents or affiliates in such a way as to bring about the sort of abuse at which RICO is aimed, in which event it might be possible to characterize the assemblage as a RICO enterprise."). The Court goes no further than that observation, though, as there are other bases upon which to grant Payer Matrix's motion to dismiss the Superior Biologics Enterprise aspect of AbbVie's RICO claim.

14

conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989).

To demonstrate a pattern over a closed period, AbbVie must allege "a series of related predicates extending over a substantial period of time." *Id.* at 242. RICO is concerned only with "long-term criminal conduct," so "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* Open-ended continuity, on the other hand, "is present when (1) 'a specific threat of repetition' exists, (2) 'the predicates are a regular way of conducting [an] ongoing legitimate business,' or (3) 'the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Vicom*, 20 F.3d at 782 (quoting *H.J., Inc.*, 492 U.S. at 242–43).

In its earlier order denying AbbVie's motion for a preliminary injunction, the Court found that Payer Matrix's PAP, CAP, and drug-conversion activities are not ongoing. [343] at 15, 24. Now, to support its motion to dismiss, Payer Matrix relies on this earlier finding to argue that AbbVie cannot meet the requirements for an open-ended period. But the Court cannot consider the evidence from the preliminary injunction hearing to decide a Rule 12(b)(6) motion (or at least not without treating the motion as one for summary judgment and giving the parties the opportunity to supplement their presentations). *See Nanda v. Bd. of Trs. of Univ. of Illinois*, No. 00 C 4757, 2002 WL 1553330, at *4, n.4 (N.D. Ill. July 12, 2002). What's more, "in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed '*at the time the racketeering activity occurred.*'" *Inteliquent, Inc. v. Free*

15

*Conferencing Corp.*, No. 16-CV-06976, 2017 WL 1196957, at *10 (N.D. Ill. Mar. 30, 2017) (emphasis added) (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012)). "Subsequent events are irrelevant to the continuity determination." *Heinrich*, 668 F.3d at 410. For example, "[t]he lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict." *Id.* at 410 (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)); *see also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (plaintiffs sufficiently pled continuity where "there [was] no reason to suppose that [the alleged RICO violation] would not have continued indefinitely had the Plaintiffs not filed [the] lawsuit").[2]

Here, although hindsight reveals that Payer Matrix's allegedly unlawful activities have since stopped, nothing in the complaint indicates that Payer Matrix would not have continued them had AbbVie not filed this lawsuit. Indeed, Payer Matrix does not dispute that these activities constituted a regular part of its business model before this suit came to be. *See* [351] at 5–6 (arguing that its PAP and CAP activities were part of its "ordinary business model"). Moreover, none of AbbVie's allegations suggest that Payer Matrix's scheme otherwise had a "natural ending

---

[2] Other courts of appeals also endorse this approach. *See, e.g., Hartman v. Does 1-2*, No. 23-13473, 2025 WL 398846, at *6 (11th Cir. Feb. 4, 2025); *Planned Parenthood Fed'n of Am., Inc. v. Newman*, No. 20-16068, 2022 WL 13613963, at *3 (9th Cir. Oct. 21, 2022); *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 929 (4th Cir. 2013); *United States v. Richardson*, 167 F.3d 621, 626 (D.C. Cir. 1999). By not addressing this line of case law in its reply (even after AbbVie raised it in its response, *see* [356] at 13), Payer Matrix has waived any argument that the Court may consider subsequent events in the continuity determination. *See Curry v. Revolution Lab'ys, LLC*, 124 F.4th 441, 462 (7th Cir. 2024) (arguments not made to the district court are waived).

point." *See, e.g.*, *Vicom*, 20 F.3d at 782; *see also Menzies*, 943 F.3d at 343. Therefore, AbbVie has sufficiently pled a pattern of racketeering activity under the open-ended continuity test. *See Inteliquent*, 2017 WL 1196957, at *10. Because AbbVie has done so, the Court does not address Payer Matrix's argument that AbbVie's allegations fail the closed-ended continuity test. *See* [351] at 19–21.

### C. Causation

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (cleaned up) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). This requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 9 (quoting *Holmes*, 503 U.S. at 268). "The key word is 'direct'; foreseeability does not cut it." *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 945 (2025) (quoting *Hemi Grp.*, 559 U.S. at 12). Although a direct relationship is required, courts permit a plaintiff "directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656 (2008). In other words, a RICO plaintiff need not be the recipient of the alleged misrepresentation to be directly injured. *Id.*

17

AbbVie has sufficiently pled a "direct relation" between its injury and Payer Matrix's conduct. *Hemi Grp.*, 559 U.S. at 9. Take, for example, AbbVie's allegations that Payer Matrix made false statements to health-care providers to attempt to switch the providers' patients onto non-AbbVie medicines. [233] ¶¶ 367–71. Under *Bridge*, it makes no difference that AbbVie was not the recipient of these alleged misrepresentations. 553 U.S. at 656–57. Taking AbbVie's allegations as true, AbbVie was directly injured when Payer Matrix's misrepresentations caused "approximately 170 doctors to switch their patients to alternative medicines" away from AbbVie medicines. [233] ¶ 402. Payer Matrix insists causation cannot be established because AbbVie "alleges no facts plausibly demonstrating that Payer Matrix—as opposed to the independent decisions of physicians—proximately caused those medication changes." [366] at 10; *see also* [351] at 19 (arguing that any physician "worth their salt" would have acted "with little regard for what Payer Matrix suggested"). The Court disagrees. It is entirely plausible that a physician would prescribe another medication after Payer Matrix told this physician that AbbVie medications were no longer accessible to her patient. [233] ¶¶ 370–71.

The Court is not persuaded by Payer Matrix's reliance on *Sidney Hillman Health Center of Rochester v. Abbott Laboratories*, 873 F.3d 574 (7th Cir. 2017). There, insurers sued Abbott Laboratories alleging that they covered their plan members' use of a drug for off-label purposes, even though Abbott had marketed the drug for those purposes. *Id.* at 576. The Seventh Circuit found that the causal chain between Abbott's unlawful marketing of the drug and the insurers' economic loss in paying for

18

the drug was too attenuated to suffice under the RICO standard. *Id.* at 577–78. It noted that some off-label uses of the drug were in fact beneficial to patients. *Id.* at 577. In addition, it described that physicians rely on various factors outside of Abbott's marketing in prescribing medications for particular uses, including double clinical studies and anecdotal evidence. *Id.* ("Disentangling the effects of the improper promotions from the many other influences on physicians' prescribing practices would be difficult."). These intervening factors made insurers "several levels removed in the causal sequence," meaning that the insurers could not state a claim under RICO. *Id.* at 578.

Here, unlike in *Sidney Hillman*, AbbVie does not allege Payer Matrix engaged in a broad marketing campaign that leaves us guessing as to what ultimately influenced a physician's prescribing decision. Instead, AbbVie alleges that Payer Matrix directly told physicians that AbbVie medicines were no longer available to their patients; the doctors were thus "misled to believe they had no other choice"; and the immediate consequence was that 170 physicians switched their patients to non-AbbVie drugs. [233] ¶¶ 398, 402. And unlike the insurers in *Sidney Hillman*, AbbVie is not "several levels removed in the causal sequence," *see* 873 F.3d at 578; as the drug manufacturer, AbbVie is only one level removed from a doctor's decision to prescribe another manufacturer's medication. Payer Matrix's drug-conversion

statements, as alleged by AbbVie, thus satisfy RICO's "direct relation" test. *Hemi Grp.*, 559 U.S. at 9.[3]

The same goes for Payer Matrix's alleged misrepresentations related to PAP and CAP applications. AbbVie alleges that Payer Matrix Care Coordinators misrepresented information about members' insurance coverage as part of the PAP applications the coordinators submitted on the patients' behalf. [233] ¶ 217. As a direct result of these misrepresentations, AbbVie alleges that it "was economically harmed because patients who were commercially insured for specialty drugs were obtaining the medicines for free from AbbVie's charitable program instead of the plan sponsors paying for the medicines." *Id.* ¶ 218. In other words, AbbVie alleges it was hurt when Payer Matrix caused it to accept patients AbbVie otherwise would have denied. That is enough to satisfy direct causation.

Payer Matrix argues that "AbbVie's injuries depend upon a series of intervening acts by plan sponsors, patients, and healthcare providers … [who] might have taken those actions independently with or without Payer Matrix's input." [366] at 8–9. For example, Payer Matrix speculates that AbbVie might not have relied on Payer Matrix's allegedly fraudulent BCLs because AbbVie knew about Payer Matrix's

---

[3] To the extent Payer Matrix challenges causation related to additional predicate acts, *see* [351] at 17, the Court need not consider those arguments, *see Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1004 (7th Cir. 2004) ("[A] plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim."). Payer Matrix also suggests that, in addition to the "direct relationship" test discussed, AbbVie must plead that Payer Matrix's conduct "giving rise to the fraud" was what "directly caus[ed] the harm" as well. [351] at 13 (quoting *Hemi Grp.*, 559 U.S. at 2, 11). To the extent this requirement is different from the direct relation requirement, AbbVie's allegations suffice for the reasons already discussed.

20

scheme and decided to accept those patients into its PAP anyway. [351] at 17 ("AbbVie's alleged PAP 'losses' in those years *could be* attributable to the simple fact that it did not exclude from its PAP otherwise eligible, commercially underinsured members with benefit 'carveouts' whose plan sponsors had contracted with Payer Matrix.") (emphasis added); *see also* [351] at 15 ("AbbVie cannot plausibly convert PAP applications it once welcomed with open arms—knowing Payer Matrix was submitting them—into 'harm' simply by redefining what its rules were all along."). Payer Matrix also suggests that "some plan sponsors already had ample financial incentive" to carve out specialty drugs like AbbVie's, "[w]ith or without Payer Matrix." [351] at 18. Even if these theories ultimately bear some truth, Payer Matrix does not support them by citing to allegations in AbbVie's complaint, which is all the Court may consider in resolving this motion to dismiss. For now, the Court credits AbbVie's allegation that it "did in fact rely on the Enterprises' misrepresentations in admitting the Enterprises' clients' members, who had guaranteed insurance coverage for their AbbVie specialty drugs, into the PAP." [233] ¶ 216.

Finally, Payer Matrix contends that AbbVie falls short on proximate causation because various third parties like Payer Matrix's plan-sponsor clients, patients, and healthcare providers—not AbbVie—were the "direct victims" of Payer Matrix's alleged fraud. [351] at 10. But it was AbbVie—not these parties—who was the "direct victim" of Payer Matrix's alleged misrepresentations in the PAP applications. Payer Matrix cannot argue that the patient or plan sponsor was injured by Payer Matrix's misrepresentations in the PAP applications. To the contrary, the patient and plan

sponsor *benefited* from the alleged misrepresentations by receiving AbbVie drugs at zero cost. *Id.* at 14 (Payer Matrix admitting that "the successful PAP applications benefitted patients—*they received free specialty drugs*") (emphasis in original). For these reasons, AbbVie's PAP and CAP allegations likewise satisfy RICO's "direct relation" test. *Hemi Grp.*, 559 U.S. at 9.

* * *

In sum, the Court denies Payer Matrix's motion to dismiss Counts I, II, and III (the PBM Enterprises) and grants Payer Matrix's motion to dismiss Count IV (the Superior Biologics Enterprise) without prejudice.

## II. Lanham Act (Counts V & VI)

Payer Matrix next moves to dismiss AbbVie's Lanham Act claims for false association (Count V) and false advertising (Count VI). The Court considers each claim in turn.

### A. False Association

Section 1125(a)(1)(A) "provides a civil remedy if false or misleading factual representations are likely to confuse or deceive their audience about the plaintiff's 'affiliation, connection, or association' with the defendant 'or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities.'" *Martin v. Living Essentials, LLC*, 653 F. App'x 482, 484 (7th Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014)).

Payer Matrix first argues that AbbVie has not stated a false association claim because it has not adequately alleged a protectable mark. [351] at 21. But AbbVie's

22

complaint references a Payer Matrix presentation "showing AbbVie's *trademark-protected logo* and the trademarks of other pharmaceutical manufacturers under a title 'top manufacturers.'" [233] ¶ 328 (emphasis added); *see also id.* ¶ 334 (referencing another slide "showing AbbVie's logo and other manufacturers' logos under a title 'We partner with top manufacturers'"). Although Payer Matrix characterizes this allegation as "so conclusory it violates Rule 8," it does not say what more is required to plead a protected mark at this stage. The Court finds it is enough. *See Lynn Scott, LLC v. Grubhub Inc.*, No. 20 C 6334, 2024 WL 3673718, at *5 (N.D. Ill. Aug. 6, 2024) ("[A]t the pleading stage, Plaintiffs need only allege a plausible trademark interest, not prove it.").[4]

AbbVie's false association claim is premised on allegedly false representations Payer Matrix made during marketing presentations to plan sponsor clients and their brokers. AbbVie says these misrepresentations "suggest that [Payer Matrix] had a business relationship with AbbVie and that AbbVie approved and endorsed the services Payer Matrix provided." [233] ¶¶ 326–27. AbbVie recounts one particular presentation where Payer Matrix's Jordan presented a slide showing AbbVie's logo

---

[4] This analysis assumes without deciding that AbbVie even needs to establish a protectable trademark. Some circuit precedent suggests that plaintiffs in all Lanham Act cases must do so, *see, e.g.*, *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000), at least one court in this district has noted that "[n]othing in the plain text of section 1125(a)(1)(A) requires trademark ownership," *FireBlok IP Holdings, LLC v. Hilti, Inc.*, No. 3:19-CV-50122, 2021 WL 6049964, at *6 (N.D. Ill. Dec. 21, 2021); *c.f. Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003) (noting that § 1125(a) "is one of the few provisions [of the Lanham Act] that goes beyond trademark protection"). Given the contents of AbbVie's complaint, the Court does not need to take a side in this debate.

under a title "Top Manufacturers." *Id.* ¶ 328. When discussing the slide, Jordan said pharmaceutical manufacturers were putting specialty drugs "down two runways":

> One is the traditional plan sponsor access system, by which you're paying probably 1,000 times what it costs them to make the drug, and then there's another pathway you can follow, which is the Manufacturer Assistance Program, and really, what these big pharma organizations are doing is they're allowing access on both sides, but frankly, a lot of people don't know how to get access to the side that's significantly reduced in cost, and they do it for a variety of reasons … but *the bottom line is we're a model that's actually helping plans tap into these programs, which are overfunded and underutilized.*

*Id.* ¶ 328 (emphasis added). Later in the presentation—in another series of statements that AbbVie describes as typical of Payer Matrix's representations during its marketing presentations—Jordan suggested that AbbVie "knew about and approved of what Payer Matrix was doing." *Id.* ¶¶ 329, 332. Jordan told his audience that by permitting Payer Matrix access to its PAP and CAP programs, AbbVie was improving its reputation; earning a tax deduction; and "expand[ing] the net of who they're getting onto these particular drugs." *Id.* ¶ 329. In the same vein, AbbVie alleges that other Payer Matrix "marketing materials deceptively represent[ed] that its program leverages 'extensive, often unused funds made available by Pharma Manufacturers.'" *Id.* ¶ 333.

Understood in the light most favorable to AbbVie, these statements could plausibly confuse a plan sponsor into believing that AbbVie approved of Payer Matrix's PAP and CAP activities. And such confusion would be understandable where, according to AbbVie, Payer Matrix grew "more blatant in misrepresenting its ties to AbbVie" by including in its presentations a slide with AbbVie's logo under the

title "[w]e partner with top manufacturers." *Id.* ¶ 334. Indeed, AbbVie alleges that at least one plan sponsor *was* confused about the nature of AbbVie's and Payer Matrix's working relationship based on Payer Matrix's various representations. *Id.* ¶ 333 ("[A]t least one plan sponsor working with Payer Matrix was led to believe and represented to its members that Payer Matrix seeks 'grant money' from pharmaceutical companies to reduce the cost of some specialty drugs.").

Payer Matrix's arguments to the contrary are unavailing. Payer Matrix contends "it was a statement of opinion for Payer Matrix to represent that manufacturers (not just AbbVie) set up PAPs because it benefits them" and that "[s]tatements of opinion are not actionable under the Lanham Act." [351] at 23. But AbbVie's allegations do not suggest that Payer Matrix told plan sponsor clients only what it *believed* were AbbVie's motivations. When Payer Matrix tells a plan sponsor that AbbVie "win[s] from a financial standpoint" by accepting patients into its "overfunded and underutilized" PAP, [233] ¶¶ 328–29, a plan sponsor could rationally understand such a statement to mean that AbbVie endorses Payer Matrix's scheme of enrolling members in the PAP.

Payer Matrix also argues that its statement that it "partner[s]" with AbbVie is "(at best) non-actionable puffery." [351] at 23. But unlike the "meaningless superlatives" courts typically find to be non-actionable, *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009), "the verb 'partner' has a plain and readily understood meaning to the public," [356] at 29. For example, Cambridge Dictionary defines the verb "partner" as

25

"to join with another person or organization in a business activity." *Partner*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/ partner. And whether Payer Matrix "joined" with AbbVie to facilitate applications to its PAP—or, in AbbVie's telling, whether Payer Matrix operated under the radar and later concealed its identity, *see* [233] ¶¶ 340, 591–92—is an objectively verifiable fact, *c.f. Sanchez v. Walmart Inc.*, 733 F. Supp. 3d 653, 672 (N.D. Ill. 2024) ("Statements are not puffery if they make objective and verifiable claims and are 'specific enough to induce consumer reliance.'"). Moreover, Payer Matrix was clearly suggesting that it was already cooperating with AbbVie, not that it had some future hope of doing so. *See Pray, Inc. v. Christian Care Ministry, Inc.*, No. 2:23-CV-10660-SB-JC, 2024 WL 3509781, at *11 (C.D. Cal. June 7, 2024) (statement was not a "forward-looking or generalized statement of optimism" where defendant expressed a "*contemporaneous* position … of continued partnership and cooperation") (emphasis in original).

Even if Payer Matrix's "partner" representation were puffery, AbbVie alleges Jordan made additional (oral) comments during marketing presentations that could mislead listeners into believing that AbbVie endorsed Payer Matrix's program. *See, e.g.*, [233] ¶¶ 328–29. For this reason, the Court is also not persuaded by Payer Matrix's argument that some of the slide deck titles AbbVie challenges lack a verb. [351] at 23. Again, read in the light most favorable to AbbVie, the complaint includes plenty from which the Court can reasonably infer consumer confusion.[5]

---

[5] Relatedly, Payer Matrix argues that its clients are sophisticated entities who could not be misled into thinking that AbbVie sponsored or endorsed Payer Matrix's services. But this is not a foregone conclusion, especially when the facts are viewed in the light most favorable to AbbVie.

26

AbbVie offers a second category of allegations to support its false association claim—this time pertaining to drug importation. [356] at 32. Specifically, AbbVie contends that the medicines Payer Matrix imports, or helps import, from Canada are "likely to cause consumer confusion, given the material differences between these medicines and their domestic counterparts." *Id.* at 32.

To support its claim, AbbVie cites case law suggesting that, where a defendant sells genuine products intended for foreign consumption to U.S. consumers, courts only need to determine "whether the defendant's gray market product is materially different from the [domestic] product sold by the plaintiff." [356] at 32 (quoting *Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, No. 17 C 3166, 2018 WL 3920617, at *2 (N.D. Ill. Aug. 16, 2018)). But when a plaintiff brings a claim under § 1125(a)(1)(A), they still must show that the defendant made some false or misleading representation "likely to confuse or deceive their audience about the plaintiff's 'affiliation, connection, or association' with the defendant 'or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities.'" *Martin*, 653 F. App'x at 484.

Here, the closest AbbVie comes to meeting this mark is its allegation that Payer Matrix advertises RxFree4Me's Canadian-sourced medicines as the "same brand medications." [233] ¶ 49. But Payer Matrix's statement that RxFree4Me supplies the "same brand medications" says nothing about whether AbbVie sponsors or approves of the drugs' importation and the processes and procedures through which the importation happens. This representation, therefore, does not support an

27

allegation (or even inference) that AbbVie can plausibly be held "responsible for any medicine shipping delays and any counterfeit, adulterated, mislabeled, ineffective, or spoiled product that [patients] receives through Payer Matrix's program." *Id.* ¶ 498. And although "same brand" inherently suggests some affiliation or association between AbbVie and the imported AbbVie-branded drugs, AbbVie also alleges nothing to suggest that this intimation was, in fact, false or deceptive. AbbVie occasionally describes the imported drugs as "*purported* versions of AbbVie's medicines," *e.g.*, [233] ¶¶ 466–67, 498, 544, 581 (emphasis added), but this qualifier constitutes a meaningless, and therefore wholly conclusory, effort to put distance between AbbVie and the imported products. AbbVie never makes the more precise allegation, for example, that the imported drugs were actually manufactured by some entity other than AbbVie.

The Court therefore grants Payer Matrix's motion to dismiss Count V to the extent Count V relies on Payer Matrix's statements related to the international drug importation program. AbbVie may proceed with the remainder of its false association claim.

## B. False Advertising

Section 1125(a)(1)(B) "prohibits false or misleading 'commercial advertising or promotion of the nature, characteristics, qualities, or geographic origin of the advertiser's or another person's goods, services, or commercial activities.'" *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (quoting 15 U.S.C. § 1125(a)). To state a false advertising claim, AbbVie must allege:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Id.* (citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999)). To recover money damages, "a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages." *Id.* at 819–20.

False statements generally fall into one of two categories: "(1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* at 820. If the statement is literally false, "the plaintiff need not show that the statement either actually deceived consumers or was likely to do so." *Id.* However, if the statement is literally true or ambiguous, "the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion." *Id.*

AbbVie brings five categories of statements it maintains are false or misleading under the Lanham Act. These include: (1) advertisements on Payer Matrix's website saying that patients will not experience any disruption or change in their specialty drug access, (2) statements Payer Matrix made to doctors during drug-conversion efforts, (3) statements made to plan sponsors, brokers, and doctors about AbbVie's restrictions on PAP access, (4) Payer Matrix's representations that the

29

imported AbbVie medicines come from "legitimate and valid" sources, and (5) Payer Matrix's statements about partnering with AbbVie. *See generally* [356] at 20–33. The Court considers each of these types of statements in turn.

### 1. Website Advertisements

To support its false advertising claim, AbbVie first points to a statement that previously appeared on Payer Matrix's website, which read: "[M]embers are not disrupted and always receive their medications. There is no interruption in supply, no requirements to change brands or dosing, the only difference is the source of the medication, and of course the reduced costs." [322] ¶ 348. AbbVie contends this statement is false or misleading because (1) "members do in fact have interruption in supply, including medicine delays," (2) "Payer Matrix does ask the members' [health care providers ("HCPs")] to change their medicine brands when Payer Matrix is unable to maneuver the members into AbbVie's PAP," and (3) "the statement that 'the only difference is the source of the medication' misleadingly suggests that Payer Matrix is the members' new insurance provider for their specialty drugs." *Id.* ¶ 349.

Payer Matrix does not dispute that the statements on its website were false or misleading. Instead, it argues that AbbVie's injury from these statements fails *Lexmark*'s proximate causation test. [366] at 17. Under *Lexmark*, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." 572 U.S. at 133. Here, AbbVie alleges that it "has suffered and continues to suffer economic and reputational injury from Payer Matrix's deceptive and misleading misrepresentations." [233]

30

¶ 549. AbbVie's theory of economic harm is plausible: when the advertisement turns out to be false, customers may very well wrongly blame AbbVie—not Payer Matrix—for interruptions in supply or changes to their medications.

In its reply, Payer Matrix suggests that *Lexmark* requires a lost sales "in something 'very close to a 1:1 relationship' every time a patient or plan sponsor" is misled by the false advertisement. [366] at 18 (quoting *Lexmark*, 572 U.S. at 139). But *Lexmark* does not require that a plaintiff lose sales every time a customer is misled. In fact, *Lexmark* does not require there be lost sales at all so long as the plaintiff is alleged to have experienced some "reputational injury flowing directly from the deception." 572 U.S. at 133. At this early stage, AbbVie plausibly pleads under *Lexmark* that its reputation was harmed by the allegedly false representations on Payer Matrix's website. *See Yellow Grp. LLC v. Uber Techs. Inc.*, No. 12 C 7967, 2014 WL 3396055, at *3 (N.D. Ill. July 10, 2014) (plaintiff plausibly satisfied *Lexmark*'s causation test "at least at [the pleading] stage of the proceedings").

The Court therefore denies Payer Matrix's motion to dismiss to the extent AbbVie bases its § 1125(a)(1)(B) claim on Payer Matrix's website statements.

## 2. Statements During Drug-Conversion Efforts

AbbVie also alleges that, during Payer Matrix's drug-conversion scheme, "Payer Matrix's Conversion team made false and misleading statements to the doctors that the patients no longer had the ability to obtain their AbbVie drug and that the HCPs, therefore, had no choice but to change their prescriptions." [233] ¶ 370. More specifically, AbbVie alleges that "Payer Matrix employees would

typically tell the HCPs that the patients were uninsured for specialty drugs and/or no longer had access to AbbVie's PAP, often disparaging and blaming AbbVie in the process." *Id.* ¶ 371.

These communications are not actionable under the Lanham Act claim for a simple reason: they were not made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). In its communications with doctors, Payer Matrix was not trying to "promote" or "advertise" anything. Rather, the point of the communications was to persuade doctors into switching their patients' prescriptions away from AbbVie drugs because AbbVie was no longer accepting Payer Matrix-associated members into its PAP. Whether this was part of a fraudulent scheme or was simply "Payer Matrix [doing] its job" is beside the point. [351] at 29. In either case, Payer Matrix's purpose was something other than to promote its own services. Indeed, if Payer Matrix were trying to promote *its* services, the "relevant purchasing public" would be plan sponsors and their brokers—not doctors. *See Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 522 (7th Cir. 2012) (quoting *LidoChem, Inc. v. Stoller Enters., Inc.*, 500 F. App'x 373, 379 (6th Cir. 2012)). Because these communications were not made in commercial advertising or promotion, the Court does not address Payer Matrix's alternative argument that AbbVie does not allege the statements were "sufficiently disseminated to the relevant purchasing public." [351] at 31 (quoting *Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.*, No. 21 C 3522, 2022 WL 683690, at *7 (N.D. Ill. Mar. 8, 2022)).

The Court therefore grants Payer Matrix's motion to dismiss to the extent AbbVie bases its § 1125(a)(1)(B) claim on Payer Matrix's alleged drug-conversion statements.

### 3. Payer Matrix's "Disparagement Campaign"

AbbVie next supports its § 1125(a)(1)(B) false advertising claim with a series of statements Jordan and other Payer Matrix leaders allegedly made in emails to plan sponsors, brokers, PBM partners, and patients. Those emails relayed that: (1) "AbbVie has cut off PAP access to any patients working with third parties and patient advocacy groups," (2) "AbbVie has shut the door on PAP to those who are underinsured," (3) "AbbVie has been converting existing Humira patients to Skyrizi for financial gain," and (4) "AbbVie is no longer accepting PAP applications at all." [322] ¶ 410.

Even taking as true that they were meant to disparage AbbVie, these statements are not actionable under the Lanham Act because they were not made for the purpose of advertising or promoting Payer Matrix's services. Rather, Payer Matrix made the statements while providing services it had already agreed to provide. While some cases suggest that statements made to a company's existing customer base can support a Lanham Act claim, *see, e.g.*, *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015), the statements still must "advertise" or "promote" the company's product or services. These statements plainly did not. If anything, as Payer Matrix points out, the statements would have deterred customers from working with Payer Matrix "given that AbbVie['s] own allegations contend that

the accessibility of PAP programs is a necessary prerequisite to Payer Matrix's business model." [366] at 19.

The Court therefore grants Payer Matrix's motion to dismiss to the extent AbbVie's § 1125(a)(1)(B) claim is based on statements made during Payer Matrix's "disparagement campaign."

### 4. Statements About Imported Drugs

AbbVie challenges two Payer Matrix statements related to drug importation. First, AbbVie says that Payer Matrix advertises in its marketing materials "that the medicines obtained through its importation program … come from 'legitimate and valid sources,' despite the fact that these medicines are being illegally imported from outside the United States." [233] ¶ 490. Although AbbVie argued in its motion for a preliminary injunction that this statement is literally false, Payer Matrix's use of these words was not so "bald-faced, egregious, undeniable, [and] over the top" to be considered literally false under the Lanham Act. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018). The statement is also not literally true but misleading in context. The Court stands by its earlier conclusion that "generic words such as 'legitimate' and 'valid' cannot reasonably be construed as synonymous with 'FDA-approved' or 'FDCA-compliant.'" [343] at 28.

Second, AbbVie points to a Payer Matrix statement saying that, as part of RxFree4Me's international drug sourcing program, "[m]embers receive their *same brand medications* delivered to their door for a \$0 copay." [233] ¶ 489 (emphasis added). This statement fares no better. AbbVie does not allege that the "same brand"

statement is literally false—in other words, that the imported medicines are not actually AbbVie-brand medicines. Moreover, as the Court concluded in its order denying the motion for a preliminary injunction, a reasonable person would not be misled into thinking that "same *brand*" means "same regulatory approval process." [343] at 29. It is no secret that RxFree4Me sources drugs from Canada, and AbbVie does not otherwise identify how consumers would be misled by the "same brand" statement.

The Court therefore grants Payer Matrix's motion to dismiss to the extent AbbVie bases its § 1125(a)(1)(B) claim on statements Payer Matrix made about international drug importation.

### 5. Statements That AbbVie Had "Partnered with" Payer Matrix or Otherwise Approved of Payer Matrix's Business Model

Finally, AbbVie bases its false advertising claim on the same statements that support its false association claim—namely, Payer Matrix's claim that it "partnered with AbbVie and that AbbVie benefitted from Payer Matrix's activities through tax deductions and an increase in customers." [356] at 21 (relying on statements alleged at [233] ¶¶ 329, 334–35).

Payer Matrix first argues that these statements cannot constitute false advertising under the Lanham Act because they are "nothing more than a recharacterization" of AbbVie's false association claim. [351] at 27. To support this argument, Payer Matrix cites to one out-of-circuit district court case dismissing a Lanham Act false advertising claim because it was "more appropriately assessed under the framework for false designation of origin." *Red Rock Sourcing LLC v. JGX*

35

*LLC*, No. 21 CIV. 1054 (JPC), 2024 WL 1243325, at *31 (S.D.N.Y. Mar. 22, 2024). But Payer Matrix overreads *Red Rock*, especially where the alleged confusion in that case only arose "from the presence of [plaintiff's] mark" on a counterfeit product. *Id.* And, as AbbVie points out, other courts have allowed plaintiffs to rely on the same statements to support liability under § 1125(a)(1)(A) and § 1125(a)(1)(B) simultaneously. *See, e.g.*, *Grubbs*, 807 F.3d at 792; *FireBlok*, 2021 WL 6049964, at *5–7; *Register.Com, Inc. v. Domain Registry of Am., Inc.*, No. 02 CIV. 6915 (NRB), 2002 WL 31894625, at *13 (S.D.N.Y. Dec. 27, 2002). The Court therefore declines to read the requested limitation into the Lanham Act.

Payer Matrix next argues that its alleged misrepresentations were merely about whether AbbVie "*likes and approves of* Payer Matrix's business," not about the "nature, characteristics, [or] qualities of [Payer Matrix's] good and services." [366] at 15 (quoting 15 U.S.C. § 1125(a)(1)(B)) (emphasis in original). The Court disagrees. As already explained, the plain meaning of "partner" suggests that Payer Matrix and AbbVie joined together for the purpose of completing some shared business activity. Thus, whether AbbVie "partners" with Payer Matrix is an objectively verifiable fact, not a statement as to AbbVie's opinion of Payer Matrix's services. *C.f. Sanchez*, 733 F. Supp. 3d at 672 (statements are actionable under Lanham Act if they are "objective" and "verifiable"). And whether AbbVie and Payer Matrix "partner" with one another plainly goes to the nature of Payer Matrix's services.

Payer Matrix otherwise relies on the same argument it makes in the false association context: that "AbbVie has alleged *no* false or misleading statement of fact

in its marketing presentation allegations." [351] at 27 (emphasis in original). For the reasons already discussed, *see supra* at 23–25, it is plausible that a plan sponsor listening to Payer Matrix's presentations could be misled into thinking that AbbVie endorses (and even aids) Payer Matrix's methods for enrolling its members in AbbVie's PAP and CAP and that this plan sponsor would be persuaded to procure Payer Matrix's services as a result.

The Court therefore denies Payer Matrix's motion to dismiss Count VI to the extent AbbVie relies on Payer Matrix's statements in its marketing materials suggesting AbbVie's approval of Payer Matrix's scheme, including statements that AbbVie had "partnered with" Payer Matrix.

### III. State Law Claims

Payer Matrix argues that AbbVie's Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), tortious interference, and common law fraud claims "all fail to the extent they rely on the same faulty premise—*i.e.*, that the BCLs misrepresented a patient's coverage status." [351] at 34. The Court begins with this preliminary question before considering the more claim-specific arguments.

### A. Whether Payer Matrix Misrepresented Members' Coverage Status

The basic premise supporting Payer Matrix's alleged misrepresentation is this: when facilitating its members' PAP applications, Payer Matrix submitted BCLs to AbbVie saying that its members were "responsible for 100% of the cost of their drugs or that their drugs have been excluded from their plans' formularies." [233] ¶ 104. But despite this representation, AbbVie says the member's employer (*i.e.*, the plan

37

sponsor) had every intention of covering the cost of the drug if the member was ultimately denied from AbbVie's PAP. For example, AbbVie alleges that Payer Matrix's "clients' amended [Summary Plan Descriptions] … commonly contain language informing members that their specialty drugs will continue to be covered by the plan if Payer Matrix is unable to obtain alternate funding." *Id.* ¶ 95. AbbVie alleges that Payer Matrix's client brochures and marketing materials represent the same, "confirming that overrides are granted as a matter of course when PAP admission is denied and that the purported specialty drug exclusion is a sham." *Id.* ¶ 96. Based on these allegations, AbbVie plausibly states that Payer Matrix misrepresented the truth when it communicated to AbbVie via BCLs that members were responsible for 100% of the cost of their drugs.

Payer Matrix argues that AbbVie did not rely on the BCLs submitted with the PAP applications "given that [AbbVie] conducted independent benefits investigations." [351] at 34. AbbVie unmistakably says otherwise, [233] ¶¶ 216, 593, and at this juncture, the Court accepts those allegations as true. In addition, Payer Matrix contends that the "BCLs were not representations by Payer Matrix" because they were issued by PBMs and plan sponsors and it was the patients, not Payer Matrix, who certified the applications' truthfulness. [351] at 34. But AbbVie alleges that Payer Matrix (1) submitted the BCLs knowing they falsely represented the members' insurance status, (2) concealed the BCLs from patients who signed the applications, and (3) provided PBMs and plan sponsors with the BCL template. [233] ¶¶ 194–96, 206–07. That is enough for now.

### B. Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII)

In Count VII, AbbVie brings a claim under the deceptive practices prong of the ICFA, 815 ILCS 505 *et seq.* [233] ¶¶ 550–66. To succeed on this claim, a plaintiff must prove (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Spector v. Mondelez Int'l, Inc.*, 178 F. Supp. 3d 657, 664 (N.D. Ill. 2016) (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100 (2005)).

In addition, as a non-consumer, AbbVie must establish that its claim has a "consumer nexus" by showing that "the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Kraft Foods Grp., Inc. v. SunOpta Ingredients, Inc.*, No. 14 C 9419, 2016 WL 5341809, at *5 (N.D. Ill. Sept. 23, 2016) (quoting *Brody v. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 698 N.E.2d 257, 268–69 (Ill. App. Ct. 1998)). In other words, AbbVie only "may sue under the ICFA if [it] allege[s] (and ultimately prove[s]) the nexus between the objectionable conduct and the consumer injury or harm." *Patel v. Zillow, Inc.*, No. 17 C 4008, 2018 WL 2096453, at *8 (N.D. Ill. May 7, 2018), *aff'd*, 915 F.3d 446 (7th Cir. 2019) (citing *GC2 Inc. v. Int'l Game Tech. PLC*, 255 F. Supp. 3d 812, 82 (N.D. Ill. 2017)). "Under the consumer nexus theory, non-consumers … must eventually establish '(1) that their actions were akin to a consumer's actions to establish a link between them and consumers; (2) how defendant's representations …

39

concerned consumers other than themselves; (3) how defendant's particular [conduct] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers.'" *Id.* (quoting *Brody*, 298 Ill. App. 3d at 160). Courts have held that "consumer protection concerns" are implicated where the defendant's conduct "involves sharp practices designed to mislead consumers about a competitor" or "public health, safety or welfare issues." *Kraft Foods*, 2016 WL 5341809, at *6 (first quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 39 (Ill. App. Ct. 1989), then quoting *Stickle Enters., Ltd. v. CPC Int'l., Inc.*, No. 96 C 3123, 1997 WL 767301, at *4 (N.D. Ill. Dec. 3, 1997)); *see also Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 847 (N.D. Ill. 2024).

AbbVie has not met this burden here. Even if Payer Matrix's allegedly deceptive conduct might ultimately hurt specialty drug patients, AbbVie does not act in a role akin to a consumer when it accepts or denies patients from its PAP and CAP. According to AbbVie, as a result of Payer Matrix's PAP- and CAP-related efforts, consumers (1) face delays in obtaining their specialty drugs, (2) may have their prescriptions changed unnecessarily, and (3) experience "unnecessary inconvenience, uncertainty, and confusion" regarding their specialty drugs. [233] ¶ 562. In contrast, the harm to AbbVie is primarily economic: "an increase in the operational costs associated with its patient assistance programs and a loss of sales." *Id.* ¶ 565. In other words, while AbbVie is facing operational and financial issues, patients are facing access-to-health-care issues. AbbVie therefore cannot say that its actions are "akin to

40

a consumer's actions" when it administers the PAP and CAP. *Patel*, 2018 WL 2096453, at *8 (quoting *Brody*, 298 Ill. App. 3d at 160).

In the same vein, the damages AbbVie requests to remedy its economic harm will not "serve the interests of consumers." *Patel*, 2018 WL 2096453, at *8; *see also ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 282 F. Supp. 3d 1043, 1051 (N.D. Ill. 2017) ("To implicate consumer protection concerns, there must be … a connection between the requested relief and consumers generally.") (citing *Brody*, 298 Ill. App. 3d at 160). One could easily imagine wholly different damages that a patient might seek to recover in a suit the patient brought against Payer Matrix. For example, a patient might seek damages to compensate him for physical injuries stemming from gaps in treatment caused by delays in filling prescriptions. The patient might also seek compensatory damages for time he expended calling health care providers, insurance companies, and PBMs in an effort to get his hands on an appropriate and covered medication. Although the damages AbbVie seeks and the damages the hypothetical patient-plaintiff would seek may arise out of the same alleged conduct committed by the same bad actor, AbbVie does not say how the damages it seeks will somehow serve injured consumers. *See Patel*, 2018 WL 2096453, at *9 (finding no consumer nexus where homeowner plaintiffs' "requested relief would not serve the interests of consumers because the actual damages they seek are costs incidental to their inability to sell their homes").

41

For these reasons, the Court grants Payer Matrix's motion to dismiss Count VII.[6] Because the deficiency the Court describes is one that bears on the fundamental legal theory underlying AbbVie's ICFA claim, rather than a defect that could be cured with repleading, the dismissal is with prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015).

### C. Illinois Uniform Deceptive Trade Practices Act (Count VIII)

In Count VIII, AbbVie claims Payer Matrix violated various provisions of the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510 *et seq.* [233] ¶¶ 567–74. "Unfair competition claims and deceptive trade practice claims brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *Medscript Pharmacy, LLC v. My Script, LLC*, 77 F. Supp. 3d 788, 798 (N.D. Ill. 2015).

AbbVie first alleges that Payer Matrix violated §§ 510/2(a)(2), (a)(3), and (a)(5) of the IDTPA, which prohibit practices that are likely to cause confusion as to one company's sponsorship or approval of another company's goods or services. The requirements for these claims are essentially the same as the Lanham Act's requirements for a false association claim under § 1125(a)(1)(A), and Payer Matrix provides no reason why AbbVie cannot state an IDTPA false association claim if it has stated an equivalent claim under the Lanham Act. The Court therefore denies

---

[6] The Court acknowledges that the parties did not address this issue in their briefing on Payer Matrix's motion to dismiss. *See* [351] at 34–35; [356] at 34–35. However, the parties fully briefed the consumer nexus issue on AbbVie's motion for a preliminary injunction. *See* [277] at 35–37; [304] at 17–20; [326] ¶ 65; [332] ¶¶ 101–03, 106–09. AbbVie therefore has had the opportunity to convince the Court that its ICFA claim meets the consumer nexus test.

Payer Matrix's motion to dismiss AbbVie's IDTPA claim under §§ 510/2(a)(2) and (a)(3) to the extent that AbbVie, for reasons already set forth earlier (*see supra* at 22–27, has articulated a false-association claim under the Lanham Act based on allegedly false representations Payer Matrix made during marketing presentations to plan sponsor clients and their brokers.

AbbVie also brings IDTPA claims pursuant to §§ 510/2(a)(7) and (a)(12). Section 510/2(a)(7) prohibits a company from "represent[ing] that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another." Section 510/2(a)(12), meanwhile, prohibits a company from "engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding." AbbVie's claims under these provisions mirror its Lanham Act false advertising claims. Therefore, for the reasons already discussed, AbbVie has stated an IDTPA claim related to the advertising on Payer Matrix's website and Payer Matrix's statements about partnering with AbbVie. *See supra* at 29–37.

AbbVie argues that even the statements that do not pass muster under the Lanham Act still state a claim under the IDTPA because, "for IDTPA liability, deceptive statements do not have to occur in the context of commercial advertising." [356] at 35. For support, AbbVie cites one district court case describing the differences between the two statutes based on the elements included in the parties' jury instructions. *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2023 WL 6198827, at *5 (N.D. Ill. Sept. 22, 2023), *aff'd*, 135 F.4th 572 (7th Cir.

2025). But *Republic Technologies* acknowledges that an IDPTA claim requires "advertising," *id.*, and the Seventh Circuit has previously assumed that the Lanham Act analysis applies equally to Illinois false advertising claims, including the requirement that a misrepresentation be made "in a commercial advertisement." *See Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007); *see also Neuros*, 698 F.3d at 523 (noting that the IDTPA is "generally thought indistinguishable from the Lanham Act except of course in its geographical scope"); *Daniels Sharpsmart, Inc. v. Becton, Dickinson & Co.*, No. 17 C 6940, 2018 WL 11470992, at *1 (N.D. Ill. May 20, 2018) ("The standards for the claim under the IDTPA are the same as those for the claim under the Lanham Act."). Without a more robust argument from AbbVie explaining why the requirement does not apply, the Court follows the Seventh Circuit's suggestion that IDTPA claims must occur in the context of commercial advertising or promotion.[7]

Payer Matrix's motion to dismiss Count VIII, AbbVie's IDTPA claim, is therefore granted in part and denied in part consistent with the analysis above concerning AbbVie's Lanham Act claims.

---

[7] AbbVie also argues that unlike the Lanham Act, IDTPA claims can be based on material omissions. *See, e.g.*, [356] at 35. But the one case AbbVie provides in support of this proposition says only that omission-based claims are allowed under the ICFA, 815 ILCS 505 *et seq. See Kirkruff v. Wisegarver*, 297 Ill. App. 3d 826, 837–38 (Ill. App. Ct. 1998). To be sure, the case does mention the IDTPA, but only because the ICFA describes "unfair methods of competition and unfair or deceptive acts or practices" to include "any practice described in Section 2 of the [IDTPA]." *Id.* at 838 (quoting 815 ILCS 505/2). Without additional authority supporting that an IDTPA claim can be based on an omission, the Court considers AbbVie's omission-based argument waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

**D. Tortious Interference (Count IX)**

In Count IX, AbbVie brings a claim for tortious interference with prospective business opportunity. [233] ¶¶ 575–87. To prevail on a tortious interference claim in Illinois, a plaintiff must prove: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998).

To the extent AbbVie's tortious interference claim relies on Payer Matrix's facilitation of imported drugs from Canada, AbbVie's claim fails for the same reason stated in the Court's earlier order denying AbbVie's motion for a preliminary injunction. AbbVie alleges that Payer Matrix tortiously interfered by "falsely and misleadingly marketing new, unapproved versions of purported AbbVie medicines that are illegally imported from outside the United States as being the same as FDA-approved versions of AbbVie's medicines." [233] ¶ 581. But as discussed, AbbVie does not allege that Payer Matrix made any false or misleading statements about the imported drugs or that Payer Matrix falsely said they are FDA-approved. *See supra* at 34–35. AbbVie's tortious interference claim based on international drug importation fails as a result. *See* [343] at 30.

AbbVie also bases its tortious interference claim on Payer Matrix's facilitation of PAP applications and drug-conversion efforts. *See* [233] ¶¶ 579–80. Payer Matrix

45

says this claim fails because it relies on the same "faulty premise" that it misrepresented patients' insurance coverage. [351] at 34. As discussed, at this stage, the Court will not find as a matter of law that Payer Matrix truthfully represented its members' coverage status. Payer Matrix otherwise offers little reason to dismiss this theory of tortious interference other than to say that all of AbbVie's other theories "fail for reasons explained elsewhere." *Id.* at 35 n.16. Having taken into account the remainder of its rulings, the Court sees no reason why AbbVie's tortious interference claim based on Payer Matrix's PAP facilitation and drug-conversion efforts should not survive this stage.[8]

The Court grants Payer Matrix's motion to dismiss Count IX to the extent it relies on Payer Matrix's facilitation of imported drugs from Canada but denies the motion as to AbbVie's remaining theories of tortious interference.

### E. Common Law Fraud (Count X)

In Count X, AbbVie alleges Payer Matrix engaged in common law fraud when it represented to AbbVie that PAP applicants lacked commercial insurance coverage for Skyrizi, Humira, and Rinvoq, even though the plans guaranteed coverage for those medicines if they were denied PAP benefits. [233] ¶ 588–94. To state a claim for common law fraud under Illinois law, AbbVie must allege: "(1) a false statement

---

[8] Payer Matrix also insists that "AbbVie lacks any valid business expectancy in retaining patients when cheaper alternatives exist." [351] at 35; *see also* [366] at 23. Without the benefit of discovery, the Court declines to conclude as a matter of law that AbbVie could not reasonably expect to continue its relationships with patients taking Skyrizi, Rinvoq, and Humira. *See* [233] ¶ 577; *see also Lantern Haus Co. v. Hoskins*, No. 21-CV-4490, 2023 WL 2745151, at *6 (N.D. Ill. Mar. 31, 2023) ("[A] plaintiff need not prove his case at the motion to dismiss stage."). For now, it is enough that AbbVie alleges interference with its "continuing business relationship with the patient." [233] ¶ 582.

of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996) (citing *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989)).

In challenging AbbVie's common law fraud claim, Payer Matrix only argues that it made no false statement of material fact because the BCLs "truthfully conveyed" patients' coverage status. [351] at 34. For the reasons already discussed, AbbVie plausibly states that Payer Matrix did misrepresent members' insurance coverage in the process of facilitating PAP applications. Because Payer Matrix offers no other reason to dismiss AbbVie's common law fraud claim, the Court denies Payer Matrix's motion to dismiss Count X.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Payer Matrix's motion to dismiss. [347]. In resolving Payer Matrix's motion to dismiss, the Court considered AbbVie's surreply in support of its opposition to the motion to dismiss, and so the Court grants AbbVie's leave to file that surreply. [368].

To summarize: AbbVie has sufficiently stated RICO claims between Payer Matrix and the respective PBMs (Counts I through III). It has also stated claims for false association under the Lanham Act (Count V); false advertising under the Lanham Act (Count VI); deceptive practices under the IDTPA (Count VIII); tortious interference (Count IX); and common law fraud (Count X), although subject to the

specific limitations identified in the Court's opinion. AbbVie's RICO claim based on the Superior Biologics Enterprise (Count IV) is dismissed without prejudice. AbbVie's claim under the ICFA (Count VII) is dismissed with prejudice.

The Court grants AbbVie leave to file a second amended complaint on or before 8/29/25 if it can cure the deficiencies identified in Counts IV, V, VI, VIII, and IX while still complying with its Rule 11 obligations. *See Runnion*, 786 F.3d at 519–20. If AbbVie elects not to file a second amended complaint by 8/29/25, the dismissal of Count IV will convert to a dismissal with prejudice.

_____
Georgia N. Alexakis
United States District Judge

Date: 8/15/25