**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ABBVIE INC.,

        Plaintiff,

    v.

PAYER MATRIX, LLC,

        Defendant.

No. 23 CV 2836

Judge Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

Plaintiff AbbVie brings its second amended complaint against defendant Payer Matrix. [392]. Payer Matrix moves under Rule 12(b)(6) to dismiss it in part. [402]. Payer Matrix brings counterclaims against AbbVie. [405]. AbbVie moves to dismiss them all. [421]. For the following reasons, the Court grants Payer Matrix's motion and grants AbbVie's motion in part and denies it in part.

### LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

At the pleading stage, the Court must "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff," as it does in the discussion that follows. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

The parties are familiar with the procedural history and factual backdrop here, which the Court set forth when denying AbbVie's earlier motion for a preliminary injunction. [343] at 2–11. Another earlier opinion from the Court, granting in part and denying in part Payer Matrix's motion to dismiss AbbVie's first amended complaint, provides relevant context as well. [387]. The Court therefore foregoes another recitation of this material and provides overviews of only the relevant new allegations. The Court addresses AbbVie's motion to dismiss before moving to Payer Matrix's partial motion to dismiss.

## I. AbbVie's Motion to Dismiss Payer Matrix's Counterclaims

### A. Payer Matrix's Allegations

Payer Matrix contracts with employers or an employer's pharmacy benefit manager ("PBM") or third-party administrator ("TPA") to help their members access high-cost specialty drugs not covered under an insurance plan. [405] ¶¶ 33, 38.[1] One

---

[1] Payer Matrix's counterclaims begin at page 250 of [405]. All citations in this opinion to paragraphs in [405] are to Payer Matrix's counterclaims.

way that Payer Matrix helps members afford specialty drugs is by assisting them in applying for drug companies' patient assistance programs ("PAP"). *Id.* ¶ 37.

PAP eligibility is determined by the drug company and is usually based on financial need and the applicant's insurance status; the company often requires applicants to be insured or underinsured. *Id.* AbbVie's PAP also requires the member's healthcare provider to complete much of the application, so Payer Matrix follows up with providers to ensure that the applications submitted are timely. *Id.* ¶ 41. Payer Matrix began assisting its members with applications for AbbVie's PAP starting no later than 2019. *Id.* ¶ 78. Payer Matrix disclosed its involvement in these applications to AbbVie and worked with AbbVie representatives as part of its PAP eligibility investigations. *Id.* ¶ 79. Payer Matrix also started a biosimilar program to encourage members and their health care providers to explore biosimilar alternatives to brand-name specialty drugs. *Id.* ¶ 45. Payer Matrix is not a health plan and does not pay for members' medications. *Id.* ¶ 43. It simply helps members navigate the "pharmacy benefit ecosystem." *Id.*

Around 2021, AbbVie began investigating the impact of alternative funding programs ("AFPs"), including Payer Matrix, on its revenue. *Id.* ¶ 80. AbbVie used Salesforce to identify and track AFPs, *id.* ¶ 81, and engaged Hayden Consulting Group ("Hayden") to assess the financial impact of AFPs, *id.* ¶ 82. Hayden informed AbbVie that AFPs cause "lost revenue" and recommended that AbbVie find ways to keep patients on its co-pay assistance program instead of on PAP. *Id.* Hayden also

3

recommended amending PAP eligibility requirements by denying applications from patients affiliated with AFPs. *Id.*

In 2022, AbbVie began taking action. In an internal presentation, it described alternate funding as a "malignant tumor" that "needed to be dealt with strategically and aggressively." *Id.* ¶ 83. The presentation proposed revising PBM contract language to make members affiliated with AFPs ineligible for formulary rebates in order to "potentially stop the spread of" AFPs. *Id.* About a month after that presentation was circulated and while continuing to work with Hayden, AbbVie developed a "PAP Sustainability Plan" that discussed various factors, internal and external, affecting the long-term viability of AbbVie's PAP. *Id.* ¶ 84.

In January 2023, AbbVie changed its PAP eligibility requirements to exclude "[p]atients with insurance plans or employers participating in an alternate funding program (also sometimes referred to as … Payer Matrix, among other names)." *Id.* ¶ 86. AbbVie published the changed eligibility requirements on the PAP application, which was available on its public website. *Id.* ¶ 216(a). It also developed talking points in anticipation of pushback from patients who now would be denied access to AbbVie's PAP and from those patients' providers. *Id.* ¶ 96. Representatives were instructed to tell callers that AbbVie had "updated [its] eligibility guidelines to respond to changes with [the patient's] insurance provider." *Id.* ¶ 96. It also instructed representatives to say that AFPs "[c]an cause delays to treatment and be highly disruptive to patients, as well as infringing on benefits intended for patients who are uninsured or underinsured." *Id.* ¶ 100. Around the same time, AbbVie

developed similar talking points to respond to inquiries about this lawsuit against Payer Matrix. *Id.* ¶ 98. Payer Matrix alleges on information and belief that Hayden and ZS Associates, another consulting firm, assisted in drafting these talking points. *Id.* ¶ 192.

When AbbVie denied patients' PAP applications, it sent them denial letters stating that the denial was because AbbVie "believe[d] [the patient's] insurance provider is, or is partnering with a third-party company to, inappropriately utilize our program instead of their insurance coverage." *Id.* ¶ 111. Payer Matrix also alleges on information and belief that Hayden and ZS Associates assisted in drafting this language. *Id.* ¶ 191. AbbVie's representatives made similar statements to patients who called in to ask about the PAP denials, *id.* ¶ 123, but sometimes the representatives went further, telling patients that Payer Matrix was "committing fraud," *id.* ¶ 119, or "operating illegally," *id.* ¶ 118, and directing them to contact Payer Matrix for assistance in paying for their medications, *id.* ¶ 120. AbbVie representatives also responded to telephone inquiries from healthcare providers by telling them that "Payer Matrix was causing [] problems with coverage," *id.* ¶ 93, that Payer Matrix was acting illegally, *id.* ¶ 92, and that the providers should not work with Payer Matrix, *id.* ¶ 93.

Meanwhile, the Patient Access Network ("PAN"), a charitable foundation, began speaking out against AFPs. *Id.* ¶¶ 16–17. For example, in January 2023, PAN participated in sending an open letter to Payer Matrix accusing it of not truly being a "patient advocacy company." *Id.* ¶ 202. In November 2023, one of PAN's officers

appeared on a podcast with a partner at ZS Associates, where the PAN officer discussed her organization's commitment to eradicating AFPs and educating employers about the purported dangers of AFPs. *Id.* ¶ 169. AbbVie was a major contributor to PAN, donating approximately $100 million in 2023. *Id.* ¶ 171.

Payer Matrix says that AbbVie's actions have caused it to lose business relationships and revenue. *See, e.g., id.* ¶¶ 136–48, 210–14. It therefore seeks redress through eight claims: (1) defamation, *id.* ¶¶ 215–25; (2) tortious interference with business expectancy, *id.* ¶¶ 226–37; (3) tortious interference with contractual relationships, *id.* ¶¶ 238–45; (4) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.*, [405] ¶¶ 246–57; (5) violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 *et seq.*, [405] ¶¶ 258–64; (6) monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, [405] ¶¶ 265–73; (7) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), predicated on an AbbVie-Foundations Enterprise, [405] ¶¶ 274–84; and (8) violations of RICO predicated on an AbbVie-Consultants Enterprise, *id.* ¶¶ 285–95.

### B.    Analysis

The Court first analyzes Payer Matrix's RICO and antitrust claims before proceeding to its state law claims.

### 1.   Payer Matrix's RICO Claims (Counts VII & VIII)

To establish a violation of § 1962(c), a plaintiff must show that the defendant participated in (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

In seeking to dismiss Payer Matrix's RICO claims, AbbVie contends, among other things, that Payer Matrix has failed to allege that AbbVie participated in the "conduct" of an "enterprise." [424] at 14–19. "[E]nterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Payer Matrix asserts the existence of two enterprises of the last kind: associations-in-fact. [405] ¶¶ 163–64. The first consists of AbbVie, PAN, and other unidentified charitable foundations. The Court refers to this alleged enterprise as the "Foundation Enterprise." The second consists of AbbVie, third-party consultants Hayden, ZS Associates, and JBI, as well as other unnamed third-party consultants. The Court refers to this alleged enterprise as the "Consultant Enterprise."

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). It has "at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946 (cleaned up). The RICO enterprise must be distinct from the person of the defendant. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015) (citing *United Food & Com. Workers Unions &*

7

*Emps. Midwest Health Benefits Fund v. Walgreen*, 719 F.3d 849, 853–54 (7th Cir. 2013)). The plaintiff also must "establish that the defendant 'person' participated in the operation or management of the distinct enterprise." *Id.* (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)).

AbbVie contends that the Foundation Enterprise and the Consultant Enterprise fail for the same two reasons (at least). First, Payer Matrix's counterclaims do not show a relationship among the non-AbbVie members of either purported enterprise. Second, the counterclaims show that AbbVie's relationships with the entities allegedly associated with each enterprise were run-of-the-mill business relationships, not relationships formed in pursuit of a common purpose. The Court considers each argument in turn.

### a. Relationships Among Those Associated with the Enterprise

To plausibly allege relationships among those associated with an enterprise, a pleading must show "how the different actors are associated." *See Rao v. BP Prods. N.A., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009). The actors must be members of "a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948. It is not enough for the pleading to show that one actor in the enterprise has relationships with each of the other entities associated with the purported enterprise; it must also show relationships among those other entities. *See New England Carpenters Health & Welfare Fund v. Abbot Lab'ys*, No. 12 CV 1662, 2014 WL 4783833, at *6 (N.D. Ill. Sept. 25, 2014); *D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010).

Payer Matrix's counterclaims do not show relationships among the non-AbbVie entities allegedly associated with the Foundation Enterprise. Payer Matrix alleges that the charitable foundations are "all associated," [405] ¶ 275, engage in "coordinated activities," *id.* ¶ 282, and engage in "consistent dialogue and joint strategizing," *id.* ¶ 168. But the Court need not consider those conclusory allegations "without reference to its factual context." *Iqbal*, 556 U.S. at 686. And the counterclaims have no factual context showing any relationship among the foundations outside of their individual relationships with AbbVie. *See id.* ¶ 163 ("AbbVie orchestrates and maintains this association-in-fact enterprise, operating as both a member and leader."). Indeed, Payer Matrix alleges almost nothing about the non-PAN charitable foundations' roles in the purported enterprise, except that "the Foundations act as conduits for the AbbVie-Foundations Enterprise by funneling millions of dollars for patients' drug co-payments," *id.* ¶ 276, and were "willing[] to steer patients towards AbbVie medications, provide AbbVie with detailed 'return on investment' [] data associated with the donations, and support AbbVie's commercial and policy objectives," *id.* ¶ 197. The counterclaims' well-pleaded facts might plausibly show a bilateral relationship between AbbVie and PAN, but they in no way show a relationship or collaboration "among" the various unnamed foundations "associated with" the enterprise that Payer Matrix alleged. *Boyle*, 556 U.S. at 944; *see also Ins. Brokerage*, 618 F.3d at 375.

Payer Matrix also has failed to allege relationships or collaboration among the entities associated with the Consultant Enterprise. It alleges (again, in conclusory

fashion) that AbbVie and the consultants engaged in "consistent dialogue and joint strategizing," [405] ¶ 176; "regular[] shar[ing]" of "intelligence," *id.* ¶ 198; "racketeering conduct … with the coordinated assistance of third-party consultants," *id.* ¶ 287; and "coordinated activities" as "part of a unified, calculated effort," *id.* ¶ 293. Setting aside these conclusory allegations, *Iqbal,* 556 U.S. at 686, the factual content demonstrating a relationship among the non-AbbVie members of the purported Consultant Enterprise is scant. There is one allegation that, read in the light most favorable to Payer Matrix, asserts that Hayden and ZS Associates both assisted with drafting standard language for PAP denial letters, [405] ¶ 191, and another allegation that, also read in the light most favorable to Payer Matrix, asserts that Hayden and ZS Associates assisted with drafting AbbVie's internal talking points, *id.* ¶¶ 192, 200. There are no factual allegations describing any relationship among JBI and the other, unnamed consultants.

The allegations describing each consultant's distinct role in the purported association-in-fact enterprise are slightly more substantial. According to Payer Matrix, "JBI focuses on the financial strategy, including how to best leverage AbbVie's monetary contributions" to the charitable foundations. *Id.* ¶ 180. Specifically, JBI gave a 2016 presentation laying out the business case for a $55-million charitable donation. *Id.* ¶ 71. For its part, "ZS Associates focuses on external public relations, including anti-AFP messaging." *Id.* ¶ 179. Specifically, a ZS Associates partner hosted a podcast on which PAN's chief media officer discussed "the purported dangers of AFPs." *Id.* ¶¶ 169, 179, 201. Hayden "focuses on AbbVie's

10

internal response to AFPs." *Id.* ¶ 178. Specifically, it recommended to AbbVie that it "consider denying patients" whose insurance companies work with AFPs, *id.* ¶ 82, which AbbVie then did, *id.* ¶¶ 84, 86. It also "profile[d] and track[ed] … the presence and growth of AFPs" and "their effect on AbbVie's revenues[ and] market shares." *Id.* ¶ 198.

The factual allegations describing the consultants' relationships and roles might be sufficient to infer relationships among AbbVie and two of the alleged consultants, ZS Associates and Hayden, as these entities allegedly collaborated in drafting standard language and talking points for AbbVie, *id.* ¶¶ 191–92, 200. But they do not support an inference that JBI or the other unnamed consultants had relationships with anyone other than AbbVie. There are no factual allegations that JBI collaborated with ZS Associates or Hayden, and there is no reason to think that JBI's recommendation to increase charitable giving had anything to do with the work of ZS Associates or Hayden. Payer Matrix has thus failed to plausibly allege "relationships among" the entities "associated with" the Consultant Enterprise as Payer Matrix has alleged it. *Boyle*, 556 U.S. at 944.

### b. Common Purpose

Separately, Payer Matrix has failed to plausibly allege that AbbVie had relationships directed toward a common purpose with the purported members of the Foundation Enterprise and the Consultant Enterprise.

The Seventh Circuit distinguishes "run-of-the-mill commercial relationship[s] where each entity acts in its individual capacity to pursue its individual self-interest" from "joint enterprise[s] where each individual entity acts in concert with the others

11

to pursue a common interest." *Bible*, 799 F.3d at 655–56. The latter can constitute an association-in-fact enterprise; the former cannot. *See id.* at 656. That is because a defendant is only liable under RICO for "conducting the affairs of [the enterprise], as opposed to [its] own affairs." *Walgreen*, 719 F.3d at 854.

As the Court explained in an earlier opinion in this matter, *see* [387] at 5–11, the distinction between run-of-the-mill business relationships and association-in-fact enterprises often turns on the degree to which company officials, operations, and finances intertwine. For example, in *Walgreen*, an employee benefit plan brought RICO claims against Walgreens and Par Pharmaceutical, alleging that the two companies had schemed to systemically fill prescriptions for Par's drugs with a dosage form that was more expensive than the form prescribed to the customer. *Id.* at 851–52. The *Walgreen* plaintiff alleged in some detail the various communications in which Par proposed the scheme and Walgreens agreed to it, *id.* at 854, as well as the ways Walgreens implemented the scheme, *id.* at 852. It also alleged that the two companies negotiated price reductions to offset Walgreens' revenue losses after Walgreens, under scrutiny from the Justice Department, gave up on the scheme. *Id.* at 852.

The Seventh Circuit nevertheless held that the plaintiff had not plausibly alleged "that Walgreens and Par were conducting the affairs of this [alleged enterprise], as opposed to their own affairs." *Id.* at 854. The complaint lacked allegations that "officials from either company involved themselves in the affairs of the other" or that "profits from the illegal drug-switching scheme were siphoned off

to the [] enterprise or to individual enterprise members." *Id.* Ultimately, the court of appeals explained, the plaintiff's allegations were "entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filling prescriptions." *Id.* at 855.

In *Bible*, on the other hand, the plaintiff brought RICO claims against the guaranty agency responsible for collecting her student loans in the event of default, alleging that it wrongfully assessed collection costs against her in violation of RICO. 799 F.3d at 638. She alleged an association-in-fact enterprise comprising the guaranty agency, another company the agency used as its debt collector, and the debt collector's parent company. *Id.* at 655. The Seventh Circuit held that the three companies had "more than a run-of-the-mill commercial relationship." *Id.* at 656. It reasoned, first, that the complaint alleged an "unusual degree of economic interdependence among the entities," including an arrangement by which the entities referred business to each other. *Id.* The appeals court also noted that the complaint detailed the ways that the entities' debt collection operations were intertwined, including their use of each other's fax machines, their officers' input and approval of each other's correspondence, their assumption of each other's statutory responsibilities, and their negotiations of legal settlements on each other's behalf. *Id.*

Here, with respect to the Foundation Enterprise, AbbVie says that the counterclaims show only a donor-recipient relationship between AbbVie and PAN

(the only named foundation), not a relationship directed toward a common purpose.[2] [424] at 15–17. Payer Matrix disagrees, asserting that it has sufficiently pled that "AbbVie and PAN are engaged in a collusive, quid pro quo arrangement meant to maximize AbbVie's special drug revenues and expand and preserve AbbVie' market share." [435] at 16. The Court agrees with AbbVie.

The Foundation Enterprise asserted here is more like *Walgreen* than *Bible*. Payer Matrix alleges that AbbVie made several donations to PAN between 2019 and 2024 totaling more than $550 million and, in 2023, providing around 27% of PAN's total contributions. [405] ¶¶ 72, 171, 173. Payer Matrix also lists a few of PAN's anti-AFP advocacy efforts, including the 2023 podcast appearance by its chief media officer and its participation in a 2023 open letter to Payer Matrix. *Id.* at 302 ¶¶ 169, 171, 173, 202. Those allegations show nothing more than a charitable foundation engaged in advocacy receiving a large sum of money from an even larger firm (Payer Matrix alleges that AbbVie's enterprise valuation is nearly $450 billion. *Id.* ¶ 49.). That is neither unheard of nor untoward, notwithstanding the fact that AbbVie's interest in combating AFPs overlaps with PAN's advocacy. *See Taylor v. Ocwen Loan Servicing,*

---

[2] As part of its argument, AbbVie contends that the Court should decline to consider "conclusory, speculative, and implausible 'information and belief' allegations." [424] at 15. Of course, the Court need not credit conclusory allegations. *Iqbal*, 556 U.S. at 686. But allegations made on information and belief are not necessarily conclusory. In general, claims may be pled on information and belief if the plaintiff has done some reasonable pre-complaint inquiry but nevertheless does not have access to the information. *Crockett v. WKM Auto., Inc.*, No. 23-CV-14899, 2025 WL 886171, at *7 (N.D. Ill. Mar 21, 2025). Although information-and-belief allegations ordinarily do not satisfy Rule 9(b)'s particularity requirements, Rule 9(b) governs allegations of fraud, including allegations of the predicate acts to Payer Matrix's RICO claims, and not "enterprise allegations necessary to support a RICO claim," as are at issue in this analysis. *Crissen v. Gupta*, 994 F. Supp. 2d 937, 948 (S.D. Ind. 2014) (citing *Walgreen*, 719 F.3d at 853).

*LLC*, 4:16-cv-04167-SLD-JEH, 2017 WL 3443209, at \*4 (Aug. 10, 2017) (mere overlapping interests were insufficient to "show the level of entanglement required" for a RICO enterprise). Indeed, a donor giving to a charity engaged in work of which it approves is a common business transaction, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 712 (2014), analogous to the buyer-seller relationship between alleged enterprise members in *Walgreen*, 719 F.3d at 855. Thus, while AbbVie's donations clearly suggest the existence of some kind of relationship between AbbVie and PAN, they do not make it plausible (as opposed to merely possible) that the two entities formed a separate enterprise for the shared purpose of reinforcing AbbVie's market position, *see* [435] at 16; [405] ¶ 174. *See Walgreen*, 719 F.3d at 855 (although complaint did not "entirely rule out" that the companies were acting as an enterprise, "there [was] ultimately not enough in [the] complaint to elevate that inference from a 'sheer possibility' to something that is 'plausible on its face'" (quoting *Iqbal*, 556 U.S. at 678)).

Payer Matrix also alleges that the salary of PAN's CEO increased by 49% between 2019 and 2024, [405] ¶ 173, but it fails to demonstrate why the Court should reasonably infer that this spike has anything to do with AbbVie as opposed to the myriad other factors that go into setting rates of executive compensation. *Cf. United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779 (7th Cir. 2016) (affirming dismissal where defendant's alleged conduct "could have [an] entirely innocent explanation[]."). There are no allegations that AbbVie intertwined its operations or finances with PAN like the entities in *Bible* did; any financial

15

reliance by PAN on donations from AbbVie is not meaningfully different from the reliance of Par, a seller, on Walgreens, a buyer, in *Walgreen*. This is another instance of "sheer possibility" rather than plausibility. *See Walgreen*, 719 F.3d at 855.

Payer Matrix attempts to tie its innocuous factual allegations together with conclusory allegations of collusion and wrongdoing. It asserts that AbbVie's donations were part of a quid pro quo that directly benefited PAN's executives and "serve[d] as conduits for AbbVie's financial objectives," [405] ¶¶ 173, 289(b), 289(d); that AbbVie engaged in "consistent dialogue" to "collectively set and implement policies targeting AFPs, coordinate media messaging, and develop talking points for AbbVie representatives," *id.* ¶ 168; that the Foundation Enterprise used "direct funding, strategic coordination, and mutually reinforcing public advocacy" to "systematically advance[] AbbVie's market dominance while suppressing … AFPs," *id.* ¶ 174; and that AbbVie conditioned donations on support for its "commercial and policy objectives," *id.* ¶ 197. The Court need not credit these conclusory assertions under

16

Rule 8. *Iqbal*, 556 U.S. at 686.[3] And, as already detailed, Payer Matrix's factual allegations fall short of plausibly alleging a "joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Bible*, 799 F.3d at 656.

Payer Matrix also points to two distinct legal settlements—one involving AbbVie and one involving PAN—as facts supporting a plausible inference of collusive pursuit of a common purpose, [435] at 16 (citing [405] ¶¶ 21, 172), but they do not move the needle. *Cf. Astellas US Holding, Inc. v. Fed. Ins. Co.*, 66 F.4th 1055, 1070 (7th Cir. 2023) (declining to treat settlement of a fraud claim as evidence of fraud); *Martinez v. Clarian Health Partners, Inc.*, No. 12-cv-00567, 2014 WL 545893, at *2 (S.D. Ind. Feb. 10, 2014) ("[S]ettled matters are not evidence of wrongdoing.").

Payer Matrix, having alleged little more than a run-of-the-mill donor-recipient relationship between AbbVie and PAN, has failed to plausibly allege that the Foundation Enterprise constitutes an association-in-fact.

---

[3] *Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016), cited by Payer Matrix, [435] at 15, does not counsel otherwise. In that case, the court allowed pleading by information and belief, where the plaintiff's complaint "devote[d] over four pages to detailing" a basis for the pertinent allegations. *Id.* at 742. *Huon* then supported its analysis of these allegations with a *cf.* citation to a pre-*Iqbal* case followed by an explanatory parenthetical containing a quotation about "conclusory pleading on 'information and belief.'" *Id.* at 743. The language about "conclusory pleading" was merely incidental to the *Huon* court's holding. *Huon* does not genuinely undermine a fundamental pleading-related point the Seventh Circuit has advanced: that "flexibility in the face of information asymmetries should not be conflated with whistling past the rules of civil procedure." *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Nor does the Court find persuasive *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-04-2934, 2005 WL 3710370, at *8 (E.D.N.Y.), which Payer Matrix also cites, [435] at 5. That is an out-of-circuit district-court opinion—not binding on this Court—and pre-dates *Iqbal*, which lays out the binding principles followed here.

AbbVie also believes that Payer Matrix's allegations fail to show that AbbVie and the other members of the Consultant Enterprise share relationships directed toward a common purpose, showing instead run-of-the-mill client-consultant relationships. [424] at 17. Payer Matrix, however, says that the Consultant Enterprise aimed "to curtail AFPs' market presence and reinforce the continuity of AbbVie's high-cost branded drugs." [405] ¶ 181. It is true that each of the consultants that Payer Matrix identifies engaged in some work aimed at that purpose—Hayden made strategic recommendations, *id.* at ¶ 82; ZS Associates focused on external communications, *id.* at ¶ 169; and JBI made financial recommendations, *id.* at ¶ 71. So, the question is whether the factual allegations plausibly suggest that the entities acted as a joint enterprise with a common purpose rather than in their own individual capacities, considering the degree to which their officials, operations, and finances intertwine. *See Walgreen*, 719 F.3d at 854–55; *Bible*, 799 F.3d at 656.

Here, unlike in *Bible*, there are no allegations showing "an unusual degree of economic interdependence among the entities." *Id.* 656. There are no allegations of revenue sharing or that AbbVie's finances have any direct effect on the consultants. And the allegations that Hayden and ZS Associates helped AbbVie draft standard language for PAP rejection letters and talking points for AbbVie representatives, [405] ¶¶ 191–92, fall far short of the type of operational integration between entities in *Bible*, where the entities' officers exercised approval over other entities' correspondence and the entities assumed each other's statutory responsibilities, 799 F.3d at 656. There are no factual allegations, for example, that AbbVie was required

18

to adopt the language proposed by Hayden or ZS Associates, or that AbbVie's language had to be approved by either consultancy. At bottom, they (and JBI, [405] ¶ 71) were simply providing recommendations, hardly different from the PowerPoint pitch that the pharmaceutical company gave in *Walgreen*, 719 F.3d at 854. That was not enough to plausibly allege concerted action on behalf of an association-in-fact in *Walgreen*, *id.* at 855, and it isn't here, either.

Payer Matrix also argues that "[t]he consultants' recommendations were [] 'essential to the success of the alleged scheme.'" [435] at 17 (quoting *Malik v. Prairie Raynor LLC*, No. 23 C 1182, 2023 WL 8451688, at \*5 (N.D. Ill. Dec. 6, 2023)). But the types of work that the consultants performed for AbbVie—primarily, market surveillance and recommendations, *see, e.g.*, [405] ¶¶ 178–80—characterize almost all consultant-client relationships. The allegations in the counterclaims thus do not support a reasonable inference that AbbVie and the consultants were working in concert in pursuit of the purported enterprise's common purpose. *See Walgreen*, 719 F.3d at 856.

Payer Matrix asks the Court not to "impose a more burdensome standard than the liberal standard for RICO enterprise allegations required by the Supreme Court and the Seventh Circuit." [435] at 15 (quoting *Obiefuna v. Hypotec, Inc.*, 451 F. Supp. 3d 928, 950 (S.D. Ind. 2020)). The Court, in distinguishing run-of-the-mill commercial relationships from RICO enterprises, does not do so. In *Obiefuna*, the court rejected the defendant's argument that plaintiffs must present specific allegations of "interdependence" in order to establish the existence of a RICO enterprise. 451 F.

19

Supp. 3d. at 950. The Court agrees with *Obiefuna* on that point, as there may be other ways to show a common purpose. But it would be wrong to read that holding to mean that the pleader need not allege factual content plausibly showing the existence of a common purpose. And that is what Payer Matrix's counterclaims fail to do.

*       *       *

Payer Matrix thus has failed to allege that AbbVie engaged in the conduct of an enterprise, dooming their RICO claims. The Court recognizes that AbbVie has advanced several other reasons why Payer Matrix has failed to sufficiently allege a claim under § 1962(c). The Court does not need to address whether Payer Matrix's RICO allegations are otherwise flawed. Payer Matrix's failure to plead that AbbVie engaged in the conduct of an enterprise is enough to dispose of its § 1962(c) claim. Still, because Payer Matrix may seek leave to amend its RICO counterclaim down the road, Payer Matrix should pay close attention to AbbVie's other challenges to its RICO claims. They strike the Court as having merit.

### 2. Payer Matrix's Antitrust Claim (Count VI)

Payer Matrix alleges monopolization and attempted monopolization by AbbVie under the Sherman Act and the Illinois Antitrust Act. [405] ¶¶ 265–73. Implied in the Sherman Act (and in the Illinois Antitrust Act[4]) are "additional rules for determining whether the plaintiff is the proper party to bring a private antitrust

---

[4] The Illinois Antitrust Act "expressly requires harmonization with federal antitrust law, … so Illinois courts interpret the state antitrust law in harmony with 'federal case law construing analogous provisions of federal legislation.'" *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (citing *People v. ex rel. Scott v. Coll. Hills Corp.*, 435 N.E.2d 463, 469 (Ill. 1982)).

20

action," often referred to as "antitrust standing." *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002)). Under those rules, "[s]ome injuries are 'too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit.'" *Id.* at 1064 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982)). An antitrust plaintiff must therefore "establish that they (1) have suffered an antitrust injury and (2) are the proper plaintiffs to maintain an antitrust action with respect to each [relevant] market[]." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) (citing *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197 (1202 (7th Cir. 1986)); *see also McGarry*, 937 F.3d at 1065 (citing *Serfecz*, 67 F.3d at 597).

To be an "antitrust injury," an injury must be "the type of loss that the claimed violations would be likely to cause." *Serfecz*, 67 F.3d at 597 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). That means that "the injury must flow directly 'from higher prices or lower output, the principal vices proscribed by the antitrust laws.'" *McGarry*, 937 F.3d at 1065 (quoting *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1158 (1992)); *see also Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("The antitrust injury doctrine … requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." (quoting *Chi. Pro. Sports Ltd. P'Ship v. Nat. Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992)). Under that principle, "[s]uppliers to direct market participants typically cannot seek recovery under the antitrust laws because their injuries are too

21

secondary and indirect to be considered 'antitrust injuries.'" *Serfecz*, 67 F.3d at 597 (citing *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1379 (7th Cir. 1987)).

*Southwest Suburban* shows that among the "suppliers to direct market participants" who cannot seek recovery are those who provide services that facilitate market participation but aren't themselves buyers or sellers in the relevant market. *Serfecz*, 67 F.3d at 597 (citing *Sw. Suburban*, 830 F.2d at 1379). In *Southwest Suburban*, a trade association for real estate brokers brought antitrust claims against a not-for-profit neighborhood planning association. 830 F.2d at 1376. The trade association maintained a property listing service, which it provided to all its members for a fee. *Id.* at 1376–77. But the planning association did not want all of the trade association's members to operate in its neighborhood; it wanted neighborhood home sales to go through certain preferred brokers. *See id.* at 1376. So the planning association encouraged the preferred brokers to maintain their own property listings and discouraged them from listing properties with the trade association's listing service. *Id.* That way, the nonpreferred brokers, who relied on the trade association's now-noncomprehensive listing service, were disadvantaged in brokering sales in the neighborhood.

The trade association sought injunctive relief and damages for loss of business, *id.* at 1377, but the Seventh Circuit held that its injury was too remote to constitute an antitrust injury, *id.* at 1379. It reasoned that the trade association was not a participant in the relevant market—per the complaint, "the provision of real estate

22

brokerage services"—since the trade association neither provided nor purchased brokerage services. *Id.* Rather, it merely supplied listing services to brokerage firms. *Id.* Thus, even though the planning association "took direct action against the [trade association] to reduce the value of its product," any injury to the trade association "was only indirectly related and incidental to the anticompetitive scheme, the intent and effect of which was [] to gain control of the real estate brokerage services market." *Id.*

Here, according to the counterclaims, the relevant market is "the [nationwide] market for prescription pharmaceuticals that are reasonably interchangeable with, or serve as effective therapeutic substitutes for, the AbbVie Drugs in treating the same indications." [405] ¶ 266. But Payer Matrix does not buy or sell drugs in that market. *Id.* ¶¶ 43, 218. It is merely a service provider to market participants, *id.* ¶¶ 43, 48, like the trade association in *Southwest Suburban*. Thus, even though AbbVie allegedly "undermin[ed] market confidence in Payer Matrix," resulting in "reputational damage, loss of clients, terminated business relationships, and a significant decline in referrals," [405] ¶ 270, Payer Matrix's injuries were "only indirectly related and incidental to the alleged scheme," *Sw. Suburban*, 830 F.2d at 1380, the aim of which was to "achiev[e] monopoly power in the AbbVie Drug Market," [405] ¶ 268.

Payer Matrix disagrees, of course, asserting that it has incurred an antitrust injury because its injury "'was inextricably intertwined with the injury [AbbVie] sought to inflict' in the relevant market." [435] at 23 (quoting *Blue Shield*, 457 U.S.

at 484). It is true that an injury to a non-market participant can be an antitrust injury if it is "inextricably intertwined with" the injury to the market. *Blue Shield*, 457 U.S. at 484. But in the Seventh Circuit, that language is construed narrowly. *See McGarry*, 937 F.3d at 1066 ("In *Blue Shield of Virginia v. McCready*, the Supreme Court carved out a narrow exception.").[5]

The "inextricably intertwined" exception applied, for example, in *Sanner v. Bd. of Trade*, 62 F.3d 918, 929–30 (7th Cir. 1995). In *Sanner*, a group of soybean farmers sued the Chicago Board of Trade for issuing a resolution directed at the soybean futures market. The court of appeals held that the soybean farmers had antitrust standing even though they were only participants in the soybean cash market, not in the soybean futures market. *Sanner* first held that the soybean cash and soybean futures markets were not actually separate markets for antitrust standing purposes. *Id.* at 929. It then held that, even if they were separate, the farmers' injuries were "inextricably intertwined" with the injury the Chicago Board of Trade sought to inflict on the market. *Id.* at 929–30. It reasoned that "[t]he cash and futures markets for soybeans are so closely related that a directive issued toward one promised to invariably impact the other." *Id.* Here, unlike the farmers in *Sanner*, Payer Matrix

---

[5] Indeed, the Supreme Court first applied the "inextricably intertwined" exception in *Blue Shield*, where it answered the narrow question of whether consumers could bring antitrust claims even though they weren't competitors in the relevant market. 457 U.S. at 467. The answer was "yes," because consumers' injuries are inextricably intertwined with the injury to the market. *Id.* at 485. Consumers' injuries are in fact *so* intertwined that many courts subsequently described both sellers and buyers as market participants. *See, e.g., Sw. Suburban*, 830 F.2d at 1379; *see also McGarry*, 937 F.3d at 1065 ("We usually presume that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws.").

24

has not alleged that it is a buyer or seller in a market that is "so closely related" to the market for AbbVie drugs that it would be "invariably impact[ed]" by AbbVie's allegedly anti-competitive scheme. *Id.* Instead, it is as a "financial case manager" that helps employer-sponsored health plans—either directly, or through intermediary TPAs and PBMs—provide the plans' individual insured with high-cost medications by "assessing available programs, coordinating third-party resources, and facilitating the paperwork needed to secure funding or, if necessary, explore more affordable drug alternatives." [405] ¶ 48; *see also id.* ¶¶ 26, 33, 43. Its position relative to the relevant market is, therefore, remarkably akin to that of the listing-service provider in *Southwest Suburban.*

Additionally, because *Southwest Suburban* is still good law, *see, e.g.*, *McGarry*, 937 F.3d at 1066 (quoting *Sw. Suburban*, 830 F.2d at 1378), and that case is not meaningfully distinguishable from this one, the Court is unpersuaded by the out-of-circuit cases that Payer Matrix cites, *see* [435] at 24 (citing *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 175–76 (3d Cir. 2015)); *id.* at 26 (citing *E. Portland Imaging Ctr. v. Providence Health Sys.*, 2006 WL 752590, at *18 (D. Or.

25

Mar. 21, 2006)); *id.* (citing *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293–94 (2d Cir. 1983)[6]).

At bottom, Payer Matrix does not allege "the type of injury the antitrust laws were meant to prevent," so it may not bring its antitrust claim against AbbVie. *McGarry*, 937 F.3d at 1065.

### 3.     Payer Matrix's Defamation Claim (Count I)

Payer Matrix contends that AbbVie defamed it in a variety of ways, [405] ¶¶ 215–25, but AbbVie insists that Payer Matrix's defamation claim fails because the allegedly defamatory statements are protected by Illinois' qualified privilege and are in any event unactionable. The Court assesses each of AbbVie's arguments in turn.

### a.     Qualified Privilege

Illinois law "recognizes privileges, both absolute and qualified, to protect defendants from defamation liability under certain circumstances." *Finn v. Project Res. Sols., LLC*, 2024 IL App (1st) 221016, ¶ 29, 258 N.E.3d 20, 26 (citing *Project44,*

---

[6] *Crimpers*, which Payer Matrix presents as a case "directly on point" [435] at 16, is also unpersuasive because it is materially distinguishable. There, the defendants were middlemen between television program producers and cable system providers, and plaintiff was a would-be middleman attempting to compete with defendants. 724 F.2d at 291, 294. Here, in contrast, Payer Matrix (the counterclaim plaintiff) is a middleman, but AbbVie (the counterclaim defendant) is not—it is a manufacturer of specialty drugs. Payer Matrix therefore does not compete with AbbVie. Indeed, Payer Matrix's business model depends on the existence of AbbVie and other manufacturers of specialty drugs. *See* [405] ¶¶ 33, 38. So its endgame cannot be to displace AbbVie from the pharmaceutical market completely, unlike the *Crimpers* plaintiff who had no need for the defendants' continued existence, *see* 724 F.2d at 291 ("The purpose of [plaintiff] is to bring together … all suppliers of cable programming … so that Cable System Operators would not be dependent upon the defendants.").

*Inc. v. FourKites, Inc.*, 2022 IL App (1st) 210575, ¶ 47, 209 N.E.3d 427).[7] The purpose of the qualified privilege is to protect honest communications in certain circumstances in which the free exchange of information is of particular importance. *See id.*, ¶ 30, 258 N.E.3d at 26 (citing *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 30, 202 N.E.3d 248, 256). The qualified privilege has the effect of "elevat[ing] a defamation plaintiff's burden of proof." *Id.*, ¶ 31, 258 N.E.3d at 27 (citing *Dent*, 2022 IL 126795, ¶ 30, 202 N.E.3d at 256). Absent a qualified privilege, the "plaintiff need only show that the defendant acted with negligence in making the defamatory statement." *Id.* But with the qualified privilege, the plaintiff must show malice—"that is, a direct intention to injure the plaintiff or a reckless disregard of the plaintiff's rights and the resulting harm to the plaintiff." *Id.*

Here's how it works. First, once a party raises the qualified privilege defense, the court determines, as a matter of law, whether it applies. *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 134 (Ill. 1993)). It does so by looking only to the occasion of the communication, not the communication itself, to determine whether the occasion created some interest in making the communication that justifies the privilege. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 43, 984 N.E.2d 132, 146 (citing *Kuwik*, 619 N.E.2d at 134). The interest can be that of the person publishing the statement, of the person to whom it was published, of some third party, or of the public. *Kuwik*, 619 N.E.2d at 134.

---

[7] The parties do not raise choice-of-law issues, so the Court applies the substantive law of the forum state, Illinois. *See Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010).

27

Once the defendant has established that the qualified privilege applies, it is protected from liability unless the plaintiff can prove that the defendant abused the privilege. *Tamburo v. Dworkin*, 974 F. Supp. 2d 1199, 1214 (N.D. Ill. 2013) (citing *DePinto v. Sherwin-Williams Co.*, 776 F. Supp. 2d 796, 804 (N.D. Ill. 2011)). A person abuses the privilege by publishing false material while knowing that it was false or while entertaining serious doubts about its truth. *Id.* "Abuse of a privilege may also occur when the defendant fails to 'limit the scope of the material, or [to] send the material to only the proper parties.'" *Id.* (quoting *Kuwik*, 619 N.E.2d at 136). Whether the defendant abused the privilege is a question of fact. *Id.* (citing *Kuwik*, 690 N.E.2d at 136). Even so, once the defendant has established a qualified privilege, the allegations must plausibly establish abuse of the privilege for the defamation claim to survive. *See Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 845–46 (N.D. Ill. 2015).

By the Court's tally, Payer Matrix has alleged that AbbVie made approximately 21 different potentially defamatory communications. The Court sorts these communications into six categories based on the context in which they were made: (1) the terms of participation for AbbVie's PAP, which were contained in the PAP application that was published online, [405] ¶¶ 86, 216(a); (2) letters that AbbVie sent to PAP applicants whose applications were denied, *id.* ¶ 111, 115; (3) talking points that AbbVie developed to help its call representatives respond to questions about PAP denials, *id.* ¶¶ 96, 100, 216(c); (4) statements by AbbVie's call representatives to patients asking about PAP denials, *id.* ¶¶ 104, 118–22, 124, 126–28, 130, 216(g); (5) AbbVie statements to healthcare providers, *id.* ¶¶ 92–93, 216(h);

and (6) talking points to help AbbVie's call representatives respond to questions about this lawsuit, *id.* ¶¶ 98, 216(d). Of these categories, the first four and some of the fifth are covered by a qualified privilege.

Illinois courts have recognized a qualified privilege for letters from insurance companies explaining their coverage denial decisions. *See, e.g.*, *Kuwik*, 619 N.E.2d at 135. In doing so, they recognized two (sometimes more) interests that justified the privilege: the interest of the insurance company (the publisher), who had a legal duty to explain coverage decisions, and the interest of the insured (the person to whom the statement was published) in knowing the reason for coverage decisions. *Id.*; *see also SmileDirectClub, LLC v. Delta Dental Plans Ass'n*, 2022 IL App (1st) 220208-U, ¶ 40, 2022 WL 17496069, at *7 ("[T]he insureds … clearly have an interest in learning the reasons for the denial of their claims.").

Although the PAP is not insurance, it is closely related. Like insurance, it is one way that people avoid out-of-pocket medical costs. *See* [405] ¶ 11. Thus, a PAP applicant has the same interest in knowing the eligibility terms when applying for the program that an insurance plan member has in knowing their plan's policies. *See Kuwik*, 619 N.E.2d at 135. The first category of communications, the PAP terms of participation, are therefore covered by a qualified privilege.

Likewise, denial of a PAP application is analogous to denial of an insurance claim, so a denied PAP applicant has the same interest in receiving an explanation as a denied insurance claimant has. *See Kuwik*, 619 N.E.2d at 135. The second, third, and fourth categories each involve such explanations, either in a letter from AbbVie

providing an initial explanation (category two), [405] ¶¶ 111, 115, 216(b), or during a phone call to AbbVie seeking additional clarification (categories three and four), *id.* ¶¶ 96, 100, 104, 118–22, 124, 126–28, 130, 216(c), 216(g). These categories are also covered by the privilege.

The fifth category of communications, those between AbbVie and healthcare providers, are a mixed bag. Some communications were clearly made in response to inquiries by healthcare providers regarding their patients' PAP denials. *See* [405] ¶¶ 93, 94. Those statements are covered by a qualified privilege; the providers have an interest in knowing the reasons for the denial of their patients' applications like the interest of insurance claimants in knowing the reasons for denial of their claims. There is one statement in this fifth category, however, that lacks allegations of context: Payer Matrix alleges that, in March 2023, "Payer Matrix's Lead Clinical Care Coordinator was told by a doctor's office that 'what we are doing was illegal and AbbVie told them not to work with us.'" *Id.* ¶ 92. AbbVie cannot establish at this juncture that this statement is protected by a qualified privilege. *See Kuwik*, 619 N.E.2d at 134 (holding that applicability of qualified privilege turns on the "occasion itself for the communication").

The sixth category of communications, about AbbVie's reasons for bringing this lawsuit, is different. Payer Matrix does not allege that those communications occurred in a context related to PAP eligibility or applications or to any kind of insurance coverage decision. Nor does AbbVie identify any cases showing other

reasons that a privilege should protect communications like these. *See* [424] at 33–34. They are therefore not protected by a qualified privilege.

### b. Abuse of Privilege

For the statements covered by a qualified privilege,[8] the next question is whether Payer Matrix has plausibly alleged that AbbVie abused the privilege.

To begin with, Payer Matrix has not plausibly alleged that AbbVie sent any of the allegedly defamatory material to anyone other than the proper parties. *Tamburo*, 974 F. Supp. 2d at 1214. There are no allegations that the PAP denial letters were sent to anyone other than denied applicants. *See Dark v. U.S. Fid. & Guar. Co.*, 529 N.E.2d 662, 669 (Ill. App. Ct. 1988) (holding that plaintiff's "attorney, his adjustors, the Department of Insurance, and [] 'the many persons in defendants' employ'" were proper recipients of an insurance claim denial letter). Nor are there any allegations that any of the responses by AbbVie's representatives to questions from patients and healthcare providers were given to anyone other than the patient or provider. There are no allegations that the talking points that AbbVie developed were distributed to anyone other than the call representatives who were to use them. Even assuming that the call representatives used them, the only reasonable inference is that they did so in response to callers' specific questions. And, again, there are no allegations

---

[8] For added clarity, the statements covered by a qualified privilege are: (1) the terms of participation for AbbVie's PAP, which were contained in the PAP application that was published online, [405] ¶¶ 86, 216(a); (2) letters that AbbVie sent to PAP applicants whose applications were denied, id. ¶¶ 111, 115, 216(b); (3) talking points that AbbVie developed to help its call representatives respond to questions about PAP denials, id.¶¶ 96, 100, 216(c); (4) statements by AbbVie's call representatives to patients asking about PAP denials, id. ¶¶ 104, 118–22, 124, 126–28, 130, 216(g); and (5) some of the AbbVie statements to healthcare providers, id. ¶¶ 93, 216(h).

that they were communicated to anyone other than those individuals seeking the information.

Even the updated PAP participation terms, which were included on the PAP application that was available to the public on AbbVie's website, were disseminated only to the proper parties—those with an interest in applying for the PAP. *See Tamburo*, 974 F. Supp. 2d at 1218 (holding that allegedly defamatory statement published to a public website was not an abuse of privilege "because the segment of the public that had an interest in the statements was broad").

Whether AbbVie "fail[ed] to 'limit the scope of the material'" is a more difficult question. *Id.* at 1214 (quoting *Kuwik*, 629 N.E.2d at 136). Several statements by AbbVie's call representatives, particularly those adhering to the PAP-denial-response talking points, were appropriately limited in scope. They explained that the PAP terms had changed and why, [405] ¶¶ 96, 100, 216(c); advised patients whose PAP applications had been denied about who to contact for help, *id.* ¶¶ 104, 120–22, 124, 127–28, 130, 216(g); and explained to healthcare providers why AbbVie had denied their patients' PAP applications, *id.* ¶ 93. *See SmileDirectClub*, 2022 IL App (1st) 220208-U, ¶ 44, 2022 WL 17496069, at *7. The PAP denial letters were similarly limited in scope, explaining only the reason for the denial. [405] ¶¶ 111, 115, 216(c). The updated PAP participation terms, which described the types of insurance plans whose members were ineligible for the PAP, [405] ¶¶ 86, 216(a), were also appropriately limited in scope, to information that would help applicants understand the eligibility requirements.

32

A few statements by call representatives, however, were not appropriately limited in scope: statements to patients that Payer Matrix was acting "illegally" or "committing fraud," *id.* ¶¶ 118–19, 126; and statements to healthcare providers that they should not work with Payer Matrix and that "all of the other [drug] manufacturers" would be following AbbVie's lead, *id.* ¶ 94. The qualified privilege in this case is justified by the need for AbbVie to help patients and their providers understand their eligibility for the PAP. *See* section I.B.3.a, *supra.* It is reasonable to conclude that statements that Payer Matrix was acting illegally and that healthcare providers should not work with Payer Matrix go beyond the scope of that need. Payer Matrix has thus plausibly alleged that AbbVie abused the qualified privilege with respect to those statements. *See Williams v. Marriott Corp.*, No. 97 C 0091, 1997 WL 457820, at *5 (N.D. Ill. Aug. 5, 1997) (holding that a qualified privilege can be overcome by a showing that the "statements were not limited in scope to a proper purpose or occasion").

The Court next considers whether Payer Matrix has plausibly alleged that AbbVie published any of the remaining privileged material while knowing that it was false or entertaining serious doubts about its truth. *See Tamburo*, 974 F. Supp. 2d at 1214. The counterclaims are rife with conclusory assertions that AbbVie knew (or should have known) that various statements were false, *see* [405] ¶¶ 97, 100, 111, 115, 118–22, 127, 128, 131, 224, but only the well-pleaded facts matter at this stage. *See Iqbal*, 556 U.S. at 686.

Payer Matrix first contends that AbbVie knew that its PAP-eligibility talking points were false. The talking points allegedly directed AbbVie call representatives to state that AFPs "[c]an cause delays to treatment and be highly disruptive to patients, as well as infringing on benefits intended for patients who are uninsured or underinsured." *Id.* ¶ 100. But, Payer Matrix alleges, the delays were not Payer Matrix's fault, and AbbVie, whose own benefits investigations were the real reason for the delays, knew it. *Id.* ¶ 100. That is enough to plausibly allege that AbbVie made this statement while knowing that it was false. For the same reason, Payer Matrix has plausibly alleged that AbbVie knew of the falsity of its alleged statement to a healthcare provider that "Payer Matrix was causing the problems with [PAP] coverage." *Id.* ¶ 93.

AbbVie's PAP-eligibility talking points also allegedly communicated that AbbVie "updated [its] eligibility guidelines to respond to changes with [the applicant's] insurance provider." *Id.* ¶¶ 96, 216(c). Payer Matrix argues that AbbVie also knew that this statement was false. That is because, it alleges, AbbVie had worked with insurance plans affiliated with Payer Matrix and understood Payer Matrix's role "since at least 2021," so there were no AFP-related changes to applicants' insurance plans in 2023 when the terms changed. *Id.* ¶ 97. Based on these facts, Payer Matrix has plausibly alleged that AbbVie knew that this alleged statement was false.

Payer Matrix next contends that AbbVie knew that statements in its PAP denial letters were false. *Id.* ¶¶ 111, 115. The letters allegedly stated that the

34

applicants' insurance providers were "partnering with a third-party company to[] inappropriately utilize [AbbVie's] program instead of their insurance coverage, *id.* ¶ 111, and that AbbVie "believe[d] Payer Matrix assisted in your enrollment … and inappropriately utilized [AbbVie's] charitable free-drug program for uninsured patients instead of [the applicant's] insurance coverage," *id.* ¶ 115. Payer Matrix contends that AbbVie knew these assertions were false because the PAP was not only for uninsured patients but also for underinsured patients, *id.* ¶¶ 37, 115, and AbbVie "knew from its benefits investigations" that the applicants' insurance did not cover AbbVie's drugs, *id.* ¶¶ 111, 115. But whether the applicants' insurance "inappropriately" used the PAP is a characterization of their conduct; it is not itself a verifiable fact, much less one that turns on the mere fact that the applicant's insurance plan didn't cover certain AbbVie drugs. *See Ludlow*, 79 F. Supp. 3d at 840 ("[C]haracterization … as 'deeply inappropriate' … is non-verifiable opinion."). Payer Matrix has therefore failed to plausibly allege that AbbVie knew that statements in its PAP denial letters were false or entertained serious doubts as to their veracity.

Payer Matrix also argues that AbbVie knew of the falsity of statements by its representatives instructing denied PAP applicants to ask Payer Matrix for help with drug coverage. [405] ¶¶ 120–22, 127, 130. The Court agrees. Payer Matrix alleges that AbbVie had been collecting intelligence on Payer Matrix and other AFPs. *Id.* ¶ 198. It also alleges that PAN, to whom AbbVie donated millions of dollars, *id.* ¶ 16, published an open letter criticizing Payer Matrix's business model on its website. *Id.* ¶ 202. Those allegations support a reasonable inference that AbbVie was "well aware

35

that Payer Matrix is not an insurance company or a health plan and does not cover the cost of medication." *Id.* ¶ 120; *see also id.* ¶¶ 121–22, 130. That inference holds up even after accounting for the fact that the members' insurance documents directed them to "[c]ontact Payer Matrix for assistance" with specialty medications, generally, *id.* ¶ 112, rather than more explicitly directing them to contact Payer Matrix for assistance with payment for, or coverage of, specialty medications. Payer Matrix has thus plausibly alleged that AbbVie knew that these alleged statements were false.

Finally, Payer Matrix does not argue or allege that AbbVie's PAP terms of participation contain any material that AbbVie published while knowing that it was false or entertaining serious doubts as to its truth.

*　　*　　*

In summary, the statements made in AbbVie's terms of participation and its PAP denial letters (categories one and two) are protected by a qualified privilege that AbbVie did not abuse; they therefore cannot form the basis of a defamation claim. The other alleged statements are not protected by the privilege, either because the privilege does not apply in the first place (part of category five and all of category six) or because Payer Matrix has plausibly alleged that AbbVie abused the privilege (categories three, four and the rest of category five).[9]

---

[9] For clarity, the categories that include at least some statements not protected by the privilege are (3) talking points that AbbVie developed to help its call representatives respond to questions about PAP denials, *id.* ¶¶ 96, 100, 216(c); (4) statements by AbbVie's call representatives to patients asking about PAP denials, *id.* ¶¶ 104, 118–22, 124, 126–28, 130, 216(g); (5) AbbVie statements to healthcare providers, *id.* ¶¶ 92–93, 216(h); and (6) talking points to help AbbVie's call representatives respond to questions about this lawsuit, *id.* ¶¶ 98, 216(d).

### c. Non-Actionable Opinion

The Court next considers whether any of the non-privileged alleged statements are nevertheless non-actionable because they are expressions of opinion rather than assertions of fact.

Defamation claims cannot be premised on expressions of opinion, which are constitutionally protected. *Bd. of Forensic Document Exam'rs, Inc. v. Am. Bar Ass'n*, 287 F. Supp. 3d 726, 736 (N.D. Ill. 2018) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006)). True, "a speaker cannot just couch a 'false assertion of fact' in 'terms of an opinion' and thereby evade liability." *Id.* (citing *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1220 (Ill. 1996)). The question of opinion versus fact therefore turns on three factors: (1) "whether the statement has a precise and readily understood meaning"; (2) "whether the statement is verifiable"; (3) and "whether the statement has a literary or social context that signals that it has factual content." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 859 (7th Cir. 2023) (citing *Solaia*, 852 N.E.2d at 840). "Negative characterizations of … actions" are not in themselves actionable, but allegations of the underlying actions may be if they are false. *Brown v. Montgomery*, No. 20 CV 04893, 2024 WL 1243669, at *10 (N.D. Ill. Mar. 22, 2024).

AbbVie's talking points explaining its reasons for bringing this lawsuit, [405] ¶¶ 98, 216(d), are non-actionable opinion. First, the statements in the talking points—that Payer Matrix "misus[ed] patient assistance programs" and that "AbbVie aims to protect [its] programs and patients from [Payer Matrix's] exploitative tactics," *id.* ¶¶ 98, 216(d)—are characterizations of Payer Matrix's conduct, not verifiable

37

actions. *See Brown*, 2024 WL 1243669, at \*10. Additionally, "misuse" and "exploit" are not words with precise meanings. *Cf. Tamburo*, 974 F. Supp. 2d at 1213 ("Whether a person's actions are ethical or deceptive is not objectively verifiable."). The context, an explanation of the reasons for bringing a lawsuit, *id.* ¶ 98, bolsters the point that these statements are opinion rather than fact. *See Wiley v. Am. Soc'y of Anesthesiologists, Inc.*, No. 25 CV 412, 2025 WL 2976482, at \*5 (N.D. Ill. Oct. 21, 2025) ("Wiley's statements were not facts but a description of her personal motive for bringing suit, which is laden with her opinion about the ASA's conduct.").

Payer Matrix disagrees, but the Court is unpersuaded by the cases it cites, which involve completely different factual contexts. *See* [435] at 37–38 (citing *Bryson*, 672 N.E.2d at 1220 (involving a magazine story charging the plaintiff with sexual promiscuity, *see id.* at 1213); *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, No. 4:13-cv-4021, 2013 WL 5973938, at \*14 (C.D. Ill. Nov. 8, 2013) (involving charges, made by a technology company contracting with governments to provide secure access to public records, that a real estate data company obtained unauthorized access to records, *see id.* at \*1–\*5)).

AbbVie also contends that various assertions by its call representatives to patients and healthcare providers that Payer Matrix's conduct was "illegal," [405] ¶¶ 92, 118, 216(h), and "fraud," *id.* ¶¶ 119, 126, are non-actionable opinion. *See* [424] at 41. That argument falls flat. Both of those assertions have readily understood meanings and are verifiable. *See Trahanas*, 64 F.4th at 859. "Fraud" comprises a specific subset of crimes under Illinois law that Payer Matrix either committed or not.

38

Illegality is likewise a question of whether Payer Matrix's conduct violated the law. It either did or did not. The Court need not strain to characterize these statements as opinion. *See id.* ("The constitution protects a defamatory statement 'only if it cannot be reasonably interpreted as stating actual fact.'" (quoting *Solaia*, 852 N.E.2d at 840)).

The Court is unpersuaded by AbbVie's citation of *Shivarelli v. CBS, Inc.*, 776 N.E.2d 693 (Ill. App. Ct. 2002), in which the court held a charge of "cheating" to be protected opinion, *id.* at 699. [424] at 41. "Cheating," unlike "fraud," is not the name of a crime. Nor is the Court persuaded by *Black v. Wrigley*, No. 17 C 101, 2017 WL 8186996 (N.D. Ill. Dec. 8, 2017), as *Black* held that accusations of "criminal conduct" were not pled with sufficient particularity to be considered defamatory *per se*, not that they amounted to unverifiable opinion, *id.* at *9–*10.

### d.  Merits of Defamation Claim

This leaves several statements that might support Payer Matrix's defamation claim:

- that AbbVie changed its PAP eligibility requirements due to changes with patients' insurance providers, [405] ¶¶ 96, 216(c);

- that members should ask Payer Matrix for help with drug coverage, *id.* ¶¶ 120–22, 124, 127–28, 130;

- that Payer Matrix was acting illegally, *id.* ¶¶ 92, 118;

- that Payer Matrix was acting fraudulently, *id.* ¶¶ 119, 126; and

- that Payer Matrix was causing delays or other problems with coverage, *id.* ¶¶ 93, 100.

To claim defamation under Illinois law, Payer Matrix must plausibly allege that (1) AbbVie made a false statement about it; (2) to a third party; and (3) Payer Matrix suffered damages as a result. *See Bd. of Forensic Document Exam'rs v. Am. Bar Ass'n*, 922 F.3d 827, 831–32 (7th Cir. 2019). Alleged statements by AbbVie that it changed its PAP eligibility requirements due to "changes with [the patient's] insurance provider," [405] ¶¶ 96, 216(c), cannot support a defamation claim because they fail the first element. "[I]f a statement can be reasonably interpreted as referring to someone else, it fails to qualify as even being a statement targeting the plaintiff." *Bd. of Forensic Document Exam'rs*, 287 F. Supp. 3d at 733–34. The statement alleged here refers to changes with individuals' insurance providers. It does not even mention Payer Matrix. It can thus "be reasonably interpreted as referring to someone other than Payer Matrix," *id.*, and fails to qualify as a statement "about" Payer Matrix, *Bd. of Forensic Document Exam'rs*, 922 F.3d at 831. Payer Matrix does not argue otherwise. *See* [435] at 36–39.

The viability of the remaining statements (directing members to ask Payer Matrix for drug coverage and accusing Payer Matrix of illegality, fraud, and causing problems with drug coverage) turns on whether Payer Matrix has sufficiently plead the third element, damages. In Illinois, the satisfaction of the damages element depends on whether the statement was defamatory *per se* or defamatory *per quod*. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). A statement is defamatory *per quod* when someone needs to know facts outside of the statement itself to understand it as defamatory. *Id.* A *per quod* claimant must plead

special damages with specificity, Fed. R. Civ. P. 9(g), although it is enough to identify a concrete loss. *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013).

In contrast, a statement is defamatory *per se* when the defamatory character of the statement is apparent on its face; that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed. *Kapotas v. Better Gov't Ass'n*, 2015 IL App (1st) 140534, ¶ 31, 30 N.E.3d 572, 587. When the plaintiff is a corporation, Illinois recognizes three types of defamation *per se*: (1) statements "imputing … commission of a crime"; (2) statements suggesting an "inability to perform or lack of integrity in performing employment duties"; and (3) statements prejudicing the corporation in its profession or trade. *L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1129 (7th Cir. 2022) (citing *Solaia*, 852 N.E.2d at 839); *see also Chi. Conservation Ctr. v. Frey*, 40 F. App'x 251, 255 (7th Cir. 2002). Payer Matrix contends that each of the remaining statements constitutes defamation *per se* or, in the alternative, defamation *per quod*.

The alleged statements directing members to ask Payer Matrix for assistance with drug coverage are neither defamatory *per se* nor defamatory *per quod*. They are not defamatory *per se* because they do not impute commission of a crime, suggest an inability or lack of integrity in performing employment duties, or prejudice Payer Matrix in its trade. *See L. Offs. of David Freydin*, 24 F.4th at 1129. Payer Matrix disagrees, arguing that "these statements imply that [] Payer Matrix is responsible for paying Members' drug costs or providing medication, but has failed to perform its

41

duties; and [] Payer Matrix has control over AbbVie's change in PAP policy." [435] at 39. But, as is clear from the fact that Payer Matrix points to the implications of the statements rather than to the statements themselves, the statements' defamatory character is "not apparent on its face." *Kapotas*, 2015 IL App (1st) 140534, ¶ 31, 30 N.E.3d at 587.

Nor are these statements defamatory *per quod*. Payer Matrix identifies several ways in which it suffered damages, *see infra*, but it does not adequately plead a connection between any of them and these statements. There are only two allegations of damages that are at all related to communications with members, and both fail to satisfy Rule 9(g)'s requirement that special damages be pled with specificity. Fed. R. Civ. P. 9(g). "A complaint fails to plead special damages with [specificity] where the plaintiff fails to draw a connection between the defamatory statement and the damage alleged." *Cody v. Harris*, No. 03-CV-934, 2004 WL 783105, at *5 (N.D. Ill. Jan. 22, 2004). Here, the first relevant damages allegation is that AbbVie's "fraudulent statements, deceptive practices, and exclusionary tactics … have caused [] [m]embers to stop working with Payer Matrix." [405] ¶ 137. No factual allegations show a specific connection between members who stopped working with Payer Matrix and these statements or between those members and any loss of actual business, meaning loss of clients or revenue. The second damages allegation related to members is that Payer Matrix "incurred additional expenses" of "$50,000 per month in corrective public relations campaigns." *See* [405] ¶ 138. That allegation also lacks any specific tie to these statements. Payer Matrix has thus failed to adequately allege

42

that it suffered damages "as a result of" these statements, so it may not base its defamation claim on them. *See Bd. of Forensic Document Exam'rs*, 922 F.3d at 831–32.

The remaining statements (accusations of illegality, fraud, and causing problems with coverage) constitute defamation *per quod* (so the Court need not consider at this juncture whether the statements separately constitute defamation *per se*). Consider the following allegations:

- A doctor's office told Payer Matrix's lead clinical coordinator that "what [Payer Matrix] [was] doing was illegal and AbbVie told them not to work with [Payer Matrix]." *Id.* ¶ 92.

- An AbbVie representative told an insurance plan client that "Payer Matrix is operating illegally." *Id.* ¶ 118.

- AbbVie told a plan client that Payer Matrix was "committing fraud." *Id.* ¶ 119.

- AbbVie told a plan client that Payer Matrix "was a fraud/scam." *Id.* ¶ 126.

- AbbVie had been "[t]elling [healthcare providers] … that Payer Matrix's business was illegal since March 2023." *Id.* ¶ 216(h).

- AbbVie told a healthcare provider that AbbVie was "causing problems with [a patient's] coverage." *Id.* ¶ 93.

- AbbVie instructed its representatives to say that AFPs "cause delays to treatment" and are "highly disruptive to patients." *Id.* ¶ 100.

As a result of such statements, Payer Matrix contends, it suffered "special damages, including loss of contracts with health plans, cessation of referrals from brokers and [healthcare providers], lost profits, and harm to its reputation in the healthcare and health benefits industries," *id.* ¶ 223; *see also id.* ¶ 142 (alleging a $26 million drop in revenue from a single broker in 2024); *id.* ¶¶ 136–48. These are more

than enough to plausibly allege that AbbVie told both patients and providers that Payer was acting illegally or committing fraud and that it suffered special damages as a result. *Pippen*, 734 F.3d at 614 ("It is enough to identify a concrete loss.").

AbbVie believes that a few minor grammatical inconsistencies in two of the alleged accusations render those accusations unactionable. [424] at 41–42 (discussing [405] ¶¶ 92, 118). But, in conjunction with the other alleged statements and the alleged special damages, they support a claim of defamation. Grammatical inconsistencies are not the type of "[u]nexplained contradictory statements" that "are afforded no weight in federal courts." *Woodward v. Health Ins. All.*, No. 23 C 2630, 2024 WL 942629, at *2 (N.D. Ill. Mar. 5, 2024). And the court need not apply a heightened pleading standard to allegations of defamation *per quod*, as the Federal Rules of Civil Procedure govern pleadings in federal courts, *Iqbal*, 556 U.S. at 684.[10]

*     *     *

Payer Matrix's defamation claim thus survives, but only to the extent that it is grounded in AbbVie's alleged statements that Payer Matrix was acting illegally, [405] ¶¶ 92, 118, 216(h); that Payer Matrix was committing fraud, *id.* ¶¶ 119, 126;

---

[10] AbbVie asks the Court to consider two telephone call transcripts that, it contends, contradict some of the defamation-related allegations. [424] at 40–41. But the Court may not consider those transcripts without converting AbbVie's motion to one for summary judgment. Fed. R. Civ. P. 12(d). That is because, while the telephone call was referenced in the complaint, the transcript was not. *See McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."). Consideration of the transcripts also would be inappropriate because they are not supported by an authenticating declaration or affidavit. *See, e.g.*, *Brown v. Montgomery*, No. 20-cv-04893, 2022 WL 767254, at *4 (N.D. Ill. Mar. 14, 2022) (citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)).

and that Payer Matrix was delaying or causing other problems with patients' coverage, *id.* ¶¶ 93, 100.

### 4. Tortious Interference Claims (Counts II and III)

Payer Matrix asserts two tortious interference claims: tortious interference with business expectancy (Count II), [405] ¶¶ 226–37; and tortious interference with contractual relationships (Count III), *id.* ¶¶ 238–45. Both claims are premised on its relationships with plan sponsors, PBMs, and TPAs. *Id.* ¶¶ 227, 239. And both claims require Payer Matrix to establish that AbbVie intentionally and unjustifiably interfered with those relationships. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (citing *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133–34 (Ill. 2001)) (business expectancy); *Alarm Detection Sys., Inc. v. Vill. of Schaumberg*, 930 F.3d 812, 829 (7th Cir. 2019) (contractual relationships). To do so, Payer Matrix must plausibly allege that AbbVie engaged in some kind of wrongful conduct. *See Benjamin v. Thompson*, No. 17 C 2509, 2017 WL 5632695, at *2 (N.D. Ill. Aug. 16, 2017).

Payer Matrix believes that several of AbbVie's actions were wrongful and therefore constitute intentional and unjustified interference: (1) its refusal to allow PAP participation by members of insurance plans affiliated with Payer Matrix, [405] ¶¶ 231(a), 231(b), 241(a); (2) its publication of PAP policies that identified Payer Matrix by name, through the online publication of the PAP terms of participation, *id.* ¶¶ 231(c), 241(b), and through denial letters and communications to members, *id.* ¶ 241(c); and (3) its communications with plan sponsors, PBMs, and brokers alleging that Payer Matrix engaged in misconduct, including fraud, *id.* ¶¶ 231(d), 241(d).

The actions in the first category are not wrongful. "As a general rule, businesses are free to choose the parties with whom they will deal." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (discussing antitrust law). Thus, a business's refusal to deal with a third party does not amount to wrongdoing that can support a tortious interference claim. *See K & R Leasing Corp. v. Gen. Motors Corp., Oldsmobile Div.*, 551 F. Supp. 842, 849 (N.D. Ill. 1982); *see also Polyad Co. v. Indopco Inc.*, No. 06 C 5732, 2008 WL 4287623, at *6 (N.D. Ill. Sep. 12, 2008) (citing Restatement (Second) of Torts § 768 cmt. e; *Soderlund Bros. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. App. Ct. 1995)). Here, AbbVie's refusal to grant PAP applications from plan members associated with Payer Matrix is nothing more than a refusal to deal. Whether characterized as a refusal to deal with the members or with Payer Matrix, it is not wrongful and does not constitute intentional and unjustified interference. Payer Matrix does not identify any cases suggesting otherwise.

Nor do the actions in the second category constitute intentional and unjustified interference. "Illinois law recognizes a qualified privilege for claims of tortious interference." *See Ellicson v. Oden Mach., Inc.*, No. 22 CV 02113, 2025 WL 2987011, at *3 (N.D. Ill. Oct. 23, 2023); *see also Adelman Reyes v. Saint Xavier University*, 500 F.3d 662, 668 (7th Cir. 2007). The same rationale justifies the privilege in tortious interference cases as in defamation cases: the protection of some important interest. *See Ellicson*, 2025 WL 2987011, at *3 (citing *Buckley v. Peak6 Invs., LP*, 827 F. Supp. 2d 846, 853 (N.D. Ill. 2011)). Likewise, the same showing of malice is required to overcome the privilege. *See Sweports, Ltd. v. Abrams*, 2021 IL App (1st) 200139-U,

46

¶ 60, 2021 WL 2697177, at *8. As already shown, the actions in the second category—AbbVie's communications explaining its PAP participation terms and its reasons for denying PAP coverage to certain applicants—are protected by a qualified privilege and cannot support a defamation claim. *See* Section I.B.3.a–b, *supra*. For the same reason, these communications cannot support Payer Matrix's tortious interference claims.

Payer Matrix believes that these actions can amount to wrongful interference even if they aren't actionable as defamation. [435] at 42. But the case it cites, *Bullet Express, Inc. v. New Way Logistics, Inc.*, 2016 IL App (1st) 160651, 70 N.E.3d 251, doesn't help. In that case, a shipping company's independent contractor destroyed the shipping company's customer relationships by hijacking a shipment in order to extort payment from the shipping company. *Id.* at ¶¶ 4–9, 70 N.E.3d at 253. It did not involve allegations of defamation or any statements protected by a qualified privilege.

That leaves actions in the third category: communications with plan sponsors, PBMs, and brokers alleging that Payer Matrix engaged in fraud and other misconduct. Payer Matrix's only explicit allegations that AbbVie communicated these accusations to plan sponsors, PBMs, and brokers are in Payer Matrix's recitation of Counts II and III. Count II states:

> AbbVie intentionally and without justification interfered with Payer Matrix's business relationships with Plans in ways that included … [c]ontacting Members, HCPs, PBMs, and others indicating that Payer Matrix had engaged in misconduct, including fraud and other unlawful and/or improper conduct, both with respect to AbbVie's PAP and as a general business practice.

[405] ¶ 231(d). Count III states:

47

> AbbVie intentionally, maliciously, and without justification interfered with Payer Matrix's contractual relationships, including but not limited to … [d]irectly contacting Plans, HCPs, PBMs, brokers, and Members, disseminating false statements about Payer Matrix's business model, professional conduct, and legal compliance.

[405] ¶ 241(d).

AbbVie says that these allegations are too conclusory to count, and that there are no other factual allegations supporting them. [424] at 44. That sinks Payer Matrix's tortious interference claims, it says, because wrongful communications only count as intentional interference if they were with the parties with whom Payer Matrix was doing business. *Id.* (*citing Grund v. Donegan*, 700 N.E.2d 157, 166 (Ill. App. Ct. 1998)). Thus, allegations of communications with patients and healthcare providers aren't enough.

That's true, as far as it goes. *Grund* says that an action for tortious interference requires "action by the defendant directed toward the party with whom the plaintiff expects to do business." 700 N.E.2d at 161. In that case, a lawyer sued a judge for interfering with one of his lawyer-client relationships after the judge allegedly privately denigrated the lawyer's work to another lawyer. *Id.* at 159. The court held that the judge's out-of-court statement did not amount to intentional interference because the plaintiff "fail[ed] to allege that [the judge] directed any extrajudicial remarks toward [the client] and further fail[ed] to allege any facts which would show that [the judge] knew or had reason to believe that his alleged extrajudicial comments concerning [the lawyer] would be relayed to [the client]." *Id.* at 161.

That's not what's going on here. True, Payer Matrix alleges that AbbVie told healthcare providers and patients that Payer Matrix was acting illegally and

committing fraud. *See* section I.B.3.d, *supra* (discussing [405] ¶¶ 92, 118, 119, 126, 216(h)). But, unlike the judge in *Grund*, AbbVie had reason to believe that its comments would make their way back to Payer Matrix's clients; it would be unreasonable to expect patients to whom AbbVie allegedly accused Payer Matrix of fraud to keep those accusations from their plan administrators or sponsors. And, also unlike *Grund,* Payer Matrix offers additional allegations that strengthen the inference that AbbVie directed accusations of fraud toward Payer Matrix's clients. For example, it alleges that Payer Matrix lost 81 clients in 2023, and "[m]any … stated that this was due to AbbVie's actions—including but not limited to its [] statements that Payer Matrix engaged in fraudulent activity," *id.* ¶ 139, including "a client who first engaged in a contractual relationship with Payer Matrix in January 2021" that "terminated its relationship in December 2023 due to AbbVie's false accusations about Payer Matrix's alleged 'scheme,'" *id.* ¶ 140. It is reasonable to infer from those allegations that AbbVie directed accusations of fraud to Payer Matrix's immediate clients, either directly or by using healthcare providers "as intermediaries," *id.* ¶ 95.[11]

---

[11] *Lucky Lincoln Gaming, LLC v. Dikenoski*, No. 23 C 16664, 2024 WL 4721511 (N.D. Ill. Oct. 28, 2024), on which AbbVie relies, [441] at 26, holds that a tortious interference defendant can only be liable if he "directed his actions at [] third parties" with whom the plaintiff had dealings. *Lucky Lincoln*, 2024 WL 4721511, at *4. It does not hold that the directed actions cannot go through intermediaries. Likewise, in *Grund*, the tortious interference claim failed because the plaintiff "fail[ed] to allege facts in support of the conclusion that [defendant] directed his alleged remarks to [plaintiff's client], either directly or indirectly," not because the statements were relayed by a third party. 700 N.E.2d at 161. Indeed, Illinois courts have declined to require tortious interference claimants to allege that the interfering party had direct contact with a third party with whom the claimant had a business expectancy. *See Schuler v. Abbott Lab'ys*, 639 N.E.2d 144, 147 (Ill. App. Ct. 1993) ("While it is true that 'action

Payer Matrix's tortious interference claims may thus proceed, but only to the extent that they are based on AbbVie's accusations of fraud and other wrongdoing directed toward plan sponsors, PBMs, and brokers, *id.* ¶¶ 231(d); 241(d).

### 5.   Illinois Consumer Fraud Act Claim (Count IV)

The ICFA prohibits "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." 815 ILCS 505/2. The elements of an ICFA claim are: (1) an unfair or deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception or unfairness; (3) the unfair or deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the unfair or deceptive act. *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014) (citing (*De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012)). The Illinois Supreme Court recently emphasized that in all ICFA claims, the plaintiff must allege that it was the intended target of the alleged deception, and the "consumer nexus test" provides no exception to that rule. *See Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶¶ 37–38, 241 N.E.3d 454, 465.

Payer Matrix does not allege that AbbVie intended for it to rely on any alleged deception or unfairness, but only that it intended to cause reliance by "Members,

---

directed at a third party' will often include contact with the third party, we can find no requirement of contact in the law and do not create one now.").

Plans, PBMs, and TPAs." [405] ¶¶ 249, 252. Payer Matrix's ICFA claim is therefore dismissed.

### 6. Illinois Uniform Deceptive Trade Practices Act Claim (IDTPA) (Count V)

AbbVie argues that Payer Matrix's IDTPA claim fails because the alleged false statements underlying the claim were not made "in the context of false advertising or promotion or a trademark violation." [424] at 45. Payer Matrix is judicially estopped from arguing otherwise.

"Judicial estoppel is a flexible equitable doctrine designed to prevent 'the perversion of the judicial process.'" *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (quoting *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990)). "The doctrine protects the courts from being 'manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories.'" *Id.* (quoting *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 527 (7th Cir. 1999)). "The application of judicial estoppel is 'not reducible to any general formulation of principle,' though the inquiry is typically informed by several factors." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). Three considerations "help guide the inquiry: (1) whether 'a party's later position must be clearly inconsistent with its earlier position;' (2) whether 'the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;' and (3) whether 'the party seeking to assert an inconsistent position

51

would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.' *Id.* (quoting *New Hampshire*, 532 U.S. at 750–51).

Here, all three considerations militate in favor of estoppel. Earlier in this case, Payer Matrix urged the Court to dismiss several of AbbVie's IDTPA claims because those claims mirrored certain of AbbVie's Lanham Act claims, which, according to Payer Matrix, failed because they were not made in commercial advertising or promotion. *See* [351] at 37–38, 44. In making its argument, Payer Matrix argued that "the IDTPA is 'generally thought indistinguishable from the Lanham Act except of course in its geographical scope.'" *Id.* at 44 (quoting *Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 519 (7th Cir. 2012)). The Court found that reasoning persuasive and dismissed AbbVie's claims. [387] at 32.

Payer Matrix attempts to distinguish its IDTPA counterclaims from AbbVie's dismissed claims because its counterclaims are based on a different subsection of the IDTPA—815 ILCS 510/2(a)(8) and (a)(12), as opposed to 815 ILCS 510/2(a)(7). [435] at 45; [441] at 27. That argument is a non-starter. Sections 510/2(a)(8) and (a)(12) overlap with the Lanham Act's false advertising provision just as much as section 815 ILCS 510/2(a)(7) does. *See* 15 U.S.C. § 1125(a)(1)(B). And the mere fact that Payer Matrix did not attempt to allege a Lanham Act claim cannot be the difference maker; the assertion of a Lanham Act claim does not magically impose additional requirements on other claims. Thus, because Payer Matrix argued, and the Court agreed, that AbbVie's IDTPA claims failed because they were based on statements made outside the commercial context, Payer Matrix is now estopped from arguing

that its IDTPA counterclaims may advance despite having been made outside the advertising context. *See Grochocinski*, 719 F.3d at 795. Count V is dismissed with prejudice, as amendment of an IDTPA claim premised on statements made outside the commercial advertising context would be futile.

## II.     AbbVie's Motion to Dismiss Payer Matrix's Counterclaims

In its first amended complaint, [233] AbbVie brought claims for, among other things, false association and false advertising under the Lanham Act. The Court dismissed both claims to the extent that they were premised on allegations that Payer Matrix imported or helped import medicines from Canada. [387] at 28, 35. In its second amended complaint, [392], AbbVie brings three new or amended claims based on the same alleged importation scheme: trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count IV); false association, endorsement, and designation of origin under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count V); and a claim under the IDTPA, 814 ILCS 510 *et seq* (Count VII). Payer Matrix moves to dismiss each of those claims to the extent that they are premised on the same alleged "international sourcing" scheme. [402] at 1.

### A.     Allegations

While the international sourcing scheme alleged here is substantially the same as the one alleged in AbbVie's first amended complaint, AbbVie has supplemented its second amended complaint with explanations of how Payer Matrix's international drug importation program works and of the differences between AbbVie drugs sold in the Canadian market and those sold in the U.S. market. The Court provides an overview of each set of allegations before assessing the merits of AbbVie's claims.

53

### 1. Payer Matrix's International Drug Importation Program

In 2024, Payer Matrix began facilitating the importation of Canadian AbbVie medications, including Skyrizi and Rinvoq, in partnership with RxFree4me and RxFree4me's affiliated Canadian pharmacies. [392] ¶¶ 453, 472. Not all of Payer Matrix's clients use its importation program, but it advertises the program to plan sponsors and brokers and, in so doing, describes RxFree4me as its "vendor partner" and makes clear that the drugs are sourced internationally. *Id.* ¶ 480. When a plan sponsor decides to participate in the importation program, Payer Matrix informs RxFree4me and provides the plan sponsor with enrollment forms. *Id.* ¶ 481. Payer Matrix then sends authorization forms to the plan sponsor's specialty drug patients. *Id.* ¶ 482. The form asks each patient to authorize Payer Matrix to contact the patient's prescriber and send the patient's prescription to RxFree4me. *Id.* The form also states that the drugs will be dispensed by foreign pharmacies and asks the patient to appoint Payer Matrix as an agent to facilitate the order, including having the product packaged and delivered. *Id.*

Once a patient completes the form, Payer Matrix asks the patient's doctor to send the patient's prescription to one of RxFree4me's partner U.S. pharmacies. *Id.* ¶ 483. The partner U.S. pharmacy then works with a Canadian doctor who writes a new prescription copied from the original, and the Canadian doctor sends the new prescription to a Canadian pharmacy for filling and international shipment to the patient in the U.S. *Id.* Payer Matrix monitors and facilitates the shipments, including by contacting patients to confirm that they received the shipments. *Id.* ¶ 484.

54

### 2. Differences Between AbbVie's U.S. and Canadian Drugs

There are several differences between the drugs AbbVie sells in the U.S. and those it sells in Canada, mainly having to do with labeling and regulatory compliance.

To begin with, AbbVie's U.S. drugs are approved by the FDA, while its Canadian drugs are approved by Health Canada, the FDA's Canadian counterpart. *Id.* 459–60. The packaging on U.S. AbbVie drugs includes medication instructions and guides that state that they were approved by the FDA. *Id.* ¶ 463. The medication guides also include a toll-free number that patients can call to report side effects to the FDA. *Id.* ¶ 464. The Canadian drugs, on the other hand, direct patients to a Health Canada webpage and a Canadian phone number. *Id.* The U.S. instructions for Skyrizi and Humira include contact information for an AbbVie patient support program in the United States, but the Canadian instructions direct patients to AbbVie's Canadian patient support program. *Id.* ¶ 465. Some Canadian AbbVie labels include temperature ranges in Celsius, and dosage information for children and adolescents based on their weight in kilograms, whereas the U.S. AbbVie labels list temperatures in Fahrenheit and give weights in pounds. *Id.* ¶ 466.

AbbVie also asserts differences in how Canadian AbbVie drugs provided through Payer Matrix and RxFree4me are shipped and how AbbVie's U.S. drugs are shipped. Payer Matrix and RxFree4me use third-party carriers to ship the drugs from the Canadian pharmacy to the U.S. consumer using third-party carriers. *Id.* ¶ 473. But Payer Matrix, RxFree4me, and the third-party carriers have not been authorized by AbbVie and therefore are not subject to AbbVie's quality controls. *Id.* ¶¶ 474–75. As a result, although AbbVie requires its authorized distributors to comply with the

Drug Supply Chain Security Act, it is unable to monitor and regulate unauthorized distributors "to avoid the delivery of counterfeit or compromised medicines bearing the AbbVie mark." *Id.* ¶ 475. Additionally, because international shipping routes regularly exceed the storage temperature ranges for AbbVie's medications, AbbVie ships its medicines in sealed, temperature-controlled containers and requires its authorized distributors to follow specific temperature-related guidelines during storage and transport. *Id.* ¶ 477. AbbVie is unable to ensure that the shippers used by Payer Matrix and RxFree4me comply with these requirements. *Id.* ¶ 475. Lastly, AbbVie recalls are targeted only to the regions in which the affected drugs were sold, so U.S. patients would be alerted to recalls for drugs that they bought in the U.S., but not for drugs that they bought in Canada. *Id.* ¶ 476.

## B. Analysis

All three claims at issue require AbbVie to allege that (1) it has a protectable trademark in the ABBVIE® mark, and (2) Payer Matrix's use of the mark is likely to cause confusion among consumers. *Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, No. 17 C 7354, 2018 WL 3920617, at *2 (N.D. Ill. Aug. 16, 2018) (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001)). Payer Matrix only challenges the second element. [401] at 7, 11.

The test for determining whether use of the mark is likely to cause confusion among consumers differs depending on whether this case involves "gray-market goods," which the parties dispute. [401] at 13–14; [419] at 6–7. "A gray-market good is a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." *K Mart Corp.*

56

*v. Cartier, Inc.*, 486 U.S. 281, 285 (1988). Payer Matrix, however, believes that a case only involves gray-market goods if it involves a bait-and-switch scenario where consumers expecting to receive a domestic product unknowingly receive an imported one. [401] at 13.

The Court needn't resolve that dispute to resolve this motion because AbbVie's claims fail even if they involve gray-market goods. The key difference between gray-market cases and ordinary trademark infringement cases is that, in gray-market cases, "courts in this circuit and beyond answer the likelihood of confusion question by determining whether the defendant's gray market product is materially different from the product sold by the plaintiff." *Duracell*, 2018 WL 3920617, at \*2 (collecting cases). "A difference is material if consumers would consider it relevant to a decision about whether to purchase a product." *Id.* at \*3 (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009)). The guiding question in assessing materiality is "whether the difference confuses consumers and impinges on the trademark holder's goodwill." *Id.* (quoting *Beltronics*, 562 F.3d at 1073 (cleaned up); *see also R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 700 (7th Cir. 2006) ("[I]f the domestic and foreign products are materially different, [] then sale of the foreign product in the United States under the domestic marks has a potential to mislead or confuse consumers about the nature or quality of the product they are buying."). Thus, assuming this is a gray-market case, AbbVie must allege facts plausibly showing that consumers will be confused by differences between the foreign and domestic products.

57

In its previous orders, the Court noted that "[i]t is no secret that RxFree4Me sources drugs from Canada," [387] at 35, and "it should be obvious to Payer Matrix's members that the imported drugs do not undergo U.S. regulatory processes because they are sourced from Canadian pharmacies," [343] at 30. The same logic applies here and now. AbbVie alleges that plan members "agree to … purchase Canadian AbbVie Medicines." [405] ¶ 473. They do so by completing an authorization form that represents that the medication will be "dispensed by the foreign Pharmacy." [392] ¶ 482 (cleaned up). The form also authorizes Payer Matrix—not AbbVie—to facilitate the international order, "including by packing the Product and delivering it to the patient." *Id.* (cleaned up).

Thus, the question is whether the specific differences between AbbVie medications sold in Canada and those sold in the United States would "confuse consumers" who knowingly purchase medications sourced from international pharmacies. *Duracell*, 2018 WL 3920617, at *3. The answer is no. The differences that AbbVie cites are exactly the differences that Payer Matrix's customers would reasonably expect from medications purchased internationally. For instance, it alleges that Canadian AbbVie drugs are not subject to U.S. supply-chain protections. [392] ¶ 475. It also alleges that the labels of the Canadian drugs do not show FDA regulatory approvals, warnings, and recommendations, *id.* ¶ 460–61, 463, 467–68; lack phone numbers for FDA reporting and U.S. patient support, *id.* ¶¶ 464–65; and use the metric system for storage and adolescent dosing instruction, *id.* ¶ 466. Additionally, recalls affecting drugs sold only in Canada are not publicized in the

United States. *Id.* ¶ 476. All these differences are inherent to the Canadian market and could not reasonably confuse Payer Matrix's consenting members. Even AbbVie's allegation that the drugs would not be protected by its shipping quality controls, *id.* ¶ 477, is obviated by the fact that Payer Matrix members seeking non-U.S. drugs authorize Payer Matrix (that is, not AbbVie) to facilitate packing and delivery, *id.* ¶ 482. The alleged differences, then, are not "material." *See Beltronics*, 562 F.3d at 1072–73.

AbbVie disagrees, presenting a slew of cases in support. [419] at 11–13. To be sure, many of the cases suggest that the types of labeling, compliance, and quality control issues alleged here can be material in certain circumstances. But none of those cases involve the type of informed purchase at issue here. *See Duracell*, 2018 WL 3920617, at *1 (foreign-market batteries sold in U.S. store without disclosure); *Zip Int'l Grp. LLC v. Zenith Foods LLC*, No. 20-CV-3356 (ARR) (PK), 2021 WL 5399452, at *1–*2 (E.D.N.Y. Nov. 18, 2021) (foreign-market foods sold in U.S. store without disclosure); *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. de C.V.*, 516 F. Supp. 3d 633, 640–41 (W.D. Tex. 2021) (same); *Gilead Scis., Inc. v. Meritain Health, Inc.*, No. 1:24-CV-03566-JRR, 2025 WL 1745669, at *2–*3 (D. Md. June 24, 2025) (Turkish medication sold to U.S. consumer without disclosure or consent).

AbbVie also contends that disclosure by the seller does not mitigate the potential for consumer confusion. [419] at 9–11. But the three cases it cites in support are unpersuasive, as none of them involve the type of end-user disclosures that Payer Matrix provides. [392] ¶ 482. In *Johnson & Johnson v. Advanced Inventory Mgmt.*,

*Inc.*, No. 20-cv-3471, 2020 WL 6119516 (N.D. Ill. Oct. 16, 2020), the defendant was allegedly selling counterfeit medical goods from India, *id.* at *2–*4, a fact not obviated by its disclosure that it was a "wholesaler," *id.* at *15–*16. AbbVie does not allege that Payer Matrix is importing counterfeit drugs, which would indeed be confusing to consumers.[12]

In *Abbott Lab'ys v. Adelphia Supply USA,* No. 15-CV-5826 (CBA) (MDG), 2015 WL 10906060 (E.D.N.Y. Nov. 6, 2015), the defendant sold foreign-market blood glucose test strips to U.S. pharmacies. *Id.* at *4. Although it disclosed the strips' origins to its customers—the pharmacies—no disclosure was made to the consumers who ultimately purchased the strips. *Id.* at *5–*6. The disclosures here, in contrast, are made directly to the consumers, [405] ¶¶ 473, 482.

And in *Hyundai Const. Equip. U.S.A., Inc. v. Chris Johnson Equip., Inc.*, No. 06 C 3238, 2008 WL 4210785 (N.D. Ill. Sept. 10, 2008), the defendant imported construction equipment intended for the Korean and Chinese markets. *Id.* at *1. The court recognized that, "[w]hile it may have been [defendant's] intention to warn all of his customers … this would not protect subsequent customers who may purchase the equipment from Johnson's customers." *Id.* at *3. That rationale holds up for the types of extremely expensive durable goods at issue in *Hyundai*, but it does not make sense here, where Payer Matrix's members purchase consumable medications.

---

[12] AbbVie alleges that its lack of control over the Payer Matrix-RxFree4me supply chain prevents it from monitoring and regulating shipping carriers "in order to avoid the delivery of counterfeit … medicines bearing [its] mark." [405] ¶ 475. But any inference that this would result in actual sales of counterfeit drugs is too speculative to support the requisite consumer confusion.

Elsewhere in its brief, AbbVie cites *Novartis Animal Health US, Inc. v. Abbeyvet Exp. Ltd.*, 409 F. Supp. 2d 264 (S.D.N.Y. 2005). In that case, a website sold British-market pet medications to U.S. consumers. *Id.* at 267. Even assuming the consumers in that case knew that they were purchasing medications intended for the British market, the differences were so significant that U.S. consumers would likely be confused by the British product. *Id.* For example, the U.S. versions of the pills were flavored, and the British versions were unflavored; the British versions were also sold in different dosages. *Id.* Those are differences that would be meaningful to consumers. *Id.* Converting a dog's weight from pounds to kilograms is one thing; converting a dog's weight from pounds to kilograms and then separately calculating whether the dog should receive one pill, or a pill and a half, is another. *Id.* A pet might also readily consume a flavored medication but not an unflavored one. *Id.* And unlike the differences at issue here that are inherent to the differences between the Canadian and U.S. pharmaceutical markets—such as regulation by Canadian rather than U.S. regulatory bodies, and use of the metric system—there is nothing about the British pet medication market that would make a U.S. consumer expect to receive an unflavored medication when they were used to buying flavored medications from the same brand.

AbbVie has thus failed to plausibly allege the consumer confusion element of its claims based on international drug importation. Count IV is therefore dismissed in full, and Counts V and VII are dismissed to the extent that they rely on those allegations.

61

These dismissals are with prejudice. Although a district court should grant leave to amend a complaint "when justice so requires," Fed. R. Civ. P. 15(a), it "may [] deny leave to amend if 'there is good reason—futility, undue delay, undue prejudice, or bad faith.'" *Engstrom v. Air Line Pilots Ass'n, Int'l*, No. 23 C 15792, 2024 WL 5056447, at *2 (N.D. Ill. Dec. 10, 2024) (quoting *Life Plans, Inc. v. Sec. Life of Denv. Ins. Co.*, 800 F.3d 343, 358 (7th Cir. 2015)). One way amendment may cause undue prejudice is by forcing the defendant to continue to defend against a plaintiff's "grab bag" approach to stating a claim. *Engstrom v. United Airlines, Inc.*, No. 25-1039, 2026 WL 1539302, at *3 (7th Cir. June 1, 2026). In *Engstrom*, for example, the plaintiff asserted Florida Civil Rights Act claims in its second amended complaint. 2024 WL 5056447, at *1. The district court dismissed those claims, and the plaintiff sought leave to file an amended complaint asserting new Title VII claims based on the same nucleus of fact. *See id.* at *2, *3. The district court denied leave to amend, noting that the plaintiff could have asserted a Title VII claim in any of its earlier complaints but did not. *Id.* at *4. The Seventh Circuit affirmed, reasoning that the cost of briefing another motion to dismiss would amount to undue prejudice. *Engstrom*, 2026 WL 1539302, at *3.

Here, AbbVie first asserted claims based on Payer Matrix's drug importation program in its first amended complaint, [233] ¶¶ 466–500, which it filed approximately 16 months after commencing this action, *see* [1]; [233], and following expedited discovery in advance of a preliminary injunction hearing, [54]. The Court dismissed those claims—not because the complaint lacked sufficient detail, but

62

because the asserted causes of action were a poor fit for the factual scenario outlined in the complaint. *See* [387] at 27–28, 34–35, 45. AbbVie then tried again in its second amended complaint, asserting new claims based on the same core set of facts. *See* [392] ¶¶ 453–494, 522–31, 534, 550.

To be sure, the second amended complaint includes details about the importation program that were not in the first amended complaint. *See* [392-1] ¶¶ 457–81. But the importation program underlying the claims in the first amended complaint is the same as the one underlying the new claims in the second amended complaint. And the Court's dismissals of AbbVie's claims related to the international drug importation program are based on the same, underlying flaw in AbbVie's pleadings: a failure to plausibly claim that Payer Matrix's program is likely to cause confusion among consumers. *See supra* at 61; [387] at 34–35, 45; *see also* [343] at 26–31 (denying AbbVie's motion for a preliminary injunction, in part, because AbbVie was not likely to succeed on its Lanham Act claims made in connection with Payer Matrix's international drug importation program).

AbbVie now has had ample opportunity to state a claim based on this program and has not done so. Any further attempts to state a claim based on this nucleus of facts would amount to a "grab bag" approach like the one in *Engstrom*; forcing Payer Matrix to defend against such claims would therefore be unduly prejudicial. 2026 WL 1539302, at *3. At bottom: AbbVie may not bring any new or amended claims related to consumer protection, trade practices, or trademarks—under the Lanham Act, the

ICFA, the IDTPA, or any other cause of action—based on Payer Matrix's international drug importation program.

## CONCLUSION

For the reasons set forth above, the Court grants Payer Matrix's partial motion to dismiss AbbVie's second amended complaint [402] and dismisses Count IV in full and Counts V and VII to the extent that they rely on allegations about Payer Matrix's international drug importation program. The dismissals are with prejudice.

Additionally, the Court grants in part and denies in part AbbVie's motion to dismiss Payer Matrix's counterclaims. [421]. Counts I, II, and III may proceed subject to the limits identified in the Court's opinion. Counts IV, VI, VII, and VIII are dismissed without prejudice. Count V is dismissed with prejudice.


ENTER:

_____

Georgia N. Alexakis
United States District Judge

Date: 6/26/2026

64